COHN LIFLAND PEARLMAN
 HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately
Park 80 West - Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile:  (201) 845-9423

*Counsel for Lead Plaintiffs and Liaison
Counsel*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT STERLING, individually and on behalf of all others similarly situated, | Case No. 1:22-cv-7273 |
| Plaintiff, | Class Action |
| vs. | **FIRST AMENDED COMPLAINT** |
| IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, DAVID BARTHOLOMEW, CHRISTOPHER GUZOWSKI, MICHAEL ALFRED, J.P. MORGAN SECURITIES LLC, CANACCORD GENUITY LLC, CITIGROUP GLOBAL MARKETS INC., CANTOR FITZGERALD & CO., GALAXY DIGITAL PARTNERS LLC, COMPASS POINT RESEARCH & TRADING, LLC, and MACQUARIE CAPITAL (USA) INC., | JURY TRIAL DEMANDED |
| Defendants. | |

Lead Plaintiffs Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd., individually and on behalf of others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' First Amended Complaint against Defendants, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with Confidential Witnesses, a review of the Defendants' public documents, conference calls, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Iris Energy Limited ("Iris" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

/ / /

/ / /

1

## I.      NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired: (a) Iris ordinary shares pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about November 17, 2021 (the "IPO" or "Offering") and/or (b) Iris securities between November 17, 2021 and November 1, 2022, both dates inclusive (the "Class Period").

2.      Iris Energy operates as a Bitcoin mining company using primarily renewable energy to power its mining operations. The Company has been mining Bitcoin since 2019 and does not hold Bitcoin on its balance sheet.

3.      Iris's Bitcoin mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called "miners" or "Bitcoin miners" and exchanging these Bitcoin for fiat currencies such as U.S. dollars ("USD") or Canadian dollars ("CAD") on a daily basis.

4.     On October 25, 2021, Iris filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on November 16, 2021 (the "Registration Statement").

5.     On November 18, 2021, Iris filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus," together with the Registration Statement, the "Offering Documents").

6.     On or about November 17, 2021, Iris conducted the IPO, issuing approximately 8,269,231 shares to the public at the Offering price of $28 per ordinary share for gross proceeds to the Company of $231,538,468. The underwriters were also given a "greenshoe" option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price.

7.     The Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading.   Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the

3

Company's business, operations, and prospects. Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (i) certain of Iris's Bitcoin miners, owned through allegedly Non-Recourse SPVs, were not capable of producing sufficient cash flow to service their respective debt financing obligations; (ii) the SPVs had pledged Bitcoin mined by the SPVs as collateral for the loans, and the Company was at risk of liability for the debts of the SPVs; (iii) the Company's goodwill was materially impaired; (iv) Iris's use of equipment financing agreements to procure Bitcoin miners was not sustainable, as Defendants had represented; (v) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition, including its ability to continue as a going concern; and (vi) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

8.     After the IPO, Iris' stock price began to decline as the price of Bitcoin declined.  However, in order to prevent a further and precipitous

decline in Iris' stock price, Defendants Daniel Roberts and William Roberts caused Iris to issue false and misleading statements to stem the decline. The statements represented that Iris was still profitable, still had significant positive free cash flows and abundant low-cost renewable energy, and that Iris was mining Bitcoin at a cost of $8,000, allowing it to remain profitable at prices above that level. Defendants also failed to disclose material facts and risks concerning the Company's use of equipment finance loans to fund the Company's operations and growth. The false statements achieved their purpose and resulted in Iris stock continuing to trade at artificially inflated levels during the Class Period.

9.    Less than one year after the IPO, on November 2, 2022, Iris issued a press release disclosing, among other things, that "[c]ertain equipment (*i.e.*, Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the principal amount of the relevant loans" and that "[r]estructuring discussions with the lender remain ongoing."

10.     On this news, Iris's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly 90% decline from the Offering price.

11.     Then, on November 4, 2022, Iris disclosed that the "Non-Recourse SPVs" had received a notice from their lender alleging the occurrence of an event of default and acceleration under the equipment financing facilities (the "Acceleration Notice"). The Acceleration Notice stated that the Non-Recourse SPVs had failed to continue to engage in good faith restructuring discussions pursuant to the agreement between the Non-Recourse SPVs and the lender extending the due date for certain scheduled principal payments to November 8, 2022.

12.     The Acceleration Notice alleged that the failure to engage in good faith restructuring discussions was an immediate "Event of Default" under each facility and declared a payment default for certain scheduled principal payments that were due on the original due date of October 25, 2022, and further declared the entire principal amount of each facility,

together with the accrued and unpaid interest thereon, to be immediately due and payable by each Non-Recourse SPV.

13.     By December 2022, Iris' stock had declined almost 92%, as reflected in the following chart:

Since its IPO, IREN's stock price has fallen 91.7% vs. the U.S. S&P 500 index' drop of around 9.6%, as the chart below indicates:



14.     As of the time this Amended Complaint was filed, Iris's ordinary shares continue to trade significantly below the $28 per share Offering price, damaging investors.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.    JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), and Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)). Several of the Defendants named herein reside in or have offices in this District.  In addition, pursuant to Iris's most recent annual report on Form 20-F, as of June 30, 2022, there were 54,982,916 of the Company's ordinary shares

outstanding.   Iris's ordinary shares trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Iris's ordinary shares located within the U.S., some of whom undoubtedly reside in this Judicial District.  Moreover, a significant portion of the wrongful conduct that occurred related to the IPO occurred in this District and in New York.  Underwriting and due diligence work for the IPO occurred in New York and in this District and Defendant Iris was advised by Davis Polk lawyers in New York in connection with the IPO. Cryptocurrency asset manager Galaxy Digital Partners, which has offices in New Jersey, acted as an underwriter and the digital asset adviser for the IPO.

19.    In connection with the acts alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications, and the facilities of the national securities markets.

/ / /

/ / /

## III.   PARTIES

20.    Lead Plaintiffs Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd., as set forth in the attached Certifications, purchased or otherwise acquired Iris ordinary shares pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Iris securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.   The Securities Act Defendants further solicited Plaintiffs' purchases of Iris Energy stock in the IPO.

21.    Defendant Iris Energy is organized under the laws of Australia with principal executive offices located at Level 12, 44 Market Street, Sydney, NSW 2000 Australia. The Company's ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "IREN."

22.    Defendant Daniel Roberts ("D. Roberts") has served as a Co-Chief Executive Officer ("Co-CEO") and Director of the Company at all

relevant times. D. Roberts signed or authorized the signing of the Registration Statement filed with the SEC.

23.     Defendant William Roberts ("W. Roberts") has served as a Co-CEO and Director of the Company at all relevant times.  W. Roberts signed or authorized the signing of the Registration Statement filed with the SEC.

24.     Defendants D. Roberts and W. Roberts are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

25.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Iris's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Iris's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Iris, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the

11

positive representations being made were then materially false and misleading. The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

26. Iris and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

27. Defendant David Bartholomew ("Bartholomew") has served as the Chairman of Iris at all relevant times. Bartholomew signed or authorized the signing of the Registration Statement filed with the SEC.

28. Defendant Christopher Guzowski ("Guzowski") has served as a Director of Iris at all relevant times. Guzowski signed or authorized the signing of the Registration Statement filed with the SEC.

29. Defendant Michael Alfred ("Alfred") has served as a Director of Iris at all relevant times. Alfred signed or authorized the signing of the Registration Statement filed with the SEC.

30. Defendants D. Roberts, W. Roberts, Bartholomew, Guzowski, and Alfred are sometimes referred to herein collectively as the "Securities Act Individual Defendants."

31.    As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Iris ordinary shares in the IPO for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

32.    Defendant J.P. Morgan Securities LLC is an underwriter and served as one of the three joint book-running managers for the IPO.  J.P. Morgan Securities LLC has offices in New Jersey and New York, including offices at 575 Washington Boulevard, Jersey City, NJ 07310.

33.    Defendant Citigroup Global Markets Inc. is an underwriter and served as one of the three joint book-running managers for the IPO.  It has offices in New York and New Jersey, including offices at 480 Washington Blvd., Floor 16, Jersey City, NJ 07310.

34.    Defendant Canaccord Genuity LLC is an underwriter and served as one of the underwriters for the IPO.  It has offices in New York at 535 Madison Avenue, New York, NY 10022.

13

35.     Defendant Macquarie Capital (USA) Inc. is an underwriter and served as one of the underwriters for the IPO.  It has offices in New York located at 125 West 55th Street, New York, NY 10019.

36.     Defendant Galaxy Digital Partners LLC is an underwriter and served as one of the underwriters for the IPO.  Its headquarters are located at 300 Vesey Street, New York, NY 10282, and the company also has offices in New Jersey.

37.     Defendant Cantor Fitzgerald & Co. is a corporation providing financial and investment banking services.   It served as one of the underwriters for Iris' IPO.  It has offices in New York and New Jersey, including offices at 39 Avenue of Commons, Suite 205, Shrewsbury, NJ 07702.

38.     Defendant Compass Point Research & Trading, LLC is a corporation providing financial and investment banking services.  It served as one of the underwriters for Iris' IPO.  It has offices in New York at 144 East 44th Street, Suite 702, New York, NY 10017.

39.     Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Canaccord Genuity LLC, Cantor Fitzgerald & Co., Macquarie Capital (USA) Inc., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC are collectively referred to herein as the Underwriter Defendants.

40.     The Underwriter Defendants received commissions of $16,207,693 for their work on the IPO.  The underwriters were also allocated a greenshoe option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price.

41.     The Prospectus stated that Iris Energy entered into an underwriting agreement with the Underwriter Defendants. Subject to the terms and conditions of the underwriting agreement, Iris agreed to sell to each Underwriter, and each Underwriter severally agreed to purchase, at the public offering price less the underwriting discounts and commissions, the number of Ordinary shares listed next to its name in the following table:

/ / /

/ / /

| Name | Number of Ordinary Shares |
|---|---|
| J.P. Morgan Securities LLC | 2,687,500 |
| Canaccord Genuity LLC | 1,860,577 |
| Citigroup Global Markets Inc. | 1,860,577 |
| Macquarie Capital (USA) Inc. | 620,192 |
| CLSA Australia Pty Ltd | 330,769 |
| Cowen and Company, LLC | 330,769 |
| Cantor Fitzgerald & Co. | 248,077 |
| Compass Point Research & Trading, LLC | 165,385 |
| Galaxy Digital Partners LLC | 165,385 |
| Total | 8,269,231 |

42.     Iris Energy, the Underwriter Defendants, and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

43.     The Exchange Act Defendants and Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## IV.   SUBSTANTIVE ALLEGATIONS

### A. Background

44.   Iris touts itself as a leading owner and operator of institutional-grade, highly efficient, proprietary Bitcoin mining data centers powered by 100% renewable energy.

45.   Iris Energy only has one operating segment – the mining of Bitcoin.  Its entire success depends on its ability to profitably mine and sell Bitcoin.  The Company has repeatedly stated that it does not hold Bitcoin on its balance sheet but instead sells Bitcoin immediately once it is mined.

46.   Iris's Bitcoin mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called "miners" or "Bitcoin miners" and exchanging these Bitcoin for fiat currencies such as USD or CAD on a daily basis.

47.   On October 25, 2021, Iris filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on November 16, 2021.

17

48.     On November 18, 2021, Iris filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.  The Registration Statement and Prospectus are referred to herein collectively as the Offering Documents.

49.     On or about November 17, 2021, Iris conducted the IPO, issuing 8,269,231 shares to the public at the Offering price of $28 per ordinary share for approximate proceeds to the Company of $215 million, before expenses, and after applicable underwriting discounts and commissions.

## B. Allegations Under the Securities Act of 1933 Regarding Materially False and Misleading Statements Contained in the Offering Documents

50.     The Offering Documents were approved by Defendants Daniel Roberts, William Roberts, Michael Alfred, David Bartholomew, Christopher Guzowski, and Michael Alfred, who were identified in the Offering Documents as Directors of Iris Energy.

51.     The Prospectus stated that Iris Energy was a high-growth company which had secured operational facilities and funding to continue such growth.

52.     The Prospectus explained that Iris Energy earns revenue by mining Bitcoin:[1]

> Our mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of our specialized computers called Application-Specific Integrated Circuits ("ASICs") and exchanging these Bitcoin for currencies such as USD or CAD on a daily basis.

53.     With respect to Iris's use of equipment financing agreements to procure Bitcoin miners, the Offering Documents stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of September 30, 2021, the aggregate amount of the loan facilities was $53.9 million, and the aggregate amount of funds borrowed under these loans was $22.9 million. The loans carry an annual interest rate of 12% and are to be repaid through monthly payments of interest and principal through September 2023. The agreements include customary restrictions and outstanding borrowings are secured by the financed mining units purchased with the loans.

---

[1] The Prospectus defined Bitcoin as "Bitcoin is a scare digital asset that is created and transmitted through the operation of a peer-to-peer network of computers running the Bitcoin software."

54.     The Offering Documents stated that Iris had a competitive advantage over other Bitcoin miners due to the fact that it had entered into contracts with Bitmain Technologies to acquire "new generation miners" that would give it mining capacity of 15.2 EH/s.  Listed under a heading of "**Iris Energy Competitive Features,"** the Prospectus touted the Company's *"Contracted Mining Hardware Supply" as follows:*

> As of September 30, 2021, w*e have entered into binding hardware purchase contracts with Bitmain Technologies Limited, a leading producer of Bitcoin mining hardware, to acquire new generation miners, Antminer S19j and Antminer S19j Pro, with an aggregate nameplate hashrate capacity of 14.5 EH/s and deliveries commencing in October 2021 and ending in September 2023, which is expected to increase our operating and contracted nameplate hashrate capacity to 15.2 EH/s* and result in an average nameplate hardware efficiency of approximately 30 W/TH.

55.     The Prospectus also represented that Iris Energy owned all its Bitcoin mining equipment, which provided it control over its assets and "more sustainable cash flows" than competitors which leased their equipment or utilized third party hosting agreements.  With respect to the purported efficiency and overall operational quality of Iris's Bitcoin mining operations, the Offering Documents stated, *inter alia*:

20

*Long-term Security Over Infrastructure, Land and Power Supply*

*We have ownership of our electrical infrastructure and data centers*, including freehold and long-term leasehold land. *This provides us with security and operational control over our assets*.

*Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party hosting services* or short-term land leases which may be subject to termination rights, profit sharing arrangements and/or potential changes to contractual terms such as pricing.

We also focus on grid-connected power access which again helps to ensure we are able to utilize a reliable, long-term supply of power.

*Operations and Maintenance*

As both the owner and operator of our hardware and infrastructure, we are directly incentivized to optimize each component of our value chain.  Learnings and efficiency gains can then be applied across our entire portfolio.

In addition, we believe that *we are able to identify and respond to operational issues in a more efficient and timely manner than would be the case under an outsourced hosted model*. We believe this allows us to maximize operating performance as well as hardware life.

21

> *While outsourcing infrastructure and operations and maintenance to third-parties may result in near-term returns and scale, short-term contractual arrangements may result in increased counterparty risk (e.g. potential non-performance, delays and disputes) and renewal risk*.

56.    The Prospectus also stated that Iris Energy was experiencing rapid growth and was well-positioned to continue such strong revenue growth because it had secured facilities to support a targeted hashrate capacity of 15.2 EH/s:

*Growth Opportunities*

**Develop existing sites**

In addition to our first site in BC, as of September 30, 2021, *we have conditional and unconditional rights to a number of sites across BC (e.g. Mackenzie and Prince George), Texas (USA) and Asia-Pacific*, over which we are currently pursuing development activities.

Upon development of these sites, we target up to approximately 1 GW of aggregate power capacity, which would *support our operating and contracted nameplate hashrate capacity of 15.2 EH/s (approximately 530 MW of data center capacity when online and fully operational), as well as provide capacity for additional future growth*.

57.    The statements referenced in ¶¶ 51-56 were materially false and misleading because the Offering Documents contained untrue statements of

material fact or omitted to state other facts necessary to make the statements made not misleading. Specifically, the Offering Documents failed to disclose that: (1) certain of Iris's Bitcoin miners were owned through allegedly Non-Recourse SPVs which had been financed by third party lenders, which made Iris' operations, including the mining equipment and Bitcoin mined, subject to the very "increased counterparty risk" that the Offering Documents stated Iris Energy was immune from; (2) the SPVs and Iris Energy had the same individuals on their board and otherwise failed to maintain sufficient corporate distinctness to provide protection to Iris in the event of a default by the SPVs; (3) Iris Energy had not only pledged the bitcoin mining equipment as collateral to the lender, but had also pledged the Bitcoin mined by the equipment and the proceeds from the sale of the Bitcoin as collateral; (4) the undisclosed SPVs were not capable of producing sufficient cash flow to service their respective debt financing obligations; (5) accordingly, Iris's use of equipment financing agreements to procure Bitcoin miners was subject to substantial risk, including counterparty risks; (6) the foregoing was likely to have a material negative impact on the Company's business,

23

operations, and financial condition; and (7) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

58. The Offering Documents concealed material risks to the Company from use of the SPVs and equipment financing contracts. The Offering Documents in fact made no mention whatsoever of the SPVs or their risks.  In addition to not disclosing the SPVs, the Offering Documents concealed and failed to disclose the material risks to the Company's operating capacity, power costs, cash flows, and profitability in the event of a default by the SPVs on the financing agreements.  The Offering Documents also affirmatively misrepresented that the Company was protected from certain risks due to the fact that it owned and operated its own mining equipment.  As noted *supra*, the Prospectus stated that "***We have ownership of our electrical infrastructure and data centers***, including freehold and long-term leasehold land. ***This provides us with security and operational control over our assets.  Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with***

24

*miners that rely upon third-party hosting services* or short-term land leases which may be subject to termination rights, profit sharing arrangements and/or potential changes to contractual terms such as pricing."

59.    The Offering Documents also failed to disclose the following material risks: (1) a default by any of the three SPVs would materially increase Iris Energy's electricity costs per Bitcoin mined because the Company had in place fixed-price contracts for power; as a result, the reduction in the number of Bitcoin miners in the event of a default by the SPVs would result in higher demand charges (*i.e.*, fixed charges) per Bitcoin mined; and (2) any default by one or more of the SPVs would adversely impact the Company's operating metrics; with a lower operating capacity, increased electricity costs per Bitcoin mined,  Iris Energy's revenue and operating cash flows would decline materially, resulting in significant net operating losses.

60.    The Offering Documents also failed to disclose that the SPVs were financed by New York Digital Investment Group, LLC ("NYDIG"), which is located at 510 Madison Ave. Fl 21, New York City, New York, 10022.

The Offering Documents contained exactly one (1) mention of NYDIG – on page 106 of the Prospectus, in a single sentence stating that Defendant Alfred was the former CEO of a company called Digital Assets Data, Inc., which was later acquired by NYDIG in November 2020.  The Offering Documents completely failed to disclose that NYDIG was the lender for all three SPVs. It also failed to disclose that Defendant Alfred in fact had a continuing equity interest in NYDIG following NYDIG's acquisition of Digital Assets Data, Inc. in November 2020.

61.     The Offering Documents stated the following with respect to the Company's assets and financial condition:

| | AS OF SEPT 30, 2021 | | AS OF JUNE 30, 2021 | |
|---|---|---|---|---|
| | UNAUDITED | | AUDITED | |
| | (US$ thousands) | (A$ thousands) | (US$ thousands) | (A$ thousands) |
| **Assets** | | | | |
| Total current assets | 88,811 | 122,871 | 38,986 | 53,938 |
| Total non-current assets | 163,329 | 225,967 | 90,771 | 125,583 |
| Total assets | 252,140 | 348,838 | 129,757 | 179,521 |
| **Liabilities** | | | | |
| Total current liabilities | 771,038 | 1,066,738 | 164,370 | 227,407 |
| Total non-current liabilities | 16,949 | 23,449 | 12,989 | 17,971 |
| **Total liabilities** | 787,987 | 1,090,187 | 177,359 | 245,378 |
| **Total equity/(deficit)** | (535,847) | (741,349) | (47,602) | (65,857) |
| **Total liabilities and equity/(deficit)** | 252,140 | 348,838 | 129,757 | 179,521 |

62.    The Prospectus also represented that the following chart accurately conveyed information with respect to the Company's consolidated statement of profit/(loss) and other comprehensive income/(loss) for the periods presented:

| | THREE MONTHS ENDED SEPT 30, | | | YEAR ENDED JUNE 30, | | |
| --- | --- | --- | --- | --- | --- | --- |
| | UNAUDITED | | | AUDITED | | |
| | 2021 | 2021 | 2020 | 2021 | 2021 | 2020 |
| | (US$ thousands) | (A$ thousands) | (A$ thousands) | (US$ thousands) | (A$ thousands) | (A$ thousands) |
| Bitcoin mining revenue | 10,371 | 14,348 | 1,123 | 7,540 | 10,432 | 3,260 |
| Other income | — | — | 593 | 578 | 800 | 23 |
| Depreciation and amortization | (712) | (985) | (444) | (1,212) | (1,677) | (1,137) |
| Electricity charges | (1,587) | (2,196) | (787) | (2,559) | (3,541) | (1,961) |
| Employee benefits expense | (1,169) | (1,618) | (409) | (2,126) | (2,942) | (1,375) |
| Share-based payments expense | (1,856) | (2,568) | (163) | (768) | (1,063) | (261) |
| Impairment of assets | (353) | (488) | (101) | (409) | (566) | — |
| Loss on disposal of assets | — | — | (270) | (195) | (270) | — |
| Professional fees | (1,032) | (1,428) | (102) | (937) | (1,297) | (770) |
| Other expenses | (1,041) | (1,440) | (114) | (447) | (619) | (271) |
| **ofit/(loss) before interest, foreign exchange gain/(loss) and income tax** | **2,621** | **3,625** | **(674)** | **(535)** | **(743)** | **(2,492)** |
| Finance expense | (492,812) | (681,810) | (60) | (58,926) | (81,524) | (155) |
| Interest income | — | — | 1 | 6 | 8 | 4 |
| Foreign exchange gains/(loss) | 2,695 | 3,729 | 202 | 2,442 | 3,379 | (518) |
| **Loss before income tax expense** | **(487,496)** | **(674,456)** | **(531)** | **(57,013)** | **(78,880)** | **(3,161)** |
| Income tax expense | (3,085) | (4,268) | — | (1,195) | (1,653) | — |
| **Loss after income tax expense for the period** | **(490,581)** | **(678,724)** | **(531)** | **(58,208)** | **(80,533)** | **(3,161)** |
| Other comprehensive income/(loss) for the period, net of tax | 480 | 664 | (603) | 615 | 851 | (242) |
| **Total comprehensive loss for the period** | **(490,101)** | **(678,060)** | **(1,134)** | **(57,593)** | **(79,682)** | **(3,403)** |
| **Net profit/(loss) per share** | | | | | | |
| Basic and diluted (cents) | (2,333.71) | (3,228.71) | (2.68) | (282.17) | (390.38) | (19.61) |
| Pro forma, as adjusted, net profit/(loss) per Ordinary share, basic (cents)[1] | 0.21 | 0.29 | N/A | (2.12) | (2.94) | N/A |

27

| | | | | | |
|---|---|---|---|---|---|
| Pro forma, as adjusted, net profit/(loss) per Ordinary share, diluted (cents)[2] | 0.20 | 0.28 | N/A | (2.12) | (2.94) | N/A |

63.    These statements were false and misleading because the Company's assets were overstated since Iris failed to record material impairment charges to its goodwill.  The Company's financial results and condition were also overstated because Iris had claimed excessive input tax credits (ITCs) for several of its Canadian subsidiaries prior to and up to the time of the IPO.  Iris Energy had failed to remit an amount of 5% on services exported to its Australian parent under an intercompany service agreement. This later resulted in Iris Energy being assessed a charge of $1,215,000 by the Canadian authorities.  As a result of claiming excessive ITCs prior to the IPO, Iris Energy's financial results and condition were overstated at the time of the IPO.

64.    The Prospectus stated the following with respect to the Company's goodwill:

**Goodwill**

***We test annually, or more frequently if events or changes in circumstances indicate impairment, whether goodwill has suffered***

28

*any impairment. The recoverable amounts of cash-generating units have been determined based on fair value less costs of disposal calculations*. These calculations require the use of macro assumptions (estimated Bitcoin price, global hashrate, average block reward and transaction fees) as well as operational assumptions (hashrate, power consumption, power efficiency, overheads budgets) to derive a valuation and then a sensitivity analysis considering reasonably possible changes in assumptions.

65.    The Prospectus further stated that:

Goodwill arises on the acquisition of a business. Goodwill is not amortized. Instead, goodwill is tested annually for impairment, or more frequently if events or changes in circumstances indicate that it might be impaired, and is carried at cost less accumulated impairment losses. *Impairment losses on goodwill are taken to profit or loss and are not subsequently reversed*.

66.    The Prospectus also represented that the Company had $880 million (Australian dollars) in goodwill:

### Goodwill

| | Consolidated | |
|---|---|---|
| | 30 June 2021 A$'000 | 30 June 2020 A$'000 |
| *Non-current assets* | | |
| Goodwill - at cost | 880 | 828 |

Reconciliations of the goodwill balance at the beginning and end of the current and previous financial year is set out below:

| Consolidated | Goodwill A$'000 |
|---|---|
| Balance at 1 July 2019 | — |
| Additions through business combinations (note 27) | 898 |

29

| | |
|---|---|
| Exchange differences | (70) |
| | |
| Balance at 30 June 2020 | 828 |
| Exchange differences | 52 |
| | |
| Balance at 30 June 2021 | 880 |

67.    The Prospectus further represented that no further impairment

to goodwill needed to be recognized:

> *The Group only has one cash generating unit (CGU). To determine if goodwill is impaired, the carrying value of the identified CGU to which the goodwill is allocated is compared to its recoverable amount.*
>
> The recoverable amount of the CGU has been determined using the fair value less costs of disposal (FVLCOD) methodology. In assessing FVLCOD, the estimated future cash flows of the asset are discounted to their present value using a discount rate that reflects the risks specific to the asset or the CGU to which the asset belongs and relevant market assessments.
>
> The estimated cash flows are based over a four year period. No terminal growth rate has been applied. The pre-tax discount rate used to discount the estimated cash flows was 20%.
>
> *Management determined that the Group's carrying value was supported by its recoverable amount and no impairment exists at the reporting date.* In forecasting cash flows over the four year period, management has considered the key market assumptions of the business as forecasted below:

- Bitcoin price of US$24,120 determined based on the average market price from July 2020 to March 2021;
- global hashrate of 135.87 exahash determined based on the average global hashrate of 135.87 exahash from July 2020 to March 2021; and
- power costs remain at current level.

Key sensitivities:

- Had the Bitcoin price been 10% lower than the forecasted Bitcoin price of US$24,120 applied, the recoverable amount would still exceed the carrying value of the assets.
- Had the global hashrate been 10% higher than the forecasted hashrate of 135.87 applied, the recoverable amount would still exceed the carrying value of the assets.

***There are no reasonably possible changes in assumptions that would lead to an impairment of goodwill.*[2]**

68. These statements concerning the Company's assets and goodwill were false and misleading.  The Company's goodwill required further impairment reductions due to problems afflicting the SPVs, including but not limited to the fact that the Company's bitcoin miners did not have the

---

[2] *See* Prospectus at p. F-25.

capacity or ability to generate enough revenue to service the debt the Company had obtained to finance the bitcoin mining equipment.

69.  The fact that the cash flows of the SPVs were not sufficient from the beginning to service their debt was later demonstrated by the lender – New York Digital Investment Group LLC ("NYDIG").  The SPVs were formed before the IPO, as early as March 2021.  At least one of the SPVs – IE CA 4 – began making debt service payments to NYDIG in June 2021.[3]  When the SPVs later defaulted on their debt, PriceWaterHouseCoopers ("PWC") was appointed as the receiver.  In  a May 9, 2023 affidavit submitted on behalf of the receiver,  the CEO of NYDIG (Mr. Tejas Shah) stated that the SPVs were not capable of adequately servicing their debt:  "The actual financial performance of the Respondents [the SPVs] following the financing, as evidenced by the financial disclosures made by the

---

[3] The affidavit further stated that "Every debt service payment made on account of both MEFAs, without exception, originated from a single bank account in the name of Iris Energy (the "Iris Account")."  In addition, loan proceeds from NYDIG that were not paid directly to the equipment manufacturer (Bitman Techn.) were deposited into Iris' bank account, not that of the SPVs.  Shah Affidavit, ¶119.

Respondents to NYDIG, demonstrates that the Respondents could not afford to make debt service payments under the MEFAs [Master Equipment Financing Agreements] if their only income was hashpower income, especially when taking into account the related-party expenses that the Respondents were paying under the formal Hosting Agreements (in the case of IE CA 4) and the informal hosting arrangements (in the case of IE CA 3). *In fact, the intercompany income (i.e., hashpower revenue) and the intercompany expenses (i.e., hosting costs) were negative or breakeven for most of the months in respect of which NYDIG has been provided financial information.*"[4]

70.    Iris Energy is subject to IFRS accounting standards.  IFRS rules require an impairment loss to be measured as the difference between the carrying amount of the CGU, including goodwill, and its recoverable amount. The recoverable amount is the higher of:  fair value less cost of disposal (FVLCD); and value in use (VIU).

---

[4] Shah Affidavit, ¶102.

71.     VIU is an entity-specific measure, as opposed to fair value, which is a market participant-based measure.   VIU is based on management's pre-tax cash flow projections, generally excluding the effects of future restructuring or asset enhancements. Management's projections are used for a maximum of five years, unless a longer period can be supported. Thereafter, the cash flows are extrapolated using a steady or declining growth rate consistent with that of the product, industry or country.

72.     The inability of the SPVs to adequately service their debt obligations and to generate sufficient cash flows constituted events under IFRS accounting standards requiring Iris to recognize an impairment to its goodwill.  The Offering Documents were false and misleading because they overstated Iris' goodwill and failed to reflect necessary impairment charges to the value of the goodwill associated with the SPVs and the mining equipment and other assets of the Company.

/ / /

/ / /

/ / /

### C. Allegations Under the Securities Exchange Act of 1934 Regarding Materially False and Misleading Statements Issued During the Class Period

73.     The Class Period begins on November 17, 2021, when Iris's ordinary shares began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions contained in the Offering Documents, as referenced in ¶¶ 51-72, *supra*.

74.     On February 9, 2022, Iris issued a press release reporting the Company's second quarter 2022 results for the period ended December 31, 2021.  That press release quoted Defendant D. Roberts, who stated, in relevant part, that Iris "is on track to be one of the largest listed Bitcoin miners *with 15 EH/s3 of hardware secured*[.]"  Defendants' statements about the amount of mining equipment secured and the Company's ability to buy more mining equipment through debt and equipment financing were highly material because the number of miners (which are simply computers) directly affects capacity, which directly affects hashrate,[5] which directly

---

[5] The Prospectus defined Hashrate as "The speed at which a miner can produce computations (hashes) using eh Bitcoin network's algorithm,

affects the amount of Bitcoin that can be mined.  Since mining Bitcoin is Iris'

sole source of revenue, the Company's ability to obtain and preserve

financing for buying mining equipment (computers) was critical

information to investors.

75. Also on February 9, 2022, Iris filed a report of foreign issuer

on Form 6-K with the SEC, appended to which were the Company's

Unaudited Interim Consolidated Financial Statements for the Three and Six

Months ended December 31, 2021 (the "2Q22 6-K") as well as an Investor

Presentation slidedeck.  In the Investor Presentation, Iris represented that

there were four key drivers for success in the Bitcoin mining industry:

Miners (more miners = more Bitcoin mined = higher revenues); Megawatts;

Money (capital to fund growth); and Management:

[The remainder of this page is deliberately left blank.]

---

expressed in hashes per second.  The hashrate of all miners on a particular
network is referred to as the hashrate of the network."



76.     With respect to Miners, Iris represented that it was well-positioned to increase growth and profits because it had the second-most miners of any company in its field:

### 1. Miners



77.     In the Investor Presentation, Iris stressed the competitive advantages that it allegedly possessed due to the fact that it owned its data

mining equipment, compared to competitors who used third party hosting services:



78.    Iris Energy told investors that it expected revenues of $695 million by early 2023 and profits of $578 million:

[The remainder of this page is deliberately left blank.]

79.     These statements were later revealed to be false and wildly inaccurate.  When Iris reported its results for Q2 2023 on February 15, 2023, it reported a total operating capacity of just 1.7 EH/s compared to the 10 EH/s it told investors it would deliver by such time in its above-referenced February 9, 2022 presentation.  Iris said it "intended" to be able to increase its capacity to 5.5 EH/s down the line.  In addition, far from reporting a profit, Iris reported a net loss after income taxes of $144 million for Q2 2023.

80.     In the February 9, 2022 Form 6-K, Iris reported significantly improved metrics in all categories, including revenue, Bitcoin mined, hashrate, and EBITDA:



81.　With respect to the Company's equipment financing agreements

to procure Bitcoin miners, the 2Q22 6-K stated, in relevant part:

> The [Company] has entered into equipment finance and security
> agreements pursuant to which an equipment financier has
> agreed to finance the purchase of various mining hardware that
> have been delivered or yet to be delivered. These facilities carry
> an annual contractual interest rate of 12% and are denominated
> in United States dollars. The facilities are repaid through
> blended monthly payments of interest and principal with the
> final payment due to the financier on 25 September 2023.

82.     This statement was false and misleading because it (1) failed to

identify NYDIG as the lender; (2) made no disclosure of the use of the SPVs

or other facts; (3) made absolutely no disclosure about any collateral pledged

by Iris for the loans, including the material fact that Iris had pledged the

Bitcoin mined by the SPVs as collateral and that Iris was not maintaining

sufficient corporate formalities or separateness between the SPVs and Iris to

protect Iris from having its assets pursued by the lender in the event of a

default by the SPVs; and (4) failed to disclose Defendant Alfred's affiliation

with NYDIG.

83.     The press release that was attached to the Form 6-K contained

the following statements from Defendant Daniel Roberts:

> "We are pleased to report record financial and operating results as part
> of our inaugural quarterly and half-yearly report as a listed company,"
> stated Daniel Roberts, Co-Chief Executive Officer and Founder of Iris
> Energy. "***Iris Energy is on track to be one of the largest listed Bitcoin
> miners with 15 EH/s3 of hardware secured (~10 EH/s expected to be
> operational by early 2023)*** and 765MW of grid-connected power
> operating or under construction. Led by a seasoned management
> team, we are building a global energy and specialized data center
> infrastructure platform targeting markets with excess and under-
> utilized renewables where we can solve a problem. ***We are looking
> forward to the upcoming 12 to 18 months, which we expect will be
> transformational for the Company***."

84.    The press release accompanying the 2Q22 6-K also contained the following "Key Highlights":

**Key Highlights**

• **Record revenue of $20.0 million** (A$27.6 million) for the quarter (+93% vs. Q1 FY22) and $30.4 million (A$41.9 million) for the half (+1,352% vs. 1H FY21)

• **Record Adjusted EBITDA of $14.3 million** (A$19.7 million) for the quarter (+156% vs. Q1 FY22) and $19.9 million (A$27.5 million) for the half (vs. -$0.7 million (-A$0.9 million) in 1H FY21)

• **Record Adjusted EBITDA Margin of 72% for the quarter** (vs. 54% in Q1 FY22) and 66% for the half (vs. -33% in 1H FY21)

• Net Profit After Tax of $71.7 million (A$98.8 million) for the quarter and Net Loss After Tax of $418.9 million (A$580.0 million) for the half (attributable to a one-off non-cash mark-to-market of convertible notes converted into equity at IPO)

• **Record average operating hashrate of 685 PH/s (+97% vs. Q1 FY22) and 364 Bitcoin mined (+51% vs. Q1 FY22)** for the quarter from 100% renewable operations since inception

• Successfully completed $232 million IPO and listing on Nasdaq led by J.P. Morgan, Canaccord Genuity and Citigroup

• Construction ahead of schedule at Mackenzie (BC, Canada) with commissioning of the first 0.3 EH/s (9MW) now expected in early Q2 2022 followed by full ramp up to 1.5 EH/s (50MW) expected during Q3 2022

• Prince George (BC, Canada) on track to deliver 1.4 EH/s (50MW) in Q3 2022 and expansion to 2.4 EH/s (85MW) anticipated in 2023

• Post quarter end, a transformational 600MW connection agreement was executed with AEP Texas, increasing power capacity to 765MW (~22 EH/s2).

42

85.     The 2Q22 6-K also included a "going concern" warning that Iris's "ability . . . to continue as a going concern depends upon the [Company] maintaining sustained positive free operating cash flows and securing additional capital to fund the contracted mining hardware purchases and infrastructure spend, as part of its growth plan[,]" while simultaneously assuring investors that "[t]he strategy to mitigate these risks and uncertainties is to execute a business plan aimed at continued operational efficiency, revenue growth, improving overall mining profit, managing operating and capital expenditure and working capital requirements, and securing additional financing, as needed."

86.     The Company's assurances regarding the strength of its business plan, strong cash flows, and ability to raise debt to fund its growth concealed the real risks and problems faced by Iris Energy at the time, and prevented the stock from declining.   Instead of dropping, Iris' stock increased from a close of $14.28 on February 9, 2022 to $14.74 on February 10, 2022 and then closed at $14.78 on February 11, 2022.

87.    On March 28, 2022, Iris issued a press release announcing the closing of an additional $71 million equipment financing facility with NYDIG.  That press release highlighted that this was the "[t]hird facility secured with NYDIG, further cementing [a] long-term partnership"; *that the facility was "[s]ecured by 19,800 Bitmain S19j Pro miners"; and that "~10 EH/s of the Company's total stock of contracted miners remain unencumbered, providing substantial balance sheet flexibility to secure additional non-dilutive funding in due course*."

88.    The same March 28, 2022 press release also quoted Defendant D. Roberts, who stated, in relevant part:

> "We are delighted to again partner with an industry leader such as NYDIG who have been a long-standing supporter of our business.  This is our third equipment financing facility together and *we look forward to formalizing additional loan facilities as miners continue to be delivered and installed.  This transaction further demonstrates the capital structure benefits in* having a strong balance sheet and *owning and controlling our own infrastructure*."

> "With substantial equity raised to date, meaningful operational cashflow and *a 15 EH/s installation schedule which remains on track*, we are pursuing a number of other sources of non-dilutive funding to continue the

44

Company's rapid growth trajectory and delivery of
shareholder value, noting that we as management
continue to hold approximately one quarter of the shares
on issue."

89.     These statements by Iris and Defendant D. Roberts reassured the

market about Iris' financial condition and prospects and caused the stock to

increase materially.  The stock, which closed on March 28, 2022 at $13.86 per

shares, closed on March 29, 2022 at $15.61, and then further to $15.90 on

March 30, 2022, an increase of 14.7%.

90.     These statements were false and misleading and omitted

material information.  To begin with, the press release failed to disclose that

Iris' MFEAs (Master Finance Equipment Agreements) with NYDIG included

provisions pledging the Bitcoin mined (and proceeds from the sale of

Bitcoin) as collateral, not just the mining equipment (computers).  The press

release also failed to disclose the fact that the SPVs were not capable of

servicing the debt, thus jeopardizing the Company's cash flows and

operations.  The problems with the SPVs meant that ***the Company was not***

***"on track" to realize "a 15 EH/s installation schedule"*** since defaults by the

SPVs would mean that the lender would foreclose on the mining equipment

that served as collateral for the loans, thus significantly decreasing the Company's operating capacity and amount of Bitcoin mined.

91.     The press release also failed to disclose that NYDIG, the lender which was given a security interest, was a related party because Iris Director Michael Alfred had a significant equity interest in NYDIG, which he had acquired when he sold his business Digital Assets Data, Inc. to NYDIG.

92.     According to Confidential Witness #1, who worked at both companies during the relevant time period, Allfred had earned the nickname Mike "All-fraud" from employees after he falsely promised Digital Assets Data employees significant payments upon the sale and then reneged, keeping the money for himself.

93.     During and after May 2022, the price of Bitcoin began to drop. Stock market analysts began to apply greater scrutiny to the ability of companies such as Iris Energy to achieve profitability and/or to finance their growth through debt offerings and/or equipment financing.  Thus, the facts and circumstances regarding Iris' equipment financing agreements with NYDIG assumed even greater importance to the market and investors since

the vast majority of Iris Energy's Bitcoin mining equipment was financed by

NYDIG and Iris' ability to obtain more financing was critical to its growth

strategy.

94.     On May 11, 2022, Iris filed a report of foreign issuer on Form 6-

K with the SEC, appended to which were the Company's Unaudited Interim

Consolidated Financial Statements for the Three and Nine Months ended

March 31, 2022 (the "3Q22 6-K").  With respect to the Company's equipment

financing agreements to procure Bitcoin miners, the 3Q22 6-K stated, in

relevant part:

> ### Mining hardware finance
>
> During the year ended 30 June 2021, the Group entered into
> equipment finance and security agreements pursuant to which
> an equipment financier agreed to finance the purchase of various
> mining hardware that have been delivered or yet to be delivered.
> These facilities carry an annual contractual interest rate of 12%
> and are denominated in United States dollars. The facilities are
> repaid through blended monthly payments of interest and
> principal with the final payment due to the financier on 25
> September 2023.
>
> On 25 March 2022, the Group entered into a US$71.0 million
> (A$93.6 million) limited recourse equipment finance and
> security agreement with NYDIG ABL LLC. The facility has a
> contractual term of 25 months and is secured by 19,800 Bitmain

S19j Pro miners (1.98 EH/s) with an applicable interest rate of 11% per annum. The facilities are repaid through blended monthly payments of principal and interest with the final payment due April 2024. As at 31 March 2022, the Group had an undrawn balance of A$31.4 million available on the facility.

95.    This statement was false and misleading for the same reasons noted above – *i.e.*, the filing failed to disclose that Iris' MFEAs (Master Finance Equipment Agreements) with NYDIG included provisions pledging the Bitcoin mined (and proceeds from the sale of Bitcoin) as collateral, not just the mining equipment (computers), and also failed to disclose Defendant Alfred's affiliation with NYDIG.   Iris' public statements also failed to disclose that the SPVs were not maintaining corporate formalities or distinctness from Iris, thus subjecting Iris to potential liability for the debts of the SPVs, in contrast to Iris' statements during the Class Period that Iris was isolated from any such debts.  In fact, as the lender would later reveal, "Every debt service payment made on account of both MEFAs, without exception, originated from a single bank account in the name of Iris Energy (the "Iris Account")."  Shah Affidavit, ¶118.  In addition, loan proceeds from NYDIG that were not paid directly to the equipment manufacturer (Bitman

Techn.) were deposited into Iris' bank account, not that of the SPVs.  *Id.* at

¶119.

96.    On May 11, 2022, Defendant Daniel Roberts also hosted a

conference call with analysts to discuss the Company's Q3 2022 financial

results.  During the call, Roberts repeatedly emphasized the Company's

strong balance sheet, positive free cash flow, and the fact that the collateral

for the Company's equipment financing was limited to the equipment held

within the SPVs, thus protecting the Company from any failure of the SPVs:

> "And maybe just to recap, ***the debt that we have today is all on a non-
> recourse ring-fenced basis secured against some of the computers that
> we procured***. The balance is all equity.  So it's a very clean balance
> sheet. It's a strong balance sheet. It was done very deliberately."

97.    Later on in the call, Defendant Roberts similarly stated:

> "So sitting here today we feel like, we've got a very strong
> balance sheet almost $0.5 billion of equity sitting there. No
> corporate debt. ***The only debt is ring-fenced to some of the
> computers in SPVs***.
>
> ***We've proven the business model. We're generating operating
> profit today. We've got almost $150 million of cash in the bank.
> We feel like, we're in a really good position***."

98.    During the conference call, Iris Energy also stated:

In the period the quarter, for March, *we mined 357 bitcoin, which is a 449% increase over what we had mined this time last year. And that's on the back of a 686% increase in our operating hash rate*.

*We returned revenue of $15.2 million* and adjusted EBITDA of $7.3 million, both again significant increases on the prior year and it gave us in the quarter a 48% EBITDA -- adjusted EBITDA margin.

In this slide, this is our EBITDA reconciliation adjusted. This is what the management team uses to manage our underlying or review our underlying performance. It allows us to eliminate some of the one-off and non-cash items that are sitting in our P&L account.

So, on this metric, we're looking at the nine months, which gives a better view -- given the growth of the organization the period for the full nine months is a much better way to look at how we're going. *So we generated $45.6 million in revenue, which is almost 10 times that of the first nine months in our financial year 2021*.

Our adjusted EBITDA for the nine-month period was $27.3 million and that was obviously, greater than the prior year at just under $1 million in 2021. And we had over the nine months, so I mentioned we had 48% EBITDA margin in the quarter but over the year that's a 60% adjusted EBITDA margin. And it's obviously significantly increased on the prior year.
. . .
Finally, on to our balance sheet. *We ended the period with $158 million worth of cash and cash equivalents and total assets of $557 million*. In quarter three our property plant and equipment

increased by $113 million and mining hardware prepayments increased by $15 million from the end of quarter two.

*This increase in the assets was funded both from our cash reserves that we had at the beginning of the quarter as well as an additional $71 million in asset financing, a deal done with NYDIG*. Our current and non-current borrowings, also obviously increased as a result of that deal.

99.     These statements were false and misleading because they failed to disclose the significant additional collateral the Company had pledged to NYDIG and failed to disclose the fact that the SPVs were not able to service their debt based on existing cash flows, instead hyping the Company's supposed strong cash flows and ability to service its debt.  In fact, on the call, Defendant Roberts actually stated that the Company's cash flows were so strong that Iris was planning on adding additional debt: "*Now is the time to layer in debt funding on top of that*, recognizing that *we've now demonstrated a track record*, building out multiple sites, *generating daily cash flow as we said we would and now looking to use that cash flow to service debt products*."

100.   The amount of the debt that Iris had procured from NYDIG through the SPVs was highly material.  When the SPVs later defaulted on

51

that debt, the CEO of NYDIG filed an affidavit with the Supreme Court of British Columbia stating that the amount of the debt was $114 million.[6]  That is a highly material amount to Iris because, when it reported its Q2 2023 financial results on Feb. 15, 2023, Iris disclosed that it only had $39.4 million in cash and cash equivalents as of December 31, 2022.

101.   During the May 11, 2022 conference call with analysts, Defendant Daniel Roberts also stated that the Company had very favorable energy contracts in place to provide its bitcoin mining operations with low-cost renewable energy.  He stated that prices could go even lower, benefitting Iris:

"So ***there's a massive oversupply of power renewable energy up in the region in which we're specifically located***. In terms of specifics around power price, what we've said to the market and we expect you can see that ***average power prices on a baseload basis in Texas is around $0.03***

---

[6] *See* January 20, 2023 Shah Affidavit, ¶6.

*to $0.035 per kilowatt hour with the opportunity to drive that substantially lower through operational levers*."

102.   Roberts specifically represented that the Company's ability to drive energy prices lower was due to its ownership of the computers in the mining centers:

> "There's a lot of operational levers we can pull to drive that even lower. And again, this is partly why *we own and control the full stack of our infrastructure. Not only do we own and control our proprietary datacenters the computers within it, we own the land.* But importantly, we own all the electrical infrastructure, not just the low-voltage transformers, but we build the high-voltage substations that connect directly into these networks. What this does in terms of prepaying those expenses is obviates an expense line on an ongoing basis. But importantly, give us direct access into the market where we can control our interface with that market."

103.   These statements were false and misleading because, by emphasizing the Company's ownership of the bitcoin mining equipment without disclosing the significant additional collateral that had been pledged to the lender (NYDIG), Iris failed to disclose material risks to the Company's operations in the event of a default by the SPVs.  The receiver for the SPVs (PWC) alleges that Iris Energy is liable for the outstanding $114 million in debt owed by the SPVs since the Defendants ran both the SPVs and Iris as a

single entity, using a single bank account and depositing the hashed Bitcoin into Iris' account.   Moreover, PWC has pointed out that the board of directors for Iris and the SPVs is comprised of the same people and that the Individual Defendants completely ran the SPVs and failed to observe corporate formalities.   PWC has also alleged that the Defendants fraudulently conveyed Bitcoin and money from the SPVs to Iris.

104.   During the May 11, 2022 conference call, Defendant D. Roberts also hyped the Company's supposed reliable access to low-cost renewable energy without disclosing the risks to the Company's cost of power in the event of a default by the SPVs.

105.   Despite Defendant Daniel Roberts' assurances of a strong balance sheet during the May 11, 2022 conference call, analysts had concerns about the Company's ability to raise additional capital to fund the Company's growth.   Analyst Stephen Glagola of Cowen & Co. asked:

> Q:   Dan, I just want to unpack some comments earlier you made. So for the $250 million capital needed to fund your expansion just given the current market conditions, can you discuss how lenders are responding for any incremental equipment financing transactions you're looking at? And do you still feel confident in the non-dilutive financing options that you see in general to fund growth? Thanks.

106.   Roberts responded as follows:

A:  [I]n terms of the direct interface with the lenders throughout the last couple of months and into this week *we're not seeing any direct impact on those processes*. . . And *when we're selling the Bitcoin daily there is substantial cash flow very difficult to argue with that*.
.   .   .

I think one way I tend to think about it is, *we've still got 10 exahash unencumbered with no hardware financing. We just closed another $71 million with NYDIG where we encumbered 1.98 exahash of our computers. So round it to $35 a terahash*.

You extrapolate that to 10 exahash, that's $350 million just in the hardware financing capacity.   And then, if you look at the comparables in the sector, you're seeing hardware for our team deals being done at $50, $60-plus, at terahash.

*We only paid $40. So there's a lot of latent deck capacity in that*.

107.   The false statements had their desired effect, as the Company's stock price increased from $6.89 on May 11, 2022 to $7.71 on May 13, 2022 – a 11.9% increase.

108.   During the Class Period, Iris Energy also made false statements about the value of its goodwill.  As of June 30, 2022, Iris Energy represented that its goodwill had a value of $634 million.  This statement was false and

misleading because such goodwill was already materially impaired as of June 30, 2022, and in fact was worthless.   Iris later admitted this in its February 13, 2023 Form 6-K, in which it revealed that it had written down the value of its goodwill to zero by taking two separate impairment charges, one for $31 million and a second charge for $603 million.   In explaining the write-down of its goodwill to zero, Iris Energy's Form 6-K stated:

> ***The Group operates as a single cash generating unit***. To determine if goodwill is impaired, the carrying value of the identified CGU (to which the goodwill is allocated) is compared to its recoverable amount.

> ***The recoverable amount of the CGU is based on 'value in use' ('VIU') calculations, determined by discounting the future cash flows to be generated from continuing the use of the CGU***. Cash flow projections have been based on management's best estimates covering a three-year period. Cashflows beyond this three-year period are extrapolated using a growth rate of 2.5%. The growth rate does not exceed the long-term average growth rate for the business. The Group has applied a pre-tax discount rate of 19.5% to discount the forecast future cash flows attributable to the CGU.

> ***In forecasting cash flows over the three-year period, management has assumed a Bitcoin price and global hashrate*** based on historic data, completion of key construction sites within the Group, and electricity costs remain within the current regulated levels in British Columbia, Canada and at forecasted external market pricing in unregulated markets.

As at 31 December 2022, *management determined that the Group's carrying value was not supported by its recoverable amount. Based on the associated VIU projections, the Group impaired its goodwill of $603,000 to $nil.*

Given the VIU did not support the carrying amount of the CGU, management also estimated the fair value less cost of disposal of the assets in the CGU. This was performed using the market approach, based on observable market prices for similar assets. *As a result, an impairment of $25,700,000 was recognized on the Group's mining hardware.* The analysis supported the carrying value of the Group's infrastructure assets (Land, Buildings, Plant and equipment).

As *the mining hardware assets held by the Non-Recourse SPVs are no longer expected to generate future cashflows for the Group*, their associated carrying value was excluded from the Group's CGU impairment testing. *A separate impairment charge of $46,000,000 has been recognized to reduce the carrying value of the Non-Recourse SPV's assets to their expected net realizable value to the Group* (*i.e.* equal to the value of the third-party debt outstanding in each of the Non-Recourse SPVs) (see note 12 for further information).

The impairment expense described above has been recognized in the unaudited interim consolidated statements of profit or loss as impairment of assets.

109.   On June 7, 2022, Iris issued a press release announcing an investor update for May 2022. That press release advised, *inter alia*, that "[m]ultiple debt processes remain underway, with discussions involving

various aspects of the capital structure, for example, equipment financing similar to the recent $71m NYDIG facility (1.98 EH/s of miners secured)," while simultaneously assuring investors that "[t]he Company remains focused on prudently assessing various options and ensuring that any decisions consider an appropriate long-term capital structure for the Company."

110.   In addition, the same June 7, 2022 press release downplayed the severity of debt from equipment financing agreements *by highlighting in its "Business summary" that there was "[n]il corporate-level debt"*, and stating in a footnote that "[e]quipment financing is *limited recourse financing within wholly owned subsidiaries of the Company*."

111.   On June 21, 2022, Iris issued a press release providing an updated operating and capital expenditure guidance, stating, in relevant part:

> The Company has explored multiple financing options presented to it in recent months, and has determined that maintaining balance sheet flexibility is prudent having regard to market conditions and available financing terms.  As market conditions have deteriorated, the Company continues to believe this is the prudent approach. As a result, the Company expects

to defer major additional capital expenditure until the current market uncertainty subsides and financing terms improve. The Company will continue to monitor funding markets closely, and if conditions become favorable, the Company expects to explore raising additional capital.

112.   The June 21, 2022 press release also continued to downplay the severity of debt from equipment financing agreements by stating that *"[t]he Company currently has no corporate debt on its balance sheet"* and stating in a footnote that *"[e]xisting equipment financing is limited recourse financing within wholly owned subsidiaries of the Company."*

113.   On September 13, 2022, Iris issued a press release reporting the Company's full year 2022 results for the period ended June 30, 2022. That press release quoted Defendant D. Roberts, who represented, in relevant part: "Looking forward, the recent volatility in the Bitcoin price and related industry challenges reaffirms our confidence in our long-term, vertically integrated strategy. We remain focused on building a multi-decade, institutional grade, infrastructure platform while maintaining balance sheet discipline."

114.   The September 13, 2022 press release also continued to downplay the severity of debt from equipment financing agreements, stating, in relevant part, that "[c]ash and cash equivalents as of June 30, 2022 was $110.0 million, with no corporate debt held by the Company on its balance sheet" and stating in a footnote that "[e]xisting equipment financing ($109.4 million as of June 30, 2022) is limited recourse financing within wholly owned subsidiaries of the Company."

115.   Also on September 13, 2022, Iris filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the Company's fiscal fourth quarter and year ended June 30, 2022 (the "2022 20-F").  That filing contained substantively the same statements as referenced *supra*, regarding the purported efficiency and overall operational quality of Iris's Bitcoin mining operations.

116.   With respect to Iris's use of equipment financing agreements to procure Bitcoin miners, the 2022 20-F stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us.

As of June 30, 2022, the aggregate amount drawn under the loan facilities was $109.4 million.

117.   With specific respect to Iris's Bitcoin miner equipment financing agreements with NYDIG, the 2022 20-F stated, in relevant part:

> The facility established pursuant to this agreement (the "NYDIG Facility") has a contractual term of 25 months and is secured by 19,800 Bitmain S19j Pro miners (1.98 EH/s), as well as the digital assets mined therewith, with an applicable interest rate of 11% per annum. The NYDIG Facility is repaid through blended monthly payments of principal and interest with the final payment due April 2024. As of June 30, 2022, the facility was fully utilized with $71.2 million of borrowings outstanding.
>
> ***The NYDIG Agreement contains customary affirmative and negative covenants applicable to the subsidiary borrower, but not to Iris Energy Limited***.  These include restrictions on our ability to incur liens on the equipment securing the NYDIG Facility, consummate mergers, dispose of all or substantially all of our assets, consummate a change of control, make certain payments with respect to our equity interests or make certain investments.  The NYDIG Agreement also contains customary events of default.

118.   With respect to Iris's other Bitcoin miner equipment financing agreements, the 2022 20-F stated, in relevant part:

> On December 15, 2020 and May 25, 2021, certain wholly-owned subsidiaries of Iris Energy Limited entered into master equipment finance and security agreements with a certain financier, pursuant to which such financier agreed to provide financing (the "Other Financing Agreements").  Outstanding

borrowings are secured by the financed mining units purchased with the loans.  The loans carry an annual interest rate of 12% and are to be repaid through monthly payments of interest and principal through September 2023.  As of June 30, 2022, we had $38.2 million of loans outstanding under the facilities. ***The Other Financing Agreements include customary affirmative and negative covenants applicable to the subsidiary borrowers, but not to Iris Energy Limited***.  These include restrictions on our ability to incur liens on the equipment securing the loans thereunder, consummate mergers, dispose of all or substantially all of our assets or consummate a change of control.  The Other Financing Agreements also contain customary events of default.

119.   Appended as exhibits to the 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants D. Roberts and W. Roberts certified that "the [2022 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "the information contained in the [2022 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

120.   The same day – September 13, 2022 – Defendant D. Roberts hosted a conference call with analysts to discuss the Company's Q4 2022 financial results.  On the call, Defendant Roberts told analysts that that the Company was still profitable, even at the lower Bitcoin prices in the market.  He stated:

"For us, the optimal strategy is to liquidate daily, lock in those profits. As you can see there, *we're mining Bitcoin at $8,000 a coin, locking that profitability and then make a capital allocation decision with that profitability left over. Today, even in the current market, Bitcoin mining is profitable*, incremental returns on CapEx are profitable."

121.   Similarly, later on the call, D. Roberts re-emphasized that the Company was profitable and also that it was generating positive cash flows:

> "*Yes, we're still mining Bitcon at $8,000 a coin, it's still very good gross profit margins, even at $20,000 Bitcoin*" and that "*We're* building proprietary data centers, building out energy infrastructure, *locking up low-cost renewable energy*. Yes, we're monetizing that into bitcoin, but *it's a real asset base generating real cash flows*."

122.   On the September 13, 2022 conference call with analysts, Defendant D. Roberts also stated that Iris Energy had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure."  Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro *actually puts a downward pressure on that power price*."

123.   During the conference call with analysts, Roberts failed to disclose the ongoing problems with the SPVs, including ongoing discussions

with the lender to the SPVs – NYDIG.  Instead of disclosing the material

problems and the risks to the Company's cash flows and profitability,

Roberts again misrepresented that the Company's balance sheet was

extremely strong and that the only debt the Company utilized was with

respect to the SPVs and that such financing was only collateralized by the

equipment owned by the SPVs:

> "Again, *we've got some hardware financing, but that is limited to*
> *asset level*. Again, *potentially a key differentiator with other listed*
> *firms. We have not given parent company guarantees.* We do not have
> cross defaults. We do not have cross collateralization. ***Those financing***
> ***are limited recourse specifically to the individual computers*** and the
> SPVs they're holding."

124.  The statements in the Form 20-F, the press release, and by

Defendant D. Roberts on the conference call with analysts caused Iris' stock

to increase from $4.26 on September 13, 2022 to $4.48 on September 14, 2022,

an increase of 5.2%.

125.  The statements in the September 13, 2022 20-F, the

accompanying press release, and on the September 13, 2022 conference call

with analysts were false and misleading because (1) they failed to disclose

that the collateral pledged by Iris Energy to NYDIG under the SPV

equipment financing agreements was not limited to the equipment itself, but in fact extended to the Bitcoin mined by the SPVs and any proceeds from the sale of the Bitcoin; and (2) they failed to disclose existing, known material problems with significantly decreased cash flows from the SPVs.  When the SPVs were later declared in default by the lender, they sought the appointment of a receiver, which the court in Canada granted.  PriceWaterhouseCoopers LLC ("PWC") was appointed as the receiver in February 2023.  In a May 9, 2023 affidavit submitted on its behalf by the CEO of NYDIG, Mr. Tejas Shah stated that the "negotiations [to restructure the debts] between [the SPVs] and NYDIG began in earnest on or about October 3, 2022" (*see* paragraph 62 of May 9, 2023 Shah affidavit).  This demonstrates that the material problems with the SPVs started before the October 3, 2022 negotiations to restructure the debt – *i.e.,* by the time of the filing of the 2022 20-F on September 13, 2022.  Moreover, by November 2022 "all NYDIG financed Mining Equipment owned by [the SPVs] [was] unplugged and not operational at all at three of the [SPVs'] Mining Facilities."  *See* paragraph 30 of the Shah May 9, 2023 affidavit.  These facts demonstrate that the SPVs'

financial troubles started earlier than September 13, 2022 and were intentionally concealed from the 2022 20-F by the Exchange Act Defendants.

126.   Mr. Shah's May 9, 2023 affidavit also attached and quoted from the relevant financing agreements between the SPVs and NYDIG.  Notably, the financing agreements for both of the defaulted SPVs – IE CA 3 and IE CA 4 – explicitly state that the collateral for the loans includes both the mining equipment *and* the Bitcoin mined by the SPVs: "the Digital Assets produced by the Financing Mining Equipment, and the proceeds thereof, are NYDIG's collateral, pursuant to the terms of the Transaction Documents."   Shah Affidavit, ¶53.

127.   The actual language of the relevant portion of Section 3(d) of the IE CA 3 MEFA states that NYDIG was given a security interest and collateral in "all cryptocurrency and digital currency, including Bitcoin (BTC) mined or otherwise generated by the Equipment in Borrower's possession (sometimes herein called "Mined Currency") and any and all other cryptocurrency and digital currency related thereto or derived therefrom."

128.   The section of the relevant portion of the IE CA 4 MEFA contains similar language.

129.   The failure to disclose the true extent of the collateral pledged by the SPVs under the financing agreements was highly material, and directly contradicted Defendant Robert's statement on the September 13, 2022 conference call that the collateral was limited to the equipment itself. Because both the Bitcoin mined and the resulting proceeds from the sale of the Bitcoin constituted collateral that could be foreclosed upon by NYDIG, the Exchange Act Defendants' repeated statements that Iris and its balance sheet was fully protected by the limited-recourse nature of the SPV financing agreements were blatantly and knowingly false.  Due to the default of IE CA 3 and IE CA 4, the receiver (PWC) is now seeking a constructive trust over the Bitcoin and cash from the sale of the Bitcoin by Iris Energy in an action pending in the Supreme Court of British Columbia, Canada.

130.  The statements in the September 13, 2022 20-F and on the September 13, 2022 conference call with analysts were also false and misleading because they failed to disclose that the problems with the SPVs

would cause the Company's electrical costs to increase significantly.  Instead of disclosing this known effect, Defendant Roberts concealed this problem and instead affirmatively misrepresented that the Company in fact had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure."  Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro actually puts a downward pressure on that power price."   Roberts also told analysts that the Company was still profitable even though the price of Bitcoin had dropped to $20,000: "Yes, we're still mining Bitcoin at $8,000 a coin, *it's still very good gross profit margins, even at $20,000 Bitcoin*" and that "*We're* building proprietary data centers, building out energy infrastructure, *locking up low-cost renewable energy*. Yes, we're monetizing that into bitcoin, but *it's a real asset base generating real cash flows*."

131.   The statements referenced in ¶¶ 74-130 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts

about the Company's business, operations, and prospects. Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) certain of Iris's Bitcoin miners, owned through its Non-Recourse SPVs, were not capable of producing sufficient cash flow to service their respective debt financing obligations; (ii) Iris failed to record material impairment charges to its goodwill; (iii) the lender to the SPVs had been given a security interest in the Bitcoin mined by the SPVs; (iv) Iris had claimed excessive input tax credits ('ITCs') for several of its Canadian subsidiaries during the period October 2019 to November 2022 because it had failed to remit an amount of 5% on services exported to its Australian parent under an intercompany service agreement, which later resulted in Iris Energy being assessed a charge of $1,215,000 by the Canadian authorities; accordingly, Iris's use of equipment financing agreements to procure Bitcoin miners was not as sustainable as Defendants had represented; (v) the Company concealed and failed to disclose the true extent of the risks of the SPVs, misrepresenting that the allegedly "limited recourse" nature of the SPVs protected the Company while at the same time failing to disclose

material risks to the Company's operating capacity, power costs, and profitability in the event of a default by the SPVs on the financing agreements; (vi) the Company's goodwill was materially impaired; (vii) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition; and (viii) as a result, the Company's public statements were materially false and misleading at all relevant times.

### D.    The Truth Emerges

132.   On November 2, 2022, during pre-market hours, Iris issued a press release (the "November 2022 Press Release"), disclosing, *inter alia*, that "[c]ertain equipment (*i.e.*, Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the principal amount of the relevant loans" and that "[r]estructuring discussions with the lender remain ongoing."

133.   With specific respect to each Non-Recourse SPV's respective equipment financing debt obligations, and the inability of Non-Recourse

SPV 2 and Non-Recourse SPV 3 to produce sufficient cash flow to service

those debts, the November 2022 Press Release disclosed, in relevant part:

> As at September 30, 2022, the Non-Recourse SPVs had the following principal amounts outstanding under their respective limited recourse equipment financing facilities:
>
> - Non-Recourse SPV 1 – $1 million, secured against 0.2 EH/s of miners.
>
> - Non-Recourse SPV 2 – $32 million, secured against 1.6 EH/s of miners.
>
> - Non-Recourse SPV 3 – $71 million, secured against 2.0 EH/s of miners.
>
> * * *
>
> The secured miners owned by each of Non-Recourse SPV 2 and Non-Recourse SPV 3 . . . in aggregate:
>
> - ***Are currently capable of generating an indicative $2 million of Bitcoin mining monthly gross profit[], compared to aggregate required monthly principal and interest payment obligations of $7 million***.
>
> - ***Have a market value which the Company currently estimates to be approximately $65 to $70 million[], relative to an aggregate $103 million principal amount of loans outstanding*** as at September 30, 2022.

134.   The November 2022 Press Release also stated, in relevant part:

Non-Recourse SPV 2 and Non-Recourse SPV 3 are engaged in discussions with their lender and reached an agreement for a two-week deferral of scheduled principal payments originally

due under both equipment financing arrangements on October 25, 2022, to November 8, 2022.

Unless a suitable agreement is reached with the lender on modified terms for both equipment financing arrangements, the Group does not intend to provide further financial support to Non-Recourse SPV 2 and Non-Recourse SPV 3.

135.   With respect to Iris's anticipated default on Non-Recourse SPV 2's and Non-Recourse SPV 3's respective equipment financing agreements, and the corresponding negative impact this would have on Company's future operations and financial results, the November 2022 Press Release stated, in relevant part:

> In this case, **the Company expects that neither of those Non-Recourse SPVs will be able to make the scheduled principal payment on November 8, 2022, which would result in a default for those Non-Recourse SPVs** under their respective limited recourse equipment financing arrangements.[5]
>
> . . . . The [Company] is exploring opportunities to utilize its data center capacity that may become available in the event the [Company] elects to no longer provide financial support to these financing arrangements and the lender forecloses on the equipment owned by the relevant special purpose vehicles.
>
> * * *
>
> Such default would permit the lender to declare the entire $103 million aggregate principal amount of the relevant equipment financing facilities to be immediately due and payable by Non-Recourse SPV 2 and Non-Recourse SPV 3.  **We expect that Non-**

*Recourse SPV 2 and Non-Recourse SPV 3 will not have sufficient funds to repay such equipment financing facilities, in which case such lender could enforce its security interest and foreclose on the Bitcoin miners owned by Non-Recourse SPV 2 and Non-Recourse SPV 3, respectively, which could result in the loss of such miners and materially reduce the Company's operating capacity*, and could also lead to bankruptcy or liquidation of the relevant Non-Recourse SPVs.

136.   On this news, Iris's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly **90%** decline from the Offering price.

137.   The receiver for the lender later submitted a declaration from the CEO of the lender (Mr. Shah of NYDIG) stating that Iris' November 2, 2022 press release was itself false and misleading for suggesting that the defaults of the SPVs would not have any effect on Iris's other operations or assets and that the SPVs had been operated independently of Iris.  Mr. Shah stated in paragraph 71 of his January 17, 2023 affidavit that "the Press Release was a blatant statement that Iris Energy (which controls the [SPVs]) did not consider the survival or viability of [the SPVs] to be material or relevant, and signaled to the market that [the SPVs] and NYDIG's Collateral could be discarded, 'without recourse.'"

138.   On November 4, 2022, IE CA 3 Holdings Ltd. and IE CA 4 Holdings Ltd. ('Non-Recourse SPVs') received notices of defaults from the lenders under their respective lending facilities alleging the occurrence of certain defaults and potential events of default, and declaring the loans under each of the Non-Recourse SPV facilities immediately due and payable. The lender to the Non-Recourse SPVs began taking steps to enforce the indebtedness and its rights in the collateral securing such limited recourse facilities (including the approximately 3.6 EH/s of miners securing such facilities and other assets of such Non-Recourse SPVs), and later appointed a receiver (PWC) to the Non-Recourse SPVs on February 3, 2023.

139.   On November 8, 2022, Cantor Fitzgerald downgraded Iris Energy's stock after it warned that some of its BTC mining machines don't cover debt financing costs.  The analyst report noted that, earlier in the week, the company had said that its lender delivered a "Purported Acceleration Notice" whereby Iris (IREN) allegedly failed to engage in good-faith restructuring talks. As a result, the notice claimed that Iris has defaulted on its scheduled principal payments on equipment financing loans, Cantor

Fitzgerald analyst Siegler wrote in a note. "We believe Iris is unlikely to reach a negotiation with the lenders by end-of-day 11/8/22," the agreed upon expiration between Iris (IREN) and its lender to defer payments for two weeks prior to that date, the analyst contended. "As a result, Iris may lose access to 3.6 EH/s of collateralized miners." That makes it unlikely for the company to meet its annual hash rate targets, he added. "We believe the company no longer has line-of-sight into its 6.0 EH/s 2023E target, which was the crux of our Overweight thesis."

140.   In a Form 6-K filed with the SEC on February 13, 2023 and signed by Defendant Roberts, Iris Energy disclosed that the Company recognized a loss of $15,209,000 for the period ended December 31, 2022, in respect of receivables held by the Non-Recourse SPVs. Iris Energy stated that "The entire GST and PST receivable balances held by the Non-Recourse SPVs are not expected to be recoverable by the Group due to the appointment of a receiver to the Non-Recourse SPVs on 3 February 2023."

141.   On January 20, 2023, the lender to the SPVs filed a petition with the British Columbia Supreme Court, primarily seeking the appointment of

PwC as receiver over the assets and undertakings of the Non-Recourse SPVs, in relation to their failures to make payments when due under their respective equipment financing agreements. The court subsequently appointed PwC as the receiver of the Non-Recourse SPVs on February 3, 2023.

142. In a December 2022 Investor Presentation, Iris Energy told investors that "Recent market events **have nothing to do with Bitcoin**." (emphasis in original).

143. The defaults by the SPVs have had a wide-ranging and devastating impact on Iris' business. As disclosed in the Form 6-K filed on Feb. 13, 2023:

> In connection with receipt of certain notices of default received by the Non-Recourse SPVs (defined below) in November 2022 described herein under "—Liquidity and Capital Resources—Agreements for Miner Equipment Financing", certain other of the Group's subsidiaries have terminated their respective hosting arrangements with Non-Recourse SPV 2 and Non-Recourse SPV 3. As a result of the termination of such hosting arrangements, none of the approximately 3.6 EH/s of miners owned by such special purpose vehicles are operating. Excluding such miners, the remaining operating capacity at each of Canal Flats, Mackenzie and Prince George, as of December 31, 2022, is approximately 0.5 EH/s, 0.3 EH/s, and 0.4 EH/s, respectively. ***This in turn (i) resulted in a material reduction in our operating***

*capacity, (ii) increased our electricity costs per Bitcoin mined as a result of higher demand charges (i.e., fixed charges) per Bitcoin mined and (iii) adversely impacted our operating metrics. In particular, with a lower operating capacity, increased electricity costs per Bitcoin mined and a decline in the price of Bitcoin over recent months, we have experienced, and expect to continue to experience, a reduction in the Group's revenue and operating cash flows, resulting in net operating losses.*

144.   The following chart shows the devastating decline in Iris'

reported financial results as a result of the Defendants' violation of the

federal securities laws:

| | Three Months Ended December 31, 2022 | Three Months Ended December 31, 2021 | Six Months Ended December 31, 2022 | Six Months Ended December 31, 2021 |
|---|---|---|---|---|
| | ($ thousands) | | | |
| **Profit/(loss) after income tax expense** | (143,954) | 70,323 | (161,894) | (418,767) |
| Add/(deduct) the following: | | | | |
| Other finance expense/(benefit) | 10,350 | (70,700) | 13,915 | 420,674 |
| Interest income | (257) | - | (214) | - |
| Depreciation and amortization | 11,544 | 1,261 | 18,996 | 1,976 |
| Income tax (benefit)/expense | (411) | 3,151 | 2,030 | 6,226 |
| **EBITDA** | **(122,728)** | **4,035** | **(127,167)** | **10,109** |
| | | | | |
| **Bitcoin Mining Revenue** | **13,755** | **20,147** | **29,967** | **30,579** |
| | | | | |
| **Profit/(loss) after income tax expense margin(1)** | **(1,047%)** | **349%** | **(540%)** | **(1,369%)** |
| | | | | |
| **EBITDA margin(2)** | **(892%)** | **20%** | **(424%)** | **33%** |

145.   As of December 31, 2022, the outstanding principal and interest balance (less capitalized borrowing costs) owed by each of the subsidiaries was as follows:

- IE CA 2 Holdings Ltd.:  $0

- IE CA 3 Holdings Ltd.:  $34,296,000

- IE CA 4 Holdings Ltd.:  $76,294,000

146.   As at December 31, 2022, assets held by the Non-Recourse SPVs were recognized as impaired in the Group consolidated financial statements to reflect their expected net realizable value to the Group (*i.e.* to a value equal to the third-party debt outstanding in each of the Non-Recourse SPVs).

147.   A November 2022 Investor Presentation from Iris disclosed that the default of the SPVs had resulted in a material decrease of the Company's monthly average operating hashrate to just 1,445 PH/s in November 2022 from 3,899 PH/s in October 2022, and a decrease in Bitcoin mined to just 151 from 448 in October, as reflected in the attached chart:

Daily average operating hashrate chart



Technical commentary

The Company's average operating hashrate was 1,445 PH/s in November 2022 (compared to 3,899 PH/s in October[8]), with the decrease primarily attributable to the termination of hosting arrangements during the month in connection with certain of the Company's limited recourse equipment financing facilities as described above[9]. The corresponding decrease in Bitcoin mined (151 vs. 448 in October) and electricity costs ($1.9 million vs. $4.2 million in October[8]) were also primarily attributable to the termination of these hosting arrangements.

[The remainder of this page is deliberately left blank.]

148.   In February 2023, Iris Energy presented an Investor Update to the market which summarized the negative effect on its balance sheet due to the Limited-Recourse SPVs:

**Iris** Energy

# Balance sheet

- $39.4m cash as of Dec 31, 2022 (excluding limited-recourse financing SPVs)

- $59.0m Bitmain prepayment on balance sheet (as of Dec 31, 2022) was subsequently fully utilized post balance date

- $105.2m of primarily non-cash impairment, of which $66.5m relates to the limited-recourse financing SPVs

- Receiver to the limited-recourse financing SPVs appointed on Feb 3, 2023 (Adjusted Balance Sheet reflects derecognition of limited-recourse financing SPVs from the Group)

| US$m | As at Jun 30, 2022 | As at Dec 31, 2022 | Adjustments to remove limited-recourse financing SPVs | As Adjusted Dec 31, 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | 110.0 | 40.7 | (1.3) | 39.4 |
| Prepayments and other current assets | 50.3 | 34.0 | - | 34.0 |
| **Total current assets** | **160.3** | **74.6** | **(1.3)** | **73.3** |
| Property, plant & equipment | 247.6 | 273.3 | (111.8) | 161.5 |
| Mining hardware prepayments | 158.2 | 59.0 | - | 59.0 |
| Other non-current assets | 4.5 | 5.1 | - | 5.1 |
| **Total non-current assets** | **410.2** | **337.3** | **(111.8)** | **225.5** |
| **Total assets** | **570.5** | **412.0** | **(113.1)** | **298.9** |
| | | | | |
| **Liabilities** | | | | |
| Borrowings and lease liabilities | 60.5 | 110.7 | (110.6) | 0.1 |
| Other current liabilities | 24.6 | 29.5 | (2.5) | 27.0 |
| **Total current liabilities** | **85.1** | **140.2** | **(113.1)** | **27.1** |
| Borrowings | 47.8 | 1.3 | - | 1.3 |
| Other non-current liabilities | 0.2 | 0.3 | - | 0.3 |
| **Total non-current liabilities** | **48.0** | **1.6** | **-** | **1.6** |
| **Total liabilities** | **133.1** | **141.8** | **(113.1)** | **28.7** |
| | | | | |
| **Equity** | | | | |
| **Total equity** | **437.4** | **270.1** | **-** | **270.1** |
| | | | | |
| **Total equity and liabilities** | **570.5** | **412.0** | **(113.1)** | **298.9** |

149.   As of the time this Amended Complaint was filed, Iris's ordinary shares traded at approximately $3.21 per share, significantly below the $28 per share Offering price, damaging investors.

150.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## V.   THE EXCHANGE ACT DEFENDANTS' SCIENTER AND MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

151.   The following allegations only apply to Plaintiffs' claims under the Securities Exchange Act and the Exchange Act Defendants, and not to Plaintiffs' claims under the Securities Act.  The Exchange Act Defendants had actual knowledge of the falsity of all their statements because such Defendants were directly responsible for the conduct at issue in this litigation and were the key executive officers of the Company during the Class Period.

152.   The Exchange Act Defendants' scienter is inferred from the fact that the Company was small and only had one business segment and line of

business:  the mining and sale of Bitcoin.  The false statements and material omissions at issue in this case were thus all part of Iris Energy's "core product" such that the Exchange Act Defendants' knowledge of the falsity of their statements is imputed to them based on their positions with the Company, and that all the false and undisclosed facts pertained to the Company's core (and only) product.    Under these circumstances, Defendants' scienter is established pursuant to the core product doctrine and the other specific facts alleged herein.

153.   The scienter of Defendants Michael Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski is demonstrated by the fact that they served on the Board of Directors of both Iris Energy and the SPVs, and conducted all transactions on behalf of the SPVs.   The SPVs essentially had no separate existence according to NYDIG.  All operational matters for the SPVs were conducted by Defendants Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski, including the transfer of money between and among Iris and the SPVs.  As noted in the May 9, 2023 Affidavit of NYDIG CEO Shah:

"[T]he Respondents [SPVs] and Iris Energy operated a single, commingled bank account that was used to receive proceeds of NYDIG's financing and make debt service payments to NYDIG. The group's consolidated and unconsolidated financial statements disclose that the Respondents could never achieve profitability, and cash injections by Iris Energy were necessary for Respondents to meet their obligations to NYDIG. The group transacted with Bitmain Technologies Limited ("Bitmain"), the manufacturer of the Financed Mining Equipment, on a consolidated basis out of a single account, without differentiating among corporate entities or allocating coupons and credits on a per-entity basis. The Bitcoin mined by the Respondents using the Financed Mining Equipment was hashed into a common digital currency wallet in the name of Iris Energy. The Respondents and Iris Energy had, at all relevant times, the same Board of Directors."[7]

154.    Because they were the members of the SPVs and conducted all operations on behalf of the SPVs, including transferring money to satisfy the SPVs debt obligations, Defendants Michael Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski had actual knowledge at all relevant times that the SPVs "could never achieve profitability" as NYDIG's CEO noted in his May 9, 2023 Affidavit.    Defendants Michael Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski were not just on the

---

[7] Shah Affidavit, ¶6.

Board of Directors of the SPVs but also signed and directed all their operations, including the Hashpower Agreements and Hosting Agreements. As just one of many examples, a March 24, 2022 agreement between NYDIG and one of the SPVs – IE CA 4 -- was signed by Defendants Daniel Roberts, William Roberts, and Michael Alfred on behalf of *both* Iris Energy and IE CA 4 in their capacity as Directors of both entities.

155. Defendants Michael Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski had scienter of the falsity of the Class Period statements because, as Directors of the SPVs, they signed and/or approved the Master Finance Equipment Agreements for both of the defaulted SPVs – IE CA 3 and IE CA 4 – which explicitly stated that the Bitcoin mined by the SPVs constituted collateral, in addition to the equipment which had been pledged as collateral: "the Digital Assets produced by the Financing Mining Equipment, and the proceeds thereof, are NYDIG's collateral, pursuant to the terms of the Transaction Documents." Shah Affidavit, ¶53. Such Defendants therefore knew at all relevant times that their contrary statements that the only collateral pledged was the equipment itself were

84

false.

156.   The scienter of Defendant William Roberts is further demonstrated by an affidavit he filed with the Supreme Court of British Columbia, Canada on February 1, 2023.   In his affidavit, William Roberts states that he or others at Iris approached NYDIG as early as October 2022 to discuss the amounts due under the MEFAs and attempt to agree on a restructuring proposal.  *See* W. Roberts Affidavit, ¶7.  The affidavit also states that the default was going to occur in October 2022 but that the parties agreed to a two-week extension to facilitate further discussions.  Thus, well before Iris filed the November 2022 disclosure, William Roberts had actual knowledge of the fact that the SPVs were not able to service their debt and that they would default under the loan agreements absent a restructuring agreement.   William Roberts' affidavit also states that NYDIG asked Iris Energy for additional financial information as part of the restructuring negotiations but that Iris refused to provide such information.

157.   The February 1, 2023 affidavit of William Roberts also establishes the scienter of Defendants Daniel Roberts, Michael Alfred, and Christopher

Guzowski.  Since they were also directors of both Iris and the SPVs, a fair inference is that such persons were also involved in the October 2022 restructuring discussions with NYDIG or that, at a minimum, William Roberts advised/updated them on the discussions, and thus that they had actual knowledge in October 2022 of the imminent defaults by the SPVs that Iris did not disclose until November 2022.

158.  ***Temporal Proximity*** – The temporal proximity of the Defendants' September 13, 2022 false statements, including those in the 20-F and conference call with analysts, also demonstrates the scienter of the Exchange Act Defendants.   On the conference call with analysts on September 13, 2022, Defendant Daniel Roberts repeatedly represented that the Company was still mining Bitcoin profitably, even with Bitcoin's price having fallen to $20,000.  He stated that "we're mining Bitcoin at $8,000 a coin, locking that profitability [in]."  But less than one month later, D. Roberts and his brother W. Roberts, as the directors of Company's SPVs, were negotiating a restructuring of the SPVs debt due to their inability to pay the debt when it came due in October 2022 – hardly a picture of

profitability.  The temporal proximity between Roberts' September 13, 2022 statements and the lender's declaration of a default and event of acceleration of the entire balance of the debt – $114 million – on November 4, 2022 is highly indicative that Defendants D. Roberts, W. Roberts, Guzowski and Alfred knew the Company's statements on September 13, 2022 were false when made.

159.   Defendants Daniel and William Roberts possessed and exercised more than 20% ownership of Iris' stock and more than 80% voting control of Iris Energy's stock both before and after the IPO and during the Class Period and thus had a strong motive to commit fraud since the fraud would benefit themselves more than any other stockholder.  The inflated stock price achieved through the fraud significantly increased the value of the Roberts' stock during the Class Period.   The following chart reflects their ownership and voting stakes both before and after the IPO:

/ / /

/ / /

/ / /

| Name | Ordinary Shares | | Percentage of Ordinary Shares Beneficially Owned After Offering without Exercise of Underwriters' Option | Percentage of Ordinary Shares Beneficially Owned After Offering with Full Exercise of Underwriters' Option | B Class Shares | | Percentage of B Class Shares Beneficially Owned After this Offering without Exercise of Underwriters' Option | Percentage of B Class Shares Beneficially Owned After this Offering with Full Exercise of Underwriters' Option | Percentage of Total Voting Power After Offering Without Exercise of Underwriters' Option[(1)(2)] | Percentage of Total Voting Power After Offering with Full Exercise of Underwriters' Option |
|---|---|---|---|---|---|---|---|---|---|---|
| | Number | Percentage of Ordinary Shares Beneficially Owned Prior to this Offering | | | Number | Percentage of B Class Shares Beneficially Owned Prior to this Offering | | | | |
| Directors and Executive Officers: | | | | | | | | | | |
| Daniel Roberts[(3)] | 6,000,000 | 12.3% | 10.5% | 10.3% | 1 | 50.0% | 50% | 50% | 40.5% | 40.3% |
| William Roberts[(4)] | 6,000,000 | 12.3% | 10.5% | 10.3% | 1 | 50.0% | 50% | 50% | 40.5% | 40.3% |

160.  Defendants also had the motive and opportunity to commit the fraud.  The IPO was structured to satisfy the share price thresholds for certain tranches under incentive arrangements held by Daniel and William Roberts.  But for the IPO, Defendants Daniel and William Roberts would not have received such compensation.  In correspondence with the SEC regarding the draft Prospectus, the Company wrote that it "respectfully

advises the [SEC's] Staff that the compensation expense that will be recorded at time the options vest is estimated to be A$1,875,232 (comprised of total share-based amortization of A$2,060,000 less amortization of A$184,768 for the year ended June 30, 2021). The Company respectfully advises the Staff that [ ]  the IPO may potentially satisfy the share price thresholds under the incentive arrangements with Messrs. Daniel and William Roberts."[8]

## VI.   PLAINTIFFS' CLASS ACTION ALLEGATIONS

161.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants who purchased (a) Iris ordinary shares pursuant and/or traceable to the Offering Documents issued in connection with the Company's initial public offering conducted on or about November 17, 2021 (the "IPO" or "Offering") and/or (b) Iris securities between November 17, 2021 and November 1, 2022, both dates inclusive (the "Class Period") and were damaged thereby (the "Class").  Excluded from

---

[8] *See* Oct. 5, 2021 letter from Iris' attorneys at Latham & Watkins to the SEC, filed with the SEC on the same date.

the Class are Defendants, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

162.   The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Iris securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Iris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

163.   Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

164.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

165.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Iris;

- whether the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading;

- whether the Exchange Act Individual Defendants caused Iris to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Iris securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

166.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

167.   Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Iris securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Iris securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

168.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

169.   Additionally, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

/ / /

/ / /

## VII.   CAUSES OF ACTION

## <u>COUNT 1</u>

### Violations of Section 10(b) of the Exchange Act and Rule 10b-5
### (Against the Exchange Act Defendants)

170.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

171.   This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

172.   During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such scheme was

intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Iris securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Iris securities and options at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

173.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Iris securities. Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Iris's finances and business prospects.

174.   By virtue of their positions at Iris, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

175.   Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Iris, the Exchange Act Individual Defendants had knowledge of the details of Iris's internal affairs.

96

176.   The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Iris.   As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Iris's businesses, operations, future financial condition, and future prospects.   As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Iris securities was artificially inflated throughout the Class Period.   In ignorance of the adverse facts concerning Iris's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Iris securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

97

177. During the Class Period, Iris securities were traded on an active and efficient market. Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Iris securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct. Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid. At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Iris securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class. The market price of Iris securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

/ / /

/ / /

178. By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

179. As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of Section 20(a) of the Exchange Act
(Against the Exchange Act Individual Defendants)**

180. Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

181. During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Iris, and conducted and participated, directly and indirectly, in the conduct of Iris's business affairs.  Because of their senior positions, they knew the adverse

99

non-public information about Iris's misstatement of income and expenses and false financial statements.

182.    As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Iris's financial condition and results of operations, and to correct promptly any public statements issued by Iris which had become materially false or misleading.

183.    Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Iris disseminated in the marketplace during the Class Period concerning Iris's results of operations.   Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Iris to engage in the wrongful acts complained of herein.   The Exchange Act Individual Defendants, therefore, were "controlling persons" of Iris within the meaning of Section 20(a) of the Exchange Act.   In this

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Iris securities.

184.   Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Iris.  By reason of their senior management positions and/or being directors of Iris, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Iris to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants exercised control over the general operations of Iris and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

185.   By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Iris.

/ / /

/ / /

/ / /

# COUNT III

## Violations of Section 11 of the Securities Act
## (Against the Securities Act Defendants)

186.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except Counts I and II, the allegations under the Securities Exchange Act, and any allegation of fraud, recklessness, or intentional misconduct.

187.   This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

188.   The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

189.   Iris is the registrant for the IPO.  The Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

190.   As issuer of the shares, Iris is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Offering Documents.

191.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

192.   By reasons of the conduct herein alleged, each Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

193.   Plaintiffs acquired Iris shares pursuant and/or traceable to the Offering Documents for the IPO.

194.   Plaintiffs and the Class have sustained damages.  The value of Iris shares has declined substantially subsequent to and because of Defendants' violations.

/ / /

/ / /

/ / /

## COUNT IV

### Violations of Section 12 of the Securities Act
### (Against the Securities Act Defendants)

195.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein, except Counts I and II, the allegations under the Securities Exchange Act, and any allegation of fraud, recklessness, or intentional misconduct.

196.    This count is asserted by Plaintiffs against the Securities Act Defendants and is based upon Section 12(a)(2) of the Securities Act.

197.   The Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of stock offered by Iris Energy pursuant to the IPO. The Securities Act Defendants issued, caused to be issued, and/or signed the IPO Registration Statement in connection with the Offering. The IPO Registration Statement was used to induce investors, such as Plaintiffs and other members of the Class, to purchase Iris Energy securities.

198.   The IPO Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts

necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

199.   The Securities Act Defendants' actions of solicitation included participating in the preparation of the false and/or misleading IPO Registration Statement.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were true and without omission of any material facts and were not misleading.

200.   Plaintiffs and other Class members did not know, nor could they have known, of the untruths and/or omissions contained in the IPO Registration Statement.

201.  By virtue of the conduct alleged herein, the Section 12 Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

/ / /

/ / /

/ / /

## COUNT V

### Violations of Section 15 of the Securities Act
### (Against the Securities Act Individual Defendants)

202.   Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein, except Counts I and II, the allegations under the Securities Exchange Act, and any allegation of fraud, recklessness, or intentional misconduct.

203.   This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

204.   The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Iris within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Iris to engage in the acts described herein.

106

205.   The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

206.   By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## **PRAYER FOR RELIEF**

A.     Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.     Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.     Awarding Plaintiffs and the other members of the Class prejudgment and post-judgement interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.     Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated:  June 6, 2023                    Respectfully submitted,

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately

s/ Peter S. Pearlman
Peter S. Pearlman

Park 80 West – Plaza One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile:   (201) 845-9423
Email:        psp@njlawfirm.com
                  mfg@njlawfirm.com

*Counsel for Lead Plaintiffs and Liaison
Counsel*

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.  (*pro hac vice* forthcoming)
Albert Y. Chang (*pro hac vice* forthcoming)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:     (858) 914-2002
Email:    fbottini@bottinilaw.com
              achang@bottinilaw.com

*Lead Counsel for Lead Plaintiffs*

108

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Network Racing Pty Ltd., declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file with my counsel.

2.      I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      The following are my transactions during the Class Period in the securities of Iris Energy Ltd.:

| Date | Transaction | Amount | Price |
|------|-------------|--------|-------|
| 11/17/2021 | BUY | 20,000 | $28.00 |

5.      I still own all such shares, and did not sell any shares during the Class Period.

6.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____.    2/7/2023 | 5:38 PM PST

_____
NETWORK RACING PTY LTD.

BY: ROBERT SPANO, DIRECTOR

DocuSign Envelope ID: 073834BF-2B9D-4478-8586-B63EF033F93C

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Nahi Beaini, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file with my counsel.

2.      I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      The following are my transactions during the Class Period in the securities of Iris Energy Ltd.:

| Date | Transaction | Amount | Price |
|------|-------------|--------|-------|
| 11/17/2021 | BUY | 25,145 | $21.00 |

5.      I still own all such shares, and did not sell any shares during the Class Period.

6.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____.     2/8/2023 | 8:06 PM PST

*Mr. Nahi Beaini*

_____

NAHI BEAINI

DocuSign Envelope ID: D0420F5F-1693-47C5-AF4E-59624F105EF8

## CERTIFICATION OF LEAD PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, LRJ Superannuation Fund, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.      I have reviewed the complaint on file with my counsel.

2.      I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.      I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.      The following are my transactions during the Class Period in the securities of Iris Energy Ltd.:

| Date | Transaction | Amount | Price |
|------|-------------|--------|-------|
| 11/17/2021 | BUY | 9,759 | $21.00 |

5.      I still own all such shares, and did not sell any shares during the Class Period.

6.      I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.      I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 2/9/2023 | 9:42 PM PST _____.

LRJ Superannuation Fund, by:
Lima Romeo Juliet Pty Ltd, Trustee

By:  Marc De Stoop, Trustee

## <u>CERTIFICATION OF LEAD PLAINTIFF PURSUANT</u>
## <u>TO THE FEDERAL SECURITIES LAWS</u>

I, De Stoop Investments Pty Ltd., declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.     I have reviewed the complaint on file with my counsel.

2.     I did not purchase or sell the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.     I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.     The following are my transactions during the Class Period in the securities of Iris Energy Ltd.:

| <u>Date</u> | <u>Transaction</u> | <u>Amount</u> | <u>Price</u> |
| --- | --- | --- | --- |
| 11/17/2021 | BUY | 5,048 | $21.00 |

5.     I still own all such shares, and did not sell any shares during the Class Period.

6.     I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.     I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on 02/13/2022

_____

De Stoop Investments Pty Ltd, by:

JDS Investment Trust, Trustee

By:  Joel De Stoop, Trustee