## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT STERLING, individually and on behalf of all others similarly situated, Plaintiff, v. IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, DAVID BARTHOLOMEW, CHRISTOPHER GUZOWSKI, MICHAEL ALFRED, J.P. MORGAN SECURITIES LLC, CANACCORD GENUITY LLC, CITIGROUP GLOBAL MARKETS INC., CANTOR FITZGERALD & CO., GALAXY DIGITAL PARTNERS LLC, COMPASS POINT RESEARCH & TRADING, LLC, and MACQUARIE CAPITAL (USA) INC., Defendants. | No. 2:22-cv-7273 *Document Filed Electronically* <br><br> CLASS ACTION <br><br> **ORAL ARGUMENT REQUESTED** <br><br> **RETURN DATE:** December 4, 2023 |

## MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT

OF COUNSEL:
Edmund Polubinski III (*pro hac vice*)
Mari Grace (*pro hac vice*)
**DAVIS POLK & WARDWELL LLP**
450 Lexington Avenue
New York, New York 10017
(212) 450-4000
edmund.polubinski@davispolk.com
mari.grace@davispolk.com

Samuel I. Portnoy
Christina M. LaBruno
**GIBBONS P.C.**
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
claburno@gibbonslaw.com

*Counsel for Iris Energy Limited, Daniel Roberts, William Roberts, David Bartholomew, Christopher Guzowski, and Michael Alfred*

[Additional counsel listed on signature page]

# TABLE OF CONTENTS

PAGE

PRELIMINARY STATEMENT ................................................................1

BACKGROUND ...................................................................................4

    A.    Iris's Business.............................................................................4

    B.    The Initial Public Offering (IPO).................................................5

    C.    Subsequent Disclosures and Events ...........................................7

        1.    Disclosures of Earnings and Operating Results.........................8

        2.    Disclosures of Business Expectations and Projected Growth.....9

        3.    Disclosures on Iris's Equipment Ownership Model................10

    D.    Months After the IPO, the Market Price of Bitcoin Declined Steeply ...................................................................................11

    E.    As Bitcoin Continued to Decline, Two Iris SPVs Eventually Defaulted ...............................................................................11

ARGUMENT .....................................................................................12

I.    Plaintiffs' Securities Act Claims Should Be Dismissed for Failure to Plead an Actionable Misstatement or Omission..............................13

    A.    Plaintiffs Have Failed to Plead Any Actionable Misstatement or Omission Regarding Equipment Financing .................................14

        1.    Plaintiffs Have Failed to Plead Any Materially False or Misleading Statement...................................................................14

        2.    Plaintiffs Have Failed to Plead Any Actionable Omission of Material Fact.........................................................................15

    B.    Plaintiffs Have Failed to Plead Any Actionable Misstatement of Goodwill..................................................................................23

        1.    Plaintiffs Have Failed to Plead an Actionable Misstatement of Opinion.........................................................................24

        2.    Plaintiffs Fail to Plead Materiality...........................................26

II.   Plaintiffs' Claims Under Section 10(b) of the Exchange Act and Rule 10b-5 Should Be Dismissed ...........................................................................27

    A.   Plaintiffs Fail to Plead an Actionable Misstatement or Omission ......29

        1.   Plaintiffs Have Failed to Plead an Actionable Omission..........29

        2.   Plaintiffs Have Failed to Plead Any Actionable Misstatement of Goodwill...........................................................37

    B.   Plaintiffs Fail to Plead Scienter...........................................................38

        1.   Plaintiffs' Allegations of Temporal Proximity Do Not Plausibly Show Scienter ...........................................................40

        2.   Defendants' Positions on the SPV Boards Do Not Create An Inference of Scienter ...........................................................42

        3.   The Roberts' Stock Ownership Dramatically Undermines Any Inference of Scienter Here ..................................................42

        4.   Plaintiffs' Core Product Doctrine Allegations Are Insufficient to Establish Scienter .............................................43

III.  Plaintiffs Fail to Plead "Controlling Person" Liability under Section 15 of the Securities Act or Section 20(a) of the Exchange Act....................43

# TABLE OF AUTHORITIES

PAGE(S)

CASES

*In re Adams Golf, Inc. Sec. Litig.*,
    381 F.3d 267 (3d Cir. 2004) ........................................................................ 13, 16

*In re Advanta Corp. Sec. Litig.*,
    180 F.3d 525 (3d Cir. 1999) .............................................................................. 36

*In re Aetna, Inc. Sec. Litig.*,
    617 F.3d 272 (3d Cir. 2010) .............................................................................. 28

*In re Ascena Retail Grp., Inc. Sec. Litig.*,
    2022 WL 2314890 (D.N.J. June 28, 2022) ....................................................... 38

*In re Bank of Am. AIG Disclosure Sec. Litig.*,
    980 F. Supp. 2d 564 (S.D.N.Y. 2013) .......................................................... 21, 22

*Behrmann v. Brandt*,
    2020 WL 4432536 (D. Del. July 31, 2020) ................................................. 24, 25

*In re Burlington Coat Factory Sec. Litig.*,
    114 F.3d 1410 (3d Cir. 1997) ............................................................................ 36

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*,
    394 F.3d 126 (3d Cir. 2004) .............................................................................. 34

*Castlerock Mgt., Ltd. v. Ultralife Batteries, Inc.*,
    68 F. Supp. 2d 480 (D.N.J. 1999) ................................................................ 40, 41

*City of Edinburgh Council v. Pfizer, Inc.*,
    754 F.3d 159 (3d Cir. 2014) .......................................................................... 29, 36

*City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*,
    713 F. Supp. 2d 378 (D. Del. 2010) .................................................................. 43

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*,
    70 F.4th 668 (3d Cir. 2023) .......................................................................... 25, 32

*Credit Suisse Sec. (USA) LLC v. Billing*,
    551 U.S. 264 (2007) ......................................................................................... 28

*Davis v. City of Phila.*,
    821 F.3d 484 (3d Cir. 2016) ............................................................... 12

*In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*,
    7 F.3d 357 (3d Cir. 1993) ............................................................. 15, 21

*Duncan v. Vantage Corp.*,
    2019 WL 1349497 (D. Del. Mar. 26, 2019) ........................................ 44

*Fowler v. UPMC Shadyside*,
    578 F.3d 203 (3d Cir. 2009) ............................................................... 13

*Hall v. Johnson & Johnson*,
    2019 WL 7207491 (D.N.J. Dec. 27, 2019) ......................................... 43

*In re Hertz Glob. Holdings Inc*,
    905 F.3d 106 (3d Cir. 2018) ......................................................... 27, 40

*Institutional Inv'rs. Grp. v. Avaya, Inc.*,
    564 F.3d 242 (3d Cir. 2009) ......................................... 34, 35, 39, 40, 43

*James v. City of Wilkes-Barre*,
    700 F.3d 675 (3d Cir. 2012) ............................................................... 13

*Jaroslawicz v. M&T Bank Corp.*,
    296 F. Supp. 3d 670 (D. Del. 2017) ................................................... 19

*Martin v. GNC Holdings, Inc.*,
    2017 WL 3974002 (W.D. Pa. Sept. 8, 2017) ...................................... 43

*In re Merck & Co., Inc. Sec. Litig.*,
    432 F.3d 261 (3d Cir. 2005) ............................................................... 29

*In re Merck & Co., Inc. Sec., Derivative & Erisa Litig.*,
    2012 WL 3779309 (D.N.J. Aug. 29, 2012) ......................................... 45

*In re Milestone Sci. Sec. Litig.*,
    103 F. Supp. 2d 425 (D.N.J. 2000) .................................................... 42

*Moreno v. Wells Fargo Home Mortg.*,
    2015 WL 3486996 (E.D. Cal. June 2, 2015) ....................................... 32

*N. Am. Steel Connection, Inc. v. Watson Metal Prod. Corp.*,
    515 F. App'x 176 (3d Cir. 2013) ........................................................ 33

*In re NAHC, Inc. Sec. Litig.*,
  2001 WL 1241007 (E.D. Pa. Oct. 17, 2001)..................................................... 34

*In re Nice Sys., Ltd. Sec. Litig.*,
  135 F. Supp. 2d 551 (D.N.J. 2001) ............................................................ 34, 42

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*,
  575 U.S. 175 (2015) ................................................................................... 25, 32

*Oran v. Stafford*,
  226 F.3d 275 (3d Cir. 2000) .............................................................................. 29

*Ortiz v. Canopy Growth Corp.*,
  537 F.Supp.3d 621 (D.N.J. 2021) ..................................................................... 24

*Rahman v. Kid Brands, Inc.*,
  736 F.3d 237 (3d Cir. 2013) .............................................................................. 40

*SEPTA v. Orrstown Fin. Servs., Inc.*,
  2022 WL 3572474 (M.D. Pa. Aug. 18, 2022)................................................... 25

*SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*,
  499 F. Supp. 3d 49 (D. Del. 2020) ........................................................ 27, 33, 38

*In re Suprema Specialties, Inc. Sec. Litig.*,
  438 F.3d 256 (3d Cir. 2006)............................................................................... 44

*In re Synchronoss Sec. Litig.*,
  705 F. Supp. 2d 367 (D.N.J. 2010) ................................................................... 21

*Talley v. Wetzel*,
  15 F.4th 275 (3d Cir. 2021)............................................................................... 13

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.*,
  551 U.S. 308 (2007) .................................................................................... 39, 40

*Tracinda Corp. v. DaimlerChrysler AG*,
  502 F.3d 212 (3d Cir. 2007)............................................................................... 44

*TSC Indus., Inc. v. Northway, Inc.*,
  426 U.S. 438 (1976) .......................................................................................... 15

*Turnofsky v. electroCore, Inc.*,
  2023 WL 4527553 (D.N.J. July 13, 2023)................................................. 15, 16

*In re Westinghouse Sec. Litig.*,
  90 F.3d 696 (3d Cir. 1996) ................................................................................. 27

*Winer Fam. Tr. v. Queen*,
  503 F.3d 319 (3d Cir. 2007) .......................................................................... 4, 22

*Zucker v. Quasha*,
  891 F. Supp. 1010 (D.N.J. 1995) ...................................................................... 15

## STATUTES & RULES

15 U.S.C. § 77k .................................................................................. 13, 15, 25

15 U.S.C. § 77l .................................................................................. 13, 16, 25

15 U.S.C. § 77o ...................................................................................... 43, 44

15 U.S.C. § 78j ....................................................................................... 27, 28

15 U.S.C. § 78t .................................................................................. 43, 44, 45

15 U.S.C. § 78u ............................................................................................ 28

Fed. R. Civ. P. 8 ........................................................................................... 13

Fed. R. Civ. P. 9 ........................................................................................... 28

Fed. R. Civ. P. 12 ......................................................................................... 12

17 CFR § 240.10b-5 .................................................................................. 27, 29

## TABLE OF ABBREVIATIONS

| ¶ __ | ¶ __ of the First Amended Complaint (ECF #38) |
|---|---|
| 6K | Interim SEC filing on Form 6-K for foreign private issuers |
| 20F | Annual SEC filing on Form 20-F for foreign private issuers |
| Earnings Tr. | Transcript of quarterly earnings call |
| Ex. __ | Exhibit __ to the Declaration of Edmund Polubinski III[1] |
| Exchange Act | Securities Exchange Act of 1934 |
| IPO | Initial Public Offering |
| IEL | Iris Energy Limited |
| Iris, the Group, or the Company | Iris Energy Limited and its consolidated subsidiaries |
| MEFA | Master equipment financing agreements between certain Iris SPVs and NYDIG or its affiliates secured by the financed mining equipment |
| NYDIG | Equipment financier and direct or indirect counterparty to the MEFAs |
| Offering Documents | Prospectus and Registration Statement together |
| Pr. __ | IEL Prospectus filed with SEC on Nov. 18, 2021 (Ex. A) |
| PSLRA | Private Securities Litigation Reform Act |
| Reg. __ | IEL Registration Statement filed with SEC on Oct. 25, 2021, as amended (Ex. B) |
| Securities Act | Securities Act of 1933 |
| SEC | Securities and Exchange Commission |
| SPVs | Special purpose vehicles, which are IEL subsidiaries that borrowed to buy mining equipment |

[1] Page numbers refer to the .pdf page of the document, excluding the exhibit cover sheet.

## <u>PRELIMINARY STATEMENT</u>[2]

Iris[3] owns and operates data centers powered by renewable energy, where Bitcoin is "mined" or created.  In this case, Plaintiffs seek to hold Defendant Iris Energy Limited and the other Defendants liable under the securities laws for losses Plaintiffs allegedly suffered when IEL's stock price fell amid a steep, market-wide decline in the value of Bitcoin.  But the securities laws are not insurance against all stock price declines.  Instead, to state a claim, a plaintiff must identify an actionable misstatement or omission by defendants.  Plaintiffs fail to do so here.

Iris expressly disclosed the very risks Plaintiffs now claim were concealed, both in its November 2021 IPO Offering Documents and afterwards.  Iris cautioned that its profitability is directly tied to the "highly volatile" price of Bitcoin.  Iris also warned extensively of the risks associated with the loans that funded some equipment purchases, including that the business may not generate enough cash to make payments on those loans.  And Iris warned bluntly that these risks were existential.  Indeed, both in its Offering Documents and later, Iris warned that it may not continue as a "going concern": *i.e.*, that there was substantial doubt about Iris's ability to meet its obligations during the coming year.

---

[2] Unless otherwise noted, emphasis has been added to quotations, and internal quotations, brackets, citations, and footnotes have been omitted.

[3] As reflected in the Table of Abbreviations, "Iris" refers to Iris Energy Limited and its consolidated subsidiaries, including its wholly owned SPVs.

After the IPO, some of these expressly disclosed risks materialized.  The price of Bitcoin declined precipitously from roughly $65,000 to $16,000.  The Iris SPVs—the Iris entities that were parties to the equipment loans—were nevertheless still able to make payments on the loans for nearly a year after the IPO and even repaid one loan in full.  But eventually the sharply reduced cashflow following Bitcoin's decline caught up with Iris, and the SPVs were unable to continue making payments on the other two loans.  Nearly a year after the IPO, the SPVs defaulted on those loans, and this case followed.

Plaintiffs bring claims on behalf of a putative class of Iris shareholders under (1) the Securities Act seeking to allege misleading statements in the Offering Documents, and (2) the Exchange Act seeking to allege misleading statements in the Offering Documents and certain statements made after the IPO.  Each claim fails for several reasons.

Plaintiffs' Securities Act claims rest principally on their assertion that the Offering Documents should have disclosed details beyond the extensive facts and risks described in those lengthy documents.  But the securities laws do not require unlimited disclosure of every shred of information.  Instead, where (as here) there is no independent duty to disclose arising from statute or regulation, alleged omissions are actionable only if they make existing disclosures materially misleading.  The allegedly omitted information here clearly does not.  For

example, one of Plaintiffs' central allegations is that Defendants should have disclosed granular details about the equipment loan agreements described above. But the Offering Documents fully disclosed all material facts about the agreements—including the dollar amounts owed, when they were due, and the serious consequences to Iris of a default. Nothing further was required.

Plaintiffs also contend the Offering Documents misstated the "goodwill" reported in Iris's financial statements. But Plaintiffs' own allegations bar such a claim as a matter of law: goodwill—an inherently subjective assessment of intangible value—is a statement of opinion. Opinions are actionable as misstatements only if they were subjectively disbelieved by the speaker. Here, Plaintiffs expressly *disclaim* any allegation of an intent to mislead, pleading themselves out of a claim. In any event, Plaintiffs grossly misread this line item to assert that Iris's goodwill was 880 *million* Australian dollars, when in fact it was A$880 *thousand*. In fact, Iris's goodwill was less than 0.5% of its total assets—a number obviously immaterial and insufficient to support a claim as a matter of law.

Plaintiffs' Exchange Act claims arise from substantially similar allegations, including Plaintiffs' assertion that Iris omitted information about the loan agreements from its disclosures and that it overstated goodwill in its financials. But Plaintiffs again fail to state a claim because they fail to plead specific facts showing that Iris's disclosures were misleading or that the challenged opinions are

3

actionable, and they disregard Iris's robust risk warnings to investors that continued well past the IPO.  Plaintiffs' claims also fail for the independent reason that they do not plead facts giving rise to a "strong inference" that any Exchange Act Defendant intended to defraud investors, as required under the PSLRA's heightened pleading standards.

## **BACKGROUND**

### A.    **Iris's Business**

Iris owns and operates Bitcoin mining data centers that are powered by renewable energy.  (¶ 44)  Bitcoin is a cryptocurrency that is created, or "mined," by running complex software on specialized computers.  (Pr. 7)[4]  Bitcoin mining requires a lot of energy (Pr. 48), and to address environmental considerations, as well as to support energy markets and local communities, Iris's data centers are located in areas with excess supplies of low-cost renewable energy.  (Pr. 10)

Iris earns revenue by contributing computing power to a "pool" of Bitcoin miners.  (Pr. 13)  Iris is paid Bitcoin daily based, in part, on the computing power it adds to the mining pool.  (Pr. 104)  To mitigate the risk of holding Bitcoin (¶ 120), Iris daily exchanges Bitcoin into fiat currency such as Canadian dollars.  (Pr. 84)

---

[4] Because the Offering Documents "were integral to and/or were explicitly relied upon by the amended complaint" (*see*, *e.g.*, ¶¶ 4–5), the Court may consider them on this motion. *Winer Fam. Tr. v. Queen*, 503 F.3d 319, 328 (3d Cir. 2007).

Iris owns and funds the purchase of some of its mining equipment through certain wholly owned subsidiaries, which are referred to as "SPVs." (¶¶ 96–97) To fund part of the purchase of such equipment, the SPVs entered into MEFAs with a lender. (¶ 53 (quoting Pr. 94); ¶ 69) Each such agreement was secured by the equipment purchased with the loan. (¶ 123)

## B.    The Initial Public Offering (IPO)

On November 17, 2021, IEL conducted its IPO, offering about 8 million shares for $28 per share. (¶¶ 48–49) The IPO underwriters were led by J.P. Morgan Securities LLC, Canaccord Genuity LLC, and Citigroup Global Markets Inc. Davis Polk & Wardwell and Latham & Watkins advised on the offering. (Pr. 147)

For the IPO, IEL filed a Registration Statement on October 25, 2021, which after amendments, became effective on November 16, 2021. (¶ 4) On November 18, 2021, IEL filed a Prospectus. (¶ 5)

In the Offering Documents, "Iris Energy" and the "Group" are defined as Iris Energy Limited "**and** its consolidated subsidiaries," and "all references … to the terms 'Iris Energy,' 'the Company,' 'our,' 'us,' 'its' and 'we' refer to Iris Energy Limited **and** its consolidated subsidiaries." (Reg. 4, 9, 166; Pr. 3, 7, 163) The Offering Documents identified each of the SPVs—such as IE CA 3 Holdings Ltd—as among the consolidated subsidiaries. (Reg. 195; Pr. 192; *see* ¶ 138)

The Offering Documents disclosed the nature and importance of the

MEFAs, and specified the total amount of the loan facilities and amount borrowed:

> We are party to equipment finance and security agreements, …
> pursuant to which an equipment financier has agreed to finance part of
> the purchase of various miners …. As of September 30, 2021, the
> aggregate amount of the loan facilities was $53.9 million, and the
> aggregate amount of funds borrowed under these loans was $22.9
> million. The loans carry an annual interest rate of 12% and are to be
> repaid through monthly payments of interest and principal through
> September 2023. The … outstanding borrowings are secured by the
> financed mining units purchased with the loans.

(¶ 53 (quoting Reg. 97 & Pr. 94); *see also* Reg. 81–82 & n.3, 184; Pr. 78–79 & n.3)

The agreements allowed Iris to buy state-of-the-art computing equipment, with the

expectation it would increase Iris's total computing power. (Pr. 9)

In its Offering Documents, Iris extensively disclosed the risks it faced. Iris

warned explicitly of the risks of a decline in the "highly volatile" price of Bitcoin,

which had "historically been subject to wide swings." (Pr. 31, 38, 46) Iris

cautioned that "[a]dverse movements in Bitcoin prices . . . may negatively affect

our financial performance." (Pr. 15, 97) Iris disclosed that "a fall in Bitcoin

exchange values could render Bitcoin mining ineffective or not viable for us." (Pr.

36) Iris repeatedly cautioned that due to the "significant volatility" of Bitcoin (Pr.

14, 31), "there can be no guarantee that future mining operations will be

profitable," (Pr. 164, 204), and that movements in Bitcoin's price could lead to

"the failure of our business." (Pr. 84, 97) Iris starkly warned investors: "***There is***

***substantial doubt about our ability to continue as a going concern.***" (Pr. 49 (emphasis in original))

Iris also disclosed the risks associated with the equipment financing: "We"—including consolidated subsidiaries—"may be unable to maintain a level of cash flows from operating activities sufficient to permit us to repay the principal and interest on our indebtedness . . . ." (Pr. 14, 30)  Iris warned that, if that occurs, the Group may have to "limit growth, seek additional capital, sell assets, or restructure or refinance" the debt or ultimately "be forced into bankruptcy, insolvency or liquidation."  (Pr. 30)

Plaintiffs do not dispute the accuracy of Iris's audited financial statements in the Offering Documents, except for an immaterial A$880,000 entry for goodwill—which Plaintiffs misread and grossly inflate to A$880 million.  (¶ 66)  The notes to the goodwill calculation explain that "[m]anagement have exercised judgement in determining the key assumptions . . . used as part of this assessment."  (Pr. 176)  Iris's independent, outside auditors opined that the financial statements "present fairly, in all material respects, the financial position of the Company."  (Pr. 161)

## C.    Subsequent Disclosures and Events

After the IPO, Iris made regular public disclosures, including through SEC filings and calls with investors, in which it reported financial results, projected growth, and provided updates on its equipment and power capacity.

### 1.    Disclosures of Earnings and Operating Results

Iris reported various financial metrics and operating results throughout the putative class period, including in a February 2022 6K (¶¶ 80, 83–84); on a May 2022 earnings call (¶¶ 97–98); in June 7, 2022, and June 21, 2022, 6Ks (¶¶ 110, 112); in a September 2022 6K (¶ 114); and on a September 2022 earnings call (¶¶ 120–121).

Each disclosure reiterated the robust risks and warnings that were in the Offering Documents.  For example, Iris warned that "there can be no guarantee that future mining operations will be profitable."  (*E.g.*, Feb. 9, 2022 6K, Ex. C, 48)  Iris's post-IPO financial statements—including Iris's February and May 2022 6Ks—cautioned that the Group's "continuing viability [and] ability to continue as a going concern and meet its debts and commitments as they fall due" depend on "a number of factors," including "the Bitcoin price remaining at a level higher than prior financial years."  (*Id.*)  Iris also warned about "other risks and uncertainties affecting [its] operations" including "the viability of the economics of Bitcoin mining," and that Iris's "future success will depend in a large part upon the value of Bitcoin, and any sustained decline in its value could adversely affect the business and results of operations."  (*Id.*)

## 2.    Disclosures of Business Expectations and Projected Growth

During the putative class period, Iris disclosed its prospective future mining capacity, profitability, and plans—and continued to warn about risks and the uncertainty of future operations and results.  In a February 2022 presentation to investors, for example, Iris discussed "key drivers" of its potential future growth (¶ 75), including that it had secured the second-most computing power of all listed Bitcoin miners (¶ 76), putting it "on track" to become one of the largest (¶ 74). The presentation identified such statements as forward-looking, and cautioned that actual future results could be "materially different," including due to risks relating to Iris's "limited operating history," its "ability to successfully manage its growth" and "raise additional capital," and "Bitcoin prices."  (Ex. C, 7, 12)  Each of Iris's disclosures contained similar forward-looking statement warnings,[5] which incorporated the risk disclosures in the Offering Documents.[6]

The February 2022 presentation also disclosed certain "[i]llustrative economics" (¶ 78) expressly modeled on disclosed assumptions—such as "Bitcoin price of $40k"—that Iris cautioned "are likely to be different in the future," so

---

[5] *See* Mar. 28, 2022, 6K, Ex. D, 6–7; May 11, 2022, 6K, Ex. E, 7–8; May 11, 2022, Q3 Earnings Tr., Ex. F, 5; June 7, 2022, 6K, Ex. G, 11–12; June 21, 2022, 6K, Ex. H, 8–9; Sept. 13, 2022, 20F, Ex. I, 7; Sept. 13, 2022, 6K, Ex. J, 8–9, 13.

[6] Mar. 28, 2022, 6K, Ex. D, 6-7; May 11, 2022, 6K, Ex. E, 7–8, 12; June 7, 2022, 6K, Ex. G, 11–12; June 21, 2022, 6K, Ex. H, 8–9; Sept. 13, 2022, 6K, Ex. J, 8–9, 13.

investors "should input their own assumptions." (Ex. C, 27)  Iris also warned that the figures were "for illustrative purposes only . . . based on historical information which may or may not materialize in the future," and that "there is no guarantee that they will be achieved . . .." (*Id.*)

### 3.    Disclosures on Iris's Equipment Ownership Model

In post-IPO filings, Iris disclosed that it had pledged some of its mining equipment under MEFAs entered into by wholly owned subsidiaries of IEL, or SPVs.[7] (*See*, *e.g.*, ¶¶ 96, 116–118, 123; *see also* June 7, 2022, 6K, Ex. G, 6 n.3; Sept. 13, 2022, 20F, Ex. I, 93)

The Exchange Act Defendants offered their opinion that this financing structure could protect Iris in the event of a default. (*See*, *e.g.*, ¶¶ 96–97 (opining that the structure "ring fenced" the collateral at the SPV level), ¶¶110–114, 123) But even as Defendants opined as to this advantage, Iris's post-Offering disclosures also included stark reminders of the risks the debt posed to the Group as a whole. Iris warned, for example, that if the Group was "unable to repay [its] indebtedness," it "may be required to limit growth, seek additional capital, sell

---

[7] Plaintiffs' assertion that Defendants concealed NYDIG's involvement in equipment financing is not accurate. In March 2022, Iris closed its first equipment financing facility as a public company, and issued a press release to announce the financing. The release noted the agreement was between a wholly owned Iris subsidiary and a NYDIG affiliate, the third such facility with NYDIG. (Ex. D, 5)

assets, or restructure or refinance" the debt, and if that is "not . . . successful," then it "could . . . be forced into bankruptcy, insolvency or liquidation." (Sept. 13, 2022, 20F, Ex. I, 25)

### D.    Months After the IPO, the Market Price of Bitcoin Declined Steeply

As Plaintiffs acknowledge, "[d]uring and after May 2022, the price of Bitcoin began to drop." (¶ 93)  Although Iris weathered this initial downturn, the price of Bitcoin continued to decline and many of the risks that Iris had disclosed materialized.  Iris's stock price dropped in tandem with the price of Bitcoin, along with the value of virtually every other publicly traded Bitcoin mining company.

Despite the market's volatility, Messrs. Daniel and William Roberts—Iris's co-CEOs and Directors, as well as its largest shareholders—continued to hold more than twenty percent of Iris's stock "both before and after the IPO and during the Class Period." (¶ 159)  Plaintiffs do not allege that either sold a single share.

### E.    As Bitcoin Continued to Decline, Two Iris SPVs Eventually Defaulted

Despite the decline in Bitcoin's value, the SPVs continued to service their monthly debt obligations, and one of the SPVs repaid its loan in full.  But in early November 2022, after months of continued decline in the value of Bitcoin, Iris

timely disclosed[8] restructuring discussions with NYDIG, notifying investors that it "expect[ed] that [two SPVs] will not have sufficient funds to repay such equipment financing facilities, in which case such lender could enforce its security interest and foreclose on the Bitcoin miners owned by [the two SPVs], respectively, which could result in the loss of such miners and materially reduce the Company's operating capacity." (¶ 135)  In response, NYDIG issued notices of default to the SPVs under their respective equipment financing agreements.  (¶ 138; *see* ¶¶ 132–135)  After these defaults, Iris's stock price declined, and this litigation followed.

## **ARGUMENT**

Under Rule 12(b)(6), a complaint should be dismissed unless it "contain[s] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Davis v. City of Phila.*, 821 F.3d 484, 488 (3d Cir. 2016).  The Court should accept well-pleaded facts as true, but should disregard "rote recitals of the elements of a cause of action, legal conclusions, and mere conclusory statements,"

---

[8] Plaintiffs speculate that "material problems with the SPVs" must have "started . . . by the time of the filing of the 2022 20-F on September 13, 2022." (¶ 125)  But Plaintiffs' own allegations make clear that this assertion rests on sheer guesswork.  Plaintiffs purport to deduce that because negotiations to restructure the loans allegedly "began in earnest on or about October 3, 2022," negotiations must have necessarily commenced three weeks before, which Plaintiffs claim must mean that there were "material problems with the SPVs" at that time.  (*Id.*)  There is, of course, no basis for this speculation, and Plaintiffs do not allege what these supposed "material problems" even were.

*James v. City of Wilkes-Barre*, 700 F.3d 675, 679 (3d Cir. 2012), and should not draw "unsupported conclusions and unwarranted inferences," *Talley v. Wetzel,* 15 F.4th 275, 287 (3d Cir. 2021).

## I.   Plaintiffs' Securities Act Claims Should Be Dismissed for Failure to Plead an Actionable Misstatement or Omission

To state a claim under Section 11 of the Securities Act, Plaintiffs must plead facts plausibly showing that the Offering Documents contained an untrue statement of a material fact or omitted to state a required material fact or a fact necessary to make other statements contained in the documents not misleading by omission. *See* 15 U.S.C. § 77k (Section 11); *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004). Similarly, under Section 12(a)(2), a plaintiff must plausibly allege that a prospectus "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2). To plead such a claim under Rule 8 of the Federal Rules, "[A] complaint must do more than allege the plaintiff's entitlement to relief. A complaint has to 'show' such an entitlement with its facts." *Fowler v. UPMC Shadyside*, 578 F.3d 203, 211 (3d Cir. 2009).

Plaintiffs argue Iris's Offering Documents were misleading in two principal respects: first that the description of Iris's MEFAs was misleading and second that

Iris's goodwill was impaired, and therefore overstated in its financial disclosures.

As shown below, neither category states a plausible claim.

### A.    Plaintiffs Have Failed to Plead Any Actionable Misstatement or Omission Regarding Equipment Financing

In their allegations about statements in the Offering Documents regarding

the ownership and financing of mining equipment (¶¶ 51–56), Plaintiffs identify

only one fact that they contend was "affirmatively misrepresented" (¶ 58) and

several other allegedly omitted material facts (¶¶ 57–60). None, however, remotely

pleads an actionable misstatement or omission under the Securities Act.[9]

### 1.    Plaintiffs Have Failed to Plead Any Materially False or Misleading Statement

Plaintiffs assert that the Offering Documents "affirmatively misrepresented

that the Company was protected from certain risks due to the fact that it owned and

operated its own mining equipment" (¶ 58), citing Iris's disclosure that "'[w]e have

ownership of our electrical infrastructure and data centers.'"  (*Id.* (quoting Pr. 5))

Even assuming that "electrical infrastructure and data centers" includes

mining equipment, the challenged statement is true, as Plaintiffs' allegations

---

[9] Plaintiffs challenge statements about benefits to Iris of owning its data centers and land, and its rights to potential sites (¶¶ 55–56), but plead no facts plausibly showing that any of these statements was false or misleading.  Plaintiffs also wrongly attribute several challenged statements to the Offering Documents. (*E.g.*, ¶ 51 ("[t]he Prospectus stated that [IEL] was a high-growth company which had secured operational facilities and funding to continue such growth").  But statements not in the Offering Documents cannot support Plaintiffs' claims.

confirm.  The Offering Documents expressly stated that "We"—as in, for example, "[w]e have ownership of our electrical infrastructure and data centers"—means IEL *and* its consolidated subsidiaries, which included the wholly owned SPVs that (directly) owned the mining equipment.  *See* supra p. 5.  And Plaintiffs concede that the SPVs owned the mining equipment.  (¶ 9)  Because the term "we" encompassed both IEL and the SPVs, the challenged statement was true.

### 2.    Plaintiffs Have Failed to Plead Any Actionable Omission of Material Fact

The Securities Act imposes "no affirmative duty to disclose any and all material information."  *Turnofsky v. electroCore, Inc.*, 2023 WL 4527553, at *7 (D.N.J. July 13, 2023).  Indeed, the Supreme Court has warned that it would be counterproductive to impose securities law liability for "insignificant omissions," which "may cause [issuers] to bury the shareholders in an avalanche of trivial information—a result that is hardly conducive to informed decisionmaking."  *In re Donald J. Trump Casino Sec. Litig.-Taj Mahal Litig.*, 7 F.3d 357, 369 n.12 (3d Cir. 1993) (quoting *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 448–49 (1976)). Nor are issuers liable for "omissions that create a misleading impression . . . only in hindsight."  *Zucker v. Quasha*, 891 F. Supp. 1010, 1017 (D.N.J. 1995), *aff'd*, 82 F.3d 408 (3d Cir. 1996).

Rather, to plead an omissions claim under Section 11, a plaintiff must identify a duty on the part of the defendants to disclose the allegedly omitted

information.  Where—as here—Plaintiffs do not assert that Defendants were otherwise required to disclose any of the omitted information by statute or regulation, "disclosure is required only when necessary to make . . . statements made, in light of the circumstances under which they were made, not misleading." *Turnofsky ,*2023 WL 4527553, at *7.  As the Third Circuit has explained, "a defendant is not required to disclose all known information, but only information that is necessary to make other statements not misleading." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 277 (3d Cir. 2004).[10]

Plaintiffs contend that the absence of several supposed details of the MEFAs and associated risks rendered the Offering Documents false and misleading.  (¶ 57) These alleged omissions fall into three principal categories:  (1) specific details about the MEFAs, including that the SPVs were borrowers or that NYDIG was the lender (*see, e.g.*, ¶¶ 57(1), 57(5), 58, 60); (2) specific details as to the loans, including the collateral pledged (¶ *see, e.g.*, 57(2)–(3)); and (3) the risk that the SPVs would be unable to service their loans, and the associated negative effects on Iris's business (*see, e.g.*, ¶¶ 54, 57(4), 57(6), 58, 59).

---

[10] Likewise, for purposes of Section 12(a)(2), an omission is actionable only if a prospectus "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading."  15 U.S.C. § 77l(a)(2).

As explained in greater detail below, none of these purported omissions rendered the Offering Documents materially misleading. Each category rests on the premise that the Offering Documents should have disclosed additional details about the SPV structure—a structure designed to protect against loss by confining exposure to the SPV in the event of a loan default. Plaintiffs claim that these additional undisclosed details about the SPV structure somehow made the SPV structure less protective. But setting aside whether Plaintiffs are correct about this (and they are not), there is nothing misleading about the Offering Documents' disclosures. That is because the Offering Documents never promote the protection the SPV structure provides at all. Rather, the Offering Documents address the loans at a high level of generality, describing IEL together with the SPVs and describing the potential impact of a default collectively. As shown below, there would be no reason to disclose any alleged shortcomings with the SPV structure because the Offering Documents never touted the structure's advantages (as beneficial as they were) to investors in the first place.

### a. Defendants Amply Disclosed the Financing and Its Terms

Plaintiffs first contend that the Offering Documents did not sufficiently disclose details about the financing, including that the SPVs were the borrowers or that NYDIG was the lender. But Plaintiffs have failed to identify anything misleading about the relevant disclosures in the Offering Documents.

17

The Offering Documents' description of the MEFAs and associated risks was materially accurate and complete.  Iris disclosed the amount of the loan facilities, the amount of funds borrowed under the loans, the interest rate, payment schedule, due date, and the fact that they were "secured by the financed mining units purchased with the loans" (¶ 53).  *See also supra* p. 6.

Iris also extensively disclosed the risks associated with these loans, including by warning that due to the "significant volatility" of Bitcoin (Pr. 14, 31), "there can be no guarantee that future mining operations will be profitable," (Pr. 164, 204); "[w]e may be unable . . . to repay the principal and interest on our indebtedness and capital commitments" (Pr. 14, 30); and, as a result, "[w]e may be required to limit growth, seek additional capital, sell assets, or restructure or refinance our indebtedness" or ultimately "be forced into bankruptcy, insolvency or liquidation."  (Pr. 30; *see also id.* at 49)

Plaintiffs do not identify any statement in the Offering Documents that was rendered misleading in any way by the SPVs' role in the financing.  As explained above, the Offering Documents do not identify the SPVs' role in the financing, and generally did not describe the specific roles of other legal entities within the consolidated corporate group (which, again, was defined to include the SPVs). Plaintiffs fail to plead any facts showing that there was any risk uniquely associated with the SPVs' role as borrowers.  If anything, as explained above and

below (*see supra* p. 10; *infra* p. 19), structuring the debt by having the SPV as the borrower ***protected*** IEL in the event of a default.  Plaintiffs suggest that Iris did not disclose the risk that a default by the SPVs would affect its "operating capacity, power costs, cash flows, and profitability."  (¶¶ 58, 59)  But that is wrong: The Offering Documents disclosed precisely these risks and others associated with energy costs, cash flow, and the going concern warning.  (Pr. 31, 37, 41–42, 54, 68, 104; *see Jaroslawicz v. M&T Bank Corp.*, 296 F. Supp. 3d 670, 676 (D. Del. 2017) ("[T]he court need not accept as true allegations in the complaint contradicted by documents on which the complaint relies."))

Plaintiffs contend that Iris somehow concealed "increased counterparty risk" by not disclosing that some of Iris's mining equipment that was financed by third-party lenders was owned by SPVs.  (¶ 57(1) (quoting Pr. 11))  But this makes no sense: even setting aside that the SPV structure ***lowered*** exposure in the event of default, there is no different "counterparty" risk associated with the wholly owned SPVs' ownership of the assets.  The ultimate "counterparty"—*i.e.*, the lender—is the same regardless of whether the SPV or some other Iris entity is the borrower.[11]

---

[11] The Offering Documents nowhere state, as Plaintiffs assert, that Iris "was immune from" this counterparty risk.  (¶ 57)  Nor did the SPVs' role "increase[] counterparty risk" by "outsourcing infrastructure and operations" to "third parties." (¶ 55 (quoting Pr. 6))  The SPVs were wholly owned subsidiaries, not third parties, and there is no allegation that that the operations or infrastructure were outsourced to third parties.

Plaintiffs also assert that the thorough description of the loans in the Offering Documents was misleading because it did not disclose the lender (NYDIG) or the alleged equity interest in NYDIG of Mr. Alfred, one of Iris's nonexecutive directors.  (¶ 60)  But Plaintiffs never explain how or why the identity of the lender has any relevance to the matters described in the Offering Documents, much less any basis to assert that any of the Offering Documents' disclosures were materially misleading because they did not happen to include the name of the lender.  Nor do Plaintiffs offer a basis for any duty to disclose Mr. Alfred's alleged equity interest in NYDIG.  Plaintiffs do not and cannot explain what relevance any such interest would have; how it could impact the terms of those loans, which were thoroughly disclosed in the Offering Documents; or how anything in the Offering Documents was rendered misleading by the nondisclosure of this information.

> **b.    The Offering Documents Amply Disclosed Iris's Equipment Finance Liability**

Plaintiffs have also failed to identify any actionable omission concerning the details of the loans or the collateral pledged.

First, Plaintiffs contend that Defendants should have disclosed that "the SPVs and [IEL] had the same individuals on their board and otherwise failed to maintain sufficient corporate distinctness to provide protection to Iris in the event of a default by the SPVs."  (¶ 57(2))  But again the Offering Documents never

mentioned that corporate distinctness of the SPVs would protect Iris. Rather, they disclosed the debt more generally, without specifying which entity—*i.e.*, IEL versus its wholly owned subsidiaries—was the borrower. (¶ 53) Accordingly, Iris's disclosures concerning liabilities of the Group as a whole were accurate regardless of which legal entity held them. Identifying the borrowing entities within the Group would not "have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available," and thus was immaterial. *Donald J. Trump Casino*, 7 F.3d at 369; *see also In re Synchronoss Sec. Litig.*, 705 F. Supp. 2d 367, 397 (D.N.J. 2010).

Second, Plaintiffs contend that Iris should have disclosed that it had pledged as collateral "not only . . . the bitcoin mining equipment," but also "the Bitcoin mined by the equipment and the proceeds from the sale of the Bitcoin." (¶ 57(3)) But Plaintiffs have failed to explain why an exhaustive list of the different kinds of hypothetically available collateral would matter or why it would ever matter that mined Bitcoin could be collateral. The Offering Documents never suggested that Iris's liability on the debt was limited to the value of the equipment or otherwise by the structure of the SPVs. Again, because the disclosures did not speak to that degree of detail, the omitted detail was not material, *see Donald J. Trump Casino*, 7 F.3d at 369, and no further information was needed for the disclosure regarding the corporate Group's liability for the debt to be true and not misleading. *See In re*

21

*Bank of Am. AIG Disclosure Sec. Litig.*, 980 F. Supp. 2d 564, 579 (S.D.N.Y. 2013) *aff'd*, 566 F. App'x 93 (2d Cir. 2014).

In any case, the relevant MEFAs, upon which this Court may rely, *see Winer Fam. Tr.*, 503 F.3d at 328, make clear that the actual borrowers here (the SPVs) never received nor owned any mined Bitcoin and therefore never would have had such collateral in their possession. ***IEL*** purchases the computing services from the SPVs and contributes it to the Bitcoin mining pool. (IE CA Holdings 3 MEFA, Ex. L, 8(b)) In exchange, IEL is paid by the mining pool in Bitcoin and, as Plaintiffs concede, that Bitcoin is converted to cash daily. (¶ 46, 52; Pr. 99) In contrast, the description of the Bitcoin collateral in the loan documents is limited to "all . . . Bitcoin (BTC) mined or otherwise generated by the Equipment ***and in Borrower's possession***." (IE CA Holdings 3 MEFA, Ex. L, 3(d)). In the end, there is no allegation that the SPVs—who were the borrowers—ever received or owned any mined Bitcoin. Accordingly, the lender could never have foreclosed on it under the terms of the agreement.

### c. Plaintiffs Fail to Allege the SPVs Could Not Service Their Debt

Finally, Plaintiffs contend that the Offering Documents should have disclosed that the SPVs "were not capable of producing sufficient cash flow to service their respective debt financing obligations." (¶ 57)

But Iris plainly disclosed this exact risk, stating the Group may be "unable to maintain a level of cash flows from operating activities sufficient to permit us to repay the principal and interest on our indebtedness and capital commitments," (Pr. 30) and warned "significant uncertainties exist about our ability to continue as a going concern, citing our dependence on maintaining sustained positive free cash flow . . . and raising additional capital to fund the purchase of remaining mining hardware" (Pr. 49; *see also id.* at 158, 163, 204)

Nor can Plaintiffs plausibly contend that the Offering Documents misrepresented some then-existing fact. Plaintiffs plead no facts plausibly showing that at the time of the IPO, the SPVs "were not capable of producing sufficient cash flows to service their" debts. To the contrary, there is no dispute that one of the two MEFAs in existence at the time of the IPO was subsequently repaid in full,[12] and payments were made on the other for more than a year until, after Bitcoin's price precipitously declined, the SPVs received a default notice in November 2022. *See supra* pp. 11–12.

## B.    Plaintiffs Have Failed to Plead Any Actionable Misstatement of Goodwill

Plaintiffs also contend that the "goodwill" reported as an asset in the

---

[12] The third SPV did not close its debt financing until March 2022. (IE CA Holdings 4 MEFA, Ex. K)

Offering Documents was overstated because it allegedly "required further impairment reductions due to problems afflicting the SPVs," including that Iris's mining equipment allegedly "did not have the capacity or ability to generate enough revenue to service the debt" financing the equipment.  (¶¶ 61–67, 68, 70–72)  That theory fails for several independent reasons.

### 1.    Plaintiffs Have Failed to Plead an Actionable Misstatement of Opinion

As an initial matter, the goodwill figure reported in the Offering Documents is an opinion, and Plaintiffs fail to plead any actionable misstatement of opinion.

Goodwill estimates are "opinion statements because they depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact." *Behrmann v. Brandt*, 2020 WL 4432536, at *8 (D. Del. July 31, 2020); *see also Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 669–70 (D.N.J. 2021) (valuation of inventory and revenue constituted opinion where compliance with IFRS standards for valuation required defendant to "exercise a significant amount of judgment").  Consistent with this well-established law, the Offering Documents made clear Iris's goodwill estimates reflected the use of assumptions. (¶¶ 64, 67 (quoting Pr. 97, 180–81))

A statement of opinion is actionable only "if it: (i) was not sincerely believed when made; (ii) contains an expressly embedded, untrue factual assertion; or (iii) reasonably implies untrue facts and omits appropriate qualifying language."

*City of Warren Police and Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 686 (3d Cir. 2023) (summarizing the three prongs of opinion liability recognized in *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus.*, 575 U.S. 175 (2015)).

Plaintiffs have not met their burden of pleading that Iris's reported goodwill was an actionable statement of opinion. By expressly disclaiming that their Section 11 and Section 12(a)(2) claims rely on "any allegation of fraud, recklessness or intentional misconduct" (¶¶ 186, 195), Plaintiffs have "conceded that the opinions expressed in the challenged statements were 'honestly held' for purposes of *Omnicare*." *SEPTA v. Orrstown Fin. Servs., Inc.*, 2022 WL 3572474, at *49 (M.D. Pa. Aug. 18, 2022). That is fatal to any potential liability under the first prong of *Omnicare*. Under *Omnicare*'s second prong, there is no potential liability because Plaintiffs identify no factual assertion "expressly embedded" in Iris's reported goodwill—which is instead simply a single (Australian) dollar amount as of June 30, 2021. *See Behrmann*, 2020 WL 4432536, at *8 (holding plaintiffs' allegation that defendant should have taken goodwill impairment earlier was not an allegation that the supporting facts underlying goodwill calculation were false).

Under *Omnicare*'s third prong, Plaintiffs fail to plead facts plausibly showing any material omission bearing on Iris's reported goodwill. To the extent Plaintiffs are arguing that the Offering Documents failed to disclose that the SPVs

25

were unable to service their debt, Plaintiffs have not only failed to plead facts plausibly supporting that allegation, but the facts cognizable on this Motion show that the monthly debt payments were being paid at the time of the IPO (and for more than a year thereafter, despite Bitcoin's decline). *See supra* pp. 11–12.[13]

### 2.    Plaintiffs Fail to Plead Materiality

Even if Plaintiffs' contention about Iris's goodwill were otherwise actionable—which it is not for the reasons set forth above—the amount at issue is so small as to be immaterial as a matter of law.

Although Plaintiffs assert the Prospectus disclosed 880 ***million*** Australian dollars in goodwill (¶ 66), this amount is wrong. The actual disclosure—as reprinted in the Complaint—reports only 880 ***thousand*** Australian dollars in goodwill: less than 0.5% of Iris's total assets of 179,521,000 Australian dollars, and about 1.1% of Iris's net loss of 79,682,000 Australian dollars, as of the same date. (Pr. 159–60) This *de minimis* amount is "immaterial as a matter of law."

---

[13] Plaintiffs also contend that Iris's goodwill was misstated because IFRS accounting standards purportedly required an impairment against goodwill due to the SPVs' alleged "inability . . . to adequately service their debt obligations." (¶ 72) But Plaintiffs fail to plead facts from which to plausibly infer the SPVs could not service their debt obligations at the time of the IPO. Indeed, Plaintiffs themselves allege the SPVs serviced their debt for nearly a year after the IPO (¶ 138)—a concession that undercuts their own claim. Put simply, there was no "inability . . . to adequately service" debt, and no need to record any impairment, at the time of the IPO.

*See In re Westinghouse Sec. Litig.*, 90 F.3d 696, 714–15 (3d Cir. 1996).[14]

## II.    Plaintiffs' Claims Under Section 10(b) of the Exchange Act and Rule 10b-5 Should Be Dismissed

Plaintiffs' claims under the Exchange Act likewise fail to state a claim.

To state a claim for securities fraud under Section 10(b) of the Exchange Act and SEC Rule 10b-5, Plaintiffs must allege "(1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *In re Hertz Glob. Holdings Inc*, 905 F.3d 106, 114 (3d Cir. 2018).

---

[14] Plaintiffs also allege that Iris's financial condition was overstated in the Offering Documents because it claimed purportedly excessive input tax credits and subsequently was assessed $1,215,000 by the Canadian authorities after the IPO. (¶ 63)  But that does not suffice to plead that Iris's financial statements were false or misleading ***at the time they were made***.  Iris was under no obligation to predict—much less disclose—that the Canadian authorities may later adjust its tax calculation.  *See SLF Holdings, LLC v. Uniti Fiber Holdings, Inc.*, 499 F. Supp. 3d 49, 60 (D. Del. 2020), *aff'd*, 2022 WL 3442353 (3d Cir. Aug. 17, 2022) ("There is no duty to disclose specific 'litigation risks' that were not 'substantially certain to occur.'").  In any event, Iris disclosed that "[u]ncertainties exist with respect to the interpretation of complex tax regulations . . . [such that] some or all of the carrying amounts of recognized deferred tax assets and liabilities may require adjustment, resulting in a corresponding credit or charge to the consolidated statement of profit or loss and other comprehensive income/(loss )," (Reg. 170), and "an interpretation of relevant taxation laws by a taxation authority that differs to [Iris's] interpretation may lead to an increase in our taxation liabilities" (Reg. 76).

Under the PSLRA, Exchange Act claims under Section 10(b) face unusually heightened pleading requirements to "weed out unmeritorious securities lawsuits" at the outset. *Credit Suisse Sec. (USA) LLC v. Billing*, 551 U.S. 264, 284 (2007); *see also In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 277 (3d Cir. 2010) (discussing the PSLRA's "exacting and distinct pleading requirements"). First, a complaint must "specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading." 15 U.S.C. § 78u–4(b)(1). This requirement complements Rule 9(b) of the Federal Rules of Civil Procedure, which also applies to Section 10(b) claims and requires Plaintiffs to "state with particularity the circumstances constituting fraud." Fed. R. Civ. P. 9(b). The PSLRA also imposes a uniquely high pleading burden on scienter, mandating that complaints must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u–4(b)(2).

Plaintiffs' Exchange Act claims fail to meet this burden for two independent reasons. First, as with their Securities Act claims, Plaintiffs fail to plead facts showing that any of the challenged statements was false or misleading, particularly under the PSLRA's heightened pleading standards. Second, Plaintiffs fail to plead facts giving rise to the PSLRA's requisite "strong inference" of scienter.

28

## A.    Plaintiffs Fail to Plead an Actionable Misstatement or Omission

Plaintiffs have failed to plead any actionable misstatements or omissions, much less with the particularity required by the Reform Act.

### 1.    Plaintiffs Have Failed to Plead an Actionable Omission

As under the Securities Act, "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 174 (3d Cir. 2014).[15]  Thus, as with the Securities Act, "non-disclosure of material information will not give rise to liability under Rule 10b-5 unless the defendant had an affirmative duty to disclose that information." *Oran v. Stafford*, 226 F.3d 275, 285 (3d Cir. 2000).  Here, Plaintiffs fail to establish any duty of disclosure, including because no allegedly omitted information rendered an affirmative disclosure misleading.

#### a.    The Equipment Financing Disclosures Were Accurate and Complete

Plaintiffs challenge statements about Iris's equipment financing throughout the putative class period.  Because all of those disclosures were accurate and complete, Plaintiffs have failed to plead an actionable omission.

***February 2022***: Plaintiffs first challenge various statements made in February 2022 (¶¶ 74–85) that are substantively similar to challenged statements in

---

[15] A "common" materiality standard applies to Securities Act and Exchange Act claims.  *In re Merck & Co., Inc. Sec. Litig.*, 432 F.3d 261, 273 (3d Cir. 2005).

the Offering Documents.  (*Compare* ¶ 51 *with* ¶ 81)  Plaintiffs contend they were

misleading by omission for a subset of the same reasons (*compare* ¶ 57 *with*

¶ 82)—*e.g.*, because they did not identify the SPVs as the borrowers or NYDIG as

the lender and did not identify mined Bitcoin as collateral.  These claims fail for

the same reasons discussed above, *see supra* pp. 13–23, particularly under the

PSLRA's heightened standard.

   ***March 2022 and Later***: Plaintiffs also challenge a number of statements in

March 2022 and thereafter. (¶¶ 87, 88, 94, 96, 97, 106, 116–123)  Although these

statements ***did*** specify that the SPVs were the borrowers and that NYDIG was the

lender (*i.e.*, much of the information Plaintiffs claim was omitted from the Offering

Documents), as well as a host of other information and risk factors, Plaintiffs

complain that Iris should have disclosed more.

   In particular, Plaintiffs challenge opinions expressed by the Exchange Act

Defendants regarding the terms of the MEFAs (*e.g.*, ¶¶ 88–89, 96–98, 105-106,

114–118), including that the debt was "limited recourse" (¶ 94) or "all on a non-

recourse ring-fenced basis secured against some of the computers that we

procured" (¶ 96).  Plaintiffs contend these proffered views were misleading

because (1) Iris did not also disclose that the SPVs had "pledg[ed] the Bitcoin

mined (and proceeds from the sale of Bitcoin) as collateral, not just the mining

equipment (computers)" (¶ 90; *see also* ¶¶ 95, 99, 103, 125–129); or (2) Iris did not

"disclose that the SPVs were not maintaining corporate formalities or distinctness from Iris, thus subjecting Iris to potential liability for the debts of the SPVs" (¶ 95; *see also* ¶ 103).[16]

But for a number of reasons, there was nothing misleading about these statements. As exhaustively set forth above, Iris disclosed a host of information about the loans, including risks posed by the loans and the potentially serious impact on the Group should an SPV default. *See supra* pp. 18–19. As to these specific statements, there is no dispute that they were literally true—the loans are non-recourse and were "secured by some of the computers obtained with the proceeds of the loans." Plaintiffs themselves refer to the borrowers as "Non-Recourse SPVs" and to the loans as "limited recourse facilities." (¶ 138) Nor was there any duty to disclose mined Bitcoin as an alternative, hypothetical form of collateral. As set forth above, the SPVs never received nor owned any mined Bitcoin under the plain terms of the relevant documents, and therefore no Bitcoin collateral was ever available. *See supra* p. 22.

---

[16] Plaintiffs also reprise their contention that Iris had a duty to disclose that Mr. Alfred owned equity in NYDIG, the equipment lender (¶¶ 91, 92, 95), but this claim fails for the same reasons addressed above. Plaintiffs fail to explain how this fact would have mattered to an investor, much less how its omission rendered any disclosure misleading or otherwise is actionable. *See supra* p. 20.

Moreover, the challenged disclosures regarding the legal effect of the SPV structure are inactionable statements of legal opinion. *See*, *e.g.*, *Omnicare*, 575 U.S. at 194 (holding that issuer's legal opinions regarding legal compliance were subject to opinion liability); *see also Moreno v. Wells Fargo Home Mortg.*, 2015 WL 3486996, at *6 (E.D. Cal. June 2, 2015). Plaintiffs fail to plead—much less with the required specificity—that the views expressed on this topic were "not sincerely believed when made; (ii) contai[ned] an expressly embedded, untrue factual assertion; or (iii) reasonably impl[ied] untrue facts and omi[tted] appropriate qualifying language." *Prudential Fin.*, 70 F.4th at 686. Instead, they contend only that the SPVs' adversaries in post-class-period litigation in Canada have advanced a competing legal interpretation (¶ 126). But a self-interested position later taken by adversaries in litigation cannot retroactively make Iris's honestly held legal opinions about the effect of the SPV structure actionable. *See*, *e.g.*, *Omnicare*, 575 U.S. at 194.

For many of the same reasons, there is no basis for Plaintiffs' conclusory assertion that Iris should have disclosed the SPVs were allegedly not maintaining certain corporate formalities or distinctness from IEL. Plaintiffs' contention amounts to another unsupported hindsight challenge to Iris's opinion about the legal effect of the SPV structure. *See Prudential Fin.*, 70 F.4th at 686. Plaintiffs do not even attempt to plead that the Exchange Act Defendants did not honestly

believe their expressed views about the legal effect of the SPV structure.  Nor do Plaintiffs identify any facts that would remotely support a veil-piercing allegation, much less with the required particularity.  *See N. Am. Steel Connection, Inc. v. Watson Metal Prod. Corp*., 515 F. App'x 176, 179–80 (3d Cir. 2013) (discussing the "notoriously difficult" challenge of veil-piercing).  Plaintiffs do contend that the SPVs shared directors and, to service the debt, a bank account.  (¶¶ 95, 103)  But neither contention, even if true, would support a finding of "such unity of interest and ownership that the separate personalities of the corporation and [its owner] no longer exist."  *N. Am. Steel Connection, Inc.,* 515 F. App'x at 179–80.  And more importantly, none of these support an assertion now, in hindsight, that a factually accurate description of the loans as "limited recourse" was in any way misleading.[17]

### b.     Disclosures Regarding Iris's Financial and Operational Outlook Were Accurate and Complete, and Related Projections Are Not Actionable

Plaintiffs also challenge Defendants' disclosures regarding Iris's financial and operational prospects.  But Plaintiffs' claims amount to impermissible fraud by hindsight and also fail for many of the same reasons as their other allegations.

---

[17] Similarly, Plaintiffs' sparse alleged facts do not plausibly plead an actionable concealment of litigation risk (¶ 95), including given Iris's robust risk disclosures.  *See SLF Holdings*, 499 F. Supp. 3d at 60 ("There is no duty to disclose specific litigation risks that were not substantially certain to occur.").

### i.  Projections Regarding Iris's Mining Capacity and Profits Are Not Actionable

Plaintiffs contend that illustrative projections, disclosed in February 2022, of Iris's mining capacity ("~10 EH/s") and "expected … profits of $578 million" "by early 2023" (¶¶ 76–78) "were later revealed to be false and wildly inaccurate" (¶ 79).  Plaintiffs likewise challenge subsequent projections about Iris's mining capacity (*see, e.g.*, ¶¶ 88, 106).  Plaintiffs do not offer any basis for these assertions other than that Iris did not achieve the projected mining capacity.

But it is well-established that a plaintiff cannot state a claim for securities fraud by pleading that a prediction did not come true—so called "fraud by hindsight."  *Cal. Pub. Emps.' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126, 158 (3d Cir. 2004); *accord In re NAHC, Inc. Sec. Litig.*, 2001 WL 1241007, at *11 (E.D. Pa. Oct. 17, 2001), *aff'd*, 306 F.3d 1314 (3d Cir. 2002).  "Corporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them."  *In re Nice Sys., Ltd. Sec. Litig.*, 135 F. Supp. 2d 551, 586 (D.N.J. 2001).

In fact, the PSLRA expressly "immunizes from liability"—under its safe harbor for forward-looking statements—"statements of future economic performance" and "statements of the plans and objectives of management for future operations" where, as here, they are "identified as such and accompanied by meaningful cautionary language."  *Inst'l Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242,

34

254–55 (3d Cir. 2009).  Each of the challenged disclosures therefore fall squarely

within the PSLRA's safe harbor.

- The February 2022 Disclosures expressly identified the relevant statements as forward-looking,[18] and contained extensive cautionary language warning of the risks that could impede these expectations. *See supra* pp. 8–10.
- Iris's March 28, 2022, 6K flagged the presence of forward-looking statements that were "subject to risks, uncertainties, and other factors which could cause actual results to differ materially from those expressed or implied by such forward looking statements."  (Ex. D, 6).
- Iris's May 11, 2022, conference call, in which Iris "caution[ed] listeners that forward-looking information and statements are based on certain assumptions and risk factors that could cause actual results to differ materially from the expectations of the company."  (Ex. F, 5).

Similarly, Plaintiffs challenge several statements regarding Iris's "expected"

trajectory, such as: Defendants believed Iris was "on track to be one of the largest

listed Bitcoin miners with 15 EH/s3 of hardware secured" (¶¶ 74, 83); Defendants

were "looking forward to the upcoming 12 to 18 months, which we expect will be

transformational for the Company" (¶ 83); and Defendants' description of Iris's

"strategy to mitigate . . . risks and uncertainties" (¶ 85).  These statements are also

immunized from liability by the PSLRA's safe harbor for forward-looking

statements.  *See supra* pp. 34–35.  Further, these "general statements of optimism,"

---

[18] Iris expressly disclaimed the projections of mining capacity as "for illustrative purposes only . . . based on historical information which may or may not materialize in the future," and with "no guarantee that they will be achieved." (Ex. C, 27)

*In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, n.14 (3d Cir. 1997), and

statements that a company is "on track" to a goal or expects "transformational"

growth are inactionable puffery. *See City of Edinburgh Council v. Pfizer, Inc.*, 754

F.3d 159, 173 (3d Cir. 2014). So too are Defendants' statements discussing

"strategy" and professing "competitive advantages." (¶ 77; *see also* ¶ 76) *See In re*

*Advanta Corp. Sec. Litig.*, 180 F.3d 525, 537–38 (3d Cir. 1999).

> ### ii.   Iris Amply Disclosed the Risks to Its Cash Flows and Risks to Its Power Supply and Energy Costs

Finally, Plaintiffs contend again that Iris did not adequately disclose the risk

that the SPVs would not have sufficient cash flows to service their debt and

maintain operations. (*See e.g.*, ¶¶ 90, 103, 125, 130) But this assertion ignores

Iris's actual disclosures throughout the relevant period.

Iris's post-IPO disclosures were accompanied by extensive risk disclosures

reiterating Iris's prior warnings about its ability to maintain positive cash flows, the

possibility and consequence of default on the MEFAs, the risks associated with

Bitcoin mining, and the fluctuations in power supply and price. (Mar. 28, 2022,

6K, Ex. D, 6; May 11, 2022, 6K, Ex. E, 7–8, 12; June 7, 2022, 6K, Ex. G, 11–12;

June 21, 2022, 6K, Ex. H, 8–9; Sept. 13, 2022, 6K, Ex. J, 8–9, 13; *see also supra* p.

18). Iris updated its risk disclosures still further in September 2022, including by

warning that if Iris "cannot sustain greater revenues than our operating costs, we

will incur operating losses, which could adversely impact our operations, strategy and financial performance" (Ex. I, 12, 14), and "[a]ny . . . limitation of electricity supply or increase in electricity cost could materially impact our operations and financial performance." (*Id.* at 13–14) These robust risks warnings squarely address the very risks Plaintiffs claim were concealed.[19]

### 2.    Plaintiffs Have Failed to Plead Any Actionable Misstatement of Goodwill

Plaintiffs also reprise their contention that Iris's reported goodwill was overstated, including as of June 30, 2022, when plaintiffs allege that Iris reported goodwill of "$634 million." (¶ 108) But Plaintiffs again misstate Iris's goodwill by a factor of a thousand. In fact, Iris reported *de minimis* goodwill of $634,000 as of June 30, 2022, according to Plaintiffs' pleadings. (¶ 108 ("[T]he Group impaired its ***goodwill of $603,000*** to $nil."); *see also* Feb. 15, 2022, 6K, Ex. M, 49)

This challenge to Iris's goodwill thus fails for the same two reasons

---

[19] As noted above, *see supra* n. 7, Plaintiffs also offer the rank speculation that the SPVs were suffering from some unspecified "material problems" that they claim Iris or Daniel Roberts should have disclosed. (¶ 125) But this nonspecific allegation—based as it is on a chain of unsupported inferences, *see supra* n. 7— does not remotely satisfy the PSLRA's requirements for pleading an actionable omission. Plaintiffs offer no clues as to what they believe the supposed "material problems" were or how the actual disclosures—including the existing, robust risk disclosures described in the text—were at all misleading by omission.

previously stated.  First, Plaintiffs fail to plead any facts to suggest the goodwill opinion was not sincerely believed when disclosed, contained an expressly embedded, untrue factual assertion, or was misleading by omission.  *See supra* p. 24–26; *see also In re Ascena Retail Grp., Inc. Sec. Litig.*, 2022 WL 2314890, at *6 (D.N.J. June 28, 2022) (granting motion to dismiss Section 10(b) claim for failure to allege goodwill statements were false under *Omnicare*).  Plaintiffs argue that Iris's goodwill was "worthless" as of June 30, 2022, because Iris **subsequently** wrote down its goodwill to zero as of December 30, 2022.  (¶ 108)  But Plaintiffs plead no facts showing that Iris's goodwill was impaired as of June 30, 2022 or earlier.  Significantly, all three of the SPVs were continuing to make timely payments on their loans as of that date.  *See supra* p. 2.  Second, corrected for Plaintiffs' error, the amounts here are *de minimis* and immaterial as a matter of law.  *See supra* pp. 26–27.[20]

## B.    Plaintiffs Fail to Plead Scienter

Even if Plaintiffs could allege an actionable misstatement or omission—which they cannot—their Exchange Act claim would still fail for the independent

---

[20] Plaintiffs' Exchange Act claim regarding Iris's tax accounting also fails for the reasons already discussed.  Iris had no duty to disclose at the time that it faced a risk of a future tax assessment.  *See SLF Holdings*, 499 F. Supp. 3d at 60 ("There is no duty to disclose specific litigation risks that were not substantially certain to occur.").  Nor do Plaintiffs allege any facts plausibly showing the tax treatment Iris employed made a future assessment "substantially certain" to occur.

reason that Plaintiffs have failed to plead particularized facts giving rise to a
"strong inference" that any defendant acted with the requisite scienter—*i.e.*, a
"mental state embracing intent to deceive, manipulate, or defraud"—and "a
knowing or reckless state of mind." *Avaya, Inc.*, 564 F.3d  at 252, 267.  The
requisite "strong inference" must be "more than merely 'reasonable' or
'permissible'—it must be cogent and . . . at least as compelling as any opposing
inference one could draw from the facts alleged." *Tellabs, Inc. v. Makor Issues &
Rights, Ltd.*, 551 U.S. 308, 324 (2007).

Plaintiffs' allegations of scienter are insufficient, either individually or
collectively, to give rise to the necessary "strong inference."  Indeed, what is
missing from Plaintiffs' complaint speaks more powerfully to the issue than the
little that is alleged.  For all its length, the Amended Complaint is completely
devoid of the kinds of allegations typically needed to plead scienter, such as
allegations of Individual Defendants ***actually trading*** in Iris's stock (let alone
suspicious trading) as opposed to holding large amounts of stock; or credible,
relevant allegations based on internal documents or confidential witnesses.[21]

---

[21] Plaintiffs allege that Messrs. Roberts signed Sarbanes-Oxley Certifications
in connection with the 2022 20-F.  (¶ 199) But "[a]n allegation that a defendant
signed a SOX certification attesting to the accuracy of an SEC filing that turned
out to be materially false does not add to the scienter puzzle in the absence of any
allegation that the defendant knew he was signing a false SEC filing or recklessly

Instead, Plaintiffs rely on conclusory allegations and baseless speculation about the Individual Defendants' intent.[22] (*See* ¶¶ 151–160)  That is insufficient under the "PSLRA's '[e]xacting' pleading standard for scienter."  *Avaya, Inc.*, 564 F.3d at 253 (citing *Tellabs*, 551 U.S. at 321).  This utter absence of any particularized allegations supports the opposing inference of no scienter.  In fact, the obvious inference that *can* be drawn from Plaintiffs' allegations is that Defendants' numerous warnings about Iris's future, as catalogued above, materialized when the Bitcoin market turned.

### 1.    Plaintiffs' Allegations of Temporal Proximity Do Not Plausibly Show Scienter

Plaintiffs ask the Court to infer scienter based solely on allegations that a challenged statement is followed by a supposedly inconsistent event.  But this does not constitute particularized facts giving rise to a "strong inference" of scienter. *See Castlerock Mgt., Ltd. v Ultralife Batteries, Inc*., 68 F. Supp. 2d 480, 488

---

disregarded inaccuracies contained in an SEC filing."  *Hertz Glob. Holdings Inc*, 905 F.3d at 118.

[22] Plaintiffs also rely on meritless insinuation—namely, a stray allegation that Mr. "Allfred [sic] had earned the nickname Mike 'All-fraud'" at a different company.  (¶ 92) This Court should disregard that allegation, both because it is irrelevant and because Plaintiffs have relied on a statement from a confidential witness while failing to provide any "detail" as to this statement or to plead any facts to establish "the source's basis of knowledge, the reliability of the source, the corroborative nature of the other facts alleged, including from other sources, the coherence and plausibility of the allegations, and similar indicia."  *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 244 (3d Cir. 2013).

(D.N.J. 1999) ("[A]lleging in a wholly conclusory fashion that an inference of defendants' knowledge can be drawn based on the mere lapse of time between the release of the Offering documents [on May 12, 1998] and the disclosure of the production problems announced on June 11, 1998, with nothing contemporaneous to support that conclusion, is insufficient.").

Thus, even setting aside that there was nothing even arguably misleading by omission about Daniel Roberts's September 13, 2022 statements regarding the continuing profitability of Bitcoin mining (given, among other things, the stark risk warnings that accompanied those statements), Plaintiffs cannot plead scienter merely by alleging—as they do—that those statements were followed in October 2022 by negotiations over the SPVs' debt.  Nor can scienter be inferred from allegations that six weeks after the same September 13, 2022 statements, the lender declared an event of default.  Nothing about the subsequent debt negotiations and default cast doubt on the truth of the statements that, as of mid-September 2022, Iris was "mining Bitcoin at $8,000 a coin, locking that profitability [in]" (¶ 158)— particularly since there is no dispute that the SPVs were still servicing their debts at the time.  In any event, those sequences fail, as a matter of law, to plead scienter as to any one Individual Defendant, much less—as Plaintiffs contend—four Individual Defendants.  (*Id.*)

### 2. Defendants' Positions on the SPV Boards Do Not Create An Inference of Scienter

Plaintiffs assert that because certain individual Defendants served on the Board of Directors of both IEL and the SPVs, each had actual knowledge of the SPVs' cash flow, financing agreement terms and collateral, and ability to pay the loan amounts.  (¶ 153)  But "allegations that a securities-fraud defendant, because of his position within the company, must have known a statement was false or misleading are inadequate to meet the PSLRA pleading standard."  *In re Milestone Sci. Sec. Litig.*, 103 F. Supp. 2d 425, 470 (D.N.J. 2000); *accord Nice Sys., Ltd.*, 135 F. Supp. 2d at 587.

### 3. The Roberts' Stock Ownership Dramatically Undermines Any Inference of Scienter Here

Plaintiffs allege that, because Daniel and Will Roberts held shares of Iris stock ***both*** before ***and*** after the IPO, they had a motive to commit fraud to benefit themselves as shareholders.  (¶ 159)  Not only is this theory insufficient to plead scienter, it supports the ***opposite*** inference.  Plaintiffs do not (and cannot) allege that either Defendant sold any of his stock prior to the date on which "the truth" is alleged to have "emerge[d]."  Neither Defendant therefore gained or attempted to gain any benefit from the challenged statements.  To the contrary, as Iris's largest

shareholders throughout the alleged class period, the Roberts' incentives were aligned with the very shareholders who would form the putative class.[23]

### 4. Plaintiffs' Core Product Doctrine Allegations Are Insufficient to Establish Scienter

Finally, Plaintiffs posit that because Iris had one business segment—the mining and sale of Bitcoin—and because the alleged misstatements and omissions relate to that product, all Defendants must have known that their statements were false or misleading. But this too is insufficient to plead scienter, absent "some additional allegation of specific information conveyed to management and related to the fraud." *Hall v. Johnson & Johnson*, 2019 WL 7207491, at *21 (D.N.J. Dec. 27, 2019); *accord Martin v. GNC Holdings, Inc.*, 2017 WL 3974002, at *14 (W.D. Pa. Sept. 8, 2017), *aff'd*, 757 F. App'x 151 (3d Cir. 2018).

## III. Plaintiffs Fail to Plead "Controlling Person" Liability under Section 15 of the Securities Act or Section 20(a) of the Exchange Act

To establish "controlling person" liability under Section 15 of the Securities Act or Section 20(a) of the Exchange Act, Plaintiffs must plead that (1) a Defendant "controlled another person or entity," and (2) "the controlled person or

---

[23] Opportunistically timed ***sales*** of stock can constitute evidence of motive and opportunity to commit fraud, which can support an inference of scienter, but is not sufficient for one. *Avaya, Inc.*, 564 F.3d at 277. But there were no sales here. *Cf. City of Roseville Emps.' Ret. Sys. v. Horizon Lines, Inc.*, 713 F. Supp. 2d 378, 398 (D. Del. 2010) ("The mere fact that defendants had access to stock options . . . can hardly form the basis for a strong inference of scienter."), *aff'd*, 442 F. App'x 672 (3d Cir. 2011).

entity committed a primary violation of the securities laws." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 284 (3d Cir. 2006). In addition, Plaintiffs must plead that the defendant was a "culpable participant" in the primary violation. *Id.* at n.16 (Section 20(a)); *Duncan v. Vantage Corp.*, 2019 WL 1349497, at *5 (D. Del. Mar. 26, 2019) (Section 15).

Plaintiffs' control person claims here fail for two reasons. First, as shown above, Plaintiffs have "failed to establish any primary violations of the federal securities laws," and thus "necessarily [have] failed to establish control person liability as well." *Tracinda Corp. v. DaimlerChrysler AG*, 502 F.3d 212, 236 n.18 (3d Cir. 2007). Second, Plaintiffs' control person claims also fail for the independent reason that they have not alleged any Individual Defendant culpable participated in any violation by Iris. Plaintiffs primarily rest their claims on the Individual Defendants' "senior positions" at Iris (¶ 181), or service on its Board (¶ 153), as well as related allegations that they "signed or authorized the signing of the Registration Statement filed with the SEC" (¶¶ 22, 27–29), and conducted "all operational matters" (¶ 153), including "sign[ing] and/or approv[ing]" the agreements at issue (¶ 154–155).

These allegations do not come close to satisfying Plaintiffs' burden to show any Defendant culpably participated in a primary violation. To plead culpable participation, Plaintiffs must plead facts showing that a "defendant's action or

44

inaction was deliberate and done intentionally to further the fraud." *In re Merck & Co., Inc. Sec., Derivative & Erisa Litig.*, 2012 WL 3779309, at *9 (D.N.J. Aug. 29, 2012). "[M]ere reliance on a person's title or management role within a company will not suffice . . .. Likewise, Plaintiffs' emphasis on the general oversight responsibilities and positions of authority of the control person . . ., without some more concrete factual allegation about knowledge they possessed or would have possessed in the course of performing their job duties, does not meet the PSLRA's standard for wrongful state of mind." *Id.* at *11 (dismissing Section 20(a) claims).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the First Amended Complaint be dismissed with prejudice for failure to state a claim upon which relief can be granted.

Dated:  August 4, 2023

Respectfully submitted,

**GIBBONS P.C.**

*s/ Samuel I. Portnoy*
Samuel I. Portnoy
Christina M. LaBruno
One Gateway Center
Newark, New Jersey 07102
(973) 596-4500
sportnoy@gibbonslaw.com
claburno@gibbonslaw.com

**DAVIS POLK & WARDWELL LLP**

Edmund Polubinski III (*pro hac vice*)
Mari Grace (*pro hac vice*)
450 Lexington Avenue
New York, NY 10017
(212) 450-4000
edmund.polubinski@davispolk.com
mari.grace@davispolk.com

*Counsel for Iris Energy Limited,*
*Daniel Roberts, William Roberts,*
*David Bartholomew, Christopher*
*Guzowski, and Michael Alfred*

**SKADDEN, ARPS, SLATE MEAGHER & FLOM LLP**

*s/ Scott D. Musoff*
Scott D. Musoff
One Manhattan West
New York, NY 10001
(212) 735-7872
scott.musoff@skadden.com

*Counsel for J.P. Morgan Securities LLC, Cannacord Genuity LLC, Citigroup Global Markets Inc., Macquarie Capital (USA) Inc., Cantor Fitzgerald & Co., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC*

47