COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone:  (201) 845-9600
Facsimile:   (201) 845-9423

*Liaison Counsel for Lead Plaintiffs*

[Additional counsel listed on signature page]

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT STERLING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, DAVID BARTHOLOMEW, CHRISTOPHER GUZOWSKI, MICHAEL ALFRED, J.P. MORGAN SECURITIES LLC, CANACCORD GENUITY LLC, CITIGROUP GLOBAL MARKETS INC., CANTOR FITZGERALD & CO., GALAXY DIGITAL PARTNERS LLC, COMPASS POINT RESEARCH & TRADING, LLC, and MACQUARIE CAPITAL (USA) INC.,<br><br>Defendants. | Case No. 2:22-cv-7273-CCC-MAH<br><br>Class Action<br><br>The Honorable Claire C. Cecchi<br><br>RETURN DATE:  December 4, 2023<br><br>ORAL ARGUMENT REQUESTED |

**Lead Plaintiffs' Memorandum of Law in Opposition to
Defendants' Motion to Dismiss the Lead Plaintiffs'
First Amended Complaint**

# Table of Contents

PRELIMINARY STATEMENT ................................................................ 1

BACKGROUND ................................................................................... 3

I.      Iris Energy and Its IPO ............................................................ 3

II.     False and Misleading Statements in the Offering Documents ............ 4

III.    False and Misleading Statements During the Class Period ................ 7

IV.     The Emergence of the Truth ..................................................... 8

LEGAL STANDARD ........................................................................... 11

ARGUMENT ...................................................................................... 13

I.      The FAC States a Claim for Violations of Sections 11 and
        12(a)(2) of the Securities Act ................................................... 13

        A.      Defendants Failed to Disclose Increased Counterparty
                Risk ......................................................................... 14

        B.      Defendants' Remaining Arguments Regarding the
                Counterparty Risk and Cash Flow Miss the Mark .................... 19

        C.      Defendants Made False and Misleading Statements
                Regarding Goodwill ....................................................... 22

II.     The FAC States a Claim for Violations of Section 10(b) of the
        Securities Exchange Act and Rule 10b-5 Promulgated
        Thereunder .......................................................................... 24

        A.      The FAC Alleges Multiple Misrepresentations and
                Omissions of Material Facts During the Class Period ............... 25

                1.      February 9, 2022 Form 6-K ..................................... 25

                2.      February 9, 2022 Press Release ................................ 26

                3.      March 28, 2022 Press Release .................................. 27

                4.      May 11, 2022 Form 6-K.......................................... 28

i

5.    May 11, 2022 Conference Call .......................................... 29

6.    June 7, 2022 Press Release ............................................ 31

7.    June 21, 2022 Press Release .......................................... 31

8.    September 13, 2022 Press Release ................................. 31

9.    September 13, 2022 Form 20-F ...................................... 32

10.   September 13, 2022 Conference Call ............................. 33

B.    Defendants' Arguments Fail ..................................................... 34

C.    Plaintiffs Have Sufficiently Alleged Scienter ........................... 37

III.   The FAC Adequately Alleges "Control Person" Liability Under Section 15 of the Securities Act and Section 20(a) of the Exchange Act .................................................................................. 41

CONCLUSION ........................................................................................... 43

# Table of Authorities

## Cases

*Berson v. Applied Signal Tech., Inc.,*
  527 F.3d 982 (9th Cir. 2008) ............................................................ 16, 17

*Caiola v. Citibank, N.A.,*
  295 F.3d 312 (2d Cir. 2002) ................................................................... 16

*City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.,*
  70 F.4th 668 (3d Cir. 2023) ............................................................ 24, 35

*Doe v. Univ. of the Sciences,*
  961 F.3d 203 208 (3d Cir. 2020) ............................................................ 11

*Dole v. Arco Chem. Co.,*
  921 F.2d 484 (3d Cir. 1990) .................................................................. 43

*Fowler v. UPMC Shadyside,*
  578 F.3d 203 (3d Cir. 2009) .................................................................. 12

*Herman & Maclean v. Huddleston,*
  459 U.S. 375 (1983) ............................................................................... 13

*Hickey v. Univ. of Pittsburgh,*
  ____ F.4th ____,
  2023 U.S. App. LEXIS 23650, (3d Cir. Sept. 6, 2023) .............................. 11

*In re Adams Golf, Inc. Sec. Litig.,*
  381 F.3d 267 (3d Cir. 2004) ........................................................ *passim*

*In re Facebook, Inc. IPO Sec. & Derivative Litig.,*
  986 F. Supp. 2d 487 (S.D.N.Y. 2013) .................................................... 20

*In re Quality Sys.,*
  865 F.3d 1130 (9th Cir. 2017) ............................................................... 37

*In re Stone & Webster, Inc., Sec. Litig.,*
  414 F.3d 187 (1st Cir. 2005) ................................................................. 36

*In re Van Der Moolen Holding N.V. Sec. Litig.,*
  405 F. Supp. 2d 388 (S.D.N.Y. 2005) .................................................... 20

*Institutional Investors Grp. v. Avaya, Inc.,*
  564 F.3d 242 (3d Cir. 2009) ....................................................... 36

*Johnson v. City of Shelby,*
  574 U.S. 10 (2014) ...................................................................... 11

*Matrixx Initiatives, Inc. v. Siracusano,*
  563 U.S. 27 (2011) ...................................................................... 21

*Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund,*
  575 U.S. 175 (2015) ..................................................................... 23

*S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.,*
  181 F.3d 410 (3d Cir. 1999) ........................................................ 12

*S. Ferry LP, No. 2 v. Killinger,*
  542 F.3d 776 (9th Cir. 2008) ...................................................... 38

*SEC v. Cooperman,*
  243 F. Supp. 3d 597 (E.D. Pa. 2017) .......................................... 12

*SEC v. One Or More Unknown Traders*
  *in the Sec. of Fortress Inv. Grp., LLC,*
  2018 U.S. Dist. LEXIS 167164 (D.N.J. Sep. 27, 2018) ......... 12, 43

*Skinner v. Switzer,*
  562 U.S. 521 (2011) .................................................................... 11

*Suprema Specialties, Inc. Sec. Litig.,*
  438 F.3d 256 (3d Cir. 2006) .......................................... 13, 14, 42

*Tellabs, Inc. v. Makor Issues & Rights, Ltd.,*
  551 U.S. 308 (2007) ............................................................. 37, 40

*Webb v. SolarCity Corp.,*
  884 F.3d 844 (9th Cir. 2018) ...................................................... 38

**Statutes**

15 U.S.C. § 77k ................................................................... *passim*

15 U.S.C. § 77l .................................................................... *passim*

15 U.S.C. § 77o ..................................................................... 41, 43

15 U.S.C. § 78j ................................................................................ 24, 41, 42

15 U.S.C. § 78t ................................................................................. 41, 42, 43

15 U.S.C. § 78u-4 .................................................................................. 12, 37

## Rules

Fed. R. Civ. P. 8 .......................................................................................... 11

Fed. R. Civ. P. 9 ..................................................................................... 12, 14

Fed. R. Evid. 201 ...................................................................................... 12

## Regulations

17 CFR § 240.10b-5 ................................................................................... 24

## PRELIMINARY STATEMENT

The Court should deny Defendants' motion because Lead Plaintiffs[1] have sufficiently alleged each element of their negligence-based claims under the Securities Act of 1933 (the "Securities Act") and their fraud-based claims under the Securities Exchange Act of 1934 (the "Exchange Act").

This is a securities class action on behalf of all persons who purchased or acquired (1) Defendant Iris Energy Limited ("Iris Energy" or the "Company") ordinary shares pursuant or traceable to the Offering Documents issued in connection with Iris Energy's November 17, 2021 initial public offering ("IPO");[2] or (2) Iris Energy securities between November 17, 2021, and November 1, 2022, both dates inclusive ("Class Period"). Based in Australia, Iris Energy touted itself as a leading owner and operator of institutional-grade, highly efficient, proprietary Bitcoin mining data centers powered by 100% renewable energy. ¶¶ 21, 44. On November 17, 2021, Iris Energy conducted an IPO in the United States, issuing approximately 8.27 million of its ordinary shares to the public at $28 per share. ¶ 6. The Offering

---

[1] Lead Plaintiffs are Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd. The allegations in Plaintiffs' June 6, 2023 First Amended Complaint ("FAC") are cited as "¶ ____." Unless otherwise noted, all emphases in quoted texts are added.

[2] The Offering Documents include the November 16, 2021 Registration Statement and the November 18, 2021 Prospectus. ¶¶ 4–5.

Documents contained untrue statements of material facts and omitted to state other facts necessary to make the statements made not misleading. ¶ 7. Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the Company's business, operations, and prospects. *Id.* These false and misleading statements caused Iris Energy stock to trade at artificially inflated prices during the Class Period. ¶¶ 8–9.

Since its IPO, IREN's stock price has fallen 91.7% vs. the U.S. S&P 500 index' drop of around 9.6%, as the chart below indicates:



*See* ¶ 13. When the truth of Iris Energy's financial condition and business operations came to light on November 2, 2022—less than a year after the IPO, Iris Energy's stock price plummeted to $2.88 per share—a nearly 90% decline from the $28 offering price. ¶ 10.

Plaintiffs brought this class action to recover damages resulting from Defendants' violations of the federal securities laws. As discussed below, the Court should deny Defendants' motion to dismiss the FAC.

## BACKGROUND

### I.    Iris Energy and Its IPO

Iris Energy operates as a Bitcoin mining company using primarily renewable energy to power its mining operations.  ¶¶ 2, 44.  The Company has only one operating segment—the mining of Bitcoin—and, therefore, its success depends on its ability to profitably mine and sell Bitcoin.  ¶¶ 44–45.

Iris Energy has been mining Bitcoin since 2019 and does not hold Bitcoin on its balance sheet.  ¶¶ 2, 45.  It generates revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called "Bitcoin miners" (or simply "miners") and exchanging the Bitcoin for fiat currencies such as U.S. dollars or Canadian dollars on a daily basis.  ¶¶ 3, 46.

On October 25, 2021, Iris Energy filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on November 16, 2021.  ¶ 47. On November 18, 2021, Iris Energy filed the Prospectus on Form 424B4 with the SEC, which incorporated and formed part of the Registration Statement. ¶ 48.  On November 17, 2021, Iris Energy conducted the IPO, issuing 8,269,231 shares to the public at the IPO price of $28 per ordinary share for approximate proceeds to the Company of $215 million, before expenses, and after applicable underwriting discounts and commissions.  ¶ 49.

The Offering Documents were approved by Defendants Daniel Roberts (Co-CEO), William Roberts (Co-CEO), David Bartholomew (Chairman), Michael Alfred, and Christopher Guzowski, all of whom were directors at the time. ¶¶ 22–23, 27–29, 50.[3]

Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Canaccord Genuity LLC, Cantor Fitzgerald & Co., Macquarie Capital (USA) Inc., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC (collectively, the "Underwriter Defendants") served as the underwriters of the Company's IPO. ¶¶ 32–39, 41. The Underwriter Defendants received commissions of $16,207,693 for their work on the IPO. ¶ 40. They were also allocated a greenshoe option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price. *Id.*

## II.    False and Misleading Statements in the Offering Documents

The Offering Documents represented that Iris Energy had a competitive advantage over other Bitcoin miners because it owned all its Bitcoin mining equipment, which provided it control over its assets and "more sustainable cash flows" than competitors which leased their equipment or utilized third party hosting agreements. ¶ 55. The Prospectus

---

[3] Daniel Roberts and William Roberts are collectively referred to as the "Exchange Act Individual Defendants" and, together with Bartholomew, Alfred, and Guzowski, as the "Securities Act Individual Defendants."

further stated that Iris Energy was experiencing rapid growth and was well-positioned to continue such strong revenue growth because it had secured facilities to support a targeted hashrate capacity of 15.2 EH/s.[4]  ¶ 56.

The Offering Documents, however, failed to disclose the following material information:  (1) certain of the Company's Bitcoin miners were owned through allegedly Non-Recourse SPVs which had been financed by third-party lenders, which made the Company's operations, including the mining equipment and Bitcoin mined, subject to the very "increased counterparty risk" that the Offering Documents stated Iris Energy was immune from; (2) the SPVs and Iris Energy had the same individuals on their board and otherwise failed to maintain sufficient corporate distinctness to provide protection to Iris Energy in the event of a default by the SPVs; (3) Iris Energy had not only pledged the Bitcoin mining equipment as collateral to the lender, but had also pledged the Bitcoin mined by the equipment and the proceeds from the sale of the Bitcoin as collateral; (4) the undisclosed SPVs were not capable of producing sufficient cash flow to service their respective debt financing obligations; (5) as a result, the Company's use of

---

[4] The Prospectus defined Hashrate as: "The speed at which a miner can produce computations (hashes) using eh Bitcoin network's algorithm, expressed in hashes per second. The hashrate of all miners on a particular network is referred to as the hashrate of the network."  ¶ 74 n.5.

equipment financing agreements to procure Bitcoin miners was subject to substantial risk, including counterparty risks; and (6) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition.  ¶¶ 57–58.

The Offering Documents also failed to disclose that a default by any of the three SPVs would materially increase Iris Energy's electricity costs per Bitcoin mined because the Company had in place fixed-price contracts for power; as a result, the reduction in the number of Bitcoin miners in the event of a default by the SPVs would result in higher demand charges (*i.e.,* fixed charges) per Bitcoin mined.  ¶ 59.  The Offering Documents also failed to disclose that any default by one or more of the SPVs would adversely impact the Company's operating metrics because with a lower operating capacity and increased electricity costs per Bitcoin mined, Iris Energy's revenue and operating cash flows would decline materially.  *Id.*

The Offering Documents also failed to disclose that the SPVs were financed by New York Digital Investment Group, LLC ("NYDIG") and that Defendant Alfred had a continuing equity interest in NYDIG following NYDIG's acquisition of Digital Assets Data, Inc.  ¶ 60.

In addition, the FAC alleges that the financial statements included within the Offering Documents (*see* ¶¶ 61–62) were false and misleading

because the Company's assets were overstated because Iris Energy failed to record material impairment charges to its goodwill.  ¶ 63.  The Company's financial results and condition were also overstated because Iris Energy had claimed excessive input tax credits ("ITCs") for several of its Canadian subsidiaries prior to and up to the time of the IPO but failed to remit an amount of 5% on services exported to its Australian parent under an intercompany service agreement.  *Id.*  This later resulted in Iris Energy being assessed a charge of $1,215,000 by the Canadian authorities.  *Id.*  As a result of claiming excessive ITCs prior to the IPO, Iris Energy's financial results and condition were overstated at the time of the IPO.  *Id.*

## III.  False and Misleading Statements During the Class Period

The FAC alleges the Exchange Act Defendants issued further false and misleading statements during the Class Period that omitted material facts about the SPVs' structure, the collateral pledged, and the SPVs' inability to service their debt.  These statements were made in, among other things:  (1) Forms 6-K filed on February 9, 2022, and May 11, 2022; (2) Form 20-F filed on September 13, 2022; (3) press releases issued on February 9, 2022, March 28, 2022, June 7, 2022, June 21, 2022, and September 13, 2022; and (4) conference calls held on May 11, 2022, and September 13, 2022.  ¶¶ 73–131. These misstatements and omissions are discussed in more detail below.

## IV.    The Emergence of the Truth

On November 2, 2022, Iris Energy issued a press release, disclosing that "[c]ertain equipment (*i.e.*, Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the principal amount of the relevant loans" and that "[r]estructuring discussions with the lender remain ongoing."    ¶ 133. Shockingly, the press release revealed that the secured miners owned by each of Non-Recourse SPV 2 and Non-Recourse SPV 3 in aggregate:  (1) were "currently capable of generating an indicative $2 million of Bitcoin mining monthly gross profit[], compared to aggregate required monthly principal and interest payment obligations of $7 million," and (2) had "a market value which the Company currently estimates to be approximately $65 to $70 million[], relative to an aggregate $103 million principal amount of loans outstanding as at September 30, 2022." *Id.*

The press release noted that although the SPVs were engaged in discussions with the lender, the Company expected that "neither of those Non-Recourse SPVs will be able to make the scheduled principal payment on November 8, 2022, which would result in a default for those Non-Recourse SPVs under their respective limited recourse equipment financing

8

arrangements." ¶¶ 134–135.  The press release noted that such default would permit the lender to declare the entire $103 million aggregate principal amount to be immediately due and payable and that it was expected the SPVs will not have sufficient funds to repay, in which case the lender could enforce its security interest and foreclose on the Bitcoin miners owned by the SPVs, "which could result in the loss of such miners and materially reduce the Company's operating capacity, and could also lead to bankruptcy or liquidation of the relevant Non-Recourse SPVs." ¶ 135.

On this news, Iris Energy's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly 90% decline from the $28 offering price. ¶ 136.

On November 4, 2022, the Non-Recourse SPVs received notices of defaults from the lender alleging the occurrence of certain defaults and declaring the loans under each of the Non-Recourse SPV facilities immediately due and payable. ¶ 138.  The lender began taking steps to enforce the indebtedness and its rights in the collateral securing such limited recourse facilities (including the approximately 3.6 EH/s of miners securing such facilities and other assets), and later appointed a receiver (PWC) to the Non-Recourse SPVs on February 3, 2023. *Id.*  In a Form 6-K filed with the SEC on February 13, 2023, Iris Energy disclosed that it recognized a loss of

$15,209,000 for the period ended December 31, 2022, in respect of receivables held by the Non-Recourse SPVs. ¶ 140.

The Form 6-K also disclosed that the defaults had a wide-ranging and devastating impact on Iris Energy's business, including: (1) resulting in a material reduction in its operating capacity, (2) increasing the electricity costs per Bitcoin mined as a result of higher demand charges per Bitcoin mined; and (3) adversely impacting the Company's operating metrics. ¶ 143. This, in turn, has resulted in a reduction in the Company's revenue and operating cash flows, resulting in net operating losses. *Id.*

The default also resulted in a material decrease of the Company's monthly average operating hashrate to just 1,445 PH/s in November 2022 from 3,899 PH/s in October 2022, and a decrease in Bitcoin mined to just 151 from 448 in October 2022. ¶ 147. Further, as of the time the FAC was filed, the Company's stock traded at approximately $3.21 per share—significantly below the $28 IPO price, thus severely damaging investors. ¶ 149.

## LEGAL STANDARD

To state a negligence-based claim, such as a claim under the Securities Act, Plaintiffs are only required to allege a "short and plain statement of the claim showing that the pleader is entitled to relief." FED. R. CIV. P. 8(a)(2); Rule 8(a) does not require "detailed factual allegations." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007).

On a motion to dismiss, the Court reviews the contents of the complaint, accepting all factual allegations as true and drawing all reasonable inferences in favor of the nonmoving party. *Doe v. Univ. of the Sciences*, 961 F.3d 203, 208 (3d Cir. 2020). A complaint will survive a motion to dismiss if it contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. Notably, to be "sufficient to cross the federal court's threshold," *Skinner v. Switzer*, 562 U.S. 521, 530 (2011), the complaint need only "state[] simply, concisely, and directly events that … entitle[] [the plaintiff] to [the relief requested]." *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014) (*per curiam*). The question for the Court is "not whether plaintiffs will ultimately prevail but whether they are entitled to offer evidence to support the claims." *Hickey v. Univ. of Pittsburgh*, ____ F.4th ____, 2023 U.S. App. LEXIS 23650, at *8 (3d Cir. Sept. 6, 2023).

Pleading standards for claims under the Exchange Act are different

11

than those under the Securities Act.  As this Court recognized in claims under § 10(b) of the Exchange Act "are subject to heightened pleading standards" under Rule 9(b) and the Private Securities Litigation Reform Act of 1995 ("PSLRA").  *See SEC v. One Or More Unknown Traders in the Sec. of Fortress Inv. Grp., LLC*, 2018 U.S. Dist. LEXIS 167164, at *13 (D.N.J. Sept. 27, 2018) (Cecchi, J.) (quoting *SEC v. Cooperman*, 243 F. Supp. 3d 597, 601 (E.D. Pa. 2017)).  Rule 9(b) requires a plaintiff to "state with particularity the circumstances constituting fraud."  FED. R. CIV. P. 9(b).  The PSLRA requires a plaintiff to "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).

In all, when reviewing a complaint for failure to state a claim,[5] the Court should engage in a two-part analysis:  "First, the factual and legal elements of a claim should be separated ....  Second, [the] Court must then determine whether the facts alleged in the complaint are sufficient to show that the plaintiff has a 'plausible claim for relief.'"  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210–11 (3d Cir. 2009).

---

[5] Defendants have submitted Exhibits A through M in support of their motion.  To the extent judicial notice is proper, the Court may not consider the truth of the matters asserted in the exhibits, but only the existence of those matters.  *See* FED. R. EVID. 201; *S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp. Ltd.*, 181 F.3d 410, 426–27 (3d Cir. 1999).

## ARGUMENT

### I.    The FAC States a Claim for Violations of Sections 11 and 12(a)(2) of the Securities Act

A *prima facie* case under Section 11 and Section 12(a)(2) is straightforward, requiring only a showing of a material misrepresentation or omission from the registration statement or the prospectus.  *See Herman & Maclean v. Huddleston*, 459 U.S. 375, 382 (1983).  To that end, Section 11 imposes liability if a registration statement (1) contained an untrue statement of material fact, (2) omitted to state a material fact required to be stated therein, or (3) omitted to state a material fact necessary to make the statements therein not misleading.  *See In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006); 15 U.S.C. § 77k.  Similarly, to state a *prima facie* claim under Section 12(a)(2), the plaintiff need only allege the purchase of securities pursuant to a materially false or misleading prospectus or oral communication.  *See Suprema Specialties*, 438 F.3d at 269–70; 15 U.S.C. § 77*l*(a)(2).

Section 11 "was designed to assure compliance with the disclosure provisions of the [Securities Act] by imposing ***a stringent standard of liability*** on the parties who play a direct role in a registered offering." *Huddleston*, 459 U.S. at 381–82.  Together with Section 12(a)(2), it provides for "***virtually absolute***" liability, which does ***not*** require plaintiffs to

allege or prove scienter, reliance, or loss causation. *See Suprema Specialties*, 438 F.3d at 270–71; *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 n.5 (3d Cir. 2004).

Moreover, neither Rule 9(b) nor the heightened-pleading requirements under the PSLRA apply to Section 11 or Section 12(a)(2) claims that are pleaded in negligence—even when § 10(b) claims against some of the same defendants are pleaded separately in the same complaint. *See Suprema Specialties*, 438 F.3d at 274.

## A.    Defendants Failed to Disclose Increased Counterparty Risk

The Offering Documents touted the fact that Iris Energy was purportedly immune from "increased counterparty risk" because it owned all of its equipment. ¶¶ 54–56. According to the Offering Documents, the Company's ownership of its equipment provided it control over its assets and "***more sustainable cash flows***" as compared to competitors who leased their equipment or utilized third-party hosting agreements. ¶ 55. For example, the Offering Documents stated (*id.*):

> We have ownership of our electrical infrastructure and data centers, including freehold and long-term leasehold land. ***This provides us with security and operational control over our assets.***
> ***Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party***

**hosting services** or short-term land leases which may be subject to termination rights, profit sharing arrangements and/or potential changes to contractual terms such as pricing.

       *       *       *

While outsourcing infrastructure and operations and maintenance to third-parties may result in near-term returns and scale, **short-term contractual arrangements may result in increased counterparty risk** (*e.g.* potential non-performance, delays and disputes) and renewal risk.

These statements were rendered misleading because the Offering Documents omitted key details about the way the Company's miners were owned, including that they were owned through Non-Recourse SPVs that were financed by NYDIG, which made the Company's operations—including the mining equipment and Bitcoin mined—subject to the very same "**increased counterparty risk**" that the Offering Documents stated Iris Energy was purportedly immune from.  ¶¶ 57–58.

The statements were further rendered misleading by the omission of the fact that the SPVs were not capable of producing sufficient cash flow to service their respective debt financing obligations, which subjected the Company to substantial risk because the Company pledged both the mining equipment and the Bitcoin mined by the equipment as collateral.  *Id.*

These allegations are more than sufficient to state a claim under Section 11 and Section 12(a)(2).  The law is clear that when a company chooses to speak about an issue, it has "a duty to be both accurate and

complete." *Caiola v. Citibank, N.A.*, 295 F.3d 312, 331 (2d Cir. 2002). Here, once Defendants chose to tout the fact that the Company owned all of its equipment and, thus, had "more sustainable cash flows" than its competitors, which purportedly made it immune from "increased counterparty risk" (¶¶ 54–56), they had an obligation to also discuss the numerous issues that made those statements questionable and, in fact, exposed the Company to the very same "counterparty risk"—such as how the SPVs were financed, how they were not capable of producing sufficient cash flow in order to service their debt, and how that exposed the Company as a whole (not just the SPVs) to substantial risk in case of a default (¶¶ 57–59). *See Berson v. Applied Signal Tech., Inc.*, 527 F.3d 982, 987 (9th Cir. 2008) ("Had defendants released no backlog reports, their failure to mention the stop-work orders might not have misled anyone. But once defendants chose to tout the company's backlog, they were bound to do so in a manner that wouldn't mislead investors as to what that backlog consisted of.").

In sum, the failure to discuss the fact that the SPVs were not capable of producing sufficient cash flow and the substantial risks to the Company as a result of any default by the SPVs made misleading the other statements in the Offering Documents regarding how the Company was purportedly immune from "increased counterparty risk" because it owned its equipment

16

and, thus, had a more sustainable cash flow than competitors.

Defendants do not dispute the omission of these facts from the Offering Documents. Instead, they resort to compartmentalizing the FAC's detailed allegations, focusing on each allegation in isolation and arguing that the omission of each individual fact did not render the other statements in the Offering Documents misleading. *See* Defs.' Br. at 17–23. But courts have often rejected such an approach, holding that the relevant inquiry must be on whether the offering documents, when viewed in totality, "would give a reasonable investor the impression of a state of affairs that differs in a material way from the one that actually exists." *See Berson*, 527 F.3d at 985.

Indeed, the Third Circuit addressed this issue in *Adams Golf*, finding statements that the company purportedly sold its golf equipment exclusively to authorized retailers to be actionable—even though they may have been "technically true"—because "those statements may have nevertheless led a reasonable investor to conclude that the selective distribution model was functioning properly," when, in fact, the company's golf clubs were also sold on the gray market, including through Costco:

> The relevant statements in the offering materials indicated that distribution was limited to certain retailers and that the Company "does not sell its products through price sensitive general discount warehouses." The District Court properly found that Costco's unauthorized possession of Adams Golf clubs could not be reasonably taken to make those statements false, for there

17

was no allegation that Adams Golf itself sold golf clubs to unauthorized retailers. ***But while technically true, those statements may have nevertheless led a reasonable investor to conclude that the selective distribution model was functioning properly***, *i.e.*, that this method was exclusive, and therefore that unauthorized retailers were not selling significant quantities of its Adams Golf merchandise. ***Reasonable minds could disagree as to whether the omitted fact of Costco's unauthorized possession, in addition to the alleged "sales by other unauthorized discount retailers and international gray market distributors," were necessary to make the statements regarding the Company's limited distribution not misleading.*** Accordingly, we will reverse the District Court's dismissal of the plaintiffs' gray market claims.

*Adams Golf*, 381 F.3d at 277–78.

The same is true here. Just like in *Adams Golf*, even though it may have been "technically true" that the Company owned its equipment and, thus, may not have faced the typical "counterparty risk" associated with leasing the equipment from third parties who may default, reasonable minds could disagree as to whether the omitted fact of the SPVs' inability to generate sufficient cash flow in order to service their debt obligations and the fact that a default by the SPVs would have a substantial impact on the Company as a whole (not just the SPVs) was necessary to make the statements regarding the Company's ownership of its equipment and purported immunity from "increased counterparty risk" not misleading. *See id.*

### B.  Defendants' Remaining Arguments Regarding the Counterparty Risk and Cash Flow Miss the Mark

Defendants make several arguments as to why the omissions regarding counterparty risk and cash flow were not misleading.  *See* Defs.' Br. at 17–23. As discussed below, none of these arguments has merit.

First, as discussed above, the fact that "[t]he Offering Documents' description of the MEFAs and associated risks was materially accurate and complete" (*see* Defs.' Br. at 18) does not immunize those statements from the omission of material information relating to counterparty risk and the SPVs' insufficient cash flow.  *See Adams Golf*, 381 F.3d at 277–78 (finding statements to be actionable even though they were "technically true").

Second, Defendants impermissibly seek to contradict Plaintiffs' allegations by arguing that the Offering Documents purportedly disclosed some of the risks faced by the SPVs.  *See* Defs.' Br. at 19, 23.  Because these facts do not appear in the FAC, the Court can and should decline to consider them on a motion to dismiss.  *See Doe*, 961 F.3d at 208.

In any event, the purported disclosures that Defendants point to do not discuss the counterparty risk or that the SPVs were already not capable of generating sufficient cash flow.  *See, e.g.*, ¶¶ 57–59.  Courts have long refused to exonerate defendants from liability on the basis of generic risk warnings advising that certain risks "may" occur, when, in fact, those warned-of risks

were already occurring.  *See, e.g.*, *In re Facebook, Inc. IPO Sec. & Derivative Litig.*, 986 F. Supp. 2d 487, 516 (S.D.N.Y. 2013) ("purported risk warnings misleadingly represented that this revenue cut was merely possible when, in fact, it had already materialized"); *In re Van Der Moolen Holding N.V. Sec. Litig.*, 405 F. Supp. 2d 388, 400, 415 (S.D.N.Y. 2005) (statements that company's business "could" be negatively impacted "if" it failed to comply with industry regulations were materially misleading as the company was already violating industry regulations).

For example, in *Panther Partners Inc. v. Ikanos Communications, Inc.*, the Second Circuit rejected as inadequate the company's generic warning that its products "frequently contain defects and bugs" that could harm its reputation and "ability to retain existing customers and attract new customers" and "could interrupt or delay sales or shipment of [its] products." 681 F.3d 114, 117, 122 (2d. Cir. 2012).  Here, the Company's generic warnings were similarly inadequate because they never informed investors of the already existing problems, such as the fact that the Company was not, in fact, immune to increased counterparty risk because the SPVs were already not capable of producing sufficient cash flow to service their debt, which posed substantial risk to the Company.  *See, e.g.*, ¶¶ 57–59.

Third, Defendants suggested that the omitted details regarding the

20

lender (NYDIG) and the collateral pledged were immaterial.  Defs.' Br. at 20–22.  But the FAC alleges that the information about NYDIG was material because Defendant Alfred had an equity interest in NYDIG following NYDIG's acquisition of Digital Assets Data, Inc.  ¶ 60.  And information regarding the collateral pledged—not just the equipment, but Bitcoin mined by the Company—was material because it posed a substantial risk to the livelihood of the Company as a whole.  ¶¶ 57–59.

In any event, it is well-settled that materiality is a highly fact-sensitive inquiry that is rarely appropriate for resolution on a motion to dismiss.  *See Adams Golf*, 381 F.3d at 274.  "Only if the alleged misrepresentations or omissions are ***so obviously unimportant*** to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable ***as a matter of law***."  *Id.* at 275; *see also Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 40–43 (2011) ("materiality … is a fact-specific inquiry").  Here, it cannot be said, "as a matter of law" that Defendants' omissions are "plainly immaterial" to a reasonable investor.  *See Adams Golf*, 381 F.3d at 274.

## C.    Defendants Made False and Misleading Statements Regarding Goodwill

The statements in the Offering Documents regarding the Company's assets and goodwill (¶¶ 64–67) were false and misleading because the Company's goodwill required further impairment reductions due to problems afflicting the SPVs, including but not limited to the fact that the Company's Bitcoin miners did not have the capacity or ability to generate enough revenue to service the debt the Company had obtained to finance the Bitcoin mining equipment.  ¶ 68.

Iris Energy is subject to IFRS (International Financial Reporting Standards) accounting standards.  ¶ 70.  IFRS rules require that an impairment loss to be measured as the difference between the carrying amount of the CGU, including goodwill, and its recoverable amount.  *Id.*  The recoverable amount is the higher of:  fair value less cost of disposal (FVLCD); and value in use (VIU).  *Id.*  VIU is an entity-specific measure, as opposed to fair value, which is a market participant-based measure.  ¶ 71. VIU is based on management's pre-tax cash flow projections, generally excluding the effects of future restructuring or asset enhancements.  *Id.*  Management's projections are used for a maximum of five years, unless a longer period can be supported.  *Id.*  Thereafter, the cash flows are extrapolated using a steady or declining growth rate consistent with that of the product, industry, or

country.  *Id.*

Here, the inability of the SPVs to adequately service their debt obligations and to generate sufficient cash flows constituted events under IFRS accounting standards requiring Iris Energy to recognize an impairment to its goodwill.  ¶ 72.  The Offering Documents were false and misleading because they overstated the Company's goodwill and failed to reflect necessary impairment charges to the value of the goodwill associated with the SPVs and the Company's mining equipment and other assets.  *Id.*

Contrary to Defendants' argument, these are not nonactionable statements "of opinion."  *See* Defs.' Br. at 24–25.  Rather, the overstatement of goodwill was misleading because the Company failed to comply with the applicable objective IFRS accounting standards that required Iris Energy to recognize an impairment to its goodwill.  ¶¶ 70–72.

*Omnicare* does not require that a Section 11 claim alleging material omissions plead subjective falsity.  *See Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 190–95 (2015).  Because the FAC specifically pleads material omissions, *Omnicare* does not shield the statements overstating goodwill—even if they do qualify as "opinions."

Finally, Defendants' materiality argument fails for the same reasons as discussed above. Here, it cannot be said that overstatement of goodwill by nearly 1 million Australian dollars would be "obviously unimportant" to a reasonable investor "as a matter of law." *See Adams Golf*, 381 F.3d at 274–75 (concluding that 5,000 golf clubs out of 235,000 sold—or roughly 2%—was not immaterial as a matter of law and reversing on that ground).

## II. The FAC States a Claim for Violations of Section 10(b) of the Securities Exchange Act and Rule 10b-5 Promulgated Thereunder

Together, § 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder imply a private cause of action for securities fraud. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 679 (3d Cir. 2023). That claim has six elements: (1) a misrepresentation or omission of material fact; (2) scienter; (3) a connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation. *Id.* Defendants only challenge the first two elements. *See* Defs.' Br. at 27–43. As set forth below, the FAC pleads with required particularity both (1) multiple actionable misrepresentations and omissions of material fact; and (2) the Exchange Act Defendants' scienter.

## A.   The FAC Alleges Multiple Misrepresentations and Omissions of Material Facts During the Class Period

### 1.   February 9, 2022 Form 6-K

On February 9, 2022, Iris Energy filed a report on Form 6-K with the SEC, appended to which was an Investor Presentation slide deck.  ¶ 75.  The Presentation emphasized that "miners" was one of the four "key value drivers" and represented that Iris Energy was well-positioned to increase growth and profits because it had the second-most miners of any company with "15 EH/s computing power secured."  ¶¶ 75–76.  The Presentation also stressed the competitive advantage the Company allegedly possessed due to its ownership of data mining equipment, whereas the competitors used third-party hosting services that exposed them to "counterparty risk."  ¶ 77.

In the Form 6-K, the Company told investors that it expected revenues of $695 million by early 2023 and profits of $578 million.  ¶ 78.  The FAC alleges that these statements were false and wildly inaccurate as was proven a year later when, on February 15, 2023, the Company reported a total operating capacity of just 1.7 EH/s (compared to 10 EH/s it told investors it would deliver by such time) and a net loss after income taxed of $144 million for Q2 2023 (instead of a profit as represented in the 2Q22 6-K).  ¶ 79.

The 2Q22 6-K also stated that the Company entered into equipment finance and security agreements to finance the purchase of various mining

hardware.  ¶ 81.  These statements were misleading because they:  (1) failed to identify NYDIG as the lender or disclose Defendant Alfred's affiliation with NYDIG; (2) made no disclosure of the use of the SPVs; and (3) made absolutely no disclosure about the collateral pledged by Iris Energy for the loans, including the material fact that the Company had pledged the Bitcoin mined by the SPVs as collateral, or the fact that due to the lack of sufficient corporate formalities between Iris Energy and the SPVs, the lender could pursue the Company's assets in the event of a default by the SPVs.  ¶ 82.

### 2.    February 9, 2022 Press Release

On February 9, 2022, the Company also issued a press release reporting its second quarter 2022 results for the period ended December 31, 2021.  ¶ 74.  That press release quoted D. Roberts, who stated, in relevant part, that Iris Energy "is on track to be one of the largest listed Bitcoin miners ***with 15 EH/s3 of hardware secured***[.]"  ¶¶ 74, 83.  The press release also contained "Key Highlights" about the Company's purported "record" revenue, adjusted EBITDA, and average operating hashrate of 685 PH/s and 364 Bitcoin mined for the quarter.  ¶ 84.

Defendants' statements about the amount of mining equipment secured and the Company's ability to buy more mining equipment through debt and equipment financing were highly material because the number of

miners (which are simply computers) directly affects capacity, which directly affects hashrate, which directly affects the amount of Bitcoin that can be mined. ¶ 74. Because mining Bitcoin is Iris Energy's sole source of revenue, the Company's ability to obtain and preserve financing for buying mining equipment (computers) was critical information to investors. *Id.*

### 3.    March 28, 2022 Press Release

On March 28, 2022, Iris Energy issued a press release announcing the closing of an additional $71 million equipment financing facility with NYDIG. ¶ 87. The press release emphasized that although the facility was "[s]ecured by 19,800 Bitmain S19j Pro miners," approximately "10 EH/s of the Company's total stock of contracted miners remain unencumbered, providing substantial balance sheet flexibility to secure additional non-dilutive funding in due course." *Id.* The press release also quoted D. Roberts once again emphasizing the alleged benefits of the Company "owning and controlling [its] own infrastructure" and representing that the "15 EH/s installation schedule ... remains on track." ¶ 88.

These statements were false and misleading and omitted material information because they failed to disclose that the Company's MEFAs with NYDIG included provisions pledging the Bitcoin mined (and proceeds from the sale of Bitcoin) as collateral, not just the mining equipment (computers).

27

¶ 90.  The press release also failed to disclose that the SPVs were not capable of servicing the debt, thus jeopardizing the Company's cash flows and operations.  *Id.*  The problems with the SPVs meant that the Company was not "on track" to realize "a 15 EH/s installation schedule" because defaults by the SPVs would mean that the lender would foreclose on the mining equipment that served as collateral for the loans, thus significantly decreasing the Company's operating capacity and amount of Bitcoin mined. *Id.*  The press release also failed to disclose that NYDIG, the lender which was given the security interest, was a related party because Defendant Alfred had a significant equity interest in NYDIG.  ¶ 91.

### 4.    May 11, 2022 Form 6-K

On May 11, 2022, Iris Energy filed a report of foreign issues on Form 6-K that repeated prior statements about its equipment finance and security agreements.  ¶ 94.  These statements were misleading for the same reasons discussed above, including because they (1) failed to disclose that the MEFAs with NYDIG included provisions pledging the Bitcoin mined and proceeds from the sale of Bitcoin as collateral; (2) failed to disclose Alfred's affiliation with NYDIG; and (3) failed to disclose that because Iris Energy and the SPVs were not maintaining corporate formalities, the Company was not isolated from the SPVs' debts.  ¶ 95.

Indeed, confirming the lack of corporate formalities and distinctness between the Company and the SPVs, the lender would later reveal that the payments under both MEFAs "originated from a single bank account in the name of Iris Energy." *Id.* Similarly, loan proceeds from NYDIG were deposited into Iris Energy's bank account, not that of the SPVs. *Id.*

### 5. May 11, 2022 Conference Call

On May 11, 2022, D. Roberts also hosted a conference call with analysts to discuss the Company's Q3 2022 financial results. ¶ 96. During the call, he repeatedly emphasized the fact that the collateral for the Company's equipment financing was limited to the equipment held within the SPVs, thus purportedly protecting the Company from any failure of the SPVs. *See* ¶ 96 ("And maybe just to recap, the debt that we have today is all on a ***non-recourse ring-fenced basis*** secured against ***some*** of the computers that we procured. The balance is all equity. So it's a very clean balance sheet. It's a strong balance sheet. It was done very deliberately."); ¶ 97 ("So sitting here today we feel like, we've got a very strong balance sheet almost $0.5 billion of equity sitting there. No corporate debt. ***The only debt is ring-fenced to some of the computers in SPVs***.").

These statements were false and misleading because they failed to disclose the significant additional collateral the Company had pledged to

NYDIG and failed to disclose that the SPVs were not able to service their debt based on existing cash flows, which, in turn, exposed the Company to material risks in the event of a default by the SPVs. ¶ 99.

Notably, the amount of the debt procured through the SPVs was highly material to Iris Energy. ¶ 100. When the SPVs later defaulted, the CEO of NYDIG filed an affidavit with the Supreme Court of British Columbia stating that the amount of the debt was $114 million. *Id.* That is a highly material amount to Iris Energy because, when it reported its Q2 2023 financial results on February 15, 2023, the Company disclosed that it only had $39.4 million in cash and cash equivalents as of December 31, 2022. *Id.*

During the May 11, 2022 conference call, D. Roberts also emphasized the Company's favorable energy contracts that provided its Bitcoin mining operations with low-cost renewable energy. ¶ 101. He also represented that the Company had the ability to drive these prices even lower due to its ownership and control of not just the computers but also the land and all the electrical infrastructure. ¶¶ 101–102. This was false and misleading because, by emphasizing the ownership of the equipment without disclosing the significant additional collateral that had been pledged to the lender (NYDIG), Iris Energy failed to disclose material risks to the Company's operations in the event of a default by the SPVs. ¶¶ 103–104.

### 6. June 7, 2022 Press Release

On June 7, 2022, Iris Energy issued a press release regarding multiple debt processes that were underway. ¶ 109. Among other things, the press release sought to downplay the severity of debt from equipment financing agreements by highlighting that there was "[*n*]*il corporate-level debt*" and by stating, in a footnote, that "[e]quipment financing is *limited recourse financing within wholly owned subsidiaries of the Company*." ¶ 110.

### 7. June 21, 2022 Press Release

On June 21, 2022, the Company issued a press release providing an updated operating and capital expenditure guidance in light of the deteriorating market conditions. ¶ 111. The press release continued to downplay the severity of debt from equipment financing by stating that "[*t*]*he Company currently has no corporate debt on its balance sheet*" and, stating in a footnote, that "[*e*]*xisting equipment financing is limited recourse financing within wholly owned subsidiaries of the Company*." ¶ 112.

### 8. September 13, 2022 Press Release

On September 13, 2022, Iris Energy issued a press release regarding the volatility in the Bitcoin price. ¶ 113. Among other things, the press release again continued to downplay the severity of debt from equipment

financing agreements by stating that there was "no corporate debt held by the Company on its balance sheet" and, in a footnote, that "[e]xisting equipment financing ($109.4 million as of June 30, 2022) is limited recourse financing within wholly owned subsidiaries of the Company." ¶ 114.

### 9.    September 13, 2022 Form 20-F

Also on September 13, 2022, Iris Energy filed an annual report on Form 20-F with the SEC, which contained substantively the same statements as discussed above regarding the purported efficiency and overall operational quality of the Company's Bitcoin mining operations. ¶ 115. With respect to Iris Energy's use of equipment financing agreements to procure Bitcoin miners, the Form 20-F stated that both the financing agreement with the NYDIG as well as other financing agreements contain "customary affirmative and negative covenants ***applicable to the subsidiary borrowers, but not to Iris Energy Limited***." ¶¶ 116–118.

These statements were false and misleading because (1) they failed to disclose that the collateral pledged by Iris Energy to NYDIG under the SPV equipment financing agreements was ***not*** limited to the equipment itself, but in fact extended to the Bitcoin mined by the SPVs and any proceeds from the sale of the Bitcoin; and (2) they failed to disclose existing, known material problems with significantly decreased cash flows from the SPVs. ¶ 125.

When the SPVs were later declared in default, they sought the appointment of a receiver, which the court in Canada granted, appointing PWC as the receiver in February 2023. *Id.* In a May 9, 2023 affidavit submitted on its behalf, the CEO of NYDIG stated that the negotiations to restructure the debts between NYDIG and the SPVs "***began in earnest on or about October 3, 2022***." *Id.* This demonstrates that the material problems with the SPVs must have started long before that—*i.e.*, by the time of the filing of the September 13, 2022 Form 20-F, thus confirming that the SPVs' financial troubles were intentionally concealed from the Form 20-F.

### 10.   September 13, 2022 Conference Call

Also on September 13, 2022, D. Roberts hosted a conference call with analysts to discuss the Company's Q4 2022 financial results. ¶ 120. On the call, he told analysts that the Company was still profitable, even at the lower Bitcoin prices in the market. *Id.* He also emphasized that the Company was generating positive cash flows and that it still had a competitive advantage due to its low electricity costs. ¶¶ 121–122. These statements were misleading because he failed to disclose the ongoing problems with the SPVs, including ongoing discussions with the lender to the SPVs—NYDIG, which posed material problems and risks to the Company's cash flows and profitability. ¶ 123.

33

On the call, D. Roberts once again downplayed the risks to the Company from the equipment financing agreements, stating:

> Again, we've got some hardware financing, but that is limited to asset level.  Again, potentially a key differentiator with other listed firms.  **We have not given parent company guarantees.**  We do not have cross defaults.  We do not have cross collateralization.  **Those financing are limited recourse specifically to the individual computers and the SPVs they're holding.**

*Id.*  As noted above, this was false and misleading because he failed to disclose that the collateral pledged by the Company under the agreements was not limited to the equipment itself, but in fact extended to the Bitcoin mined by the SPVs and any proceeds from the sale of the Bitcoin.  ¶ 125.

## B.    Defendants' Arguments Fail

In challenging the Class Period statements, Defendants repeat their arguments regarding the lack of actionable misstatements or omissions.  *See* Defs.' Br. at 29–31.  These arguments fail for the same reasons as discussed above.

Defendants next argue the statements regarding the SPVs' structure are "inactionable statements of legal opinion."  *Id.* at 32.  Not so.  The Exchange Defendants stated that the SPVs' debt was "ring-fenced," such that there was "[n]o corporate debt."  ¶¶ 96–97; *see also* ¶ 110 (stating there was "[n]il corporate debt"), ¶¶ 112, 114, 116–118.  To a reasonable investor, this suggests there was no risk—much less substantial risk—to the Company were

the SPVs not able to meet their debt obligations and default. In reality, however, the debt was ***not*** "ring-fenced" and a default by the SPVs could—and did—pose a substantial risk to the Company as a whole. ¶¶ 99, 125.

There is no merit to Defendants' suggestion that Plaintiffs are trying to plead a fraud by hindsight. Defs.' Br. at 34. While the PSLRA forbids reliance on "speculative fraud by hindsight" allegations, the Third Circuit has held that "later developments may allow a reasonable inference that prior statements were untrue or misleading when made." *City of Warren*, 70 F.4th at 693. "And an inference of falsity is easier to justify for statements that are followed shortly by corrective disclosures of significant dimension." *Id.*

Here, the falsity of the Exchange Defendants' statements in February 2022 that the Company was well-positioned to increase growth and profits and had "15 EH/s computing power secured" (¶¶ 74–76; *see also* ¶¶ 83, 88) can be inferred from the fact that just a year later, the Company reported a total operating capacity of just 1.7 EH/s (¶ 79). *See City of Warren*, 70 F.4th at 690 (inferring falsity from "the combined effect of the temporal proximity of [the CFO's] assurances ... and the magnitude of the corrective actions").

Nor are the statements protected by the PSLRA's safe harbor for forward-looking statements. Defs.' Br. at 34–35. "A mixed present/future statement is ***not*** entitled to the safe harbor with respect to the part of the

statement that refers to the present." *Institutional Investors Grp. v. Avaya, Inc.*, 564 F.3d 242, 255 (3d Cir. 2009).[6]  Here, Plaintiffs challenge Defendants' statements that the Company had 15 EH/s of computing power "secured" (¶¶ 74–76, 83)—which refers to the **present**, not the future.

Moreover, to be protected under the safe harbor, "[c]autionary language must be ***extensive*** and ***specific***." *Avaya*, 564 F.3d at 256.  "A vague or blanket (boilerplate) disclaimer [that] merely warns the reader that the investment has risks will ordinarily be inadequate." *Id.*  Here, the cautionary language Defendants point to (Defs.' Br. at 8–10, 35–37) was *boilerplate* and *generic*, neither extensive nor specific.

Defendants' statements are also not "general statements of optimism" or "inactionable puffer."  Defs.' Br. at 35–36.  Rather, as discussed above, Plaintiffs challenge concrete statements during the Class Period regarding the SPVs' structure, the risk to the Company from the SPVs' debt, and the Company's then-current purported competitive advantages.  Even "general statements of optimism, when taken in context," may be actionable "when those statements address specific aspects of a company's operation that the

---

[6] *Accord In re Stone & Webster, Inc., Sec. Litig.*, 414 F.3d 187, 213 (1st Cir. 2005) ("The mere fact that a statement contains some reference to a projection of future events cannot sensibly bring the statement within the safe harbor if the allegation of falsehood relates to non-forward-looking aspects of the statement.").

speaker knows to be performing poorly." *In re Quality Sys.*, 865 F.3d 1130, 1143–44 (9th Cir. 2017) (finding actionable statements about the current and past state of the company's pipeline such as "fair game," "record levels," and "[o]ur pipeline is deep"). That's the case here.

### C.    Plaintiffs Have Sufficiently Alleged Scienter

Under the PSLRA, a plaintiff must "state with particularity facts giving rise to a strong inference that the defendant acted with the required statement of mind." 15 U.S.C. § 78u-4(b)(2). The inquiry is "whether ***all*** of the facts alleged, ***taken collectively***, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 310 (2007). Thus, "the court's job is not to scrutinize each allegation in isolation but to assess all the allegations holistically." *Id.* at 326.

Here, the FAC alleges with particularity that the Exchange Act Defendants acted with scienter. *First*, scienter can be inferred from the fact that the Company is small and only had one business segment—the mining and sale of Bitcoin. ¶ 152. The false statements and material omissions in this case were thus all part of Iris Energy's "core product" such that the Exchange Act Defendants' knowledge of the falsity can be imputed to them based on their positions within the Company. *See* ¶¶ 152–156.

The "core product" doctrine allows the knowledge of certain facts that are critical to a business's "core operations" to be attributed to a company's key officers. *Webb v. SolarCity Corp.*, 884 F.3d 844, 854 (9th Cir. 2018). "Allegations that rely on the core-operations inference are among the allegations that may be considered in the complete PSLRA analysis." *S. Ferry LP, No. 2 v. Killinger*, 542 F.3d 776, 784 (9th Cir. 2008). Here, the Exchange Act Defendants (D. and W. Roberts) are Co-CEOs of the Company and possessed and exercised more than 80% of voting control. ¶¶ 22–23, 159). They were aware of all operation matters at the Company and reviewed and signed all of the relevant agreements. ¶¶ 153–155.

*Second*, the FAC expressly alleges that D. and W. Roberts had actual knowledge at all relevant times that the SPVs "could never achieve profitability" on the basis of NYDIG's CEO's subsequently-filed affidavit. ¶ 154. Their scienter is further demonstrated by an affidavit filed by W. Roberts with the Supreme Court of British Columbia, Canada on February 1, 2023. ¶ 156. In his affidavit, W. Roberts states that he or others at Iris Energy approached NYDIG as early as October 2022 to discuss the amounts due under the MEFAs and attempt to agree on a restructuring proposal. *Id.* The affidavit also states that the default was going to occur in October 2022 but that the parties agreed to a two-week extension to facilitate further

discussions. *Id.* Thus, well before Iris Energy filed the November 2022 disclosure, the Exchange Act Defendants had actual knowledge of the fact that the SPVs were not able to service their debt and that they would default under the loan agreements absent a restructuring agreement. *Id.*

*Third*, the temporal proximity of Defendants' September 13, 2022 false statements, including those in the Form 20-F and conference call with analysts, also demonstrates the scienter of the Exchange Act Defendants. ¶ 158. On the conference call with analysts on September 13, 2022, D. Roberts repeatedly represented that the Company was still mining Bitcoin profitably, even with Bitcoin's price having fallen to $20,000. *Id.* But less than one month later, D. Roberts and W. Roberts, as the directors of the Company's SPVs, were negotiating a restructuring of the SPVs' debt due to their inability to pay the debt when it came due in October 2022—hardly a picture of profitability. *Id.* The temporal proximity between D. Roberts's September 13, 2022 statements and the lender's declaration of a default and event of acceleration of the entire balance of the debt—$114 million—on November 4, 2022 is thus highly indicative that D. and W. Roberts knew the Company's statements on September 13, 2022 were false when made. *Id.*

Arguing the contrary, Defendants nitpick at individual allegations and impermissibly compartmentalize them and focus on each in isolation. Defs.' Br. at 40–43. Defendants also incorrectly suggest that to plead scienter with particularity, Plaintiffs must allege "actual[] trading" in the stock or "credible, relevant allegations based on internal documents or confidential witnesses." Defs.' Br. at 39. "But the Supreme Court has made clear that plaintiffs' allegations of scienter need not be irrefutable, *i.e.*, of the smoking-gun genre." *Avaya*, 564 F.3d at 269. Instead, the Court's inquiry is "whether all of the facts alleged, **taken collectively**, give rise to a strong inference of scienter." *Id.*; *see also Tellabs*, 551 U.S. at 326 ("the court's job is **not** to scrutinize each allegation in isolation but to assess all the allegations holistically").

Here, the totality of the facts alleged in the FAC and discussed above establishes a strong inference of scienter on behalf of the Exchange Act Defendants. Just like in *Avaya*, contrary to Defendants' arguments, Plaintiffs "do not simply allege 'fraud by hindsight.'" *See* 564 F.3d at 269. Rather, the FAC proffers an array of allegations—based, among other things, on the "core product" doctrine, subsequently filed affidavits, and temporal proximity—giving rise to a strong inference that the Exchange Act Defendants' statements regarding the SPVs and how their default may

impact the Company as a whole were at least reckless, which is enough to survive a motion to dismiss under the PSLRA. *See id.* at 268–69.

Indeed, just like in *Avaya*, "the most powerful evidence of scienter is the content and context of [the Exchange Act Defendants'] statements themselves." *See id.* at 269. The Exchange Act Defendants did not simply make statements inconsistent with the Company's exposure to counterparty risk and the SPVs' subsequent inability to service their debts; they explicitly represented that the Company was not exposed to any counterparty risk because it owned its equipment and they repeatedly represented that the SPVs' debt was "ring-fenced" and posed no risk to the Company as a whole, much less substantial risk. As the Third Circuit held in *Avaya*, "the most powerful evidence of scienter is the content and context of [defendants'] statements themselves," and when the defendants are "specifically asked, directly and repeatedly" about the company's core operations, denials of any issues can support a strong inference of scienter. *See id.* at 268–69.

## III. The FAC Adequately Alleges "Control Person" Liability Under Section 15 of the Securities Act and Section 20(a) of the Exchange Act

Section 15 of the Securities Act provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12. 15 U.S.C. § 77o; *Adams Golf*, 381 F.3d at 273 n. 3. Section 20(a) of the Exchange

Act imposes joint and several liability upon one who controls a violator of Section 10(b).  15 U.S.C. § 78t(a).  "Under both provisions, the plaintiff must prove that one person controlled another person or entity and that the controlled person or entity committed a primary violation of the securities laws."  *Suprema Specialties*, 438 F.3d at 284.

Defendants attack Plaintiffs' Section 15 and Section 20 claims primarily on the purported failure to allege a primary violation.  Accordingly, to the extent the Court concludes that the FAC adequately states a claim for violations of Section 11 and Section 12(a)(2) of the Securities Act and Section 10(b) of the Exchange Act, it should uphold Plaintiffs' claims under Section 15 of the Securities Act and Section 20 of the Exchange Act.  *Id.* at 285–86.

Defendants also argue that to establish control-person liability, Plaintiffs also need to plead "culpable participation" by the controlling persons.  Defs.' Br. at 44.  This argument finds no support in case law.  On the contrary, the Third Circuit has held that to adequately state a control-person claim, "[a] plaintiff need only establish the controlled person's liability."  *Suprema Specialties*, 438 F.3d at 285.  Here, just like in *Suprema Specialties*, the alleged "controlled person" for purposes of Section 15 and Section 20 is the Company itself—Iris Energy.  Accordingly, as long as the FAC adequately states a claim under Section 11 and Section 12(a)(2) of the

Securities Act and under Section 10(b) of the Exchange Act against Iris Energy, it also adequately states a claim under Section 15 of the Securities Act and Section 20 of the Exchange Act. *See id.* at 284–86.

Finally, to the extent Defendants argue that the Individual Defendants are not "controlling persons" for purposes of Section 15 of the Securities Act and that the Exchange Act Defendants are not "controlling persons" for purposes of Section 20 of the Exchange Act, that argument fails in light of the FAC's detailed allegations that these Defendants were officers or directors of the Company and, thus, had the ability to control the Company during the relevant period. *See* ¶¶ 22–23, 25, 27–29, 181–184, 204–205.

## CONCLUSION

For all the foregoing reasons, the Court should deny Defendants' motion to dismiss in its entirety. If the Court is inclined to grant the motion, the Court should grant leave to amend. *See*, *e.g.*, *Dole v. Arco Chem. Co.*, 921 F.2d 484, 487 (3d Cir. 1990) (enforcing the "policy favoring liberal amendment of pleadings"); *One Or More Unknown Traders*, 2018 U.S. Dist. LEXIS 167164, at *38 & n.8 (granting leave to file a second amended complaint alleging securities fraud).

Dated:  October 4, 2023

Respectfully submitted,

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately

s/ Peter S. Pearlman

Peter S. Pearlman

Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey  07663
Telephone:    (201) 845-9600
Facsimile:    (201) 845-9423
E-mail:       psp@njlawfirm.com
              mfg@njlawfirm.com

*Liaison Counsel for Lead Plaintiffs*

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr. (*pro hac vice*)
Albert Y. Chang (*pro hac vice*)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California  92037
Telephone:    (858) 914-2001
Facsimile:    (858) 914-2002
E-mail:       fbottini@bottinilaw.com
              achang@bottinilaw.com

*Lead Counsel for Lead Plaintiffs*

44