**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT STERLING, individually and on behalf of all others similarly situated,<br><br>            Plaintiff,<br><br>v.<br><br>IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, DAVID BARTHOLOMEW, CHRISTOPHER GUZOWSKI, MICHAEL ALFRED, J.P. MORGAN SECURITIES LLC, CANACCORD GENUITY LLC, CITIGROUP GLOBAL MARKETS INC., CANTOR FITZGERALD & CO., GALAXY DIGITAL PARTNERS LLC, COMPASS POINT RESEARCH & TRADING, LLC, and MACQUARIE CAPITAL (USA) INC.,<br><br>            Defendants. | Civil Action No. 22-07273<br><br>**OPINION**<br><br>September 27, 2024 |

**SEMPER**, District Judge.

Before the Court is Defendants Iris Energy Limited, Michael Alfred, David Bartholomew, Christopher Guzowski, Daniel Roberts, William Roberts, J.P. Morgan Securities LLC, Canaccord Genuity LLC, Citigroup Global Markets Inc., Macquarie Capital (USA) Inc., Cantor Fitzgerald & Co., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC's (collectively "Defendants") motion to dismiss Plaintiffs' First Amended Complaint (ECF 38, "FAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). (ECF 47.) Plaintiffs filed a brief in opposition. (ECF 56, "Opp.") Defendants filed a reply. (ECF 63, "Reply.") The Court reviewed the Plaintiffs' First Amended Complaint and the parties' submissions and decided the motion without oral argument

pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1. For the reasons set forth

below, Defendants' motion to dismiss is **GRANTED**.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

This putative securities class action lawsuit alleges Iris Energy Limited ("Iris")—a Bitcoin

mining company that primarily uses renewable energy to power its mining operations—and its co-

defendants violated the Securities Act of 1933 and the Securities Exchange Act of 1934. (ECF 38,

FAC ¶¶ 1-7.) Plaintiffs assert this lawsuit on behalf of a class of all persons and entities that

purchased or otherwise acquired: (a) Iris ordinary shares pursuant and/or traceable to the offering

documents issued in connection with Iris' initial public offering conducted on or about November

17, 2021 (the "IPO") and/or (b) Iris securities between November 17, 2021 and November 1, 2022

(the "Class Period"). (*Id.* ¶ 1.)

### A.     Defendants

Defendant Iris is organized under the laws of Australia with principal executive offices

located at Level 12, 44 Market Street, Sydney, NSW 2000 Australia. (*Id.* ¶ 21.) Since 2019, Iris

has mined Bitcoin. (*Id.* ¶ 2.) As explained in Iris' Prospectus:

> Bitcoin is a scarce digital asset that is created and transmitted
> through the operation of a peer-to-peer network of computers
> running the Bitcoin software. The Bitcoin network allows people to
> exchange digital tokens, called Bitcoin, which are recorded on a
> publicly distributed digital transaction ledger forming the Bitcoin
> blockchain, which contains the record of every Bitcoin transaction
> since the inception of Bitcoin. The Bitcoin network is decentralized,
> meaning no central authority, bank or financial intermediary is
> required to create, transmit or determine the value of Bitcoin.

---

[1] When considering a motion to dismiss under Rule 12(b)(6), the Court is obligated to accept as true allegations in the complaint and all reasonable inferences that can be drawn therefrom. *See Rocks v. City of Phila.*, 868 F.2d 644, 645 (3d Cir. 1989). The Court also considers any "document integral to or explicitly relied upon in the complaint." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) (quoting *Shaw v. Digit. Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)).

(ECF 47-4, Ex. B at 94.) While Iris does not hold Bitcoin on its balance sheet, Iris' operations "generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called 'miners' or 'Bitcoin miners' and exchanging these Bitcoin for fiat currencies such as U.S. dollars ("USD") or Canadian dollars ("CAD") on a daily basis." (FAC ¶¶ 2-3.)

Defendant Daniel Roberts ("D. Roberts") has served as a co-chief executive officer ("co-CEO") and director of Iris at all relevant times. (*Id.* ¶ 22.) D. Roberts signed or authorized the signing of the Registration Statement filed with the SEC. (*Id.*) Defendant William Roberts ("W. Roberts") was co-CEO and director of Iris at all relevant times. (*Id.* ¶ 23.) W. Roberts signed or authorized the signing of the Registration Statement filed with the SEC. (*Id.*) Iris, D. Roberts, and W. Roberts are sometimes collectively referred to as the "Exchange Act Defendants." (*Id.* ¶ 26.)

Defendant David Bartholomew ("Bartholomew") has served as the Chairman of Iris at all relevant times. (*Id.* ¶ 27.) Bartholomew signed or authorized the signing of the Registration Statement filed with the SEC. (*Id.*) Defendant Christopher Guzowski ("Guzowski") has served as a Director of Iris at all relevant times. (*Id.* ¶ 28.) Guzowski signed or authorized the signing of the Registration Statement filed with the SEC. (*Id.*) Defendant Michael Alfred ("Alfred") has served as a Director of Iris at all relevant times. (*Id.* ¶ 29.) Alfred signed or authorized the signing of the Registration Statement filed with the SEC. (*Id.*) Plaintiffs collectively refer to Defendants D. Roberts, W. Roberts, Bartholomew, Guzowski, and Alfred as the "Securities Act Individual Defendants." (*Id.* ¶ 30.) Plaintiffs assert that as directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Iris ordinary shares in the IPO for their own benefit and the benefit of the Iris. (*Id.* ¶ 31.) The Securities Act Individual Defendants were key members of the IPO working

group and executives of the Company who pitched investors to purchase the shares sold in the IPO. (*Id.*)

Defendant J.P. Morgan Securities LLC is an underwriter and served as one of the three joint book-running managers for the IPO. (*Id.* ¶ 32.) Defendant Citigroup Global Markets Inc. is an underwriter and served as one of the three joint book-running managers for the IPO. (*Id.* ¶ 33.) Defendant Canaccord Genuity LLC is an underwriter and served as one of the underwriters for the IPO. (*Id.* ¶ 34.) Defendant Macquarie Capital (USA) Inc. is an underwriter and served as one of the underwriters for the IPO. (*Id.* ¶ 35.) Defendant Galaxy Digital Partners LLC is an underwriter and served as one of the underwriters for the IPO. (*Id.* ¶ 36.) Defendant Cantor Fitzgerald & Co. is a corporation providing financial and investment banking services, and it served as one of the underwriters for Iris' IPO. (*Id.* ¶ 37.) Defendant Compass Point Research & Trading, LLC is a corporation providing financial and investment banking services, and it served as one of the underwriters for Iris' IPO. (*Id.* ¶ 38.)

Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Canaccord Genuity LLC, Cantor Fitzgerald & Co., Macquarie Capital (USA) Inc., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC are collectively referred to herein as the Underwriter Defendants. (*Id.* ¶ 39.) The Underwriter Defendants received commissions of $16,207,693 for their work on the IPO. (*Id.* ¶ 40.) The underwriters were also allocated a greenshoe option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price. (*Id.*) Moreover, the Prospectus stated that Iris Energy entered into an underwriting agreement with the Underwriter Defendants. (*Id.* ¶ 41.) Subject to the terms and conditions of the underwriting agreement, Iris agreed to sell to each Underwriter, and each Underwriter severally agreed to

purchase, at the public offering price less the underwriting discounts and commissions, a certain number of ordinary shares. (*Id.*)

### B.    The Initial Public Offering

On October 25, 2021, Iris filed a registration statement on Form F-1 with the Securities and Exchange Commission ("SEC"), which the SEC declared effective on November 16, 2021 (the "Registration Statement"). (*Id.* ¶ 4.) On or about November 17, 2021, Iris conducted the IPO, issuing approximately 8,269,231 shares to the public at $28 per ordinary share for gross proceeds to Iris of $231,538,468. (*Id.* ¶ 6.) Iris' ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "IREN." (*Id.* ¶ 22.) The underwriters were given a "greenshoe" option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price. (*Id.* ¶ 6.) On November 18, 2021, Iris filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus," together with the Registration Statement, the "Offering Documents"). (*Id.* ¶ 5.)

### C.    Allegations Related to the Securities Act of 1933

Plaintiffs assert the Offering Documents contained untrue statements of material fact or omitted other facts necessary to make the statements not misleading. (*Id.* ¶ 7.) With respect to Iris' use of equipment financing agreements for Bitcoin miners, the Offering Documents stated:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of September 30, 2021, the aggregate amount of the loan facilities was $53.9 million, and the aggregate amount of funds borrowed under these loans was $22.9 million. The loans carry an annual interest rate of 12% and are to be repaid through monthly payments of interest and principal through September 2023. The agreements include customary restrictions and outstanding borrowings are secured by the financed mining units purchased with the loans.

(*Id.* ¶ 53.) The Offering Documents stated that Iris had a competitive advantage over other Bitcoin miners because it contracted with Bitmain Technologies to acquire "new generation miners" that would give it mining capacity of 15.2 EH/s. (*Id.* ¶ 54.) The Prospectus also represented that Iris owned its mining equipment, which provided Iris with control over its assets and gave it "more sustainable cash flows" over competitors that leased their equipment or utilized third-party hosting agreements. (*Id.* ¶ 55.) Specifically, the Offering Documents stated that Iris has "ownership of our electrical infrastructure and data centers . . . [which] provides us with security and operational control over our assets. Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party hosting services . . . ." (*Id.*) The Offering Documents also stated that Iris was "both the owner and operator of our hardware infrastructure . . . ." (*Id.*) The Offering Documents further stated:

> In addition, we believe that we are able to identify and respond to operational issues in a more efficient and timely manner than would be the case under an outsourced hosted model. We believe this allows us to maximize operating performance as well as hardware life.
>
> While outsourcing infrastructure and operations and maintenance to third-parties may result in near-term returns and scale, short-term contractual arrangements may result in increased counterparty risk (e.g. potential non-performance, delays and disputes) and renewal risk.

(*Id.*) The Prospectus also indicated that Iris was experiencing rapid growth and was well-positioned to continue such strong revenue growth because of its facilities capable of supporting the targeted hashrate[2] capacity of 15.2 EH/s. (*Id.* ¶ 56.) Plaintiffs assert that the above statements were materially false or misleading because the Offering Documents contained untrue statements

---

[2] The Offering Documents define hashrate as "[t]he speed at which a miner can produce computations (hashes) using the Bitcoin network's algorithm, expressed in hashes per second. The hashrate of all miners on a particular network is referred to as the hashrate of the network." (ECF 44-4, Ex. B at 8.)

of material fact or omitted to state other facts necessary to make the statements not misleading.

Specifically, Plaintiffs assert that the Offering Documents failed to disclose:

> (1) certain of Iris's Bitcoin miners were owned through allegedly Non-Recourse SPVs which had been financed by third party lenders, which made Iris' operations, including the mining equipment and Bitcoin mined, subject to the very "increased counterparty risk" that the Offering Documents stated Iris Energy was immune from; (2) the SPVs and Iris Energy had the same individuals on their board and otherwise failed to maintain sufficient corporate distinctness to provide protection to Iris in the event of a default by the SPVs; (3) Iris Energy had not only pledged the bitcoin mining equipment as collateral to the lender, but had also pledged the Bitcoin mined by the equipment and the proceeds from the sale of the Bitcoin as collateral; (4) the undisclosed SPVs were not capable of producing sufficient cash flow to service their respective debt financing obligations; (5) accordingly, Iris's use of equipment financing agreements to procure Bitcoin miners was subject to substantial risk, including counterparty risks; (6) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition; and (7) as a result, the Offering Documents were materially false and/or misleading and failed to state information required to be stated therein.

(*Id.* ¶ 57.) Plaintiffs further assert that the Offering Documents failed to disclose: (1) a default by any of the three SPVs would materially increase Iris Energy's electricity costs per Bitcoin mined because the Company had in place fixed-price contracts for power, resulting in higher demand charges; (2) any default by one or more of the SPVs would adversely impact the Company's operating metrics; with a lower operating capacity, increased electricity costs per Bitcoin mined, Iris Energy's revenue and operating cash flows would decline materially, resulting in significant net operating losses; and (3) the SPVs were financed by New York Digital Investment Group, LLC ("NYDIG") and Defendant Alfred had an equity interest in NYDIG. (*Id.* ¶¶ 59-60.)

Plaintiffs allege that statements regarding Iris' assets, profits and losses, and overall financial condition were false and misleading because Iris' assets were overstated since Iris failed to record material impairment charges to its goodwill. (*Id.* ¶ 63.) The Prospectus represented that

the Company had $880 million (Australian dollars) in goodwill. (*Id.* ¶ 66.) The Prospectus stated that goodwill arose on the acquisition of a business, and Iris tested annually "whether goodwill has suffered any impairment. The recoverable amounts of cash-generating units have been determined based on fair value less costs of disposal calculations." (*Id.* ¶¶ 64-65.) "Impairment losses on goodwill are taken to profit or loss and are not subsequently reversed." (*Id.* ¶ 65.) The Prospectus explained that no further impairment to goodwill needed to be recognized. (*Id.* ¶ 67.) Plaintiffs assert that Iris' goodwill required further impairment reductions because of problems with the SPVs, including but not limited to Iris' Bitcoin miners not having the capacity or ability to generate enough revenue to service the debt Iris obtained to finance the Bitcoin mining equipment. (*Id.* ¶¶ 68-69.) Plaintiffs conclude that the Offering Documents were false and misleading because they overstated Iris' goodwill and did not reflect necessary impairment charges to the goodwill's value associated with the SPVs, mining equipment, and other Iris assets. (*Id.* ¶ 72.)

### D.   Allegations Related to the Exchange Act of 1934

#### a.   February 9, 2022 Press Release and Form 6K

On February 9, 2022, Iris issued a press release reporting Iris' second quarter 2022 results for the period ending December 31, 2021. (*Id.* ¶ 74.) The press release quoted Defendant D. Roberts, who stated Iris "is on track to be one of the largest listed Bitcoin miners with 15 EH/s3 of hardware secured[.]" (*Id.*)

That same day, Iris filed a report of foreign issuer on Form 6-K with the SEC, appended to which were Iris' Unaudited Interim Consolidated Financial Statements for the Three and Six Months ended December 31, 2021 (the "2Q22 6-K") as well as an Investor Presentation slide deck. (*Id.* ¶ 75.) In the Investor Presentation, Iris represented that there were four key drivers for success in the Bitcoin mining industry: Miners (more miners = more Bitcoin mined = higher revenues);

Megawatts; Money (capital to fund growth); and Management. (*Id.*) With respect to Miners, Iris represented that it was well positioned to increase growth and profits because it had the second-most miners of any company in its field. (*Id.* ¶ 76.) In the Investor Presentation, Iris stressed the competitive advantages that it allegedly possessed because it owned its data mining equipment as compared to competitors who used third-party hosting services. (*Id.* ¶ 77.) Iris Energy told investors that it expected revenues of $695 million by early 2023 and profits of $578 million. (*Id.* ¶ 78.)

Plaintiffs assert these statements were later revealed to be false and inaccurate. (*Id.* ¶ 79.) When Iris reported its results for Q2 2023 on February 15, 2023, it reported a total operating capacity of 1.7 EH/s compared to the 10 EH/s it told investors it would deliver by such time in its February 9, 2022 presentation. (*Id.*) Iris said it "intended" to be able to increase its capacity to 5.5 EH/s down the line. (*Id.*) Additionally, Iris reported a net loss after income taxes of $144 million for Q2 2023. (*Id.*)

With respect to the Company's equipment financing agreements to procure Bitcoin miners, the 2Q22 6-K stated, in relevant part:

> The [Company] has entered into equipment finance and security agreements pursuant to which an equipment financier has agreed to finance the purchase of various mining hardware that have been delivered or yet to be delivered. These facilities carry an annual contractual interest rate of 12% and are denominated in United States dollars. The facilities are repaid through blended monthly payments of interest and principal with the final payment due to the financier on 25 September 2023.

(*Id.* ¶ 81.) Plaintiffs assert this statement was false and misleading because it (1) failed to identify NYDIG as the lender; (2) made no disclosure of the use of the SPVs; (3) made no disclosure about any collateral pledged by Iris for the loans, including that Iris had pledged the Bitcoin mined by the SPVs as collateral and that Iris was allegedly not maintaining sufficient corporate formalities

or separateness between the SPVs and Iris to protect Iris from having its assets pursued by the lender in the event of a default by the SPVs; and (4) failed to disclose Defendant Alfred's affiliation with NYDIG. (*Id.* ¶ 82.)

The press release also contained "Key Highlights" about the Company's purported "record" revenue, adjusted EBITDA, and average operating hashrate of 685 PH/s and 364 Bitcoin mined for the quarter. (*Id.* ¶ 84.)

The 2Q22 6-K also included a "going concern" warning that Iris'

> "ability . . . to continue as a going concern depends upon the [Company] maintaining sustained positive free operating cash flows and securing additional capital to fund the contracted mining hardware purchases and infrastructure spend, as part of its growth plan[,]" while simultaneously assuring investors that "[t]he strategy to mitigate these risks and uncertainties is to execute a business plan aimed at continued operational efficiency, revenue growth, improving overall mining profit, managing operating and capital expenditure and working capital requirements, and securing additional financing, as needed."

(*Id.* ¶ 85.) Plaintiffs allege that Iris' assurances regarding the strength of its business plan, strong cash flows, and ability to raise debt to fund its growth concealed the real risks and problems faced by Iris Energy at the time and prevented the stock from declining. (*Id.* ¶ 86.) Iris' stock increased from a close of $14.28 on February 9, 2022 to $14.74 on February 10, 2022 and then closed at $14.78 on February 11, 2022. (*Id.*)

### b. March 28, 2022 Press Release

On March 28, 2022, Iris issued a press release announcing the closing of an additional $71 million equipment financing facility with NYDIG. (*Id.* ¶ 87.) That press release highlighted that this was the "[t]hird facility secured with NYDIG, further cementing [a] long-term partnership"; that the facility was "[s]ecured by 19,800 Bitmain S19j Pro miners"; and that "~10 EH/s of the Company's total stock of contracted miners remain unencumbered, providing substantial balance

sheet flexibility to secure additional non-dilutive funding in due course." (*Id.*) The press release

quoted D. Roberts, who stated:

> We are delighted to again partner with an industry leader such as
> NYDIG who have been a long-standing supporter of our business.
> This is our third equipment financing facility together and we look
> forward to formalizing additional loan facilities as miners continue
> to be delivered and installed. This transaction further demonstrates
> the capital structure benefits in having a strong balance sheet and
> owning and controlling our own infrastructure.
>
> With substantial equity raised to date, meaningful operational
> cashflow and a 15 EH/s installation schedule which remains on
> track, we are pursuing a number of other sources of non-dilutive
> funding to continue the Company's rapid growth trajectory and
> delivery of shareholder value, noting that we as management
> continue to hold approximately one quarter of the shares on issue.

(*Id.* ¶ 88.) On March 28, 2022, Iris stock closed at $13.86 per share. (*Id.* ¶ 89.) On March 29, 2022,

stock closed at $15.61 per share, and then at $15.90 per share on March 30, 2022, an increase of

14.7%. (*Id.*)

Plaintiffs assert that these press release statements were false and misleading because they

failed to disclose: (i) that Iris' MFEAs (Master Finance Equipment Agreements) with NYDIG

included provisions pledging the Bitcoin mined (and proceeds from the sale of Bitcoin) as

collateral, not just the mining equipment; (ii) the SPVs were not capable of servicing the debt,

allegedly jeopardizing Iris' cash flows and operations; and (iii) NYDIG, the lender that was given

a security interest, was allegedly a related party because Iris Director Michael Alfred had a

significant equity interest in NYDIG, which he had acquired when he sold his business Digital

Assets Data, Inc. to NYDIG. (*Id.* ¶¶ 90-91.)

### c. May 11, 2022 Form 6-K

During and after May 2022, the price of Bitcoin began to drop. (*Id.* ¶ 93.) On May 11,

2022, Iris filed a report of foreign issuer on Form 6-K with the SEC, appended to which were the

Company's Unaudited Interim Consolidated Financial Statements for the Three and Nine Months ended March 31, 2022 (the "3Q22 6-K"). (*Id.* ¶ 94.) Regarding the Company's equipment financing agreements to procure Bitcoin miners, the 3Q22 6-K stated, in relevant part:

> Mining hardware finance[.] During the year ended 30 June 2021, the Group entered into equipment finance and security agreements pursuant to which an equipment financier agreed to finance the purchase of various mining hardware that have been delivered or yet to be delivered. These facilities carry an annual contractual interest rate of 12% and are denominated in United States dollars. The facilities are repaid through blended monthly payments of interest and principal with the final payment due to the financier on 25 September 2023.

> On 25 March 2022, the Group entered into a US$71.0 million (A$93.6 million) limited recourse equipment finance and security agreement with NYDIG ABL LLC. The facility has a contractual term of 25 months and is secured by 19,800 Bitmain S19j Pro miners (1.98 EH/s) with an applicable interest rate of 11% per annum. The facilities are repaid through blended monthly payments of principal and interest with the final payment due April 2024. As of 31 March 2022, the Group had an undrawn balance of A$31.4 million available on the facility.

(*Id.*) Plaintiffs assert these statements were false and misleading because they failed to disclose (i) that Iris' MFEAs with NYDIG included provisions pledging the Bitcoin mined (and proceeds from the sale of Bitcoin) as collateral, not just the mining equipment; (ii) Alfred's affiliation with NYDIG; and (iii) that the SPVs failed to maintain corporate formalities or distinctness from Iris. (*Id.* ¶ 95.)

### d.  May 11, 2022 Conference Call

On May 11, 2022, D. Roberts hosted a conference call with analysts to discuss the Company's Q3 2022 financial results. (*Id.* ¶ 96.) During the call, he emphasized Iris' strong balance sheet, positive free cashflow, and the fact that the collateral for the Company's equipment financing was limited to the equipment held within the SPVs, thus purportedly protecting the

Company from any failure of the SPVs. (*See id.* ("And maybe just to recap, the debt that we have today is all on a non-recourse ring-fenced basis secured against some of the computers that we procured. The balance is all equity. So it's a very clean balance sheet. It's a strong balance sheet. It was done very deliberately."); *id.* ¶ 97 ("So sitting here today we feel like, we've got a very strong balance sheet almost $0.5 billion of equity sitting there. No corporate debt. The only debt is ring-fenced to some of the computers in SPVs.").) D. Roberts also emphasized Iris' favorable energy contracts that provided its Bitcoin mining operations with low-cost renewable energy. (*Id.* ¶ 101.) He also represented that Iris had the ability to drive these prices even lower due to its ownership and control of not only the computers, but also the land and all the electrical infrastructure. (*Id.* ¶¶ 101-02.)

Iris' stock price increased from $6.89 on May 11, 2022 to $7.71 on May 13, 2022, a 11.9% increase. (*Id.* ¶ 107.)

### e.   June 7, 2022 Press Release

On June 7, 2022, Iris issued a press release announcing an investor update for May 2022. (*Id.* ¶ 109.) The press release stated that "[m]ultiple debt processes remain underway, with discussions involving various aspects of the capital structure, for example, equipment financing similar to the recent $71m NYDIG facility (1.98 EH/s of miners secured)," and "[t]he Company remains focused on prudently assessing various options and ensuring that any decisions consider an appropriate long-term capital structure for the Company." (*Id.*) In addition, the press release allegedly downplayed the severity of debt from equipment financing agreements by highlighting in its "Business summary" that there was "[n]il corporate-level debt" and stating in a footnote that "[e]quipment financing is limited recourse financing within wholly owned subsidiaries of the Company." (*Id.* ¶ 110.)

### f.  June 21, 2022 Press Release

On June 21, 2022, Iris issued a press release providing an updated operating and capital expenditure guidance, stating, in relevant part:

> The Company has explored multiple financing options presented to it in recent months, and has determined that maintaining balance sheet flexibility is prudent having regard to market conditions and available financing terms. As market conditions have deteriorated, the Company continues to believe this is the prudent approach. As a result, the Company expects to defer major additional capital expenditure until the current market uncertainty subsides and financing terms improve. The Company will continue to monitor funding markets closely, and if conditions become favorable, the Company expects to explore raising additional capital.

(*Id.* ¶ 111.) The June 21, 2022 press release also stated that "[t]he Company currently has no corporate debt on its balance sheet" and stating in a footnote that "[e]xisting equipment financing is limited recourse financing within wholly owned subsidiaries of the Company." (*Id.* ¶ 112.)

### g.  September 13, 2022 Press Release

On September 13, 2022, Iris issued a press release reporting Iris' full year 2022 results for the period ended June 30, 2022. (*Id.* ¶ 113.) That press release quoted Defendant D. Roberts, who represented, in relevant part: "Looking forward, the recent volatility in the Bitcoin price and related industry challenges reaffirms our confidence in our long-term vertically integrated strategy. We remain focused on building a multi-decade, institutional grade, infrastructure platform while maintaining balance sheet discipline." (*Id.*) The press release also states that "[c]ash and cash equivalents as of June 30, 2022 was $110.0 million, with no corporate debt held by the Company on its balance sheet" and stating in a footnote that "[e]xisting equipment financing ($109.4 million as of June 30, 2022) is limited recourse financing within wholly owned subsidiaries of the Company." (*Id.* ¶ 114.) Plaintiffs assert this downplayed the severity of debt from equipment financing agreements. (*Id.*)

### h.  September 13, 2022 Form 20-F

Also on September 13, 2022, Iris filed an annual report on Form 20-F with the SEC, reporting Iris' financial and operational results for its fiscal fourth quarter and year ended June 30, 2022 (the "2022 20-F"). (*Id.* ¶ 115.) Regarding Iris' use of equipment financing agreements to procure Bitcoin miners, the 2022 20-F stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of June 30, 2022, the aggregate amount drawn under the loan facilities was $109.4 million.

(*Id.* ¶ 116.) Regarding to Iris' Bitcoin miner equipment financing agreements with NYDIG, the 2022 20-F stated, "The NYDIG Agreement contains customary affirmative and negative covenants applicable to the subsidiary borrower, but not to Iris Energy Limited." (*Id.* ¶ 117.) Regarding Iris' other Bitcoin miner equipment financing agreements, the 2022 20-F stated, "The Other Financing Agreements include customary affirmative and negative covenants applicable to the subsidiary borrowers, but not to Iris Energy Limited." (*Id.* ¶ 118.)

Appended as exhibits to the 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants D. Roberts and W. Roberts certified that "the [2022 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "the information contained in the [2022 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company." (*Id.* ¶ 119.)

### i.  September 13, 2022 Conference Call

On September 13, 2022, Defendant D. Roberts hosted a conference call with analysts to discuss the Company's Q4 2022 financial results. On the call, D. Roberts told analysts that Iris was still profitable, even at the lower Bitcoin prices in the market. (*Id.* ¶ 120.) He stated,

> For us, the optimal strategy is to liquidate daily, lock in those profits. As you can see there, we're mining Bitcoin at $8,000 a coin, locking that profitability and then make a capital allocation decision with that profitability left over. Today, even in the current market, Bitcoin mining is profitable, incremental returns on CapEx are profitable.

(*Id.*) He also said, "Yes, we're still mining Bitcoin at $8,000 a coin, it's still very good gross profit margins, even at $20,000 Bitcoin" and that "[w]e're building proprietary data centers, building out energy infrastructure, locking up low-cost renewable energy. Yes, we're monetizing that into Bitcoin, but it's a real asset base generating real cash flows." (*Id.* ¶ 121.) D. Roberts also stated that Iris had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure." (*Id.* ¶ 122.) Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro actually puts a downward pressure on that power price." (*Id.*)

Plaintiffs assert that during the call, D. Roberts failed to disclose the ongoing problems with the SPVs. (*Id.* ¶ 123.) Plaintiffs assert he misrepresented that Iris' balance sheet was strong and stated:

> Again, we've got some hardware financing, but that is limited to asset level. Again, potentially a key differentiator with other listed firms. We have not given parent company guarantees. We do not have cross defaults. We do not have cross collateralization. Those financing are limited recourse specifically to the individual computers and the SPVs they're holding.

(*Id.*)

Plaintiffs assert that the September 13, 2022 Press Release, Form 20F, and Conference Call were false and misleading because (1) they failed to disclose that the collateral pledged by Iris to NYDIG under the SPV equipment financing agreements was not limited to the equipment itself, but in fact extended to the Bitcoin mined by the SPVs and any proceeds from the sale of the Bitcoin; and (2) they failed to disclose existing, known material problems with significantly

16

decreased cash flows from the SPVs. (*Id.* ¶ 125.) Plaintiffs further assert that the September 12, 2022 statements caused Iris' stock to increase from $4.26 on September 13, 2022 to $4.48 on September 14, 2022, an increase of 5.2%. (*Id.* ¶ 124.)

      **E.**    **Stock Price Decline and Default on Obligations**

On November 2, 2022, Iris issued a press release stating, among other things, that "'[c]ertain equipment (i.e., Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the principal amount of the relevant loans' and that '[r]estructuring discussions with the lender remain ongoing.'" (*Id.* ¶ 9.) Thereafter, "Iris's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly 90% decline from the Offering price." (*Id.* ¶ 10.)

On November 4, 2022, Iris disclosed that the non-recourse SPVs received a notice from their lender, which alleged the occurrence of an event of default and acceleration under the equipment financing facilities (the "Acceleration Notice"). (*Id.* ¶ 11.) The Acceleration Notice provided that the non-recourse SPVs failed to continue engaging in good faith restructuring discussions pursuant to an agreement between the Non-Recourse SPVs and the lender. (*Id.*) The Acceleration Notice stated that failure to engage in such good faith restructuring discussions was an immediate event of default under each facility. (*Id.* ¶ 12.) The Acceleration Notice declared a payment default for certain scheduled principal payments originally due October 25, 2022. (*Id.*) Furthermore, the Acceleration Notice declared the entire principal amount of each facility, together with accrued and unpaid interest, were immediately due and payable by each Non-Recourse SPV. (*Id.*) A November 2022 Investor Presentation from Iris disclosed that the default of the SPVs resulted in a material decrease of the Company's monthly average operating hashrate to just 1,445

PH/s in November 2022 from 3,899 PH/s in October 2022 and a decrease in Bitcoin mined to just 151 from 448 in October. (*Id.* ¶ 147.)

By December 2022, Iris' stock price had declined almost 92%. (*Id.* ¶ 13.) In a December 2022 Investor Presentation, Iris Energy told investors that "Recent market events *have nothing to do with Bitcoin.*" (*Id.* ¶ 142 (emphasis in original).)

On January 20, 2023, the lender to the SPVs filed a petition with the British Columbia Supreme Court primarily seeking the appointment of PwC as receiver over the assets and undertakings of the non-recourse SPVs, in relation to their failures to make payments when due under their respective equipment financing agreements. (*Id.* ¶ 141.) The court subsequently appointed PwC as the receiver of the non-recourse SPVs on February 3, 2023. (*Id.*)

In a Form 6-K filed with the SEC on February 13, 2023 and signed by D. Roberts, Iris disclosed that it recognized a loss of $15,209,000 for the period ending December 31, 2022, in respect of receivables held by the non-recourse SPVs. (*Id.* ¶ 140.) Iris stated that "[t]he entire GST and PST receivable balances held by the non-recourse SPVs are not expected to be recoverable by the Group due to the appointment of a receiver to the non-recourse SPVs on 3 February 2023." (*Id.*) The Form 6-K also explained that the SPVs' default:

> (i) resulted in a material reduction in our operating capacity, (ii) increased our electricity costs per Bitcoin mined as a result of higher demand charges (i.e., fixed charges) per Bitcoin mined and (iii) adversely impacted our operating metrics. In particular, with a lower operating capacity, increased electricity costs per Bitcoin mined and a decline in the price of Bitcoin over recent months, we have experienced, and expect to continue to experience, a reduction in the Group's revenue and operating cash flows, resulting in net operating losses.

(*Id.* ¶ 143.) "As of December 31, 2022, assets held by the Non-Recourse SPVs were recognized as impaired in the Group consolidated financial statements to reflect their expected net realizable

value to the Group (i.e. to a value equal to the third-party debt outstanding in each of the Non-Recourse SPVs)." (*Id.* ¶ 146.)

At the time of the First Amended Complaint's filing, Iris' ordinary shares traded at approximately $3.21 per share. (*Id.* ¶ 149.)

### F.    The Present Motion

On June 6, 2023, Lead Plaintiffs Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd. filed their First Amended Complaint. (ECF 38.) Plaintiffs allege Defendants' wrongful acts and omissions caused Plaintiffs and the class significant loss and damages. (*Id.* ¶ 15.) Plaintiffs' FAC asserts five counts: (1) violations of Section 10(b) of the Exchange Act and Rule 10b-5 (against the Exchange Act Defendants) (FAC ¶¶ 170-77); (2) violations of Section 20(a) of the Exchange Act (against the Exchange Act Individual Defendants) (*id.* ¶¶ 180-85); (3) violations of Section 11 of the Securities Act (against the Securities Act Defendants) (*id.* ¶¶ 186-94); (4) violations of Section 12 of the Securities Act (against the Securities Act Defendants) (*id.* ¶¶ 195-201); and (5) violations of Section 15 of the Securities Act (against the Securities Act Individual Defendants) (*id.* ¶¶ 202-06). On August 4, 2023, all Defendants moved to dismiss. (ECF 47.)

## II.    LEGAL STANDARD

### a.    Rule 12(b)(6)

Federal Rule of Civil Procedure 12(b)(6) governs motions to dismiss for "failure to state a claim upon which relief can be granted[.]" For a complaint to survive dismissal under the Rule, it must contain sufficient factual matter to state a claim that is plausible on its face. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Although the plausibility standard "does not impose a probability requirement, it does require a pleading to show more than a sheer possibility that a defendant has acted unlawfully." *Connelly v. Lane Const. Corp.*, 809 F.3d 780, 786 (3d Cir. 2016) (internal quotation marks and citations omitted). As a result, a plaintiff must "allege sufficient facts to raise a reasonable expectation that discovery will uncover proof of [his] claims." *Id.* at 789.

### b.  Rule 9(b)

Federal Rule of Civil Procedure 9(b) imposes additional pleading requirements. "Independent of the standard applicable to Rule 12(b)(6) motions, Rule 9(b) imposes a heightened pleading requirement of factual particularity with respect to allegations of fraud." *In re Rockefeller Ctr. Props., Inc. Sec. Litig.,* 311 F.3d 198, 216 (3d Cir. 2002). Thus, pursuant to Rule 9(b), when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). A party alleging fraud must therefore support its allegations with factual details such as "the who, what, when, where and how of the events at issue." *U.S. ex rel. Moore & Co., P.A. v. Majestic Blue Fisheries, LLC*, 812 F.3d 294, 307 (3d Cir. 2016). Accordingly, "[t]o satisfy the particularity standard, 'the plaintiff must plead or allege the date, time and place of the alleged fraud or otherwise inject precision or some measure of substantiation into a fraud allegation.'" *Feingold v. Graff*, 516 F. App'x 223, 226 (3d Cir. 2013) (citing *Frederico v. Home Depot*, 507 F.3d 188, 200 (3d Cir. 2007)). This heightened standard is designed to "ensure that defendants are placed on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of fraud." *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 645 (3d Cir. 1989) (internal quotation marks omitted).

### c.   Private Securities Litigation Reform Act ("PSLRA") Pleading Requirements

"To state a claim for securities fraud under Section 10(b) of the Exchange Act and Rule 10b-5, a plaintiff must allege: (1) a material misrepresentation or omission; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 639 (D.N.J. 2021) (citing *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014)).

For plaintiffs asserting securities-fraud claims, the PSLRA imposes additional pleading requirements. "The PSLRA established heightened pleading requirements for a plaintiff to meet in order to plead a cause of action successfully in class actions alleging securities fraud." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 241 (3d Cir. 2013). The PSLRA "requires that a complaint state with particularity both the facts constituting the alleged violation, and the facts evidencing scienter, *i.e.*, the defendant's intention to deceive, manipulate, or defraud." *Id.* at 241-42 (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 313 (2007)) (internal quotations omitted). In other words, plaintiffs bringing a claim involving an allegedly false or misleading statement must "(1) 'specify each statement alleged to have been misleading [and] the reason or reasons why the statement is misleading,' 15 U.S.C. § 78u-4(b)(1), and (2) 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind,' § 78u-4(b)(2)." *Rahman*, 736 F.3d at 242 (quoting *Tellabs*, 551 U.S. at 321).

Both provisions of the PSLRA pleading standard require that facts be pled "with particularity," echoing Federal Rule of Civil Procedure 9(b)'s requirements.[3] *Id.* at 241 n.3.

---

[3] Rule 9(b) provides that when "alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake . . . [m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally." Fed. R. Civ. P. 9(b). Defendants do not separately move pursuant to Rule 9(b).

Although the "PSLRA replaced Fed. R. Civ. P. 9(b) as the applicable pleading standard in private securities class actions," Rule 9(b)'s particularity requirement "is comparable to and effectively subsumed by the requirements" of the PSLRA. *Id.* This standard "requires plaintiffs to plead the who, what, when, where and how: the first paragraph of any newspaper story." *Institutional Inv'rs Grp. v. Avaya, Inc.*, 564 F.3d 242, 253 (3d Cir. 2009). Section 78u-4(b)(1) also adds the requirement that where "an allegation regarding [a defendant's] statement or omission is made on information [or] belief," plaintiffs must "state with particularity all facts on which that belief is formed"—that is, they must describe the sources of information with particularity, including "the who, what, when, where and how of the sources, as well as the who, what, when, where and how of the information those sources convey." *Id.*; *see* 15 U.S.C. § 78u-4(b)(1).

As to the second element, the PSLRA's approach for pleading scienter sharply deviates from Rule 9(b), which allows plaintiffs to plead the scienter element generally. *Avaya*, 564 F.3d at 253. Under the PSLRA, the court must evaluate whether all the facts in the complaint as alleged, taken collectively, give rise to a "strong inference of scienter" – not whether any individual allegation viewed in isolation meets that standard. *Tellabs*, 551 U.S. at 323. In determining whether the pleaded facts give rise to a strong inference of scienter, the court must "take into account plausible opposing inferences." *Id.* This involves a comparative inquiry that evaluates how likely one conclusion is as compared to others, in light of the pleaded facts. *Id.* Thus, the court must consider plausible, nonculpable explanations for the defendant's conduct as well as inferences favoring the plaintiff. *Id.* at 324. Although the inference that the defendant acted with scienter need not be irrefutable, the inference must be more than merely "reasonable" or "permissible." *Id.* A complaint will survive only if a reasonable person would "deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.*

### III.    ANALYSIS

#### A.  Securities Act of 1933 Claims

##### a.  Count III: Violations of Section 11 of the Securities Act (against the Securities Act Defendants) (FAC ¶¶ 186-94) and Count IV: Violations of Section 12 of the Securities Act (against the Securities Act Defendants) (FAC ¶¶ 195-201)

To state a claim under Section 11, Plaintiffs must allege that they purchased securities pursuant to a materially false or misleading registration statement. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d 267, 273 (3d Cir. 2004) (citing *Herman & MacLean v. Huddleston*, 459 U.S. 375, 382 (1983)). Specifically, Section 11 provides a right of action to purchasers "[i]n case any part of the registration statement, when such part became effective, contained an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading . . . ." 15 U.S.C. § 77k(a). As the Supreme Court has explained, Section 11 "was designed to assure compliance with the disclosure provisions of the Act by imposing a stringent standard of liability on the parties who play a direct role in a registered offering." *Herman & MacLean*, 459 U.S. at 381-82 (footnote omitted). "A Section 11 claim may be brought against the issuer of securities, its directors or partners, underwriters, and accountants who prepared or certified the registration statement." *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269 (3d Cir. 2006) (citing *Herman & MacLean*, 459 U.S. at 382 n.13 (citing § 77k(a))). Section 11 is a "virtually absolute liability provision[], which do[es] not require plaintiffs to allege that defendants possessed any scienter." *In re Adams Golf*, 381 F.3d at 274 n.7. "If a plaintiff purchased a security issued pursuant to a registration statement, he need only show a material misstatement or omission to establish his prima facie case." *Herman & MacLean*, 459 U.S. at 382.

To state a claim under Section 12(a)(2), plaintiffs must allege that they purchased securities pursuant to a materially false or misleading "prospectus or oral communication." *In re Adams Golf,*

*Inc. Sec. Litig.*, 381 F.3d at 273. Specifically, a plaintiff must plausibly allege that a prospectus "includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading." 15 U.S.C. § 77l(a)(2).

The basis for Plaintiffs' Section 11 and 12(a)(2) claims are Offering Document statements or omissions concerning Bitcoin mining equipment financing through the SPVs and Iris' goodwill. Defendants argue that Plaintiffs fail to identify any materially false or misleading statement or actionable omission of material fact that could support claims under either Section 11 or 12(a)(2). (Def. Br. at 14-27.)

### i. Statements or Omissions Related to Bitcoin Mining Equipment Financing

Defendants assert that Plaintiffs fail to identify any materially false or misleading statement or actionable omission of material fact related to equipment financing that could support Section 11 or 12(a)(2) claims. (Def. Br. at 14-23.) Specifically, Defendants point to the following disclosure present in the Offering Documents, which discloses the equipment finance agreements and details the debt owed:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of September 30, 2021, the aggregate amount of the loan facilities was $53.9 million, and the aggregate amount of funds borrowed under these loans was $22.9 million. The loans carry an annual interest rate of 12% and are to repaid through monthly payments of interest and principal through September 2023. The agreements include customary restrictions and outstanding borrowings are secured by the financed mining units purchased with the loans. In connection with one of the agreements, we issued the financier A$223.2 thousand in convertible notes that will mature on January 5, 2022, unless earlier converted into Ordinary shares. In conjunction with another agreement, we issued an amount of convertible notes equivalent to approximately $2.4 million to the financier in

connection with the recent convertible note capital raise in October 2021.

(Def. Br. at 6 (quoting Prospectus and Registration Statement).) In their opposition, Plaintiffs assert that Defendants' statements regarding "counterparty risk" and "more sustainable cashflows" resulting from Iris' ownership of its mining equipment were misleading because Defendants omitted key information about how the mining equipment was owned—specifically, that the equipment was owned through non-recourse SPVs financed by NYDIG. (Opp. at 14-15 (citing FAC ¶¶ 54-58).) Plaintiffs further assert that the statements regarding counterparty risk and more sustainable cashflows were further rendered misleading by Defendants' omission that the SPVs were incapable of servicing their debt financing obligations, which subjected Iris to substantial risk since Iris pledged both the mining equipment and the Bitcoin it mined as collateral. (Opp. at 15 (citing FAC ¶¶ 57-58).) In their reply, Defendants assert that the Offering Documents made sufficient disclosures regarding the mining equipment ownership and do not "promise that the SPVs would have cash flows sufficient to repay the loans." (Reply at 5; *see* Def. Br. at 17-18.) Defendants argue that nothing in the Offering Documents was misleading, that its disclosures in the Offering Documents were sufficient, and it had no duty to disclose more than it already did. (Def. Br. at 15-16.)

Courts must assess whether an issuer of securities had a duty to disclose a material[4] fact such that its omission made a statement misleading. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 277 (citing *Zucker v. Quasha*, 891 F. Supp. 1010, 1014 (D.N.J. 1995) ("To avoid committing

---

[4] Materiality is ordinarily an issue left to the factfinder and is therefore not typically a matter for Rule 12(b)(6) dismissal. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 274-75 (*citing Weiner v. Quaker Oats Co.*, 129 F.3d 310, 317 (3d Cir. 1997) ("The emphasis on a fact-specific determination of materiality militates against a dismissal on the pleadings.")). "Only if the alleged misrepresentations or omissions are so *obviously unimportant* to an investor that reasonable minds cannot differ on the question of materiality is it appropriate for the district court to rule that the allegations are inactionable as a matter of law." *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 275 (quoting *Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 281, n.11 (3d Cir. 1992) (*citing TSC Indus. v. Northway, Inc.*, 426 U.S. 438, 450 (1976))) (emphasis added).

misrepresentation, a defendant is not required to disclose all known information, but only information that is 'necessary to make other statements not misleading.'" (quoting *Craftmatic Sec. Litig. v. Kraftsow*, 890 F.2d 628, 640 n.16 (3d Cir. 1989))). Here, the Court must assess whether Iris had a duty to disclose that the Bitcoin mining equipment was owned through non-recourse SPVs financed by NYDIG, that the SPVs were incapable of meeting their financial obligations, and that these financial obligations subjected Iris to substantial risk because Iris pledged both the mining equipment and Bitcoin mined as collateral to its debt obligations. To make out prima facie violations of Sections 11 and 12(a)(2), plaintiffs must allege that an omitted material fact was required to be included by the securities laws or that its absence rendered statements in the prospectus misleading. *In re Adams Golf, Inc. Sec. Litig.*, 381 F.3d at 277 (citing 15 U.S.C. § 77k(a) (referring to "an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading"); 15 U.S.C. § 77l (referring to "an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading")).

As noted above, Plaintiffs allege that the Iris' statements regarding its counterparty risk and more sustainable cashflows were rendered false or misleading considering the omitted facts regarding the SPVs' role in financing the purchase of the mining equipment. Specifically, Plaintiffs assert that the Prospectus represented that Iris owned its mining equipment, which provided Iris with control over its assets and gave it "more sustainable cash flows" over competitors that leased their equipment or utilized third-party hosting agreements. (FAC ¶ 55.) Specifically, the Offering Documents stated that Iris has "ownership of our electrical infrastructure and data centers . . . [which] provides us with security and operational control over our assets. Long-term asset

ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party hosting services . . . ." (*Id.*) The Offering Documents also stated that Iris was "both the owner and operator of our hardware infrastructure . . . ." (*Id.*) The Offering Documents further stated that "[w]hile outsourcing infrastructure and operations and maintenance to third-parties may result in near-term returns and scale, short-term contractual arrangements may result in increased counterparty risk (e.g. potential non-performance, delays and disputes) and renewal risk." This ownership was subject to equipment finance and security agreements, which the Offering Documents disclosed. Plaintiffs have failed to sufficiently plead or explain why Defendants had a duty to disclose the information about the non-recourse SPVs and financing through NYDIG when Defendants already disclosed that ownership was subject to equipment finance and security agreements. Plaintiffs have failed to sufficiently plead or explain why the omission of this information made the statements about counterparty risk and cashflow misleading.

### ii. Statements or Omissions Related to Goodwill

Defendants argue that the goodwill figure is an opinion and Plaintiffs fail to plead materiality of the goodwill statement. (Def. Br. at 23-27.) Plaintiffs assert that the Offering Documents were false and misleading because they overstated Iris' goodwill and did not reflect necessary impairment charges to the goodwill's value associated with the SPVs, mining equipment, and other Iris assets. (FAC ¶ 72.) In their opposition, Plaintiffs assert that the statements regarding goodwill are not opinions. (Opp. at 23.)

The Second and Ninth Circuits have reasoned that statements regarding goodwill valuations are statements of opinion rather than objective fact when they depend on management's application of judgment and subjective evaluation. *City of Dearborn Heights Act 345 Police &*

*Fire Ret. Sys. v. Align Tech., Inc.*, 856 F.3d 605, 613 (9th Cir. 2017) ("statements regarding goodwill valuations are opinion statements because they 'are inherently subjective and involve management's opinion regarding fair value.'"); *Fait v. Regions Fin. Corp.*, 655 F.3d 105, 110 (2d Cir. 2011) ("Estimates of goodwill depend on management's determination of the 'fair value' of the assets acquired and liabilities assumed, which are not matters of objective fact."). *See also Ortiz v. Canopy Growth Corp.*, 537 F. Supp. 3d 621, 667 (D.N.J. 2021) (applying the reasoning from *City of Dearborn* and *Fait* to find statements regarding valuation and inventory were opinion); *Behrmann v. Brandt*, No. 19-772, 2020 U.S. Dist. LEXIS 136543, at *20 (D. Del. July 31, 2020) ("[G]oodwill estimates are opinion statements because they depend on management's determination of the fair value of the assets acquired and liabilities assumed, which are not matters of objective fact and will vary depending on the particular methodology and assumptions used." (citation omitted)). Here, Defendants' statements regarding goodwill valuations are opinions because they depend on management's determinations regarding value and impairment. (*See*, *e.g.*, Ex. A at 181-82 ("[in assessing goodwill] *Management determined* that the Group's carrying value was supported by its recoverable amount and no impairment exists at the reporting date. In forecasting cash flows over the four-year period, management has considered the key market assumptions of the business as forecasted below[.]") (emphasis added).)

As set forth by the Supreme Court in *Omnicare*, there are three scenarios in which an opinion may be false or misleading: (i) a speaker's stated opinion is insincere; (2) the stated opinion contains an expressly embedded factual assertion that is untrue; and (3) the stated opinion reasonably implies untrue facts and omits a qualifying statement regarding those facts. *City of Warren Police & Fire Ret. Sys. v. Prudential Fin., Inc.*, 70 F.4th 668, 684-85 (3d Cir. 2023) (citing *Omnicare, Inc. v. Laborers Dist. Council Constr. Indus. Pension Fund*, 575 U.S. 175, 184-89

(2015)). Here, the FAC does not allege that the statements regarding goodwill were insincere, are embedded with untrue factual assertions, or imply untrue facts and omit qualifying statements regarding those facts.

Because Plaintiffs have not established material misstatement or omission, Plaintiffs' Securities Act claims (Counts III and IV) are **DISMISSED without prejudice**.

### b. Count V: Violations of Section 15 of the Securities Act (against the Securities Act Individual Defendants) (FAC ¶¶ 202-06)

Plaintiffs assert a Section 15 Securities Act claim against Defendants D. Roberts, W. Roberts, Bartholomew, Guzowski, and Alfred. (FAC ¶¶ 202-06.) Section 15 "provides for joint and several liability on the part of one who controls a violator of Section 11 or Section 12." *Pension Tr. Fund for Operating Eng'rs v. Mortg. Asset Securitization Transactions, Inc.*, 730 F.3d 263, 268 (3d Cir. 2013) (quoting *In re Suprema Specialties, Inc. Sec. Litig.*, 438 F.3d 256, 269, 284 (3d Cir. 2006)). To state a claim under Section 15, "the plaintiff must allege (1) a primary violation of the federal securities laws by a controlled person or entity; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful way a culpable participant in the primary violation." *Carmack v. Amaya Inc.*, 258 F. Supp. 3d 454, 466 (D.N.J. 2017) (quoting *Dutton v. Harris Stratex Networks, Inc.*, 270 F.R.D. 171, 178 (D. Del. 2010)). Because Plaintiffs have not established a primary violation under Sections 11 and 12(a)(2), Plaintiffs' Section 15 claim (Count V) is **DISMISSED without prejudice.**

### B. Exchange Act of 1934 Claims

### a. Count I: Violations of Section 10(b) of the Exchange Act and Rule 10b-5 (against the Exchange Act Defendants) (FAC ¶¶ 170-77)

In Count I, Plaintiffs allege the Exchange Act Defendants violated Section 10(b) and Rule 10b-5. (FAC ¶¶ 170-77.) "The private right of action under Section 10(b) and Rule 10b-5 . . . creates liability for false or misleading statements or omissions of material fact that affect trading

on the secondary market." *In re Burlington Coat Factory Sec. Litig.,* 114 F.3d at 1417. To state a securities fraud claim pursuant to Section 10(b) and Rule 10b-5, a plaintiff "must allege (1) a material misrepresentation or omission, (2) scienter, (3) a connection between the misrepresentation or omission and the purchase or sale of a security, (4) reliance upon the misrepresentation or omission, (5) economic loss, and (6) loss causation." *City of Edinburgh Council v. Pfizer, Inc.*, 754 F.3d 159, 167 (3d Cir. 2014). In their motion to dismiss, Defendants assert that Plaintiffs have failed to plead facts that (1) show Defendants' challenged statements were false or misleading or (2) give rise to the PSLRA's requisite strong inference of scienter. (Def. Br. at 28.) Plaintiffs argue that their allegations are sufficient. (*See, e.g.* Opp. at 34.)

### i. Material Misrepresentations or Omissions

Defendants argue that "Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose any and all material information." (Def. Br. at 29 (quoting *City of Edinburgh Council*, 754 F.3d at 167).) In their opposition, Plaintiffs specify several statements upon which they base their Section 10(b) and Rule 10b-5 omissions claims. (Opp. at 25-34.)

Defendants are correct that Section 10(b) and Rule 10b-5 do not create an affirmative duty to disclose all material information. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). However, disclosure may be required in certain circumstances. "A duty to disclose under federal securities laws may arise when a statute requires disclosure, insider trading occurs, or there is an inaccurate, incomplete, or misleading prior disclosure." *City of Edinburgh Council*, 754 F.3d at 173-74 (citing *Oran v. Stafford*, 226 F.3d 275, 285-86 (3d Cir. 2000)). Specifically, "[d]isclosure is required . . . only when necessary 'to make . . . statements made, in the light of the circumstances under which they were made, not misleading.'" *Matrixx*, 563 U.S. at 44 (quoting 17 C.F.R. §

240.10b-5(b)).[5] Plaintiffs' FAC states that Defendants omitted material facts necessary to make statements made, considering the circumstances under which they were made, not misleading. (FAC ¶ 172.) The Court addresses Plaintiffs' allegations in turn.

### 1. February 9, 2022 Form 6-K, Presentation, and Press Release

Plaintiffs first identify statements in the February 9, 2022 Form 6-K and a presentation attached to the Form 6-K as false and misleading. Because Plaintiffs do not allege a duty to disclose pursuant to a statute or insider trading, the Court addresses whether Defendants have a duty to disclose because their initial disclosures were inaccurate, incomplete, or misleading. Plaintiffs assert that the following statements from the Form 6-K and accompanying presentation were misleading because they omitted material information:

- Iris was well-positioned to increase growth and profits because it had the second-most miners of any company with "15 EH/s computing power secured." (FAC ¶¶ 75-76.)
- Iris had a competitive advantage due to its ownership of data mining equipment, whereas competitors used third-party hosting services that exposed them to "counterparty risk." (*Id.* ¶ 77.)
- Iris told investors that it expected revenues of $695 million by early 2023 and profits of $578 million. (*Id.* ¶ 78.) [6]
- Iris disclosed that it entered into equipment finance and security agreements to finance the purchase of various mining hardware. (*Id.* ¶ 81.)

Plaintiffs argue these statements were misleading because they: (1) failed to identify NYDIG as the lender or disclose Defendant Alfred's affiliation with NYDIG; (2) made no disclosure of the use of the SPVs; (3) made no disclosure about the collateral pledged by Iris for the loans, including that Iris pledged Bitcoin mined by the SPVs as collateral, and (4) failed to

---

[5] Indeed, "companies can control what they have to disclose under these provisions by controlling what they say to the market." *Matrixx*, 563 U.S. at 45. "Silence, absent a duty to disclose, is not misleading under Rule 10b-5." *City of Edinburgh Council*, 754 F.3d at 174 (quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 239 n.17 (1988)).

[6] The FAC alleges that these statements were false and inaccurate as was proven a year later when, on February 15, 2023, the Company reported a total operating capacity of just 1.7 EH/s (compared to 10 EH/s it told investors it would deliver by such time) and a net loss after income taxed of $144 million for Q2 2023 (instead of a profit as represented in the 2Q22 6-K). (FAC ¶ 79.)

disclose a lack of sufficient corporate formalities between Iris and the SPVs, which allowed the lender to pursue Iris' assets in the event of a default by the SPVs. (Opp. at 26 (citing FAC ¶ 82).)

The Third Circuit has explained that "[l]iability may exist under Rule 10b-5 for misleading or untrue statements, but not for statements that are simply incomplete." *Winer Family Tr. v. Queen*, 503 F.3d 319, 330 (3d Cir. 2007) (citing *Brody v. Transitional Hospitals Corp.*, 280 F.3d 997, 1006 (9th Cir. 2002) ("Rule 10b-5 . . . prohibit[s] *only* misleading and untrue statements, not statements that are incomplete . . . . Often, a statement will not mislead even if it is incomplete or does not include all relevant facts) (emphasis in original and internal citation omitted); *Backman v. Polaroid Corp.*, 910 F.2d 10, 16 (1st Cir. 1990) (en banc) ("[The duty to disclose rule] does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so 'incomplete as to mislead.'") (quoting *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 862 (2d. Cir. 1968))). Here, Plaintiffs have failed to sufficiently plead how a lack of information about the MFEAs, the relationship between NYDIG and Alfred, a lack of corporate formalities, or the nature of the collateral makes the statements above misleading or untrue.

Furthermore, Defendants argue that the statement that Iris expected revenues of $695 million by early 2023 and profits of $578 million (FAC ¶ 78) was a forward-looking statement protected by the PSLRA Safe Harbor for forward-looking statements. Defendants make this same argument about D. Roberts' statement that Iris "is on track to be one of the largest listed Bitcoin miners with 15 EH/s3 of hardware secured[.]" (*Id.* ¶ 74.)

A statement is "forward-looking" if it contains a "projection of revenues, income [], earnings [] per share, capital expenditures, dividends, capital structure, or other financial items," or statements of "future economic performance, including any such statement contained in a

discussion and analysis of financial condition by the management." *Avaya*, 564 F.3d at 255 (citing 15 U.S.C. § 78u–5(i)(1)(A)-(C)). The PSLRA Safe Harbor "immunizes from liability any forward-looking statement, provided that: the statement is identified as such and accompanied by meaningful cautionary language; or is immaterial; or the plaintiff fails to show the statement was made with actual knowledge of its falsehood." *Avaya*, 564 F.3d at 254 (citing 15 U.S.C. § 78u-5(c)). In addition, the Safe Harbor applies to material misstatements and omissions. 15 U.S.C. § 78u-5(c).

To fall within the PSLRA Safe Harbor, Defendants must have included "meaningful cautionary language" that is "extensive and specific." *Avaya*, 564 F.3d at 254, 256 (internal quotations omitted). "To suffice, the cautionary statements must be substantive and tailored to the specific future projections, estimates or opinions in the prospectus which the plaintiffs challenge." *Id.* (quoting *GSC Partners CDO Fund v. Washington*, 368 F.3d 228, 243 n.3 (3d Cir. 2004)). A vague or boilerplate warning that "merely warns the reader that the investment has risks" will not suffice. *Id.* at 256. Finally, "[c]autionary statements disclosed in SEC filings may be incorporated by reference; they 'do not have to be in the same document as the forward-looking statements.'" *In re Aetna, Inc. Sec. Litig.*, 617 F.3d 272, 282 (3d Cir. 2010) (quoting *In re Merck & Co. Sec. Litig.*, 432 F.3d 261, 273 n.11 (3d Cir. 2005)). Oral forward-looking statements must also be accompanied with a cautionary statement or appropriate reference to a written cautionary statement. *In re Anadigics, Inc., Sec. Litig.*, No. 08-5572, 2011 WL 4594845, at *18 (D.N.J. Sept. 30, 2011).

Here, the February 9, 2022 Press Release and Form 6-K included meaningful cautionary language:

> These forward-looking statements are based on management's current expectations and beliefs. These statements are neither

> promises nor guarantees, but involve known and unknown risks, uncertainties and other important factors that may cause Iris Energy's actual results, performance or achievements to be materially different from any future results, performance or achievements expressed or implied by the forward-looking statements, including, but not limited to: Iris Energy's limited operating history with operating losses; electricity outage, limitation of electricity supply or increase in electricity costs; long term outage or limitation of the internet connection at Iris Energy's sites; Iris Energy's evolving business model and strategy; Iris Energy's ability to successfully manage its growth; Iris Energy's ability to raise additional capital; competition; [B]itcoin prices; risks related to health pandemics including those of COVID-19; changes in regulation of digital assets; and other important factors discussed under the caption "Risk Factors" in Iris Energy's final prospectus filed pursuant to Rule 424(b)(4) with the SEC on November 18, 2021, as such factors may be updated from time to time in its other filings with the SEC, accessible on the SEC's website at www.sec.gov and the Investors Relations section of Iris Energy's website at httrJs://investors.irisenergY..CO.

(ECF 47-4, Ex. C at 8.) This meaningful cautionary language expressly incorporated risks identified in Iris' Prospectus. Accordingly, the above-identified statements from the February 9, 2022 Press Release and 6-K are protected by the PSLRA safe harbor.

### 2. March 28, 2022 Press Release

On March 28, 2022, Iris issued a press release announcing the closing of an additional $71 million equipment financing facility with NYDIG. (FAC ¶ 87.) That press release highlighted that this was the "[t]hird facility secured with NYDIG, further cementing [a] long-term partnership"; that the facility was "[s]ecured by 19,800 Bitmain S19j Pro miners"; and that "~10 EH/s of the Company's total stock of contracted miners remain unencumbered, providing substantial balance sheet flexibility to secure additional non-dilutive funding in due course." (*Id.*) The press release quoted D. Roberts, who stated:

> We are delighted to again partner with an industry leader such as NYDIG who have been a long-standing supporter of our business. This is our third equipment financing facility together and we look forward to formalizing additional loan facilities as miners continue

> to be delivered and installed. This transaction further demonstrates the capital structure benefits in having a strong balance sheet and owning and controlling our own infrastructure.
>
> With substantial equity raised to date, meaningful operational cashflow and a 15 EH/s installation schedule which remains on track, we are pursuing a number of other sources of non-dilutive funding to continue the Company's rapid growth trajectory and delivery of shareholder value, noting that we as management continue to hold approximately one quarter of the shares on issue.

(*Id.* ¶ 88.) Plaintiffs assert that these press release statements were false and misleading because they failed to disclose: (i) that Iris' MFEAs with NYDIG included provisions pledging the Bitcoin mined (and proceeds from the sale of Bitcoin) as collateral, not just the mining equipment; (ii) the SPVs were not capable of servicing the debt, allegedly jeopardizing Iris' cash flows and operations; and (iii) NYDIG, the lender that was given a security interest, was allegedly a related party because Iris Director Michael Alfred had a significant equity interest in NYDIG, which he had acquired when he sold his business Digital Assets Data, Inc. to NYDIG. (*Id.* ¶¶ 90-91.)

"Liability may exist under Rule 10b-5 for misleading or untrue statements, but not for statements that are simply incomplete." *Winer Family Tr.*, 503 F.3d at 330 (citing *Brody*, 280 F.3d at 1006; *Backman*, 910 F.2d at 16). Plaintiffs do not explain how a lack of information about the MFEAs or the relationship between NYDIG and Alfred within the press release makes these specific press release statements misleading or untrue. Further, Plaintiffs have not provided sufficient allegations demonstrating that Defendants knew the SPVs were incapable of servicing the debt owed. Accordingly, Plaintiffs fail to establish a misstatement or omission from the March 28, 2022 Press Release.

### 3.  May 11, 2022 Form 6-K

During and after May 2022, the price of Bitcoin began to drop. (FAC ¶ 93.) On May 11, 2022, Iris filed a report of foreign issuer on Form 6-K with the SEC, appended to which were the

Company's Unaudited Interim Consolidated Financial Statements for the Three and Nine Months ended March 31, 2022 (the "3Q22 6-K"). (*Id.* ¶ 94.) Regarding the Company's equipment financing agreements to procure Bitcoin miners, the 3Q22 6-K stated, in relevant part:

> Mining hardware finance[.] During the year ended 30 June 2021, the Group entered into equipment finance and security agreements pursuant to which an equipment financier agreed to finance the purchase of various mining hardware that have been delivered or yet to be delivered. These facilities carry an annual contractual interest rate of 12% and are denominated in United States dollars. The facilities are repaid through blended monthly payments of interest and principal with the final payment due to the financier on 25 September 2023.
>
> On 25 March 2022, the Group entered into a US$71.0 million (A$93.6 million) limited recourse equipment finance and security agreement with NYDIG ABL LLC. The facility has a contractual term of 25 months and is secured by 19,800 Bitmain S19j Pro miners (1.98 EH/s) with an applicable interest rate of 11% per annum. The facilities are repaid through blended monthly payments of principal and interest with the final payment due April 2024. As of 31 March 2022, the Group had an undrawn balance of A$31.4 million available on the facility.

(*Id.*) Plaintiffs assert these statements were false and misleading because they failed to disclose (i) that Iris' MFEAs with NYDIG included provisions pledging the Bitcoin mined as collateral; (ii) Alfred's affiliation with NYDIG; and (iii) that the SPVs failed to maintain corporate formalities or distinctness from Iris. (*Id.* ¶ 95.) Plaintiffs do not explain how this lack of information makes the press release statements misleading or untrue such that Defendants had a duty to disclose it in the May 11, 2022 6-K. Furthermore, Plaintiffs have not pled or explained why the alleged failure to maintain corporate formalities rendered the above statements misleading or untrue. Accordingly, at this juncture, Plaintiffs fail to state a misstatement or omission based on the May 11, 2022 Form 6-K.

### 4.  May 11, 2022 Conference Call

On May 11, 2022, D. Roberts hosted a conference call with analysts to discuss the Company's Q3 2022 financial results. (FAC ¶ 96.) During the call, he emphasized Iris' strong balance sheet, positive free cashflow, and the fact that the collateral for the Company's equipment financing was limited to the equipment held within the SPVs, thus purportedly protecting the Company from any failure of the SPVs. (*See id.* ("And maybe just to recap, the debt that we have today is all on a non-recourse ring-fenced basis secured against some of the computers that we procured. The balance is all equity. So it's a very clean balance sheet. It's a strong balance sheet. It was done very deliberately."); *id.* ¶ 97 ("So sitting here today we feel like, we've got a very strong balance sheet almost $0.5 billion of equity sitting there. No corporate debt. The only debt is ring-fenced to some of the computers in SPVs.").)

Plaintiffs challenge these statements as misleading. Defendants argue there was nothing misleading about these statements because Iris disclosed information about the loans, including the risks associated within them pertaining to an SPV's default. (Def. Br. at 31.) Defendants also assert that the statements are literally true since the loans were secured by some of the computers and the loans were indeed limited recourse facilities. (*Id.*) Defendants likewise assert that Plaintiffs fail to establish a duty to disclose that mined Bitcoin was an alternative, hypothetical form of collateral. (*Id.*) At this stage, Plaintiffs have not stated a misstatement or omission pursuant to the May 11, 2022 conference call.

### 5.  September 13, 2022 Press Release, Form 20-F, and Conference Call

On September 13, 2022, Iris issued a press release reporting Iris' full year 2022 results for the period ended June 30, 2022. (FAC ¶ 113.) That press release quoted D. Roberts, who stated: "Looking forward, the recent volatility in the Bitcoin price and related industry challenges

reaffirms our confidence in our long-term vertically integrated strategy. We remain focused on building a multi-decade, institutional grade, infrastructure platform while maintaining balance sheet discipline." (*Id.*) The press release also states that "[c]ash and cash equivalents as of June 30, 2022 was $110.0 million, with no corporate debt held by the Company on its balance sheet" and stating in a footnote that "[e]xisting equipment financing ($109.4 million as of June 30, 2022) is limited recourse financing within wholly owned subsidiaries of the Company." (*Id.* ¶ 114.) Plaintiffs assert this downplayed the severity of debt from equipment financing agreements. (*Id.*)

Also on September 13, 2022, Iris filed an annual report on Form 20-F with the SEC, reporting Iris' financial and operational results for its fiscal fourth quarter and year ended June 30, 2022 (the "2022 20-F"). (*Id.* ¶ 115.) Regarding Iris' use of equipment financing agreements to procure Bitcoin miners, the 2022 20-F stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of June 30, 2022, the aggregate amount drawn under the loan facilities was $109.4 million.

(*Id.* ¶ 116.) Regarding Iris' Bitcoin miner equipment financing agreements with NYDIG, the 2022 20-F stated, "The NYDIG Agreement contains customary affirmative and negative covenants applicable to the subsidiary borrower, but not to Iris Energy Limited." (*Id.* ¶ 117.) Regarding Iris' other Bitcoin miner equipment financing agreements, the 2022 20-F stated, "The Other Financing Agreements include customary affirmative and negative covenants applicable to the subsidiary borrowers, but not to Iris Energy Limited." (*Id.* ¶ 118.)

On September 13, 2022, Defendant D. Roberts hosted a conference call with analysts to discuss the Company's Q4 2022 financial results. On the call, D. Roberts told analysts that Iris was still profitable, even at the lower Bitcoin prices in the market. (*Id.* ¶ 120.) He stated,

> For us, the optimal strategy is to liquidate daily, lock in those profits. As you can see there, we're mining Bitcoin at $8,000 a coin, locking that profitability and then make a capital allocation decision with that profitability left over. Today, even in the current market, Bitcoin mining is profitable, incremental returns on CapEx are profitable.

(*Id.*) He also said, "Yes, we're still mining Bitcoin at $8,000 a coin, it's still very good gross profit margins, even at $20,000 Bitcoin" and that "[w]e're building proprietary data centers, building out energy infrastructure, locking up low-cost renewable energy. Yes, we're monetizing that into Bitcoin, but it's a real asset base generating real cash flows." (*Id.* ¶ 121.) D. Roberts also stated that Iris had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure." (*Id.* ¶ 122.) Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro actually puts a downward pressure on that power price." (*Id.*)

Plaintiffs assert D. Roberts stated that Iris' balance sheet was strong and stated:

> Again, we've got some hardware financing, but that is limited to asset level. Again, potentially a key differentiator with other listed firms. We have not given parent company guarantees. We do not have cross defaults. We do not have cross collateralization. Those financing are limited recourse specifically to the individual computers and the SPVs they're holding.

(*Id.* ¶ 123.) Plaintiffs further assert that the September 12, 2022 statements caused Iris' stock to increase from $4.26 on September 13, 2022 to $4.48 on September 14, 2022, an increase of 5.2%. (*Id.* ¶ 124.)

Plaintiffs assert that the September 13, 2022 Press Release, Form 20F, and Conference Call were false and misleading because (1) they failed to disclose that the collateral pledged by Iris to NYDIG under the SPV equipment financing agreements was not limited to the equipment itself, but in fact extended to the Bitcoin mined by the SPVs and any proceeds from the sale of the Bitcoin; and (2) they failed to disclose existing, known material problems with significantly

decreased cash flows from the SPVs. (*Id.* ¶ 125.) Defendants argue that "robust risks warnings [accompanying these statements] squarely address the very risks Plaintiffs claim were concealed." (Def. Br. at 37.) Neither Plaintiffs' FAC nor briefing sufficiently contests the adequacy of Defendants' risk disclosures or assert Defendants' duty to disclose this additional information. *See, e.g.*, *In re Aurora Cannabis, Inc. Sec. Litig.*, No. 19-20588, 2021 U.S. Dist. LEXIS 126677, at *38-39 (D.N.J. July 6, 2021). At this stage, Plaintiffs fail to state a claim based on statements contained in the September 13, 2022 Press Release, Form 20F, and Conference Call.[7]

Accordingly, Count I is **DISMISSED without prejudice.**

### b. Count II: Violations of Section 20(a) of the Exchange Act (against the Exchange Act Individual Defendants) (FAC ¶¶ 180-85)

Section 20(a) of the Exchange Act provides:

> Every person who, directly or indirectly, controls any person liable under any provision of this chapter or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable . . . unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a). Liability under Section 20(a) "is derivative of an underlying violation of Section 10(b) by the controlled person." *Rahman v. Kid Brands, Inc.*, 736 F.3d 237, 247 (3d Cir. 2013) (quoting *Institutional Invs. Grp. v. Avaya, Inc.*, 564 F.3d 242, 252 (3d Cir. 2009)). "Thus, for a controlling person to be liable, the person over whom control was exercised must have committed a primary violation of the securities laws." *In re Intelligroup Sec. Litig.*, 527 F. Supp.

---

[7] Plaintiffs' FAC also cites to statements from June 7, 2022 and June 21, 2022 Press Releases. However, Plaintiffs have not pled or explained why those statements are false or misleading, so Plaintiffs have not pled a Section 10b and Rule 10b-5 claim based on the June 7, 2022 or June 21, 2022 Press Releases.

2d 262, 280 (D.N.J. 2007) (citations omitted). Because the Section 10(b) claim is dismissed for failure to state a claim, Plaintiffs' Section 20(a) claim (Count V) is also dismissed.

## IV.    CONCLUSION

For the reasons stated above, Defendants' motion to dismiss (ECF 47) is **GRANTED.** An appropriate order follows.

*/s/ Jamel K. Semper*
**HON. JAMEL K. SEMPER**
**United States District Judge**

Orig:   Clerk
cc:     Michael A. Hammer, U.S.M.J.
        Parties