COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately
Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile:  (201) 845-9423

*Counsel for Lead Plaintiffs and Liaison
Counsel*

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

| | |
|---|---|
| SCOTT STERLING, individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>vs.<br><br>IRIS ENERGY LIMITED, DANIEL ROBERTS, WILLIAM ROBERTS, DAVID BARTHOLOMEW, CHRISTOPHER GUZOWSKI, MICHAEL ALFRED, J.P. MORGAN SECURITIES LLC, CANACCORD GENUITY LLC, CITIGROUP GLOBAL MARKETS INC., CANTOR FITZGERALD & CO., GALAXY DIGITAL PARTNERS LLC, COMPASS POINT RESEARCH & TRADING, LLC, and MACQUARIE CAPITAL (USA) INC.,<br><br>Defendants. | Case No. 1:22-cv-7273<br><br>Class Action<br><br>**SECOND AMENDED COMPLAINT**<br><br><br>JURY TRIAL DEMANDED |

1

Lead Plaintiffs Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd., individually and on behalf of others similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' Second Amended Complaint against the defendants defined below, allege the following based upon personal knowledge as to Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, interviews with Confidential Witnesses, a review of the Defendants' public documents, conference calls, United States ("U.S.") Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Iris Energy Limited ("Iris" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial, additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

/ / /

/ / /

2

## I.    NATURE OF THE ACTION

1.    This is a federal securities class action on behalf of a class consisting of all persons and entities who purchased or otherwise acquired: (a) Iris ordinary shares pursuant and/or traceable to the Offering Documents (defined below) issued in connection with the Company's initial public offering conducted on or about November 17, 2021 (the "IPO" or "Offering") and/or (b) Iris securities between November 17, 2021 and November 1, 2022, both dates inclusive (the "Class Period").

2.    Iris operates as a Bitcoin mining company using primarily renewable energy to power its mining operations.  The Company has been mining Bitcoin since 2019 and does not hold Bitcoin on its balance sheet.

3.    Iris's Bitcoin mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called "miners" or "Bitcoin miners" and exchanging these Bitcoin for fiat currencies such as U.S. dollars ("USD") or Canadian dollars ("CAD") on a daily basis.

4.     On October 25, 2021, Iris filed a registration statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on November 16, 2021 (the "Registration Statement").

5.     On November 18, 2021, Iris filed a prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement (the "Prospectus," together with the Registration Statement, the "Offering Documents").

6.     On or about November 17, 2021, Iris conducted the IPO, issuing approximately 8,269,231 shares to the public at the Offering price of $28 per ordinary share for gross proceeds to the Company of $231,538,468.   The underwriters were also given a "greenshoe" option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price.

7.     The Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading.   Additionally, throughout the Class Period, Defendants made materially false and misleading statements regarding the

4

Company's business, operations, and prospects.    Specifically, the Defendants made false and/or misleading statements and/or failed to disclose that: (i) certain of Iris's Bitcoin miners, owned through allegedly Non-Recourse SPVs, were not capable of producing sufficient cash flow to service their respective debt financing obligations; (ii) the Company, despite allegedly having no debt and no liability for the debts of the SPVs, had made CAD $130 in debt payments on the SPVs' behalf during the Class Period; (iii) the Company's balance sheet was therefore materially exposed and impaired; (iv) Iris's use of equipment financing agreements to procure Bitcoin miners was not sustainable, as Defendants had represented; (v) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition, including its ability to continue as a going concern; and (vi) as a result, the Offering Documents and Defendants' public statements throughout the Class Period were materially false and/or misleading and failed to state information required to be stated therein.

8.    After the IPO, Iris' stock price began to decline as the price of Bitcoin declined.  However, in order to prevent a further and precipitous decline in Iris' stock price, Defendants Daniel Roberts and William Roberts caused Iris to issue false and misleading statements to stem the decline.  The statements represented that Iris was still profitable, still had significant positive free cash flows and abundant low-cost renewable energy, and that Iris was mining Bitcoin at a cost of $8,000 (allowing it to remain profitable at prices above that level).  Defendants also failed to disclose material facts and risks concerning the Company's use of equipment finance loans to fund the Company's operations and growth.  The false statements achieved their purpose and resulted in Iris stock continuing to trade at artificially inflated levels during the Class Period.

9.    Less than one year after the IPO, on November 2, 2022, Iris issued a press release disclosing, among other things, that "[c]ertain equipment (*i.e.*, Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the

principal amount of the relevant loans" and that "[r]estructuring discussions with the lender remain ongoing."

10.    On this news, Iris's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly 90% decline from the Offering price.

11.    Then, on November 4, 2022, Iris disclosed that the "Non-Recourse SPVs" had received a notice from their lender alleging the occurrence of an event of default and acceleration under the equipment financing facilities (the "Acceleration Notice"). The Acceleration Notice stated that the Non-Recourse SPVs had failed to continue to engage in good faith restructuring discussions pursuant to the agreement between the Non-Recourse SPVs and the lender extending the due date for certain scheduled principal payments to November 8, 2022.

12.    The Acceleration Notice alleged that the failure to engage in good faith restructuring discussions was an immediate "Event of Default" under each facility and declared a payment default for certain scheduled principal payments that were due on the original due date of October 25,

2022, and further declared the entire principal amount of each facility, together with the accrued and unpaid interest thereon, to be immediately due and payable by each Non-Recourse SPV.

13.    By December 2022, Iris' stock had declined almost 92%, as reflected in the following chart:

Since its IPO, IREN's stock price has fallen 91.7% vs. the U.S. S&P 500 index' drop of around 9.6%, as the chart below indicates:



14.     As of the time this Second Amended Complaint was filed, Iris's ordinary shares continue to trade significantly below the $28 per share Offering price, damaging investors.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## II.     JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 11 and 15 of the Securities Act (15 U.S.C. §§ 77k and 77o), as well as Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 22 of the Securities Act (15 U.S.C. § 77v), and Section 27 of the Exchange Act (15 U.S.C. § 78aa).

18.     Venue is proper in this Judicial District pursuant to 28 U.S.C. § 1391(b) and Section 27 of the Exchange Act (15 U.S.C. § 78aa(c)).  Several

of the Defendants named herein reside in or have offices in this District. In addition, pursuant to Iris's most recent annual report on Form 20-F, as of June 30, 2022, there were 54,982,916 of the Company's ordinary shares outstanding. Iris's ordinary shares trade on the Nasdaq Global Select Market ("NASDAQ"). Accordingly, there are presumably hundreds, if not thousands, of investors in Iris's ordinary shares located within the U.S., some of whom undoubtedly reside in this Judicial District. Moreover, a significant portion of the wrongful conduct that occurred related to the IPO occurred in this District and in New York. Underwriting and due diligence work for the IPO occurred in New York and in this District and Defendant Iris was advised by Davis Polk lawyers in New York in connection with the IPO. Cryptocurrency asset manager Galaxy Digital Partners, which has offices in New Jersey, acted as an underwriter and the digital asset adviser for the IPO.

19.    In connection with the acts alleged in this Second Amended Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the

mails, interstate telephone communications, and the facilities of the national securities markets.

### III.   PARTIES

20.    Lead Plaintiffs Network Racing Pty Ltd., Nahi Beaini, LRJ Superannuation Fund, and De Stoop Investments Pty Ltd., as set forth in the attached Certifications, purchased or otherwise acquired Iris ordinary shares pursuant and/or traceable to the Offering Documents issued in connection with the IPO, and/or Iris securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.   The Securities Act Defendants further solicited Plaintiffs' purchases of Iris stock in the IPO.

21.    Defendant Iris is organized under the laws of Australia with principal executive offices located at Level 12, 44 Market Street, Sydney, NSW 2000 Australia.  The Company's ordinary shares trade in an efficient market on the NASDAQ under the ticker symbol "IREN."

11

22.    Defendant Daniel Roberts ("D. Roberts") has served as a Co-Chief Executive Officer ("Co-CEO") and Director of the Company at all relevant times. D. Roberts signed or authorized the signing of the Registration Statement filed with the SEC.  D. Roberts also served as a Director of the Non-Recourse SPVs during the Class Period, including IE CA2 Holdings Ltd., IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd., and personally directed the formation and operation of the SPVs and personally negotiated all aspects of the debt agreements obtained from NYDIG.

23.    Defendant William Roberts ("W. Roberts") has served as a Co-CEO and Director of the Company at all relevant times.  W. Roberts signed or authorized the signing of the Registration Statement filed with the SEC. William Roberts also served as a Director of the Non-Recourse SPVs during the Class Period, including IE CA2 Holdings Ltd., IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd. and personally directed the formation and operation of the SPVs and personally negotiated all aspects of the debt agreements obtained from NYDIG.

24.     Defendants D. Roberts and W. Roberts are sometimes referred to herein collectively as the "Exchange Act Individual Defendants."

25.     The Exchange Act Individual Defendants possessed the power and authority to control the contents of Iris's SEC filings, press releases, and other market communications.  The Exchange Act Individual Defendants were provided with copies of Iris's SEC filings and press releases alleged herein to be misleading prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or to cause them to be corrected.  Because of their positions with Iris, and their access to material information available to them but not to the public, the Exchange Act Individual Defendants knew that the adverse facts specified herein had not been disclosed to and were being concealed from the public, and that the positive representations being made were then materially false and misleading.  The Exchange Act Individual Defendants are liable for the false statements and omissions pleaded herein.

26.     Iris and the Exchange Act Individual Defendants are sometimes referred to herein collectively as the "Exchange Act Defendants."

27.    Defendant David Bartholomew ("Bartholomew") has served as the Chairman of Iris at all relevant times.  Bartholomew signed or authorized the signing of the Registration Statement filed with the SEC.

28.    Defendant Christopher Guzowski ("Guzowski") has served as a Director of Iris at all relevant times.  Guzowski signed or authorized the signing of the Registration Statement filed with the SEC.

29.    Defendant Michael Alfred ("Alfred") has served as a Director of Iris at all relevant times.  Alfred signed or authorized the signing of the Registration Statement filed with the SEC.  Alred also served as a Director of the SPVs and signed various documents on behalf of the SPVs, including the parent letter agreements, debt agreements, hashpower agreements, and related documents between Iris and the Non-Recourse SPVs.

30.     Defendants D. Roberts, W. Roberts, Bartholomew, Guzowski, and Alfred are sometimes referred to herein collectively as the "Securities Act Individual Defendants."[1]

31.     As directors, executive officers, and/or major shareholders of the Company, the Securities Act Individual Defendants participated in the solicitation and sale of Iris ordinary shares in the IPO for their own benefit and the benefit of the Company.  The Securities Act Individual Defendants were key members of the IPO working group and executives of the Company who pitched investors to purchase the shares sold in the IPO.

32.     Defendant J.P. Morgan Securities LLC is an underwriter and served as one of the three joint book-running managers for the IPO.  J.P. Morgan Securities LLC has offices in New Jersey and New York, including offices at 575 Washington Boulevard, Jersey City, NJ 07310.

---

[1] The Exchange Act Individual Defendants and the Securities Act Individual Defendants are sometimes referred to generally as the "Individual Defendants."

33.     Defendant Citigroup Global Markets Inc. is an underwriter and served as one of the three joint book-running managers for the IPO.  It has offices in New York and New Jersey, including offices at 480 Washington Blvd., Floor 16, Jersey City, NJ 07310.

34.     Defendant Canaccord Genuity LLC is an underwriter and served as one of the underwriters for the IPO.  It has offices in New York at 535 Madison Avenue, New York, NY 10022.

35.     Defendant Macquarie Capital (USA) Inc. is an underwriter and served as one of the underwriters for the IPO.  It has offices in New York located at 125 West 55th Street, New York, NY 10019.

36.     Defendant Galaxy Digital Partners LLC is an underwriter and served as one of the underwriters for the IPO.  Its headquarters are located at 300 Vesey Street, New York, NY 10282, and also has offices in New Jersey.

37.     Defendant Cantor Fitzgerald & Co. is a corporation providing financial and investment banking services.  It served as one of the underwriters for Iris' IPO.  It has offices in New York and New Jersey,

16

including offices at 39 Avenue of Commons, Suite 205, Shrewsbury, NJ 07702.

38.    Defendant Compass Point Research & Trading, LLC is a corporation providing financial and investment banking services. It served as one of the underwriters for Iris' IPO. It has offices in New York at 144 East 44th Street, Suite 702, New York, NY 10017.

39.    Defendants J.P. Morgan Securities LLC, Citigroup Global Markets Inc., Canaccord Genuity LLC, Cantor Fitzgerald & Co., Macquarie Capital (USA) Inc., Compass Point Research & Trading, LLC, and Galaxy Digital Partners LLC are collectively referred to herein as the "Underwriter Defendants."

40.    The Underwriter Defendants received commissions of $16,207,693 for their work on the IPO. The underwriters were also allocated a greenshoe option to purchase an additional 1,240,384 shares within 30 days of settlement at the IPO price.

41.    The Prospectus stated that Iris entered into an underwriting agreement with the Underwriter Defendants. Subject to the terms and

conditions of the underwriting agreement, Iris agreed to sell to each Underwriter, and each Underwriter severally agreed to purchase, at the public offering price less the underwriting discounts and commissions, the number of Ordinary shares listed next to its name in the following table:

| Name | Number of Ordinary Shares |
|---|---|
| J.P. Morgan Securities LLC | 2,687,500 |
| Canaccord Genuity LLC | 1,860,577 |
| Citigroup Global Markets Inc. | 1,860,577 |
| Macquarie Capital (USA) Inc. | 620,192 |
| CLSA Australia Pty Ltd | 330,769 |
| Cowen and Company, LLC | 330,769 |
| Cantor Fitzgerald & Co. | 248,077 |
| Compass Point Research & Trading, LLC | 165,385 |
| Galaxy Digital Partners LLC | 165,385 |
| Total | 8,269,231 |

42.    Iris, the Underwriter Defendants, and the Securities Act Individual Defendants are sometimes referred to herein collectively as the "Securities Act Defendants."

18

43.     The Exchange Act Defendants and Securities Act Defendants are sometimes collectively, in whole or in part, referred to herein as "Defendants."

## IV.    SUBSTANTIVE ALLEGATIONS

### A. Background

44.     Iris touts itself as a leading owner and operator of institutional-grade, highly efficient, proprietary Bitcoin mining data centers powered by 100% renewable energy.

45.     Iris only has one operating segment – the mining of Bitcoin.  Its entire success depends on its ability to profitably mine and sell Bitcoin.  The Company has repeatedly stated that it does not hold Bitcoin on its balance sheet but instead sells Bitcoin immediately once it is mined.

46.     Iris's Bitcoin mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of specialized computing equipment called "miners" or "Bitcoin miners" and exchanging these Bitcoin for fiat currencies such as USD or CAD on a daily basis.

47.    On October 25, 2021, Iris filed the Registration Statement on Form F-1 with the SEC in connection with the IPO, which, after several amendments, was declared effective by the SEC on November 16, 2021.

48.    On November 18, 2021, Iris filed the Prospectus on Form 424B4 with the SEC in connection with the IPO, which incorporated and formed part of the Registration Statement.

49.    On or about November 17, 2021, Iris conducted the IPO, issuing 8,269,231 shares to the public at the Offering price of $28 per ordinary share for approximate proceeds to the Company of $215 million, before expenses, and after applicable underwriting discounts and commissions.

## B. Allegations Under the Securities Act of 1933 Regarding Materially False and Misleading Statements Contained in the Offering Documents

50.    The Offering Documents were approved by Defendants D. Roberts, W. Roberts, Alfred, Bartholomew, and Guzowski, who were identified in the Offering Documents as Directors of Iris.

51.     The Prospectus stated that Iris was a high-growth company which had secured operational facilities and funding to continue such growth.

52.     The Prospectus explained that Iris earns revenue by mining Bitcoin:[2]

> Our mining operations generate revenue by earning Bitcoin through a combination of block rewards and transaction fees from the operation of our specialized computers called Application-Specific Integrated Circuits ("ASICs") and exchanging these Bitcoin for currencies such as USD or CAD on a daily basis.

53.     Because investors need to know how their investments fit into a company's overall financing activities, public companies are required to provide details surrounding their material sources and terms of financing. Does the company rely on equity (*e.g.*, by selling stock), debt, or a hybrid of both?  If debt is issued, the terms of the debt are of critical importance. How much of the debt is secured?  What is the debt secured by?  Do certain

---

[2] The Prospectus defined Bitcoin as "Bitcoin is a scarce digital asset that is created and transmitted through the operation of a peer-to-peer network of computers running the Bitcoin software."

creditors get preferential treatment over stockholders or other creditors? Where will the money to pay back the creditors come from? Defendants knew that Iris was legally required to provide investors information about its financing.

54.    Rather than disclose detailed facts about Iris' sources of financing, the Offering Documents only provided generic, boilerplate disclosures. The Offering Documents also failed to disclose material risks regarding the debt obtained via SPVs.

55.    With respect to Iris's use of equipment financing agreements to procure Bitcoin miners, the Offering Documents stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of September 30, 2021, the aggregate amount of the loan facilities was $53.9 million, and the aggregate amount of funds borrowed under these loans was $22.9 million. The loans carry an annual interest rate of 12% and are to be repaid through monthly payments of interest and principal through September 2023. The agreements include customary restrictions and outstanding borrowings are secured by the financed mining units purchased with the loans.

56.    The Offering Documents stated that Iris had a competitive advantage over other Bitcoin miners because it had entered into contracts with Bitmain Technologies to acquire "new generation miners" that would give it mining capacity of 15.2 EH/s.  Listed under a heading of "**Iris Energy Competitive Features,"** the Prospectus touted the Company's **"***Contracted Mining Hardware Supply"* as follows:

> As of September 30, 2021, w*e have entered into binding hardware purchase contracts with Bitmain Technologies Limited, a leading producer of Bitcoin mining hardware, to acquire new generation miners, Antminer S19j and Antminer S19j Pro, with an aggregate nameplate hashrate capacity of 14.5 EH/s and deliveries commencing in October 2021 and ending in September 2023, which is expected to increase our operating and contracted nameplate hashrate capacity to 15.2 EH/s* and result in an average nameplate hardware efficiency of approximately 30 W/TH.[3]

57.    The Prospectus also represented that Iris owned all its Bitcoin mining equipment, which provided it control over its assets and "more sustainable cash flows" than competitors which leased their equipment or utilized third party hosting agreements.  With respect to the purported

---

[3] Unless otherwise indicated, all emphasis is added.

efficiency and overall operational quality of Iris's Bitcoin mining operations, the Offering Documents stated, *inter alia*:

> ***Long-term Security Over Infrastructure, Land and Power Supply***
>
> ***We have ownership of our electrical infrastructure and data centers***, including freehold and long-term leasehold land. ***This provides us with security and operational control over our assets***.
>
> ***Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party hosting services*** or short-term land leases which may be subject to termination rights, profit sharing arrangements and/or potential changes to contractual terms such as pricing.
>
> We also focus on grid-connected power access which again helps to ensure we are able to utilize a reliable, long-term supply of power.
>
> ***Operations and Maintenance***
>
> As both the owner and operator of our hardware and infrastructure, we are directly incentivized to optimize each component of our value chain. Learnings and efficiency gains can then be applied across our entire portfolio.
>
> In addition, we believe that ***we are able to identify and respond to operational issues in a more efficient and timely manner than would be the case under an outsourced hosted model***. We believe

24

this allows us to maximize operating performance as well as hardware life.

*While outsourcing infrastructure and operations and maintenance to third-parties may result in near-term returns and scale, short-term contractual arrangements may result in increased counterparty risk (e.g. potential non-performance, delays and disputes) and renewal risk*.

58.     The Prospectus also stated that Iris was experiencing rapid growth and was well-positioned to continue such strong revenue growth because it had secured facilities to support a targeted hashrate capacity of 15.2 EH/s:

*Growth Opportunities*

**Develop existing sites**

In addition to our first site in BC, as of September 30, 2021, *we have conditional and unconditional rights to a number of sites across BC (e.g. Mackenzie and Prince George), Texas (USA) and Asia-Pacific*, over which we are currently pursuing development activities.

Upon development of these sites, we target up to approximately 1 GW of aggregate power capacity, which would *support our operating and contracted nameplate hashrate capacity of 15.2 EH/s (approximately 530 MW of data center capacity when online and fully operational), as well as provide capacity for additional future growth*.

59.    The Offering Documents also stated:

*We estimate that our cash flows from operating activities will be positive for at least the next 12 months*. In the absence of raising additional capital, whether through this public offering or an alternative source of financing, our cash and cash equivalents of US$85.7 million (A$118.6 million) as of September 30, 2021 together with our estimated cash flows from operating activities should be sufficient to fund our contracted hardware commitments and growth infrastructure capital expenditures until February 2022.

60.    The Offering Documents also stated:

We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various miners that have been delivered to us or will be delivered to us. As of September 30, 2021, the aggregate amount of the loan facilities was $53.9 million, and the aggregate amount of funds borrowed under these loans was $22.9 million. The loans carry an annual interest rate of 12% and are to repaid through monthly payments of interest and principal through September 2023. The agreements include customary restrictions and outstanding borrowings are secured by the financed mining units purchased with the loans.

61.    The statements referenced in ¶¶ 54-60 were materially false and misleading because the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading.  Specifically, the Offering Documents failed to disclose

that: (1) certain of Iris's Bitcoin miners were owned through allegedly Non-Recourse SPVs which had been financed by third party lenders, which made Iris' operations, including the mining equipment and Bitcoin mined, subject to the very "increased counterparty risk" that the Offering Documents stated Iris was immune from;[4] (2) the SPVs and Iris had the same individuals on their board and failed to maintain sufficient corporate distinctness to provide protection to Iris in the event of a default by the SPVs; (3) Iris had been seeking financing at the time of the IPO from its lender NYDIG in the amount of $150 to $200 million, but NYDIG had declined to provide financing in such amounts; (4) the undisclosed SPVs were not capable of producing sufficient cash flow to service their respective debt financing obligations, and as a result Iris had been making and would be required to continue to make debt and interest payments on the SPVs' behalf to NYDIG;

---

[4] For example, IE CA 2 Holdings, Ltd. had been formed in late 2020 and was operational at the time of the IPO. In addition, IE CA 3 Holdings Ltd had been formed and was in existence for months prior to the IPO. It entered into a MEFA with Arctos (the predecessor to NYDIG) on May 25, 2021.

(5) Iris' need to  make millions of dollars of intercompany transfers to the SPVs to support their debt payments placed Iris at material risk since Iris could not recover its payments in the event of a default by the SPVs; (6) accordingly, Iris's use of equipment financing agreements to procure Bitcoin miners was subject to substantial risk, including counterparty risks; and (7) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition.

62.    The Offering Documents also concealed material risks to the Company from use of the SPVs and equipment financing contracts. The Offering Documents in fact made no mention whatsoever of the SPVs or their risks.  In addition to not disclosing the SPVs, the Offering Documents concealed and failed to disclose the insolvency of the SPVs and the material risks to the Company's operating capacity, power costs, cash flows, and profitability in the event of a default by the SPVs on the financing agreements.  The Offering Documents also affirmatively misrepresented that the Company was protected from certain risks due to the fact that it owned and operated its own mining equipment.  As noted *supra*, the

Prospectus stated that "*We have ownership of our electrical infrastructure and data centers*, including freehold and long-term leasehold land. *This provides us with security and operational control over our assets. Long-term asset ownership also allows our business to benefit from more sustainable cash flows in comparison with miners that rely upon third-party hosting services* or short-term land leases which may be subject to termination rights, profit sharing arrangements and/or potential changes to contractual terms such as pricing."

63. The Offering Documents also failed to disclose the following material risks: (1) Iris was already experiencing, at the time of the IPO, significantly increased costs to acquire new computers ("miners"), which posed a material risk to its ability to acquire and service debt to fund its growth and achieve its targeted hashrate capacity; (2) SPVs were being used to obtain financing that the Company claimed was not corporate debt, and yet Iris had been making the SPVs' debt payments; (3) a default by any of the three SPVs would materially increase Iris' electricity costs per Bitcoin mined because the Company had in place fixed-price contracts for power; as

a result, the reduction in the number of Bitcoin miners in the event of a default by the SPVs would result in higher demand charges (*i.e.*, fixed charges) per Bitcoin mined;  (4) any default by one or more of the SPVs would adversely impact the Company's balance sheet and operating metrics; with a lower operating capacity, increased electricity costs per Bitcoin mined, Iris' revenue and operating cash flows would decline materially, resulting in significant net operating losses; and (5) since the SPVs had no collateral other than computers, and NYDIG had priority over such collateral, Iris was at material risk of not recovering its subsidized debt and interest payments in the event of a default of the SPVs.  Indeed, during the Class Period Iris advanced ***over CAD $130 million in principal and interest payments on the SPVs' behalf*** and has stated that it will not recover any of those payments.  In his June 3, 2022 Affidavit, Defendant W. Roberts stated that "IEL remains a creditor of the Debtors [SPVs] and had over CAD $130 million in subordinated debt and equity at the end of 2022, and despite Bitcoin price recovering to approximately USD $27,000 as of May 31, 2023, IEL does not expect to recover any of its subordinated capital as a result of

the enforcement actions taken by NYDIG."[5]  Iris was also forced to recognize an impairment charge in the amount of *$67 million* on February 15, 2023.[6]

64.    The fact that the SPVs did not have sufficient cashflows at the time of the IPO was revealed in an internal December 2021 Iris Management Report on IE CA 3 Holdings Ltd., for example, which noted that IE CA 3 had a "2021 YTD loss of CAD $2,917,794" and that "As IE CA 3 Holdings did not have a bank account to 31 Dec 2021, all mining hardware prepayments to Bitmain have been funded by IEL."

65.    The Offering Documents also failed to disclose that the SPVs were financed by New York Digital Investment Group, LLC ("NYDIG"), which is located at 510 Madison Ave. Fl 21, New York City, New York, 10022, and that Iris had requested but not received debt from NYDIG in the amount

---

[5] Affidavit of William Roberts dated June 3, 2023 submitted in the Canadian receivership proceedings for the SPVs (*NYDIG ABL LLC v. IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd*., No. S230488) (Supreme Court of British Columbia), at ¶159.

[6] On the Company's February 15, 2023 conference call with analysts to discuss its quarterly results, Belinda Nucifora of Iris stated: "we also recorded a primarily non cash impairment charge of $105 million, of which $67 million relates to the limited recourse financing SPVs."

of $150 to $200 million.[7]  The Offering Documents contained exactly one (1) mention of NYDIG – on page 106 of the Prospectus – in a single sentence stating that Defendant Alfred was the former CEO of a company called Digital Assets Data, Inc., which was later acquired by NYDIG in November 2020.  The Offering Documents completely failed to disclose that NYDIG was the lender for all three SPVs.  It also failed to disclose that Defendant Alfred in fact had a continuing equity interest in NYDIG following NYDIG's acquisition of Digital Assets Data, Inc. in November 2020.

---

[7] NYDIG was a leading lender to crypto miners like Iris and thus any hesitancy by NYDIG in approving loans in the large amount sought by Iris would cast doubt on Iris' ability to sell itself in the IPO to Wall Street as a high growth company.  By the time of the IPO, Bitcoin had reached an all-time high of $60,000 per Bitcoin and, since the price of Bitcoin mining computers fluctuates with the price of Bitcoin, the cost of such computers was also at an all-time high.  NYDIG was becoming cautious about additional major loans given Bitcoin's all-time high since future declines in prices would place its loans at risk.  The Offering Documents, however, touted Iris' ability to fund a major growth expansion through debt financing without disclosing the identity of NYDIG as the lender and without disclosing the fact that Iris had not been successful in obtaining a large $150-$200 million loan from NYDIG.  As noted *infra*, when NYDIG did eventually agree to provide some debt financing in March 2022, the amount obtained was much smaller than what Iris had been seeking.

66.     The fact that the cash flows of the SPVs were not sufficient from the beginning to service their debt was later demonstrated by the lender – NYDIG.  The SPVs were formed before the IPO, as early as March 2021.  At least one of the SPVs – IE CA 4 – began making debt service payments to NYDIG in June 2021.[8]  When the SPVs later defaulted on their debt, PriceWaterHouseCoopers ("PWC") was appointed as the receiver.  In a May 9, 2023 affidavit submitted on behalf of the receiver, the CEO of NYDIG (Tejas Shah) stated that the SPVs were not capable of adequately servicing their debt:  "The actual financial performance of the Respondents [the SPVs] following the financing, as evidenced by the financial disclosures made by the Respondents to NYDIG, demonstrates that the Respondents could not afford to make debt service payments under the MEFAs [Master Equipment Financing  Agreements]  if  their  only  income  was  hashpower  income,

_____

[8] The Affidavit of Tejas Shah further stated that "Every debt service payment made on account of both MEFAs, without exception, originated from a single bank account in the name of Iris (the "Iris Account")."  In addition, loan proceeds from NYDIG that were not paid directly to the equipment manufacturer (Bitmain Tech.) were deposited into Iris' bank account, not that of the SPVs.  Shah Affidavit, ⁋ 119.

especially when taking into account the related-party expenses that the Respondents were paying under the formal Hosting Agreements (in the case of IE CA 4) and the informal hosting arrangements (in the case of IE CA 3). *In fact, the intercompany income (i.e., hashpower revenue) and the intercompany expenses (i.e., hosting costs) were negative or breakeven for most of the months in respect of which NYDIG has been provided financial information.*"[9]

67.     Iris is subject to IFRS accounting standards.  IFRS rules require an impairment loss to be measured as the difference between the carrying amount of the CGU, including goodwill, and its recoverable amount.  The recoverable amount is the higher of: (1) the fair value less cost of disposal ("FVLCD"); or (2) value in use ("VIU").

68.     VIU is an entity-specific measure, as opposed to fair value, which is a market participant-based measure.  VIU is based on management's pre-tax cash flow projections, generally excluding the effects of future

---

[9] Shah Affidavit, ¶ 102.

restructuring or asset enhancements. Management's projections are used for a maximum of five years, unless a longer period can be supported. Thereafter, the cash flows are extrapolated using a steady or declining growth rate consistent with that of the product, industry or country.

69. The inability of the SPVs to adequately service their debt obligations and to generate sufficient cash flows constituted events under IFRS accounting standards requiring Iris to recognize an impairment to its assets. The Offering Documents were false and misleading because they failed to disclose material facts regarding NYDIG's refusal to approve loans to Iris in the amounts sought by Iris at the time of the IPO and the Company's existing intent and efforts to procure financing through the Non-Recourse SPVs that Defendants knew would be insolvent from the beginning and thus incapable of servicing their debt obligations.

70. Item 303 requires disclosure of "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(a)(3)(ii).

35

71.     Under Item 303, a disclosure duty exists where a trend, event, or uncertainty is both: (1) known to management; and (2) reasonably likely to have material effects on the registrant's financial condition or results of operation.   Among other things, the issuer has a duty to disclose both "whether" and "*to what extent*" that known trend, event, or uncertainty might reasonably be expected to materially impact future revenues." Disclosure is required *unless* the company is able to conclude either that it is not reasonably likely that the trend, event, or uncertainty will occur, or that a material effect on the company's financial condition is not reasonably likely to occur.

72.     Here, Item 303 required disclosure of the omitted facts concerning the SPVs, which were known by the Company at the time of the Offering Documents because they were both known to management prior to the time the Prospectus was issued and were reasonably likely to — and, in fact, did — have a material effect on the Company's financial condition.

73.     When the truth was revealed starting in 2022, the price of Iris stock declined, thus demonstrating that the undisclosed facts were

reasonably likely to have a material impact on the Company's financial condition such that they should have been disclosed under Item 303.

74.    Item 105(a) of SEC Regulation S-K, 17 C.F.R. § 229.105, which governs disclosure of risk factors, requires a registrant to "provide under the caption 'Risk Factors' a discussion of the most significant factors that make the [securities] speculative or risky."  Specifically, Item 105 requires the issuer to "[e]xplain how the risk affects the registrant or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."  Item 105 serves to provide investors with a clear and concise summary of the material risks to an investment in the issuer's securities.

75.    Accordingly, under Item 105, a registrant has a duty to provide accurate and candid information — beyond generalizations — of risks it faces.  In violation of this duty, however, the Offering Documents failed to disclose that the risks relating to the SPVs and NYDIG.  Defendants' violation of Item 105 is particularly glaring in light of its specific disclosure (on page 24 of the Registration Statement) of Iri Energy's "estimated

outstanding capital commitments related to [its] binding hardware purchase contracts with Bitmain … totaling US$533.0 million."

## C. Allegations Under the Securities Exchange Act of 1934 Regarding Materially False and Misleading Statements Issued During the Class Period

76.    The Class Period begins on November 17, 2021, when Iris's ordinary shares began publicly trading on the NASDAQ pursuant to the materially false or misleading statements or omissions contained in the Offering Documents, as referenced in ¶¶ 54-75, *supra*.

77.    Defendants repeatedly touted Iris as a high growth company. Key to the "growth story" was the ability of Iris to expand its Bitcoin mining operations.  That could only occur by raising funds to buy the specialized computers and data centers necessary to mine bitcoin.  To assure investors that such plan was on track, on December 9, 2021 Iris filed a Form 6-K.  It was signed by Defendant D. Roberts and stated:

> On November 19, 2021, Iris Energy successfully completed a $232 million IPO and has listed on the Nasdaq Global Select Market.
>
> Net proceeds from the IPO to be primarily used to fund the Company's capex initiatives, including miner purchases (15.2

EH/s secured) and the construction of the Company's proprietary specialized data centers.

78.     On February 9, 2022, Iris issued a press release reporting the Company's second quarter 2022 results for the period ending December 31, 2021.   That press release quoted Defendant D. Roberts, who stated, in relevant part, that Iris "is on track to be one of the largest listed Bitcoin miners *with 15 EH/s3 of hardware secured*[.]"  Defendants' statements about the amount of mining equipment secured and the Company's ability to buy more mining equipment through debt and equipment financing were highly material because the number of miners (which are simply computers) directly affects capacity, which directly affects hashrate,[10] which directly affects the amount of Bitcoin that can be mined.  Since mining Bitcoin is Iris' sole source of revenue, the Company's ability to obtain and preserve financing for buying mining equipment (computers) was critical

---

[10] The Prospectus defined Hashrate as "The speed at which a miner can produce computations (hashes) using eh Bitcoin network's algorithm, expressed in hashes per second.  The hashrate of all miners on a particular network is referred to as the hashrate of the network."

information to investors.  Defendants concealed the use of SPVs to obtain financing, the fact that the SPVs did not have sufficient cash flow to service the debt, and that Iris had been making debt payments on the SPVs' behalf. An internal December 2021 Iris Management Report on IE CA 3 Holdings Ltd., for example, noted that IE CA 3 had a "2021 YTD loss of CAD $2,917,794" and that "As IE CA 3 Holdings did not have a bank account to 31 Dec 2021, all mining hardware prepayments to Bitmain have been funded by IEL."

79.    Also on February 9, 2022, Iris filed a report of foreign issuer on Form 6-K with the SEC, appended to which were the Company's Unaudited Interim Consolidated Financial Statements for the Three and Six Months ended December 31, 2021 (the "2Q22 6-K") as well as an Investor Presentation slide deck.  In its Consolidated Financial Results, Iris told investors that "The ability of the Group to continue as a going concern depends upon the Group maintaining sustained positive free operating cash flows and securing additional capital to fund the contracted mining hardware purchases and infrastructure spend, as part of its growth plan."

80.    In the Investor Presentation, Iris represented that there were four key drivers for success in the Bitcoin mining industry:  Miners (more miners = more Bitcoin mined = higher revenues); Megawatts; Money (capital to fund growth); and Management:



81.    With respect to Miners, Iris represented that it was well-positioned to increase growth and profits because it had the second-most miners of any company in its field:

[The remainder of this page is deliberately left blank.]



82.    In the Investor Presentation, Iris stressed the competitive advantages that it allegedly possessed due to the fact that it owned its data mining equipment, compared to competitors who used third party hosting services:

83.   Iris told investors that it expected revenues of $695 million by early 2023 and profits of $578 million:



84.   These statements were later revealed to be false and wildly inaccurate.  When Iris reported its results for Q2 2023 on February 15, 2023, it reported a total operating capacity of just 1.7 EH/s compared to the 10 EH/s it told investors it would deliver by such time in its above-referenced February 9, 2022 presentation.  Iris said it "intended" to be able to increase its capacity to 5.5 EH/s down the line.  In addition, far from reporting a profit, Iris reported a net loss after income taxes of $144 million for Q2 2023.

85.    In the February 9, 2022 Form 6-K, Iris reported significantly improved metrics in all categories, including revenue, Bitcoin mined, hashrate, and EBITDA:



86.    With respect to the Company's equipment financing agreements to procure Bitcoin miners, the 2Q22 6-K stated, in relevant part:

The [Company] has entered into equipment finance and security agreements pursuant to which an equipment financier has agreed to finance the purchase of various mining hardware that have been delivered or yet to be delivered. These facilities carry an annual contractual interest rate of 12% and are denominated in United States dollars. The facilities are repaid through

44

blended monthly payments of interest and principal with the final payment due to the financier on 25 September 2023.

87.    This statement was false and misleading because it: (1) failed to identify NYDIG as the lender; (2) made no disclosure of the use of the SPVs or other facts; (3) made absolutely no disclosure about any collateral pledged by Iris for the loans and the material fact that Iris was not maintaining sufficient corporate formalities or separateness between the SPVs and Iris to protect Iris from having its assets pursued by the lender in the event of a default by the SPVs; (4)  failed to disclose that the cash flow of the SPVs was not sufficient to service the debt and that Iris had been making intercompany transfers to service the debt of the SPVs; and (5) failed to disclose Defendant Alfred's affiliation with NYDIG.

88.    The press release that was attached to the Form 6-K contained the following statements from Defendant D. Roberts:

"We are pleased to report record financial and operating results as part of our inaugural quarterly and half-yearly report as a listed company," stated Daniel Roberts, Co-Chief Executive Officer and Founder of Iris Energy. "***Iris Energy is on track to be one of the largest listed Bitcoin miners with 15 EH/s3 of hardware secured (~10 EH/s expected to be operational by early***

*2023)* and 765MW of grid-connected power operating or under construction. Led by a seasoned management team, we are building a global energy and specialized data center infrastructure platform targeting markets with excess and under-utilized renewables where we can solve a problem. *We are looking forward to the upcoming 12 to 18 months, which we expect will be transformational for the Company*."

89.    The press release accompanying the 2Q22 6-K also contained the following "Key Highlights":

**Key Highlights**

•    *Record revenue of $20.0 million* (A$27.6 million) for the quarter (+93% vs. Q1 FY22) and $30.4 million (A$41.9 million) for the half (+1,352% vs. 1H FY21)

•    *Record Adjusted EBITDA of $14.3 million* (A$19.7 million) for the quarter (+156% vs. Q1 FY22) and $19.9 million (A$27.5 million) for the half (vs. -$0.7 million (-A$0.9 million) in 1H FY21)

•    *Record Adjusted EBITDA Margin of 72% for the quarter* (vs. 54% in Q1 FY22) and 66% for the half (vs. -33% in 1H FY21)

•    Net Profit After Tax of $71.7 million (A$98.8 million) for the quarter and Net Loss After Tax of $418.9 million (A$580.0 million) for the half (attributable to a one-off non-cash mark-to-market of convertible notes converted into equity at IPO)

•    *Record average operating hashrate of 685 PH/s (+97% vs. Q1 FY22) and 364 Bitcoin mined (+51% vs. Q1 FY22)* for the quarter from 100% renewable operations since inception

•    Successfully completed $232 million IPO and listing on Nasdaq led by J.P. Morgan, Canaccord Genuity and Citigroup

•    Construction ahead of schedule at Mackenzie (BC, Canada) with commissioning of the first 0.3 EH/s (9MW) now

expected in early Q2 2022 followed by full ramp up to 1.5 EH/s (50MW) expected during Q3 2022

•     Prince George (BC, Canada) on track to deliver 1.4 EH/s (50MW) in Q3 2022 and expansion to 2.4 EH/s (85MW) anticipated in 2023

•     Post quarter end, a transformational 600MW connection agreement was executed with AEP Texas, increasing power capacity to 765MW (~22 EH/s2).

90.    The 2Q22 6-K also included a "going concern" warning that Iris's "ability . . . to continue as a going concern depends upon the [Company] maintaining sustained positive free operating cash flows and securing additional capital to fund the contracted mining hardware purchases and infrastructure spend, as part of its growth plan[,]" while simultaneously assuring investors that "[t]he strategy to mitigate these risks and uncertainties is to execute a business plan aimed at continued operational efficiency, revenue growth, improving overall mining profit, managing operating and capital expenditure and working capital requirements, and securing additional financing, as needed."

91.    The Company's assurances regarding the strength of its business plan, strong cash flows, and ability to raise debt to fund its growth concealed the real risks and problems faced by Iris at the time, and prevented

the stock from declining.  Instead of dropping, Iris' stock increased from a close of $14.28 on February 9, 2022 to $14.74 on February 10, 2022 and then closed at $14.78 on February 11, 2022.

92.    On March 28, 2022, Iris issued a press release announcing the closing of an additional $71 million equipment financing facility with NYDIG.  That press release highlighted that this was the "[t]hird facility secured with NYDIG, further cementing [a] long-term partnership"; *that the facility was "[s]ecured by 19,800 Bitmain S19j Pro miners"*; that it was a "*limited recourse* equipment financing facility"; *and that "~10 EH/s of the Company's total stock of contracted miners remain unencumbered, providing substantial balance sheet flexibility to secure additional non-dilutive funding in due course*."

93.    The same March 28, 2022 press release also quoted Defendant D. Roberts, who stated, in relevant part:

> "We are delighted to again partner with an industry leader such as NYDIG who have been a long-standing supporter of our business.  This is our third equipment financing facility together and *we look forward to formalizing additional loan facilities as miners continue to be delivered and installed.  This transaction further*

> *demonstrates the capital structure benefits in* having a strong balance sheet and *owning and controlling our own infrastructure*."

> "With substantial equity raised to date, meaningful operational cashflow and *a 15 EH/s installation schedule which remains on track, we are pursuing a number of other sources of non-dilutive funding to continue the Company's rapid growth trajectory* and delivery of shareholder value, noting that we as management continue to hold approximately one quarter of the shares on issue."

94.      These statements by Iris and Defendant D. Roberts reassured the market about Iris' financial condition and prospects and caused the stock to increase materially.  The stock, which closed on March 28, 2022 at $13.86 per shares, closed on March 29, 2022 at $15.61, and then further to $15.90 on March 30, 2022, an increase of 14.7%.

95.      These statements were false and misleading and omitted material information.  To begin with, the press release failed to disclose that Iris had entered into Parent Letter Agreement with NYDIG four days earlier, on March 24, 2022.  Significantly, the Parent Letter Agreement resolved the demand NYDIG had been making (undisclosed by Iris) that Iris guarantee the debt.  Iris did not provide the parent company guarantee but *Iris agreed*

49

***to subordinate its rights to the collateral owned by the SPVs (i.e., the mining computers) to NYDIG***.  The Parent Letter Agreement was material because it put Iris at material risk in the event of a default by the SPVs, yet Defendants concealed it from the market.  The March 28, 2022 press release also failed to disclose that D. Roberts had been unsuccessfully pursuing a much larger financing package -- $150 million to $200 million – from NYDIG for four months, since the time of the Company's IPO in November 2021. Second, the press release was false and misleading because it omitted to disclose the material fact that Defendant D. Roberts had been informed by Mr. Smyth of NYDIG that NYDIG was not willing to provide the amount of financing requested by Iris unless Iris "was added as a covenantor and guaranteed payment of the debt at the parent level" was provided for in the financing agreement.[11]  Because Iris was unwilling to do so, and because it had been unable to procure financing in the amounts needed from any other

---

[11] *See* Reasons for Judgment, at p. 11, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd.*, 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).

lender, Iris was not able, at the time of its IPO and thereafter, including at the time the March 28, 2022 press release was issued, to achieve the "rapid growth trajectory" it claimed to be able to achieve.

96.    Third, the March 28, 2022 press release failed to disclose that the SPVs were not capable of servicing the debt, thus jeopardizing the Company's cash flows and operations.  In fact, as the court presiding over a subsequent receivership proceeding later found, "*From the beginning, the Debtors [SPVs] were not financially viable on their own, but depended heavily on IEL (Iris Energy Ltd.] to make the loan payments owing to NYDIG*. . . IEL was required to supplement the Debtors' income so they could make the payments required of them under the MEFAs. . . [B]y the time IEL stopped doing so, it had advanced, for this purpose, *over CDN $130 million to the Debtors in the form of subordinated inter-company loans* that also remain outstanding and unpaid."[12]  The problems Iris was experiencing

---

[12] *See* Reasons for Judgment, at p. 15, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd.*, 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).

with raising capital in the amounts it needed, coupled with the SPVs' inability to meet debt payment without intercompany transfers from Iris, meant that **the Company was not "on track" to realize "a 15 EH/s installation schedule"** since such schedule depended on achieving significant growth, which could only be realized through significant additional financing.  In addition, the inability of the SPVs to service their debt by themselves made defaults by the SPVs inevitable, which would result in the lender (NYDIG) foreclosing on the mining equipment that served as collateral for the loans, thus significantly **decreasing** the Company's operating capacity and amount of Bitcoin mined.

97.    The press release's representation that the Company was "**pursuing a number of other sources of non-dilutive funding to continue the Company's rapid growth trajectory"** was materially misleading because it omitted to disclose that the sole entity which had provided Iris with financing – NYDIG – had told Defendant Roberts three weeks before the press release that there had been a very significant tightening in the credit market and that as a result, NYDIG would be significantly reducing lending

to Iris.  As a result, and with no other credible lenders available, Iris was not on track to achieve its "rapid growth trajectory."

98.    Specifically, in a **March 8, 2022 email**, Mr. Smyth of NYDIG informed Defendant Roberts that "*there has been a very significant tightening in the capital markets generally, which has added additional complexity*.  What I'd like to see if you'd be okay to proceed with is *sizing down the initial commitment to a funding of $60,924,600* in June. . . Sizing down will provide more leeway on the legal front."[13]   The amount of the financing package was ultimately increased slightly to $71 million, but was still well below the $150 to $200 million Iris had been seeking.

99.    The press release also failed to disclose that NYDIG, the lender which was given a security interest, was a related party because Defendant

---

[13] In addition, the Master Equipment Financing Agreement ("MEFA") for IE CA 4 included a Parent Letter Agreement dated March 24, 2022, pursuant to which Iris acknowledged and agreed that NYDIG could unilaterally terminate the Hashpower Agreement in an "Event of Default" ("EOD") by the SPVs.  Thus, in a default, the Hashpower Agreements would be terminated, thus significantly reducing the Bitcoins mined and thus the revenues and growth of Iris.  These facts posed a material risk to Iris' revenues and growth.

Alfred had a significant equity interest in NYDIG, which he had acquired when he sold his business Digital Assets Data, Inc. to NYDIG.   Defendants also failed to disclose that NYDIG owned 285,088 shares of stock in Iris and that such shares were the result of the conversion of a promissory note and interest rate concessions.

100.   According to Confidential Witness #1, who worked at both companies during the relevant time period, Alfred had earned the nickname Mike "All-fraud" from employees after he falsely promised Digital Assets Data employees significant payments upon the sale and then reneged, keeping the money for himself.

101.   During and after May 2022, the price of Bitcoin began to drop. Stock market analysts began to apply greater scrutiny to the ability of companies such as Iris to achieve profitability and/or to finance their growth through debt offerings and/or equipment financing.   Thus, the facts and circumstances regarding Iris' equipment financing agreements with NYDIG assumed even greater importance to the market and investors since the vast

majority of Iris' Bitcoin mining equipment was financed by NYDIG and Iris' ability to obtain more financing was critical to its growth strategy.

102. In May 2022, seeking to distinguish itself from other cryptocurrency entities that were suffering from this industry-wide decline in crypto-valuations at the time, Iris began to trumpet its financing arrangements – albeit through false and misleading statements and omissions. On May 11, 2022, Iris filed a report of foreign issuer on Form 6-K with the SEC, appended to which were the Company's Unaudited Interim Consolidated Financial Statements for the Three and Nine Months ended March 31, 2022 (the "3Q22 6-K"). With respect to the Company's equipment financing agreements to procure Bitcoin miners, the 3Q22 6-K stated, in relevant part:

*Mining hardware finance*

During the year ended 30 June 2021, the Group entered into equipment finance and security agreements pursuant to which an equipment financier agreed to finance the purchase of various mining hardware that have been delivered or yet to be delivered. These facilities carry an annual contractual interest rate of 12% and are denominated in United States dollars. The facilities are repaid through blended monthly payments of interest and

principal with the final payment due to the financier on 25 September 2023.

On 25 March 2022, the Group entered into a US$71.0 million (A$93.6 million) limited recourse equipment finance and security agreement with NYDIG ABL LLC. The facility has a contractual term of 25 months and is secured by 19,800 Bitmain S19j Pro miners (1.98 EH/s) with an applicable interest rate of 11% per annum. The facilities are repaid through blended monthly payments of principal and interest with the final payment due April 2024. As at 31 March 2022, the Group had an undrawn balance of A$31.4 million available on the facility.

103.   The May 11, 2022 Form 6-K also contained the following charts in which Iris represented it was rapidly expanding its Hashpower growth and well-positioned to continue to do so:

[The remainder of this page is deliberately left blank.]



[The remainder of this page is deliberately left blank.]



104.   The 6-K also included a third chart representing the revenue the contracted computers would generate, "assuming contracted hardware is operating today":

[The remainder of this page is deliberately left blank.]

IrisEnergy

## Illustrative Mining Profit

### Assuming contracted hardware is operating today[5] (annualized)

| Nameplate Hashrate | 10 EH/s[1,2] | 15 EH/s[1,2] |
|---|---|---|
| Illustrative Net Revenue[3] | $626m | $939m |
| Illustrative Mining Profit[4] | $505m | $761m |

Notes:
1. Please see the Coinwarz Bitcoin Mining Calculator (https://www.coinwarz.com/mining/bitcoin/calculator):
   - Inputs for 10 EH/s: 10,000 PH/s (hashrate), 335MW (power consumption) and $0.04 /kWh (electricity costs) – prefilled link here
   - Inputs for 15 EH/s: 15,000 PH/s (hashrate), 495MW (power consumption) and $0.04 /kWh (electricity costs) – prefilled link here
   Based on binding hardware purchase contracts which are expected to increase operating and contracted nameplate hashrate capacity to 15.2 EH/s.
2. Illustrative outputs assume, as a placeholder only, as at May 10, 2022, Bitcoin price of ~US$40k, global hashrate (implied by network difficulty) of ~213 EH/s and transaction fees of ~0.1 BTC per block. Assumes pool fees of 0.5% of mining rewards and mining hardware operates at 100% uptime. Note: Online calculator excludes all overheads and fees (except mining pool fees)
3. Illustrative net revenue = Illustrative gross revenue less assumed mining pool fees
4. Illustrative mining profit = Illustrative net revenue less assumed electricity costs
5. The illustrative outputs assume nameplate hashrate is fully installed and operating today using the above assumptions. These assumptions are likely to be different in the future and users should input their own assumptions

THE ABOVE INFORMATION IS FOR GENERAL INFORMATION PURPOSES ONLY. THE NET REVENUE AND MINING PROFIT OUTPUTS ARE FOR ILLUSTRATIVE PURPOSES ONLY AND SHOULD NOT BE CONSIDERED PROJECTIONS OF IRIS ENERGY'S OPERATING PERFORMANCE. SUCH NET REVENUE AND MINING PROFIT OUTPUTS ARE BASED ON IMPORTANT ASSUMPTIONS AND HISTORICAL INFORMATION, INCLUDING INFORMATION AND CALCULATIONS FROM THIRD PARTY SOURCES (INCLUDING WEBSITES). WE HAVE NOT INDEPENDENTLY VERIFIED SUCH INFORMATION AND CALCULATIONS, AND SUCH INFORMATION AND CALCULATIONS ARE SUBJECT TO IMPORTANT LIMITATIONS AND COULD PROVE TO BE INACCURATE. THE ILLUSTRATIVE NET REVENUE AND MINING PROFIT OUTPUTS ARE BASED ON HISTORICAL INFORMATION WHICH MAY OR MAY NOT MATERIALIZE IN THE FUTURE – ACCORDINGLY, THERE IS NO ASSURANCE THAT ANY ILLUSTRATIVE OUTPUTS WILL BE ACHIEVED WITHIN THE TIMEFRAMES PRESENTED OR AT ALL OR THAT MINING HARDWARE WILL OPERATE AT 100% UPTIME. THE ABOVE AND THIS PRESENTATION SHOULD BE READ STRICTLY IN CONJUNCTION WITH THE FORWARD-LOOKING STATEMENTS DISCLAIMER ON PAGE 2

8

105.    As the second chart above from the 6-K reflects, Iris represented to investors that Iris had "*One of the industry's leading hashrate growth rates over next 12-18 months*" and that "*Faster hashrate growth will drive higher share of global network.*"   The third chart showed expected net revenue of $626 million at 10 EH/s and $939 million at 15 EH/s assuming that the contracted computers were currently operational.

106.   The statements in the May 11, 2022 Form 6-K about the Company's Hashrate Growth, the Hashrate Deployment Schedule, and the Company's expected revenues were knowingly false and misleading when made.   At the same time the Company was hyping its alleged existing capacity and capacity for growth, the Defendants Daniel and William Roberts knew, but failed to disclose, that Iris was intentionally delaying plugging in its computers for months after they were delivered.  Needless to say, a machine that is plugged in cannot produce any hashrate.   Yet Defendants were representing existing hashrate based on the number of computers they had under contract, while concealing that they were failing to plug in the computers for months even after the computers were delivered.

107.  When PWC was appointed as Receiver, it did an extensive forensic analysis of this issue.  It concluded that, with respect to both IE CA 3 and IE CA 4, Iris had failed to plug in computers for months after delivery. PWC found that:

[The remainder of this page is deliberately left blank.]

The delivery schedules do not reconcile to the operational machines, as reported by Iris Energy. According to the records provided by Iris Energy, large volumes of the Mining Equipment were not plugged in or operational for many months after delivery. Some of this delay is explained by staging and shipping needs (as all equipment is shipped to the Canal Flats site), but the majority of the delay has not been explained to the Receiver. The graph below shows the delivered amounts compared to the operational units. IE CA 4's machines were operational from December 2021 in low quantities but ramped up in September 2022. IE CA 3 machines were not plugged in for approximately eight months after their first machines were delivered.



108.    As PWC's report noted, *IE CA 3's computers "were not plugged in for approximately eight months after their first machines were delivered*." Iris never disclosed these material facts to investors, instead exclusively hyping the hashrate capacity of the purchased computers.

109.   The other statements in the May 11, 2022 6-K were false and misleading for the same reasons noted above – *i.e.*, the filing failed to disclose that the SPVs were insolvent and/or incapable of making principal and interest payments on their own under the  MFEAs (Master Finance Equipment Agreements), that Iris had been subsidizing the SPVs' principal and interest payments in the amount of millions of dollars,  and  failed to disclose Defendant Alfred's affiliation with NYDIG.[14]  Iris' public statements also failed to disclose that the SPVs were not maintaining corporate formalities or distinctness from Iris, thus subjecting Iris to potential liability for the debts of the SPVs, in contrast to Iris' statements during the Class Period that Iris was isolated from any such debts.  In fact, as the lender would later reveal, "Every debt service payment made on account of both

_____

[14] In his June 3, 2022 Affidavit, Defendant William Roberts stated that "At times, IEL [Iris Energy Ltd] has also made payments that were required to be made in US dollars because some of the Canadian entities, including the Debtors [SPVs] do not have US dollar bank accounts."  Affidavit of William Roberts dated June 3, 2023 submitted in the Canadian receivership proceedings for the SPVs (*NYDIG ABL LLC v. IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd.*, No. S230488) (Supreme Court of British Columbia), at ¶62.

MEFAs, without exception, originated from a single bank account in the name of Iris (the "Iris Account")."  Shah Affidavit, ¶118.  In addition, loan proceeds from NYDIG that were not paid directly to the equipment manufacturer (Bitmain Tech.) were deposited into Iris' bank account, not that of the SPVs.  *Id.* at ¶119.

110.   On May 11, 2022, Defendant D. Roberts also hosted a conference call with analysts to discuss the Company's Q3 2022 financial results. During the call, D. Roberts repeatedly emphasized the Company's strong balance sheet, positive free cash flow, and the fact that the collateral for the Company's equipment financing was limited to the equipment held within the SPVs, thus protecting the Company from any failure of the SPVs:

> "And maybe just to recap, **the debt that we have today is all on a non-recourse ring-fenced basis secured against some of the computers that we procured**. The balance is all equity.  **So it's a very clean balance sheet. It's a strong balance sheet. It was done very deliberately**."

111.   Later on in the call, D. Roberts similarly stated:

> "So sitting here today we feel like, we've got a very strong balance sheet almost $0.5 billion of equity sitting there. **No corporate debt. The only debt is ring-fenced to some of the computers in SPVs**.

*We've proven the business model. We're generating operating profit today. We've got almost $150 million of cash in the bank. We feel like, we're in a really good position.*"

112.  During the conference call, Iris also stated:

In the period the quarter, for March, *we mined 357 bitcoin, which is a 449% increase over what we had mined this time last year. And that's on the back of a 686% increase in our operating hash rate*.

*We returned revenue of $15.2 million* and adjusted EBITDA of $7.3 million, both again significant increases on the prior year and it gave us in the quarter a 48% EBITDA -- adjusted EBITDA margin.

In this slide, this is our EBITDA reconciliation adjusted. This is what the management team uses to manage our underlying or review our underlying performance. It allows us to eliminate some of the one-off and non-cash items that are sitting in our P&L account.

So, on this metric, we're looking at the nine months, which gives a better view -- given the growth of the organization the period for the full nine months is a much better way to look at how we're going.    *So we generated $45.6 million in revenue, which is almost 10 times that of the first nine months in our financial year 2021*.

Our adjusted EBITDA for the nine-month period was $27.3 million and that was obviously, greater than the prior year at just under $1 million in 2021. And we had over the nine months, so I mentioned we had 48% EBITDA margin in the quarter but over

64

the year that's a 60% adjusted EBITDA margin. And it's obviously significantly increased on the prior year.

. . .

Finally, on to our balance sheet. ***We ended the period with $158 million worth of cash and cash equivalents and total assets of $557 million***. In quarter three our property plant and equipment increased by $113 million and mining hardware prepayments increased by $15 million from the end of quarter two.

***This increase in the assets was funded both from our cash reserves that we had at the beginning of the quarter as well as an additional $71 million in asset financing, a deal done with NYDIG***. Our current and non-current borrowings, also obviously increased as a result of that deal.

113.   These statements were false and misleading because they failed to disclose the fact that the SPVs were not able to service their debt based on existing cash flows, and instead hyped the Company's supposed strong cash flows and the fact that Iris had ***"no corporate debt."*** This was false. Even though the loans obtained from NYDIG were in the name of the Non-Recourse SPVs, not Iris, the SPVs were insolvent and could not make the debt payments to NYDIG. As a result, Iris had been making the debt payments to NYDIG on behalf of the SPVs. Making debt payments on the SPVs' behalf is fundamentally inconsistent with the statement that Iris has "no corporate debt." In addition, Iris had entered into a Parent Letter

Agreement with NYDIG in which in subordinated its interest in the SPVs' collateral to that of NYDIG, thus making it all but certain that Iris' large debt payments on behalf of the SPVs would be lost in the event of a default. On the call, D. Roberts actually stated that the Company's cash flows were so strong that Iris was planning on adding additional debt: "***Now is the time to layer in debt funding on top of that***, recognizing that ***we've now demonstrated a track record***, building out multiple sites, ***generating daily cash flow as we said we would and now looking to use that cash flow to service debt products***." Because it chose to speak on the topic, Iris had a duty to disclose the material fact that the cash flows of the SPVs were not sufficient to meet the debt obligations, thus risking a default on the existing debt and jeopardizing Iris' ability to grow its earnings and profits through future debt funding.

114. The amount of debt that Iris had procured from NYDIG through the SPVs was highly material. When the SPVs later defaulted on that debt, the CEO of NYDIG filed an affidavit with the Supreme Court of British

Columbia stating that the amount of the debt was $114 million.[15]  That is a highly material amount to Iris because, when it reported its Q2 2023 financial results on Feb. 15, 2023, Iris disclosed that it only had $39.4 million in cash and cash equivalents as of December 31, 2022.

115.  In addition, the insolvency of the SPVs at all relevant times during the Class Period was amply later demonstrated by PWC, the Receiver that was appointed after the SPVs defaulted in November 2022.  PWC prepared the following chart, based on documents and financial statements presented to it by Iris and NYDIG, showing that IE CA 3 never had sufficient cash flow to make the debt payments:

[The remainder of this page is deliberately left blank.]

---

[15] *See* January 20, 2023 Shah Affidavit, ¶ 6.

IE CA 3's financial information

| IE CA 3 | Jan-22 | Feb-22 | Mar-22 | Apr-22 | May-22 | Jun-22 | Jul-22 | Aug-22 | Sep-22 | Oct-22 | Nov-22 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Hashpower income | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $554,509 | $1,908,083 | $715,889 | $3,178,481 |
| Interco. recharge | $0 | $0 | $0 | $0 | $0 | $6,630,921 | $0 | $0 | $0 | $0 | $0 | $6,630,921 |
| Interest income | $0 | $0 | $0 | $117 | $139 | $184 | $213 | $47 | $37 | $103 | $221 | $1,061 |
| Total income | $0 | $0 | $0 | $117 | $139 | $6,631,105 | $213 | $47 | $554,546 | $1,908,186 | $716,110 | $9,810,463 |
| Hosting fee expenses | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $462,091 | $1,590,069 | $596,574 | $2,648,734 |
| Non-refund sales tax | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $27,725 | $95,404 | $35,794 | $158,923 |
| Total cost of sales | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $489,816 | $1,685,473 | $632,368 | $2,807,657 |
| Gross profit | $0 | $0 | $0 | $117 | $139 | $6,631,105 | $213 | $47 | $64,730 | $222,713 | $83,742 | $7,002,806 |
| NYDIG Loan payments | $300,720 | $334,320 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $2,861,123 | $26,385,147 |
| Cumulative no. of miners delivered per Bitmain | 4,559 | 6,035 | 7,537 | 9,031 | 10,563 | 12,049 | 13,583 | 15,118 | 16,644 | 16,644 | 16,644 | 16,644 |

116. As the chart above demonstrates, IE CA 3 earned *zero hashpower income for each of the first eight months of 2022*. It was not until September 2022 – just two months before the default, that IE CA 3 earned any income, and then just $554,509.[16] The monthly debt obligations of IE CA

---

[16] In addition, as noted *supra*, PWC found that *IE CA 3's computers "were not plugged in for approximately eight months after their first machines were delivered."* Iris never disclosed these material facts to

3 to NYDIG -- $2,861,123 – were thus much higher than IE CA 3's income, making it insolvent at all times during 2022.  Moreover, by November 2022, when NYDIG declared a default, IE CA 3 had incurred debt obligations to NYDIG of $26,385,147 but had only booked a gross profit of $7,002,806.[17] Iris, despite telling its investors that it had "no debt" and that the only existing debt was that of the SPVs, which was allegedly "ring fenced," had been making debt payments to NYDIG during the Class Period on behalf of IE CA 3 and IE CA 4 but not disclosing that material fact to investors, nor disclosing that the SPVs' cash flows were not sufficient to meet their debt obligations and that the value of their collateral was substantially less than the debt owed to NYDIG.

---

investors, instead exclusively hyping the hashrate capacity of the purchased computers.

[17] Iris' other SPV – IE CA 4 – also failed to have sufficient income during this time to meet its debt obligations to NYDIG.  In April 2022, IE CA 4 only had a gross profit of $81,523 and owed debt payments to NYDIG in the amount of $435,086.  Thus, its debt equaled over 500% of its gross profits in April 2022.  For May 2022, IE CA 4 only had a gross profit of $77,956 but owed debt payments to NYDIG in the amount of $507,600.

117.  During the May 11, 2022 conference call with analysts, Defendant D. Roberts also stated that the Company had very favorable energy contracts in place to provide its bitcoin mining operations with low-cost renewable energy.  He stated that prices could go even lower, benefitting Iris:

> "So **there's a massive oversupply of power renewable energy up in the region in which we're specifically located**. In terms of specifics around power price, what we've said to the market and we expect you can see that **average power prices on a baseload basis in Texas is around $0.03 to $0.035 per kilowatt hour with the opportunity to drive that substantially lower through operational levers**."

118.   D. Roberts specifically represented that the Company's ability to drive energy prices lower was due to its ownership of the computers in the mining centers:

> "There's a lot of operational levers we can pull to drive that even lower. And again, this is partly why **we own and control the full stack of our infrastructure. Not only do we own and control our proprietary datacenters the computers within it, we own the land**.  But importantly, we own all the electrical infrastructure, not just the low-voltage transformers, but we build the high-voltage substations that connect directly into these networks. What this does in terms of prepaying those expenses is obviates an expense line on an ongoing basis. But importantly, give us

direct access into the market where we can control our interface with that market."

119. These statements were false and misleading because, by emphasizing the Company's ownership of the bitcoin mining equipment and its ability to fuel the Company's strong growth without disclosing the fact that Iris had been making millions of dollars of undisclosed principal and interest payments on the SPVs' behalf to the lender (NYDIG), Iris failed to disclose material risks to the Company's ability to increase its growth and risks to its operations in the event of a default by the SPVs. The receiver for the SPVs (PWC) alleges that Iris is liable for the outstanding $114 million in debt owed by the SPVs since the Defendants ran both the SPVs and Iris as a single entity, using a single bank account and depositing the hashed Bitcoin into Iris' account. Moreover, PWC has pointed out that the board of directors for Iris and the SPVs is comprised of the same people and that the Individual Defendants ran the SPVs, the SPVs had no employees, and that the Individual Defendants failed to observe corporate formalities. PWC has also alleged that the Defendants fraudulently conveyed Bitcoin and money from the SPVs to Iris. Iris also admitted in the Canadian receivership

proceedings that throughout 2022 it was making millions of dollars in undisclosed payments to or on behalf of the SPVs to subsidize the SPVs' debt obligations to NYDIG.[18]    These undisclosed material facts existed throughout the Class Period, yet Defendants did not disclose the inability of

---

[18] In an affidavit dated June 3, 2023 submitted in the Canadian receivership proceedings for the SPVs (*NYDIG ABL LLC v. IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd.*, No. S230488) (Supreme Court of British Columbia), Defendant W. Roberts stated that "Over the course of 2022 . . . it became difficult for IEL to continue to provide subordinated capital contributions to the Debtors [the SPVs] to assist them with their ongoing liabilities without a debt restructure."    Affidavit of William Roberts at ¶¶145-147.   He also admitted that "In July 2022, Dan [Roberts] and another member of the IEL Board reached out to NYDIG expressing concerns with the significant change in the Bitcoin market and to be proactive in addressing resulting issues for the operation of the MEFAs.    A meeting was subsequently held with NYDIG at Breezeblock Coffee on July 27, 2022.  Dan has advised me and I verily believe that at that meeting, Mr. Smyth at NYDIG mentioned that NYDIG recognized its financing models were probably not suitable for this section."    *Id.* at ¶¶ 149-50. W. Roberts also stated in his affidavit that "Subsequent to that meeting, the Debtors and NYDIG discussed, amongst other things, a guarantee from IEL in exchange for an additional $30 million in financing, a reduced monthly principal and interest schedule, and ensuring future repayment flexibility if markets continued to deteriorate." *Id.* at ¶ 151.

the SPVs to have sufficient cash flow to meet their debt obligations until November 2, 2022.[19]

120.    During the May 11, 2022 conference call, Defendant D. Roberts also hyped the Company's supposed reliable access to low-cost renewable energy without disclosing the risks to the Company's cost of power in the event of a default by the SPVs.

121.    During the May 11, 2022 conference call, Defendants D. Roberts stated that Iris would need a total of $1 billion in capital expenditures to achieve the 15 exahash target he told analysts Iris was on track to achieve. Of that amount he said that Iris had already raised $750 million and thus needed to raise another $250 million, which he said Iris was well-positioned to do, stating:

> We've secured through equity a little bit of debt and reinvesting some operational cash flow. ***We're looking at around $750***

---

[19] The need for Iris to make debt payments on behalf of the SPVs was known by, and agreed to, by Defendants D. Roberts and W. Roberts from the beginning.  For example, a February 21, 2022 email to Will Roberts from Trevor Smyth of NYDIG confirmed the parties' understanding that the SPVs would be "relying on the parent [Iris] to make loan payments in any case." *See* Ex. X to Affidavit of William Roberts, dated June 3, 2023.

*million, of that $1 billion already accounted for and the balance underway in terms of seeking additional debt and funding to complete it.* We're not immune to the current market and what's happening out there day to day at the moment. But we can say, that *we have multiple formal debt processes underway. We haven't seen them impacted by the volatility over the last week or two.* That's not to say, that they won't be at some point. We're realistic, *but sitting here, right now, the strength of our balance sheet, our operational performance, the daily cashflows, that we're generating, we're feeling pretty good about it.*

122.    These statements were false and misleading.  As noted above, the only lender who had actually agreed to provide funding to Iris – NYDIG – had told Roberts in a **March 8, 2022 email** that "*there has been a very significant tightening in the capital markets generally, which has added additional complexity.*"  As a result, NYDIG had significantly reduced the amount of financing it was willing to provide Iris, from $150 to $200 million to just $71 million.  And in the ensuing two months, the credit markets had deteriorated further in light of Bitcoin's declining price.

123.    Despite Defendant D. Roberts' assurances of a strong balance sheet and ability to raise another $250 million in capital during the May 11, 2022 conference call, analysts had concerns about the Company's ability to

raise additional capital to fund the Company's growth.  Analyst Stephen

Glagola of Cowen & Co. asked:

> Q:  Dan, I just want to unpack some comments earlier you made. So for the $250 million capital needed to fund your expansion just given the current market conditions, *can you discuss how lenders are responding for any incremental equipment financing transactions you're looking at? And do you still feel confident in the non-dilutive financing options that you see in general to fund growth?* Thanks.

> 124.   Roberts responded as follows:

> A:  *[I]n terms of the direct interface with the lenders* throughout the last couple of months and into this week *we're not seeing any direct impact on those processes*. . . And *when we're selling the Bitcoin daily there is substantial cash flow very difficult to argue with that*.
>
>               .   .   .
>
> I think one way I tend to think about it is, *we've still got 10 exahash unencumbered with no hardware financing. We just closed another $71 million with NYDIG where we encumbered 1.98 exahash of our computers. So round it to $35 a terahash*.
>
> *You extrapolate that to 10 exahash, that's $350 million just in the hardware financing capacity.*  And then, if you look at the comparables in the sector, you're seeing hardware for our team deals being done at $50, $60-plus, at terahash.
>
> *We only paid $40. So there's a lot of latent deck capacity in that*.

*So sitting here today we feel like, we've got a very strong balance sheet almost $0.5 billion of equity sitting there. No corporate debt. The only debt is ring-fenced to some of the computers in SPVs.*

We've proven the business model. ***We're generating operating profit today.*** We've got almost $150 million of cash in the bank.

125.   Defendant D. Roberts' statements were knowingly false when made.  He was a director of the SPVs as well as the person at Iris who had been dealing with NYDIG on financing, and D. Roberts had personally received the March 8, 2022 email from Mr. Smyth of NYDIG advising D. Roberts that the credit markets were deteriorating and that NYDIG was not willing to lend funds anywhere near the $250 million needed by Iris without, at a minimum, a parent company guarantee that Iris refused to provide.  D. Roberts concealed these material facts when he responded to the direct question above from Stephen Glagola of Cowen & Co. about "how lenders are responding for any incremental equipment financing transactions you're looking at? And do you still feel confident in the non-dilutive financing options that you see in general to fund growth?"

126.   D. Roberts' statements were also knowingly false when made because at the time he made the statements, the inability of the SPVs to service their debt had already adversely affected Iris' balance sheet.  As the court overseeing the PWC receiver action in Canada found after receiving evidence and affidavits from all the parties, including D. Roberts, Iris had to start subsidizing the SPVs' interest payments to NYDIG before the ink on the MEFAs was dry due to the SPVs' inability to make payments on their own.  The court found that "*From the beginning, the Debtors [SPVs] were not financially viable on their own, but depended heavily on IEL (Iris Energy Ltd.] to make the loan payments owing to NYDIG. . . IEL was required to supplement the Debtors' income so they could make the payments required of them under the MEFAs. . . [B]y the time IEL stopped doing so, it had advanced, for this purpose, over CDN $130 million to the Debtors in the form of subordinated inter-company loans* that also remain outstanding and

unpaid."[20]    The court's judgment in the Canadian receiver action also specifically found that "it would have appeared to NYDIG that the Debtors [SPVs] were also receiving a subsidy from [Iris Energy Ltd.] in order to put them in a position to meet their financial obligations to NYDIG.  That was the apparent pattern that began with IE CA 2 and continued with the Debtors."[21]

127.   Thus, Defendants' May 11, 2022 statements that Iris had "No corporate debt" and "a very strong balance sheet" were knowingly false for failure to disclose that Iris was advancing up to CAD $130 million in cash debt payments on behalf of the SPVs, which payments would be unrecoverable in the event of a default by the SPVs.  Being on the hook for CAD $130 million in debt payments is fundamentally inconsistent with Defendants' statements that Iris had "zero corporate debt" and "a very strong balance sheet."

---

[20] *See* Reasons for Judgment, at p. 15, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd*., 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).

[21] *Id.* at p. 42.

128.   The fact that Iris had been making cash payments on the SPVs' debt jeopardized not only Iris' balance sheet and ability to raise additional funds, but also its ongoing and current ability during the Class Period to generate more Bitcoins, and thus revenues, since the computers owned by the SPVs were the ones generating the hashpower used to create Bitcoins. Once the SPVs were cut off from Iris' subsidies, a default would inevitably ensue, thus terminating the hashpower agreements.  Needless to say, the Defendants' concealment during the Class Period that Iris was making $130 million of payments on the SPVs' debt, which Iris claimed to be separate entities whose debt was "ring fenced," was highly misleading.

129.   Defendants also failed to disclose during the Class Period that the SPVs were insolvent and that the value of their collateral had decreased well below the level of the debt owed to NYDIG.  PWC, as the Receiver appointed by the Canadian court after the SPVs defaulted, issued a Second Report on April 10, 2023 which cited facts demonstrating that the SPVs were insolvent from the start.  PWC's Second Report noted that "based on Iris Energy's position that the only income to which the Debtors were entitled

was the small profit margin realized under the Hashpower Agreement (and, with respect to IE CA 3, the informal arrangement), the Debtors [the SPVs] were not, and never would be, generating sufficient profits to fund the monthly loan payments of USD $2.9 million and USD $4.1 million to NYDIG or repay any intercompany debt from Iris Energy." PWC Second Report, at ¶ 5.5.[22]

130.    Roberts concealed the insolvency of the SPVs as well as the large debt payments that Iris was making on the SPVs' behalf during the May 11, 2022 earnings call.  The payments adversely affected Iris' balance sheet because they required substantial cash payments from Iris, thus limiting the cash available to Iris to use for other purposes.  The payments also posed material risks to Iris' financial results and balance sheet since in the event of a default by the SPVs, Iris would also get left holding the bag, not just NYDIG, since the SPVs had no collateral or assets other than the computers

---

[22]    The chart included *supra* in ¶ 115 demonstrates on a month-to-month basis the insolvency of IE CA 3 at all relevant times during the Class Period.

used in the Bitcoin mining operations, and NYDIG had priority over the collateral.  Indeed, that risk materialized just six months later when the SPVs defaulted and NYDIG exercised its right to terminate the Hashpower Agreements and declare an event of acceleration.  Iris never got repaid the money it had loaned to the SPVs.[23] It recognized an impairment charge in the amount of *$67 million* on February 15, 2023.[24]  And as Iris conceded on its February 15, 2023 conference call with analysts, "we also decommissioned the miners associated with the non-recourse SPVs two and

---

[23] In his June 3, 2022 Affidavit, Defendant W. Roberts stated that "IEL remains a creditor of the Debtors [SPVs] and had over CAD $130 million in subordinated debt and equity at the end of 2022, and despite Bitcoin price recovering to approximately USD $27,000 as of May 31, 2023, IEL does not expect to recover any of its subordinated capital as a result of the enforcement actions taken by NYDIG."  Affidavit of William Roberts dated June 3, 2023 submitted in the Canadian receivership proceedings for the SPVs (*NYDIG ABL LLC v. IE CA3 Holdings Ltd. and IE CA4 Holdings Ltd.*, No. S230488) (Supreme Court of British Columbia), at ¶ 159.

[24] On the Company's February 15, 2023 conference call with analysts to discuss its quarterly results, Belinda Nucifora of Iris stated: "we also recorded a primarily non cash impairment charge of $105 million, of which $67 million relates to the limited recourse financing SPVs."

three on the 5 of November 2022."[25]   Thus, Iris lost the bitcoin mining capacity due to the defaults of the SPVs.

131.   The May 11, 2022 false statements had their desired effect, as the Company's stock price increased from $6.89 on May 11, 2022 to $7.71 on May 13, 2022 – a 11.9% increase.

132.   The next month – July 2022 – the situation had become so dire that the Iris Board itself had to directly engage with NYDIG to try to renegotiate the debt.  "In July 2022, members of [Iris Energy Ltd.]'s board had already asked to meet with NYDIG with a view to exploring potential refinancing scenarios."[26]  The fact that the members of the Board of Directors themselves were involved with trying to renegotiate the debt with NYDIG amply demonstrates both their knowledge of the severity of the problem and the need to immediately address it.  Yet Defendants never disclosed these

---

[25] Iris never disclosed this material fact until February 15, 2023.  Iris also never explained why it unplugged the computers on November 6, 2022, even before an event of default was declared by NYDIG.

[26] *See* Reasons for Judgment, at p. 15, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd.*, 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).

material facts and continued to conceal the true facts from the market for another four months.

133.   On June 7, 2022, Iris issued a press release announcing an investor update for May 2022. That press release advised, *inter alia*, that "[m]ultiple debt processes remain underway, with discussions involving various aspects of the capital structure, for example, equipment financing similar to the recent $71m NYDIG facility (1.98 EH/s of miners secured)," while simultaneously assuring investors that "[t]he Company remains focused on prudently assessing various options and ensuring that any decisions consider an appropriate long-term capital structure for the Company."

134.   In addition, the same June 7, 2022 press release downplayed the severity of debt from equipment financing agreements *by highlighting in its "Business summary" that there was "[n]il corporate-level debt"*, and stating in a footnote that "[e]quipment financing is *limited recourse financing within wholly owned subsidiaries of the Company*."

135.   On June 21, 2022, Iris issued a press release providing an updated operating and capital expenditure guidance, stating, in relevant part:

> The Company has explored multiple financing options presented to it in recent months, and has determined that maintaining balance sheet flexibility is prudent having regard to market conditions and available financing terms.  As market conditions have deteriorated, the Company continues to believe this is the prudent approach. As a result, the Company expects to defer major additional capital expenditure until the current market uncertainty subsides and financing terms improve.  The Company will continue to monitor funding markets closely, and if conditions become favorable, the Company expects to explore raising additional capital.

136.   The June 21, 2022 press release also continued to downplay the severity of debt from equipment financing agreements by stating that ***"[t]he Company currently has no corporate debt on its balance sheet***" and stating in a footnote that ***"[e]xisting equipment financing is limited recourse financing within wholly owned subsidiaries of the Company***."  Because Defendants chose to speak on the topic, they had a duty under the federal securities laws to speak the whole truth.  Their statements were false and misleading, however, for failure to disclose that the Company's "wholly

owned subsidiaries" (*i.e.*, the SPVs) were receiving millions of dollars of subsidized interest and principal payments from Iris, and thus that, far from being protected by the limited recourse financing, the Company was at material risk from such financing because Iris had been making payments on behalf of the SPVs that Iris would not be able to recoup in the event of a default by the SPVs.[27]

137.   On August 9, 2022, Iris issued a press release on Form 6-K with the SEC, signed by Defendant D. Roberts, which emphasized that the Company was on track to expand its capacity from 4.3 EH/s to 6.0 EH/s, stating:

[The remainder of this page is deliberately left blank.]

---

[27] In a January 17, 2023 affidavit, Mr. Tejas Shah of NYDIG stated that Iris and the SPVs "did not operate as distinct operations" and that the SPVs "did not make payments on the NYDIG debt out of individual bank accounts but rather paid out of a common, Iris Energy account." *Id.* at ¶ 93.

**Updates post month end**:

•        *Commissioned remainder of the first 1.5 EH/s (50MW) at Mackenzie ahead of schedule, approximately doubling operating capacity to exceed 2.3 EH/s*

•        *Reached agreement with Bitmain Technologies Limited to ship an additional 1.7 EH/s of S19j Pro miners in August 2022, increasing expected operating capacity from 4.3 EH/s to 6.0 EH/s*

138.    On September 7, 2022, Iris issued a press release on Form 6-K with the SEC, signed by Daniel Roberts, which announced that the Company was *accelerating* its expected timeline to expand its capacity from 4.3 EH/s to 4.7 EH/s to the end of Q4 2022, and reaffirming its deployment pathway to capacity of 6.0 EH/s, stating:

<u>**Corporate**</u>:
•        *Prince George (50MW) on track for energization in September 2022, increasing total expected Company operating capacity to 3.7 EH/s*
•        *Company operating capacity guidance increased from 4.3 EH/s to 4.7 EH/s by the end of Q4 2022*
•        Company to publish its financial results for the full year ended June 30, 2022 on Tuesday, September 13, 2022 Eastern Time (conference call to be hosted at 5:00 p.m. USA Eastern Time)

<u>**Operations**</u>:
•        Average operating hashrate of 2,204 PH/s (+97% vs. July)
•        Monthly operating revenue of US$6.6 million (+97% vs. July)

86

- 301 Bitcoin mined (+96% vs. July)

**Construction**:
- Mackenzie (2.5 EH/s, 80MW – BC, Canada)
Construction activities continue to progress for expansion from 50MW to 80MW and remains on track to be completed by the end of Q4 2022
Expected site operating capacity increased from 2.1 EH/s to 2.5 EH/s by the end of Q4 2022
- Prince George (1.4 EH/s, 50MW – BC, Canada)
Commissioning activities underway, with major equipment installation in the substation close to complete
Construction of all three data center buildings complete
Internal fit out for the first and third data center buildings (20MW each) complete and well progressed for the second data center building (10MW)

139.   On September 13, 2022, Iris issued a press release signed by Defendant D. Roberts reporting the Company's full year 2022 results for the period ended June 30, 2022.   That press release quoted D. Roberts, who stated, in relevant part, that ""We are pleased to report record financial and operating results as part of our inaugural full year report as a listed company." D. Roberts also stated that "Looking forward, the recent volatility in the Bitcoin price and related industry challenges reaffirms our confidence in our long-term, vertically integrated strategy. We remain focused on building a multi-decade, institutional grade, infrastructure

platform while maintaining balance sheet discipline." The press release

listed the following "Key Highlights:"

- Record revenue of $59.0 million (+647% YoY)
- Record Adjusted EBITDA of $26.2 million (+1,791% YoY)1
- Record Adjusted EBITDA Margin of 44% (+144% YoY)2
- *Record cash flow from operations of $21.6 million (+1,124% YoY)*
- *Record average operating hashrate of 747 PH/s (+611% YoY) and 1,398 Bitcoin mined (+422% YoY)* from 100% renewable energy powered operations since inception3
- *$110.0 million cash and cash equivalents as of June 30, 2022 and no corporate debt*

   **Post financial year end**:
- *Agreement reached with Bitmain to ship an additional 1.7 EH/s of miners, increasing total expected Company operating capacity from 4.3 EH/s to 6.0 EH/s*
- *1.5 EH/s (50MW) at Mackenzie (BC, Canada) energized ahead of schedule*
- *1.4 EH/s (50MW) at Prince George (BC, Canada) on track for September 2022*
- *Company operating capacity guidance increased from 4.3 EH/s to 4.7 EH/s by the end of Q4 2022*

140. The September 13, 2022 press release also continued to

downplay the severity of debt from equipment financing agreements,

stating, in relevant part, that **"[c]ash and cash equivalents as of June 30, 2022**

**was $110.0 million, with no corporate debt held by the Company on its**

*balance sheet*" and stating in a footnote that **"[e]xisting equipment financing ($109.4 million as of June 30, 2022) is limited recourse financing within wholly owned subsidiaries of the Company.**"

141.   The September 13, 2022 press release was false and misleading. Defendants failed to disclose that the SPVs had been insolvent for nine months and were at an extremely high risk of defaulting on their debt, that their cash flows had been at all times insufficient to make the debt payments and that Iris had already  made over $100 million in debt payments on the SPVs' behalf by such point in 2022, and that, far from being on track to significantly increase its **"operating capacity from 4.3 EH/s to 6.0 EH/s," that** Iris' operating capacity would be significantly decreased in the event of a default by the SPVs, since the computers owned by the SPVs were the collateral for the loans, the value of the collateral was far less than the amount of the debt owed, and the collateral would be repossessed in the event of a default.

142.   Significantly, the capacity provided by the computers/miners purchased through the NYDIG loans represented 3.6 EH/s, thus

representing almost 84% of the Company's existing overall capacity.[28]  Thus, an event of default would decimate the Company's total mining capacity. As a result, the Company was not on track to increase its capacity from 4.3 EH/s to 6.0 EH/s, contrary to the Defendants' misrepresentations.

143.   Also on September 13, 2022, Iris filed an annual report on Form 20-F with the SEC, reporting the Company's financial and operational results for the Company's fiscal fourth quarter and year ended June 30, 2022 (the "2022 20-F").  That filing contained substantively the same statements as referenced *supra*, regarding the purported efficiency and overall operational quality of Iris's Bitcoin mining operations.

144.   With respect to Iris's use of equipment financing agreements to procure Bitcoin miners, the 2022 20-F stated, in relevant part:

> We are party to equipment finance and security agreements, denominated in US dollars, pursuant to which an equipment financier has agreed to finance part of the purchase of various

_____

[28] The Company filed a Form 6-F with the SEC on November 7, after NYDIG declared an event of default, in which it represented that "The Facilities are secured by 1.6 EH/s of Bitcoin miners and 2.0 EH/s of Bitcoin miners (together the "Limited Recourse Miners") respectively owned by the Non-Recourse SPVs."

miners that have been delivered to us or will be delivered to us. As of June 30, 2022, the aggregate amount drawn under the loan facilities was $109.4 million.

145.   With specific respect to Iris's Bitcoin miner equipment financing

agreements with NYDIG, the 2022 20-F stated, in relevant part:

> The facility established pursuant to this agreement (the "NYDIG Facility") has a contractual term of 25 months and is secured by 19,800 Bitmain S19j Pro miners (1.98 EH/s), as well as the digital assets mined therewith, with an applicable interest rate of 11% per annum. The NYDIG Facility is repaid through blended monthly payments of principal and interest with the final payment due April 2024. As of June 30, 2022, the facility was fully utilized with $71.2 million of borrowings outstanding.
>
> ***The NYDIG Agreement contains customary affirmative and negative covenants applicable to the subsidiary borrower, but not to Iris Energy Limited***.  These include restrictions on our ability to incur liens on the equipment securing the NYDIG Facility, consummate mergers, dispose of all or substantially all of our assets, consummate a change of control, make certain payments with respect to our equity interests or make certain investments.  The NYDIG Agreement also contains customary events of default.

146.   With respect to Iris's other Bitcoin miner equipment financing

agreements, the 2022 20-F stated, in relevant part:

> On December 15, 2020 and May 25, 2021, certain wholly-owned subsidiaries of Iris Energy Limited entered into master equipment finance and security agreements with a certain financier, pursuant to which such financier agreed to provide

financing (the "Other Financing Agreements").  Outstanding borrowings are secured by the financed mining units purchased with the loans.  The loans carry an annual interest rate of 12% and are to be repaid through monthly payments of interest and principal through September 2023.  As of June 30, 2022, we had $38.2 million of loans outstanding under the facilities. ***The Other Financing Agreements include customary affirmative and negative covenants applicable to the subsidiary borrowers, but not to Iris Energy Limited***.  These include restrictions on our ability to incur liens on the equipment securing the loans thereunder, consummate mergers, dispose of all or substantially all of our assets or consummate a change of control.  The Other Financing Agreements also contain customary events of default.

147.   Appended as exhibits to the 2022 20-F were signed certifications pursuant to the Sarbanes-Oxley Act of 2002, wherein Defendants D. Roberts and W. Roberts certified that "the [2022 20-F] fully complies with the requirements of Section 13(a) or 15(d) of the [Exchange Act]" and that "the information contained in the [2022 20-F] fairly presents, in all material respects, the financial condition and results of operations of the Company."

148.   The same day – September 13, 2022 – Defendant D. Roberts hosted a conference call with analysts to discuss the Company's Q4 2022 financial results.  On the call, D. Roberts told analysts that that the Company was still profitable, even at the lower Bitcoin prices in the market.  He stated:

"For us, the optimal strategy is to liquidate daily, lock in those profits. As you can see there, *we're mining Bitcoin at $8,000 a coin, locking that profitability and then make a capital allocation decision with that profitability left over. Today, even in the current market, Bitcoin mining is profitable*, incremental returns on CapEx are profitable."

149.  Similarly, later on the call, D. Roberts re-emphasized that the Company was profitable and also that it was generating positive cash flows:

> "*Yes, we're still mining Bitcon at $8,000 a coin, it's still very good gross profit margins, even at $20,000 Bitcoin*" and that "*We're* building proprietary data centers, building out energy infrastructure, *locking up low-cost renewable energy*. Yes, we're monetizing that into bitcoin, but *it's a real asset base generating real cash flows*."

150.  On the September 13, 2022 conference call with analysts, D. Roberts also stated that Iris had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure."  Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro *actually puts a downward pressure on that power price*."

151.  During the conference call with analysts, D. Roberts failed to disclose the ongoing problems with the SPVs, including ongoing discussions with the lender to the SPVs – NYDIG – that had been taking place since July

2022.  Instead of disclosing the material problems and the risks to the Company's cash flows and profitability, D. Roberts again misrepresented that the Company's balance sheet was extremely strong and that the only debt the Company utilized was with respect to the SPVs and that such financing was only collateralized by the equipment owned by the SPVs:

> "Again, *we've got some hardware financing, but that is limited to asset level*. Again, *potentially a key differentiator with other listed firms. We have not given parent company guarantees.* We do not have cross defaults. We do not have cross collateralization. ***Those financing are limited recourse specifically to the individual computers*** and the SPVs they're holding."

152.  The statements in the Form 20-F, the press release, and by Defendant D. Roberts on the conference call with analysts caused Iris' stock to increase from $4.26 on September 13, 2022 to $4.48 on September 14, 2022, an increase of 5.2%.

153. The statements in the September 13, 2022 20-F, the accompanying press release, and on the September 13, 2022 conference call with analysts were false and misleading because they failed to disclose that the Iris had been making millions of dollars of principal and interest payments on the SPVs' behalf to NYDIG under the SPV equipment financing

agreements, *which payments had reached CAD $130 million by the time of the September 13, 2022 statements, and that Iris was at material risk of not being repaid by the SPVs for such amounts, and thus that approximately 84% of the Company's total bitcoin mining capacity was jeopardized by the undisclosed insolvency of the SPVs.*[29] The statements in the 20-F were also misleading because they failed to disclose that Iris had been delaying plugging in its mining computers for months, and that IE CA 3's computers were not plugged in for approximately eight months after their first machines were delivered.

154. The 20-F also failed to disclose existing, known material problems with significantly decreased cash flows from the SPVs.  When the SPVs were later declared in default by the lender, they sought the appointment of a receiver, which the court in Canada granted.

---

[29] In his June 3, 2022 Affidavit, Defendant William Roberts stated that "IEL remains a creditor of the Debtors [SPVs] and had over CAD $130 million in subordinated debt and equity at the end of 2022, and despite Bitcoin price recovering to approximately USD $27,000 as of May 31, 2023, IEL does not expect to recover any of its subordinated capital as a result of the enforcement actions taken by NYDIG."

PriceWaterhouseCoopers LLC ("PWC") was appointed as the receiver in February 2023. In a May 9, 2023 affidavit submitted on its behalf by the CEO of NYDIG, Mr. Tejas Shah stated that the "negotiations [to restructure the debts] between [the SPVs] and NYDIG began in earnest on or about October 3, 2022" (*see* paragraph 62 of May 9, 2023 Shah Affidavit). This demonstrates that the material problems with the SPVs started before the October 3, 2022 negotiations to restructure the debt – *i.e.*, by the time of the filing of the 2022 20-F on September 13, 2022. In addition, Defendant W. Roberts signed an affidavit stating that the material problems with the SPVs' cash flows and inability to make timely principal and interest payments began before October 2022. W. Roberts stated that "[I]t was IE3 and IE4 that approached the Petitioner [NYDIG] *prior to October 2022* to initiate good faith discussions regarding the amounts coming due under their respective agreements. IE3 and IE4 made several restructuring proposals that, in the opinion of IE3 and IE4, would have benefitted the Petitioner and put it in a

better position in respect of the Agreements."[30]  W. Roberts also stated in his affidavit that during these pre-October 2022 discussions, which he, D. Roberts, and other members of the Iris Board of Directors were personally involved in, that NYDIG had requested "Iris Energy (or other entities) to provide security and/or guarantees in relation to the Agreements."[31]  In his 2023 affidavit, W. Roberts also acknowledged Iris' duty under the federal securities laws to make prompt and full disclosure of material facts regarding its wholly-owned SPVs:  "Iris Energy is a public company; it is required to disclose material information, including issues regarding the entities in which it holds significant shareholdings, including IE 3 and IE 4."[32]  W. Roberts made these statements in 2023 to defend against NYDIG's allegations that Iris' November 2, 2022 press release disclosed impertinent information that jeopardized NYDIG's interest and/or collateral in the SPVs. But W. Roberts' admission that Iris owed a duty of full disclosure regarding

---

[30] Affidavit of William Roberts dated Feb. 1, 2023, ¶7 (emphasis added).

[31] *Id.* at ¶8.

[32] *Id.* at ¶10.

the SPVs also demonstrates that, since the material problems had been ongoing throughout the Class Period, Defendants should have made additional disclosures to the market well before November 2, 2022.

155.    Moreover, by November 2022, "all NYDIG financed Mining Equipment owned by [the SPVs] [was] unplugged and not operational at all at three of the [SPVs'] Mining Facilities."  *See* paragraph 30 of the Shah May 9, 2023 Affidavit.  These facts demonstrate that the SPVs' financial troubles started earlier than September 13, 2022 and were intentionally concealed from the 2022 20-F by the Exchange Act Defendants.

156.    Mr. Shah of NYDIG also submitted a separate January 17, 2023 affidavit in which he stated that the problems with the SPVs were so bad that on October 3, 2022, "NYDIG provided a restructuring term sheet that outlined the terms pursuant to which it was willing to restructure the indebtedness owing under the MEFAs.  The terms of this original term sheet were almost completely rejected by Respondents."[33] Shah further stated that

---

[33] *See* January 17, 2023 Shah Affidavit, ¶62.

NYDIG thereafter made a revised proposal on October 8, 2022 which indicated that, given the insufficient collateral of the SPVs, "additional security would have to be provided by Iris Energy, or a related party" but that Iris rejected this proposal, indicating the parties were "miles apart."[34] These facts demonstrate the Defendants' knowledge that the SPVs would default, that the SPVs' collateral was not sufficient to satisfy the existing indebtedness, and that NYDIG would demand Iris to provide additional security to avoid a default, and that no solution was in sight and the parties were "miles apart" despite the fact that the SPVs' repayment deadline was looming on the horizon, due on October 25, 2022.

157.    The failure to disclose the true extent of the SPVs' problems, the insufficiency of the collateral pledged by the SPVs under the financing agreements, NYDIG's demand for additional security from Iris, and the fact that talks had broken down as early as October 8, 2022  was highly material, and directly contradicted Defendant D. Roberts' statements on the

---

[34] *Id.*, ¶63.

September 13, 2022 conference call, including his comments emphasizing the fact that the collateral under the MEFAs was limited to the equipment itself. Because the Roberts brothers and the rest of the Iris board were well aware at the time of the SPVs' dire problems and because they had been negotiating with NYDIG since July 2022 to restructure the debt in light of the inability of the SPVs to make debt payments (resulting in Iris being forced to make CAD $130 million of payments on the SPVs' behalf), and because they had actual knowledge that the SPVs' collateral was not sufficient to satisfy the existing indebtedness of the SPVs and that NYDIG was therefore demanding Iris itself to provide additional security in order to avoid a default by the SPVs under the MEFAs, the Exchange Act Defendants' repeated statements that Iris and its balance sheet was fully protected by the limited-recourse nature of the SPV financing agreements were blatantly and knowingly false. Defendants had actual knowledge at the time they made the false statements that Iris' balance sheet was not "fully protected," since Iris had already made CAD $130 million in payments on the SPVs' behalf, that Iris had subordinated its interest in the collateral of the SPVs to that of NYDIG via a

100

Parent Letter Agreement dated March 24, 2022, that NYDIG was demanding that Iris provide additional security to avoid a default and that Iris was rejecting such demand, and that the looming default by the SPVs jeopardized Iris' ability to mine bitcoin and generate revenue (since a default of the SPVs would eliminate the hashrate that the SPVs sold to Iris, which allowed Iris to direct the hashrate into a mining pool and be paid in Bitcoin, which it then sold to generate cash/revenue).[35]  Due to the default of IE CA 3 and IE CA 4, the receiver (PWC) is now seeking a constructive trust over the Bitcoin and cash from the sale of the Bitcoin by Iris in an action pending in the Supreme Court of British Columbia, Canada.

---

[35] Mr. Tejas Shah of NYDIG succinctly described this relationship between the SPVs and Iris as follows: "The Respondents' [SPVs] business model provides that the electricity utilities provider sells electricity to the applicable Host, who then sells its hosting services (including, importantly, electricity) to each Respondent.  The Respondent in turn sells hashrate (at a markup from the hosting costs) to Iris.  Iris then directs the hashrate into a mining pool, and is paid in bitcoin.  In the final step, Iris Energy liquidates the bitcoin into US Dollars in the market."  *See* January 17, 2023 Shah Affidavit, ¶ 28.

158.  The Company's 20-F Annual Report for the fiscal year ended June 30, 2022 was also false and misleading because it failed to disclose material events that transpired after June 30, 2022 (the "reporting date"), but before the Company's financial statements were filed with the SEC on September 13, 2022.  International Accounting Standard 10, Events After the Reporting Period, mandates that significant events that occur between the reporting date and the filing date shall either be recognized in the financial statements, or at the very least, be disclosed to investors.  IAS expressly recognizes the importance of these disclosures to the investing public.

159.  If non-adjusting events after the reporting period are material, non-disclosure could reasonably be expected to influence decisions that investors make on the basis of those financial statements. Accordingly, Iris was required to disclose the following for each material category of non-adjusting event after the reporting period: (a) the nature of the event; and (b) an estimate of its financial effect, or a statement that such an estimate cannot be made.  IAS 10.21.  Such disclosures should highlight "abnormally large changes after the reporting period in asset prices."  IAS 10.22(g).

160.    Here, Iris' 20-F violated IAS 10 by concealing significant and material events that occurred prior to the June 30, 2022 filing date.  This included: (1) the decreased cash flows of the SPVs; (2) the insolvency of the SPVs and their inability to make their debt payments without assistance from Iris; (3) the significant decrease in the market value of the mining computers that constituted the sole collateral for the SPVs' loans, as well as the fact that the value of such collateral had decreased well below the level of the debt owed to NYDIG; (4) the fact that Iris was waiting months to plug in its miners, even after they were delivered, thus further eroding cash flows; (5) that Iris had made less payments to the SPVs than called for under the Hashpower Agreements; (6) that Iris had entered into a Parent Letter Agreement with NYDIG in which it subordinated its interests in the SPVs' collateral to NYDIG; and (7) that, as a result, the SPVs were at imminent risk of default under the  loan agreements with NYDIG and that Iris' balance sheet was at material risk since it would not recovery any of its debt payments on the SPVs' behalf in a default.

161.  The statements in the September 13, 2022 20-F and on the September 13, 2022 conference call with analysts were also false and misleading because they failed to disclose that the problems with the SPVs would cause the Company's electrical costs to increase significantly.  Instead of disclosing this known effect, Defendant D. Roberts concealed this problem and instead affirmatively misrepresented that the Company in fact had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure." Defendant D. Roberts also told analysts that the Company's power costs were decreasing: "The additional revenue to BC Hydro actually puts a downward pressure on that power price."  D. Roberts also told analysts that the Company was still profitable even though the price of Bitcoin had dropped to $20,000: "Yes, we're still mining Bitcoin at $8,000 a coin, *it's still very good gross profit margins, even at $20,000 Bitcoin*" and that "*We're* building proprietary data centers, building out energy infrastructure, *locking up low-cost renewable energy*. Yes, we're monetizing that into bitcoin, but *it's a real asset base generating real cash flows*."

162.    The statements referenced in ¶¶ 77-161 were materially false and misleading because the Exchange Act Defendants made false and/or misleading statements, as well as failed to disclose material adverse facts about the Company's business, operations, and prospects.  Specifically, the Exchange Act Defendants made false and/or misleading statements and/or failed to disclose that: (i) Iris's Bitcoin miners, owned through its Non-Recourse SPVs, were not capable of producing sufficient cash flow to service their respective debt financing obligations; (ii) Iris failed to record material asset impairment charges; (iii)  Iris made CAD $130 million of debt payments on the SPVs' behalf to NYDIG during the Class Period due to the inability of the SPVs to make such debt payments on their own, and Iris was at material risk of not recovering such payments since the SPVs were undercollateralized and insolvent and Iris had entered into a Parent Letter Agreement with NYDIG that subordinated its interest in the collateral; (iv) that the problems with the SPVs risked an imminent default by the SPVs, and thus that Iris was not on track to significantly increase its operating capacity; (iv) that because the capacity provided by the computers/miners

purchased through the NYDIG loans represented 3.6 EH/s, representing almost 84% of the Company's existing overall capacity, an event of default would cut in half the Company's total mining capacity;  (v) as a result, the Company was not on track to increase its capacity from 4.3 EH/s to 6.0 EH/s, contrary to the Defendants' misrepresentations;  (vi) Iris's use of equipment financing agreements to procure Bitcoin miners was not as sustainable as Defendants had represented and did not protect Iris' balance sheet; (vii) that the true extent of the risks of the SPVs had been concealed, with Defendants instead misrepresenting that the allegedly "limited recourse" nature of the SPVs protected the Company while at the same time failing to disclose material risks to the Company's operating capacity, power costs, and profitability in the event of a default by the SPVs on the financing agreements; and (viii) the foregoing was likely to have a material negative impact on the Company's business, operations, and financial condition.  As such, the Company's public statements were materially false and misleading at all relevant times.

163.    Defendants had a duty to disclose the true facts pursuant to Item 303 and Item 105 of Regulation S-K.  Iris' SEC filings, including the Forms 6-K and Forms 20-F filed during the Class Period, failed to disclose information required to be disclosed therein under Item 303(a) and Item 105 of Regulation S-K and Securities Act Release No. 33-8350. 17 C.F.R. § 299.303, 17 C.F.R. § 229.105. Among other things, Item 303 required Iris to disclose, among other things, "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  And Item 105 required Iris to disclose with sufficient clarity and detail "the most significant factors that make the [securities] speculative or risky."

164.    Throughout the Class Period, Iris was required under Item 303 and Item 105 to disclose the facts noted above, including the following facts: (1) that the SPVs were not capable of servicing their debt with NYDIG from the beginning, thus making their default inevitable in the absence of subsidized payments from Iris, and thus jeopardizing the Company's

revenues, growth, and ability to mine bitcoins in the event of a default; (2)

that Iris made approximately CAD $130 million in debt payments on behalf

of the SPVs during the Class Period; (3) that the collateral provided by the

SPVs to NYDIG had significantly decreased in value and was insufficient to

satisfy the SPVs' debt obligations; (4) that the material problems with the

SPVs jeopardized the Company's balance sheet and cash flows, since Iris

Energy had entered into a March 24, 2022 Parent Letter Agreement with

NYDIG that subordinated its interest in the collateral, and thus that Iris

would be unable to recover its subsidized debt payments or loans to the

SPVs in the event of a default by the SPVs; (5) that significant increased risks

existed for Iris to meet its growth projections, since the capacity provided by

the computers/miners purchased through the NYDIG loans represented 1.98

EH/s --- more than 75% of the Company's existing overall capacity – and the

SPVs were insolvent and at risk of imminent default; and (6) that the

problems with the SPVs would cause the Company's electrical costs to increase significantly.[36]

165.    As set forth above, Defendants knew that these practices had a material impact on the Company's revenues, income, and balance sheet, and presented a significant uncertainty given that the revenue from the Company's bitcoin mining operations represented the Company's sole income.  Iris' senior management specifically knew that the profits being generated by the SPVs were not sufficient to cover their MEFA debt obligations and therefore that the lender (NYDIG) would eventually seek to repossess the computers used to mine the bitcoin, thus materially impacting revenues since all the SPVs' computing equipment had been pledged as collateral.  They also knew that the Company would not be able to recover its loans to the SPVs and would have to write off such amounts since the

---

[36] Instead of disclosing this known effect, Defendant D. Roberts concealed this problem and instead affirmatively misrepresented that the Company in fact had a competitive advantage due to its low electricity costs, stating: "the game is now more about that large-scale energy data center infrastructure."

SPVs were undercollateralized and Iris had entered into a March 24, 2022 Parent Letter Agreement with NYDIG which subordinated Iris' interest in the collateral.

166.  In addition to having a duty to disclose the omitted facts under Item 303 and Item 105 of Regulation S-K, the Defendants had a duty to disclose the omitted facts because the omissions rendered false and misleading specific affirmative misrepresentations that Defendants had already made to the investing public, as alleged *supra*.

## D.    The Truth Emerges

167.  On November 2, 2022, during pre-market hours, Iris issued a press release (the "November 2022 Press Release"), disclosing, *inter alia*, that "[c]ertain equipment (*i.e.*, Bitcoin miners) owned by [Non-Recourse SPV 2 and Non-Recourse SPV 3] currently produce insufficient cash flow to service their respective debt financing obligations, and have a current market value well below the principal amount of the relevant loans" and that "[r]estructuring discussions with the lender remain ongoing."

168.   With specific respect to each Non-Recourse SPV's respective equipment financing debt obligations, and the inability of Non-Recourse SPV 2 and Non-Recourse SPV 3 to produce sufficient cash flow to service those debts, the November 2022 Press Release disclosed, in relevant part:

> As at September 30, 2022, the Non-Recourse SPVs had the following principal amounts outstanding under their respective limited recourse equipment financing facilities:
>
> - Non-Recourse SPV 1 – $1 million, secured against 0.2 EH/s of miners.
>
> - Non-Recourse SPV 2 – $32 million, secured against 1.6 EH/s of miners.
>
> - Non-Recourse SPV 3 – $71 million, secured against 2.0 EH/s of miners.
>
> * * *
>
> The secured miners owned by each of Non-Recourse SPV 2 and Non-Recourse SPV 3 . . . in aggregate:
>
> - ***Are currently capable of generating an indicative $2 million of Bitcoin mining monthly gross profit[], compared to aggregate required monthly principal and interest payment obligations of $7 million***.
>
> - ***Have a market value which the Company currently estimates to be approximately $65 to $70 million[], relative to an aggregate $103 million principal amount of loans outstanding*** as at September 30, 2022.

169.   The November 2022 Press Release also stated, in relevant part:

Non-Recourse SPV 2 and Non-Recourse SPV 3 are engaged in discussions with their lender and reached an agreement for a two-week deferral of scheduled principal payments originally due under both equipment financing arrangements on October 25, 2022, to November 8, 2022.

Unless a suitable agreement is reached with the lender on modified terms for both equipment financing arrangements, the Group does not intend to provide further financial support to Non-Recourse SPV 2 and Non-Recourse SPV 3.

170.   With respect to Iris's anticipated default on Non-Recourse SPV 2's and Non-Recourse SPV 3's respective equipment financing agreements, and the corresponding negative impact this would have on Company's future operations and financial results, the November 2, 2022 Press Release stated, in relevant part:

> In this case, **the Company expects that neither of those Non-Recourse SPVs will be able to make the scheduled principal payment on November 8, 2022, which would result in a default for those Non-Recourse SPVs** under their respective limited recourse equipment financing arrangements.[37]

---

[37] The original footnote in the press release was labeled as footnote five (5) and stated: "Such default would permit the lender to declare the entire $103 million aggregate principal amount of the relevant equipment financing facilities to be immediately due and payable by Non-Recourse SPV 2 and Non-Recourse SPV 3.  We expect that Non-Recourse SPV 2 and Non-Recourse SPV 3 will not have sufficient funds to repay such equipment financing facilities, in which case such lender could enforce its security

. . . . The [Company] is exploring opportunities to utilize its data center capacity that may become available in the event the [Company] elects to no longer provide financial support to these financing arrangements and the lender forecloses on the equipment owned by the relevant special purpose vehicles.

* * *

Such default would permit the lender to declare the entire $103 million aggregate principal amount of the relevant equipment financing facilities to be immediately due and payable by Non-Recourse SPV 2 and Non-Recourse SPV 3. *We expect that Non-Recourse SPV 2 and Non-Recourse SPV 3 will not have sufficient funds to repay such equipment financing facilities, in which case such lender could enforce its security interest and foreclose on the Bitcoin miners owned by Non-Recourse SPV 2 and Non-Recourse SPV 3, respectively, which could result in the loss of such miners and materially reduce the Company's operating capacity*, and could also lead to bankruptcy or liquidation of the relevant Non-Recourse SPVs.

. . .

Iris' Co-Founder & Co-CEO, D. Roberts, said:

The limited recourse equipment financing arrangements have been a recent focus for us. We remain committed to exploring a way in which we may be able to allow the lender to recover its capital investment, however, we are also mindful of the current market and that these arrangements were deliberately

---

interest and foreclose on the Bitcoin miners owned by Non-Recourse SPV 2 and Non-Recourse SPV 3, respectively, which could result in the loss of such miners and materially reduce the Company's operating capacity, and could also lead to bankruptcy or liquidation of the relevant Non-Recourse SPVs."

113

structured to minimize any potential impact on the broader Group during a protracted market downturn.

171.   On this news, Iris's ordinary share price fell $0.51 per share, or 15.04%, to close at $2.88 per share on November 2, 2022—a nearly **90%** decline from the Offering price.

172.   The receiver for the lender later submitted a declaration from the CEO of the lender (Mr. Shah of NYDIG) stating that Iris' November 2, 2022 press release was itself false and misleading for suggesting that the defaults of the SPVs would not have any effect on Iris's other operations or assets and that the SPVs had been operated independently of Iris.  Mr. Shah stated in paragraph 71 of his January 17, 2023 affidavit that "the Press Release was a blatant statement that Iris Energy (which controls the [SPVs]) did not consider the survival or viability of [the SPVs] to be material or relevant, and signaled to the market that [the SPVs] and NYDIG's Collateral could be discarded, 'without recourse.'"

173.   On November 4, 2022, IE CA 3 Holdings Ltd. and IE CA 4 Holdings Ltd. ('Non-Recourse SPVs') received notices of defaults from the lenders under their respective lending facilities alleging the occurrence of

certain defaults and potential events of default, and declaring the loans under each of the Non-Recourse SPV facilities immediately due and payable. The lender to the Non-Recourse SPVs began taking steps to enforce the indebtedness and its rights in the collateral securing such limited recourse facilities (including the approximately 3.6 EH/s of miners securing such facilities and other assets of such Non-Recourse SPVs), and later appointed a receiver (PWC) to the Non-Recourse SPVs on February 3, 2023.

174.   On November 7, 2022, after the close of trading, Iris filed a press release, Form 6-K and updated information about the SPVs.  The Form 6-K noted in part:

> *On November 4, 2022*, subsequent to issuance of the Company's [November 2, 2022] press release, *two wholly-owned special purpose vehicles of the Company (the "Non-Recourse SPVs") received a notice from its lender alleging the occurrence of an event of default and acceleration (the "Purported Acceleration Notice") under the respective limited recourse equipment financing facilities entered into by each such Non-Recourse SPV with such lender (the "Facilities"). The Purported Acceleration Notice alleges that the Non-Recourse SPVs failed to continue to engage in good faith restructuring discussions pursuant to the agreement between the Non-Recourse SPVs and the lender extending the due date for certain scheduled principal payments to November 8, 2022*.

115

The Purported Acceleration Notice alleges that *the failure to engage in good faith restructuring discussions is an immediate "Event of Default" under each Facility and deems a payment default for certain scheduled principal payments on the original due date of October 25, 2022, thereby purporting to declare the entire principal amount of each Facility, together with the accrued and unpaid interest thereon and any other amounts due under the relevant Facility, to be immediately due and payable by each Non-Recourse SPV*. The Non-Recourse SPVs disagree with the allegations in the Purported Acceleration Notice.

As of September 30, 2022, the two Non-Recourse SPVs had approximately $32 million and $71 million in principal amount of loans outstanding under the respective Facilities. *The Facilities are secured by 1.6 EH/s of Bitcoin miners and 2.0 EH/s of Bitcoin miners (together the "Limited Recourse Miners") respectively owned by the Non-Recourse SPVs*. The lender to each Non-Recourse SPV has no recourse to, and no cross collateralization with respect to, assets of the Company or any of its other subsidiaries pursuant to the terms of the Facilities.

Iris Energy, together with its subsidiaries (collectively, the "Group"), has no debt other than the Facilities and one additional limited recourse equipment financing arrangement at a separate wholly-owned special purpose vehicle of $1 million, secured against 0.2 EH/s of miners. The Group, excluding the Non-Recourse SPVs, has $53 million of cash in the bank as at October 31, 2022 (unaudited preliminary balance).

2.4 EH/s of miners and all of the Group's data center capacity and development pipeline are unaffected by the limited recourse equipment financing arrangements or Purported Acceleration Notice.

The Non-Recourse SPVs are continuing to engage with the lender in respect of modifying the terms of each Facility. As previously disclosed in the Company's press release on November 2, 2022, *unless a suitable agreement can be reached with the lender with respect to such modified terms, Iris Energy does not intend to provide further financial support to the Non-Recourse SPVs*. In this case, the Company expects that neither of those Non-Recourse SPVs will be able to make the scheduled principal payment on November 8, 2022, which would be a default under the Facilities and would permit the lender to declare the Facilities to be immediately due and payable. The Company expects that each Non-Recourse SPV would not have sufficient funds to repay the amounts due under its respective Facility following acceleration. *In this case, the lender to each Non-Recourse SPV may seek to pursue one or more remedies available to it, including foreclosing on the Limited Recourse Miners and other assets of the relevant Non-Recourse SPV or otherwise seeking to recover against any assets of the relevant Non-Recourse SPV, any of which could lead to bankruptcy or liquidation of the relevant Non-Recourse SPV*.

*Following the Company's receipt of the Purported Acceleration Notice, effective as of November 4, 2022, certain other subsidiaries of the Company terminated their respective hosting arrangements with each of the Non-Recourse SPVs* pursuant to which they provided the Non-Recourse SPVs with data center capacity and power. As a result, the Company has available data center capacity and continues to explore opportunities to utilize this capacity to either host third-party miners or to self-mine utilizing additional miners that the Company has available or elects to purchase (or a combination thereof).

175.   The November 7, 2022 press release and Form 6-K also disclosed for the first time that the SPVs had failed to maintain required insurance:

> *On November 4, 2022, the Non-Recourse SPVs and the third wholly-owned special purpose vehicle borrower also received a separate notice of another alleged potential event of default from the lender claiming that they each have failed to maintain sufficient insurance*. If not cured within 10 business days, any such default would constitute an "Event of Default" under each applicable facility.

176.   In response to this news, when the stock market opened the next day, the Company's stock declined from $2.63 to $2.49, and then declined further the next day to close at $2.16 on November 9, 2022, a decline of 17.87% on unusually heavy trading of 390,300 shares on November 8, 2022 and 487,600 shares on November 9, 2022.

177.   On Monday, November 21, 2022, Iris filed a Form 6-K with the SEC disclosing that:

> Further, *on November 18, 2022, the Non-Recourse SPVs received a notice from the lender NYDIG (the "Demand Notice") stating that the entire principal amount of the Facilities of Non-Recourse SPV 2 and Non-Recourse SPV 3, under which the lender stated there was aggregate outstanding indebtedness of approximately $107.8 million as of November 18, 2022 (including accrued interest and late fees), had been declared immediately due and payable* pursuant to the November 4, 2022 purported

118

acceleration notice. Such notice demanded payment in full with respect to each relevant Facility, and stated that if payment was not received in full by November 29, 2022, then the lender intended to take steps to enforce the indebtedness and its rights in the collateral securing the relevant Facilities, including bringing an application for the appointment of a receiver.

*We do not expect that Non-Recourse SPV 2 and Non-Recourse SPV 3 will have sufficient funds or other resources to pay the amounts due upon acceleration of their respective Facilities in full, or that such Non-Recourse SPVs will be able to refinance, restructure or modify the terms of their Facilities*. As a result, while no assurance can be provided as to what actions may be taken, *we expect that the lender will take steps to enforce the indebtedness and its rights in the collateral securing the Facilities with Non-Recourse SPV 2 and Non-Recourse SPV 3 (including the approximately 3.6 EH/s of miners securing such Facilities* and other assets of such Non-Recourse SPVs). Following receipt of the purported acceleration notice on November 4, 2022, certain other subsidiaries of the Company terminated their respective hosting arrangements with Non-Recourse SPV 2 and Non-Recourse SPV 3, and *none of the approximately 3.6 EH/s of miners owned by such Non-Recourse SPVs are operating, which has materially reduced our operating capacity*.

178.   In response to this news, Iris' stock declined from $1.82 to $1.55 – a decline of 14.8% – on unusually heavy trading of 581,500 shares.

179.   It was later determined that Iris itself had unplugged all the computers that served as collateral for NYDIG on November 6, 2022 (*before*

119

an event of default was declared), thus immediately eliminating the ability of the computers to generate hashpower that could be used by Iris to mine Bitcoins and thus generate revenue. Because the miners constituted almost 84% of Iris' overall capacity, this was highly material and damaging to the Company's operations, revenues, growth prospects, and condition. The Receiver that was appointed later visited the site where the computers were maintained on February 6-8, 2023, took pictures, interviewed individuals, and determined that Iris had unplugged the computers, put them on pallets, and shrunk wrapped them. The Receiver provided the following photos during its multi-day site visit:[38]

[The remainder of this page is deliberately left blank.]

_____

[38] *See* Receiver's First Report dated March 10, 2023, Appendix C (Photos from Receiver's Site Visit).



*Image of warehouse storage facility with pallets of miners.*



*Image of palletized miners in walkway of data center next to machine racks, obstructing the alleyway and airflow. The left-hand wall is the cooling mechanism in the building, which is currently blocked by the machines.*



*Partially empty racks, with only Iris-owned machines currently plugged in to mine Bitcoin.*

180.   Iris never disclosed to investors that it had precipitously unplugged the machines on November 6, 2022, thus immediately cutting off their capacity.  The lender had not requested Iris to do so, and doing so was highly prejudicial to both Iris and NYDIG since the machines constituted 84% of Iris' overall capacity and unplugging the machines would immediately cut off hashpower computations and thus revenue.  In its Fourth Report dated August 17, 2023, PWC stated that Iris "unplugged the Mining Equipment and, as a result, the Mining Equipment was not

generating any revenue for a period of approximately three months prior to the Receivership."[39]

181.   The Receiver later estimated that Iris' precipitous unplugging of all the computers *resulted in a loss of income of between $51.1 and $55.1 million* during the time period November 6, 2022 through mid-April 2023.[40]

182.   On November 8, 2022, Cantor Fitzgerald downgraded Iris' stock after it warned that some of its BTC mining machines did not have sufficient cash flows to cover debt financing costs.  The analyst report noted that, earlier in the week, the company had said that its lender delivered a "Purported Acceleration Notice" whereby Iris (IREN) allegedly failed to engage in good-faith restructuring talks. As a result, the notice claimed that Iris has defaulted on its scheduled principal payments on equipment financing loans, Cantor Fitzgerald analyst Siegler wrote in a note.  "We believe Iris is unlikely to reach a negotiation with the lenders by end-of-day

---

[39] *Id.* at p. 16, ¶ 6.2.

[40] *Id.* at p. 18, ¶ 6.15.  The report also states that PWC offered to enter into a short-term hosting agreement to allow the machines to generate revenue but Iris refused.  *Id.* at p. 16, ¶6.3.

11/8/22," the agreed upon expiration between Iris (IREN) and its lender to defer payments for two weeks prior to that date, the analyst contended. "As a result, Iris may lose access to 3.6 EH/s of collateralized miners." That makes it unlikely for the company to meet its annual hash rate targets, he added. "***We believe the company no longer has line-of-sight into its 6.0 EH/s 2023E target, which was the crux of our Overweight thesis***."

183.    In a Form 6-K filed with the SEC on February 13, 2023 and signed by Defendant Roberts, Iris disclosed that the Company recognized a loss of $15,209,000 for the period ended December 31, 2022, in respect of receivables held by the Non-Recourse SPVs. Iris stated that "The entire GST and PST receivable balances held by the Non-Recourse SPVs are not expected to be recoverable by the Group due to the appointment of a receiver to the Non-Recourse SPVs on 3 February 2023."

184.    On January 20, 2023, the lender to the SPVs filed a petition with the British Columbia Supreme Court, primarily seeking the appointment of PwC as receiver over the assets and undertakings of the Non-Recourse SPVs, in relation to their failures to make payments when due under their

respective equipment financing agreements. The court subsequently appointed PwC as the receiver of the Non-Recourse SPVs on February 3, 2023.

185.   In a December 2022 Investor Presentation, Iris told investors that "Recent market events **have nothing to do with Bitcoin**." (emphasis in original).

186.   The defaults by the SPVs have had a wide-ranging and devastating impact on Iris' business.  As disclosed in the Form 6-K filed on February 13, 2023:

> In connection with receipt of certain notices of default received by the Non-Recourse SPVs (defined below) in November 2022 described herein under "—Liquidity and Capital Resources— Agreements for Miner Equipment Financing", certain other of the Group's subsidiaries have terminated their respective hosting arrangements with Non-Recourse SPV 2 and Non-Recourse SPV 3. As a result of the termination of such hosting arrangements, none of the approximately 3.6 EH/s of miners owned by such special purpose vehicles are operating. Excluding such miners, the remaining operating capacity at each of Canal Flats, Mackenzie and Prince George, as of December 31, 2022, is approximately 0.5 EH/s, 0.3 EH/s, and 0.4 EH/s, respectively. ***This in turn (i) resulted in a material reduction in our operating capacity, (ii) increased our electricity costs per Bitcoin mined as a result of higher demand charges (i.e., fixed charges) per Bitcoin mined and (iii) adversely impacted our***

*operating metrics. In particular, with a lower operating capacity, increased electricity costs per Bitcoin mined and a decline in the price of Bitcoin over recent months, we have experienced, and expect to continue to experience, a reduction in the Group's revenue and operating cash flows, resulting in net operating losses*.

187.   The following chart shows the devastating decline in Iris' reported financial results as a result of the Defendants' violation of the federal securities laws:

| | Three Months Ended December 31, 2022 | Three Months Ended December 31, 2021 | Six Months Ended December 31, 2022 | Six Months Ended December 31, 2021 |
|---|---|---|---|---|
| | ($ thousands) | | | |
| **Profit/(loss) after income tax expense** | (143,954) | 70,323 | (161,894) | (418,767) |
| Add/(deduct) the following: | | | | |
| Other finance expense/(benefit) | 10,350 | (70,700) | 13,915 | 420,674 |
| Interest income | (257) | - | (214) | - |
| Depreciation and amortization | 11,544 | 1,261 | 18,996 | 1,976 |
| Income tax (benefit)/expense | (411) | 3,151 | 2,030 | 6,226 |
| **EBITDA** | **(122,728)** | **4,035** | **(127,167)** | **10,109** |
| | | | | |
| **Bitcoin Mining Revenue** | **13,755** | **20,147** | **29,967** | **30,579** |
| | | | | |
| **Profit/(loss) after income tax expense margin(1)** | **(1,047%)** | **349%** | **(540%)** | **(1,369%)** |
| | | | | |
| **EBITDA margin(2)** | **(892%)** | **20%** | **(424%)** | **33%** |

188.   As of December 31, 2022, the outstanding principal and interest balance (less capitalized borrowing costs) owed by each of the subsidiaries was as follows:

126

- IE CA 2 Holdings Ltd.: $0

- IE CA 3 Holdings Ltd.: $34,296,000

- IE CA 4 Holdings Ltd.: $76,294,000

189.   As of December 31, 2022, assets held by the Non-Recourse SPVs were recognized as impaired in the Group consolidated financial statements to reflect their expected net realizable value to the Group (*i.e.* to a value equal to the third-party debt outstanding in each of the Non-Recourse SPVs).

190.   A November 2022 Investor Presentation from Iris disclosed that the default of the SPVs had resulted in a material decrease of the Company's monthly average operating hashrate to just 1,445 PH/s in November 2022 from 3,899 PH/s in October 2022, and a decrease in Bitcoin mined to just 151 from 448 in October, as reflected in the attached chart:

[The remainder of this page is deliberately left blank.]

Daily average operating hashrate chart



Technical commentary

The Company's average operating hashrate was 1,445 PH/s in November 2022 (compared to 3,899 PH/s in October[8]), with the decrease primarily attributable to the termination of hosting arrangements during the month in connection with certain of the Company's limited recourse equipment financing facilities as described above[9]. The corresponding decrease in Bitcoin mined (151 vs. 448 in October) and electricity costs ($1.9 million vs. $4.2 million in October[8]) were also primarily attributable to the termination of these hosting arrangements.

[The remainder of this page is deliberately left blank.]

191. In February 2023, Iris presented an Investor Update to the market which summarized the negative effect on its balance sheet due to the Limited-Recourse SPVs:

**Iris** Energy

## Balance sheet

- $39.4m cash as of Dec 31, 2022 (excluding limited-recourse financing SPVs)

- $59.0m Bitmain prepayment on balance sheet (as of Dec 31, 2022) was subsequently fully utilized post balance date

- $105.2m of primarily non-cash impairment, of which $66.5m relates to the limited-recourse financing SPVs

- Receiver to the limited-recourse financing SPVs appointed on Feb 3, 2023 (Adjusted Balance Sheet reflects derecognition of limited-recourse financing SPVs from the Group)

| US$m | As at Jun 30, 2022 | As at Dec 31, 2022 | Adjustments to remove limited-recourse financing SPVs | As Adjusted Dec 31, 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and cash equivalents | 110.0 | 40.7 | (1.3) | 39.4 |
| Prepayments and other current assets | 50.3 | 34.0 | - | 34.0 |
| **Total current assets** | 160.3 | 74.6 | (1.3) | 73.3 |
| Property, plant & equipment | 247.6 | 273.3 | (111.8) | 161.5 |
| Mining hardware prepayments | 158.2 | 59.0 | - | 59.0 |
| Other non-current assets | 4.5 | 5.1 | - | 5.1 |
| **Total non-current assets** | 410.2 | 337.3 | (111.8) | 225.5 |
| **Total assets** | 570.5 | 412.0 | (113.1) | 298.9 |
| | | | | |
| **Liabilities** | | | | |
| Borrowings and lease liabilities | 60.5 | 110.7 | (110.6) | 0.1 |
| Other current liabilities | 24.6 | 29.5 | (2.5) | 27.0 |
| **Total current liabilities** | 85.1 | 140.2 | (113.1) | 27.1 |
| Borrowings | 47.8 | 1.3 | - | 1.3 |
| Other non-current liabilities | 0.2 | 0.3 | - | 0.3 |
| **Total non-current liabilities** | 48.0 | 1.6 | - | 1.6 |
| **Total liabilities** | 133.1 | 141.8 | (113.1) | 28.7 |
| | | | | |
| **Equity** | | | | |
| **Total equity** | 437.4 | 270.1 | - | 270.1 |
| | | | | |
| **Total equity and liabilities** | 570.5 | 412.0 | (113.1) | 298.9 |

[The remainder of this page is deliberately left blank.]

192.   As of the time the original Complaint in this case was filed, Iris's ordinary shares traded at approximately $1.39 per share, significantly below the $28 per share Offering price, damaging investors.[41]

193.   As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## V.   THE EXCHANGE ACT DEFENDANTS' SCIENTER AND MOTIVE AND OPPORTUNITY TO COMMIT FRAUD

194.   The following allegations only apply to Plaintiffs' claims under the Securities Exchange Act and the Exchange Act Defendants, and not to Plaintiffs' claims under the Securities Act.  The Exchange Act Defendants had actual knowledge of the falsity of all their statements because such Defendants were directly responsible for the conduct at issue in this litigation and were the key executive officers of the Company during the Class Period.

---

[41] The original complaint was filed on Dec. 14, 2022.

195.   The Exchange Act Defendants' scienter is inferred from the fact that the Company was small and only had one business segment and line of business:  the mining and sale of Bitcoin.  The false statements and material omissions at issue in this case were thus all part of Iris' "core product" such that the Exchange Act Defendants' knowledge of the falsity of their statements is imputed to them based on their positions with the Company, and that all the false and undisclosed facts pertained to the Company's core (and only) product.   Under these circumstances, Defendants' scienter is established pursuant to the core product doctrine and the other specific facts alleged herein.

196.   The scienter of Defendants Alfred, D. Roberts, W. Roberts, and Guzowski is demonstrated by the fact that they served on the Board of Directors of both Iris and the SPVs, and conducted all transactions on behalf of the SPVs.   The SPVs essentially had no separate existence according to NYDIG.  All operational matters for the SPVs were conducted by Defendants Alfred, D. Roberts, W. Roberts, and Guzowski, including the transfer of

money between and among Iris and the SPVs.  As noted in the May 9, 2023

Affidavit of NYDIG CEO Shah:

> "[T]he Respondents [SPVs] and Iris Energy operated a single, commingled bank account that was used to receive proceeds of NYDIG's financing and make debt service payments to NYDIG.  The group's consolidated and unconsolidated financial statements disclose that the Respondents could never achieve profitability, and cash injections by Iris Energy were necessary for Respondents to meet their obligations to NYDIG.  The group transacted with Bitmain Technologies Limited ("Bitmain"), the manufacturer of the Financed Mining Equipment, on a consolidated basis out of a single account, without differentiating among corporate entities or allocating coupons and credits on a per-entity basis.  The Bitcoin mined by the Respondents using the Financed Mining Equipment was hashed into a common digital currency wallet in the name of Iris Energy.  The Respondents and Iris Energy had, at all relevant times, the same Board of Directors."[42]

197.    Because they were the members of the SPVs and conducted all

operations on behalf of the SPVs, including transferring money to satisfy the

SPVs' debt obligations, Defendants Alfred, D. Roberts, W. Roberts, and

Guzowski had actual knowledge at all relevant times that the SPVs "could

never achieve profitability" as NYDIG's CEO noted in his May 9, 2023

---

[42] Shah Affidavit, ⁋ 6.

Affidavit.  Defendants Michael Alfred, Daniel Roberts, William Roberts, and Christopher Guzowski were not just on the Board of Directors of the SPVs but also signed and directed all their operations, including the Hashpower Agreements and Hosting Agreements.  As just one of many examples, a March 24, 2022 agreement between NYDIG and one of the SPVs – IE CA 4 -- was signed by Defendants D. Roberts, W. Roberts, and Alfred on behalf of *both* Iris and IE CA 4 in their capacity as Directors of both entities.

198.   Defendants Alfred, D. Roberts, W. Roberts, and Guzowski had scienter of the falsity of the Class Period statements because, as Directors of the SPVs, they signed and/or approved the Master Finance Equipment Agreements for both of the defaulted SPVs – IE CA 3 and IE CA 4 – and knew the terms of the agreements and the fact that the SPVs were not able to service the debt without cash payments from Iris. They were also provided with monthly financial and cash flow reports for the SPVs which, as detailed *supra*, demonstrated that the SPVs were insolvent during the Class Period.

199.    The Canadian court in the Receiver's action also made findings that Iris shortchanged the SPVs by between CAD $4 million and $16 million on the amounts they were owed under the Hashpower Agreements during the Class Period.[43]  The Exchange Act Defendants were all on Iris' Board and the SPVs' Boards at the time and receiving monthly cash flow reports for the SPVs and thus knew or recklessly disregarded the shortchanging.  A rational inference of the significant shortchanging is that these Defendants were well aware of the high risk of default by the SPVs and sought to minimize the assets of the SPVs to NYDIG in the event of a default.  Defendants D. and W. Roberts personally met with the lenders as part of seeking financing.  For example, in the Canadian receiver action, the court noted in its judgment that "in 2020 . . . William and Daniel Roberts met with the then managing partner of Arctos Credit, LLC ("Arctos"),[44] Trevor Smyth, to discuss the

---

[43] *See* Reasons for Judgment, Aug. 10, 2023, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. et al.*, 2023 BCSC 1383, at pp. 40-41.

[44] Arctos later became NYDIG.

134

provision by Arctos of equipment financing to the Iris Group."[45]  W. and D. Roberts continued to have personal involvement in all aspects of the SPVs and financing deals with NYDIG (which acquired Arctos) and had personal knowledge of the adverse material facts concealed from the market, as alleged more specifically herein.

200.   The scienter of all members of Iris' board is further demonstrated by the fact that "In July 2022, members of [Iris Energy Ltd.]'s board had already asked to meet with NYDIG with a view to exploring potential refinancing scenarios."[46]  The fact that the members of the Board of Directors themselves were involved with trying to renegotiate the debt with NYDIG amply demonstrates both their knowledge of the severity of the problem and the need to immediately address it.  Yet Defendants continued to conceal the

---

[45] *See* Reasons for Judgment, at p. 8, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd.*, 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).   *See also id.* at 9-14 (detailing personal involvement of the Roberts brothers and emails they sent or received related to the financing arrangements).

[46] *See* Reasons for Judgment, at p. 15, *NYDIG ABL LLC v. IE CA 3 Holdings Ltd. And IE CA 4 Holdings Ltd.*, 2023 BCSC 1383 (Supreme Court of British Columbia, Aug. 10, 2023).

true facts from the market for another four months after their July 2022 refinancing efforts with NYDIG.

201.    The scienter of Defendant W. Roberts is further demonstrated by an affidavit he filed with the Supreme Court of British Columbia, Canada on February 1, 2023.  In his affidavit, he states that he or others at Iris had been having discussions with NYDIG about the potential defaults by the SPVs since July 2022, including follow-on discussions with NYDIG on October 3, 2022 to discuss the amounts due under the MEFAs and attempt to agree on a restructuring proposal.  *See* W. Roberts Affidavit, ¶ 7.[47]  The affidavit also states that the default was going to occur on October 25, 2022 but that the parties agreed to a two-week extension to facilitate further discussions. Thus, well before Iris filed the November 2, 2022 disclosure, W. Roberts and the other Individual Defendants had actual knowledge of the fact that the

---

[47] As noted *supra*, Mr. Shah of NYDIG also submitted a January 17, 2023 affidavit in which he stated that the problems with the SPVs were so bad that on October 3, 2022, "NYDIG provided a restructuring term sheet that outlined the terms pursuant to which it was willing to restructure the indebtedness owing under the MEFAs.  The terms of this original term sheet were almost completely rejected by Respondents."

SPVs were not able to service their debt and that they would default under the loan agreements absent a restructuring agreement. W. Roberts' affidavit also states that NYDIG asked Iris for additional financial information as part of the restructuring negotiations but that Iris refused to provide such information.

202. The documents, affidavits, and other documents from the Canadian receivership proceeding, including but not limited to the February 1, 2023 affidavit of W. Roberts, also establish the scienter of Defendants D. Roberts, W. Roberts, Alfred, and Guzowski. Since they were also directors of both Iris and the SPVs, a fair inference is that such persons were also involved in the July to October 2022 restructuring discussions with NYDIG or that, at a minimum, W. Roberts and D. Roberts advised/updated them on the discussions, and thus that they had actual knowledge throughout the Class Period of the insolvency of the Non-Recourse SPVs, the fact that Iris was making millions of dollars of debt payments on their behalf, and that the SPVs faced a high risk of default at all times, including from July to October 2022 when the members of the Iris Board of Directors were

attempting to negotiate a restructuring of the debt owed by the SPVs to NYDIG, which Iris did not disclose until November 2022.

203. **_Temporal Proximity_** – The temporal proximity of the Defendants' September 13, 2022 false statements, including those in the 20-F and conference call with analysts, also demonstrates the scienter of the Exchange Act Defendants. On the conference call with analysts on September 13, 2022, Defendant D. Roberts repeatedly represented that the Company was still mining Bitcoin profitably, even with Bitcoin's price having fallen to $20,000. He stated that "we're mining Bitcoin at $8,000 a coin, locking that profitability [in]." But less than one month later, D. Roberts and his brother W. Roberts, as the directors of Company's SPVs, were negotiating a restructuring of the SPVs debt due to their inability to pay the debt when it came due in October 2022 – hardly a picture of profitability. The temporal proximity between Roberts' September 13, 2022 statements and the lender's declaration of a default and event of acceleration of the entire balance of the debt – $114 million – on November 4, 2022 is highly indicative that Defendants D. Roberts, W. Roberts, Guzowski and

Alfred knew the Company's statements on September 13, 2022 were false when made.

204.    Defendants D. and W. Roberts possessed and exercised more than 20% ownership of Iris' stock and more than 80% voting control of Iris' stock both before and after the IPO and during the Class Period and thus had a strong motive to commit fraud since the fraud would benefit themselves more than any other stockholder.   The inflated stock price achieved through the fraud significantly increased the value of the Roberts' stock during the Class Period.   The following chart reflects their ownership and voting stakes both before and after the IPO:

[The remainder of this page is deliberately left blank.]

| Name | Ordinary Shares Number | Percentage of Ordinary Shares Beneficially Owned Prior to this Offering | Percentage of Ordinary Shares Beneficially Owned After Offering without Exercise of Underwriters' Option | Percentage of Ordinary Shares Beneficially Owned After Offering with Full Exercise of Underwriters' Option | B Class Shares Number | Percentage of B Class Shares Beneficially Owned Prior to this Offering | Percentage of B Class Shares Beneficially Owned After this Offering without Exercise of Underwriters' Option | Percentage of B Class Shares Beneficially Owned After this Offering with Full Exercise of Underwriters' Option | Percentage of Total Voting Power After Offering Without Exercise of Underwriters' Option(1)(2) | Percentage of Total Voting Power After Offering with Full Exercise of Underwriters' Option |
|---|---|---|---|---|---|---|---|---|---|---|
| Directors and Executive Officers: | | | | | | | | | | |
| Daniel Roberts(3) | 6,000,000 | 12.3% | 10.5% | 10.3% | 1 | 50.0% | 50% | 50% | 40.5% | 40.3% |
| William Roberts(4) | 6,000,000 | 12.3% | 10.5% | 10.3% | 1 | 50.0% | 50% | 50% | 40.5% | 40.3% |

205.    Defendants also had the motive and opportunity to commit the fraud.  The IPO was structured to satisfy the share price thresholds for certain tranches under incentive arrangements held by D. and W. Roberts.  But for the IPO, Defendants D. and W. Roberts would not have received such compensation.   In correspondence with the SEC regarding the draft Prospectus, the Company wrote that it "respectfully advises the [SEC's] Staff that the compensation expense that will be recorded at time the options vest

is estimated to be A$1,875,232 (comprised of total share-based amortization of A$2,060,000 less amortization of A$184,768 for the year ended June 30, 2021). The Company respectfully advises the Staff that [ ]  the IPO may potentially satisfy the share price thresholds under the incentive arrangements with Messrs. Daniel and William Roberts."[48]

## VI.    PLAINTIFFS' CLASS ACTION ALLEGATIONS

206.   Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons and entities other than Defendants who purchased (a) Iris ordinary shares pursuant and/or traceable to the Offering Documents issued in connection with the Company's initial public offering conducted on or about November 17, 2021 (the "IPO" or "Offering") and/or (b) Iris securities between November 17, 2021 and November 1, 2022, both dates inclusive (the "Class Period") and were damaged thereby (the "Class").  Excluded from the Class are Defendants, the officers and directors of the Company, at all

---

[48] *See* Oct. 5, 2021 letter from Iris' attorneys at Latham & Watkins to the SEC, filed with the SEC on the same date.

relevant times, members of their immediate families and their legal representatives, heirs, successors, or assigns, and any entity in which Defendants have or had a controlling interest.

207.  The members of the Class are so numerous that joinder of all members is impracticable.  Throughout the Class Period, Iris securities were actively traded on the NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by Iris or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

208.  Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

209.   Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

210.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

- whether the federal securities laws were violated by Defendants' acts as alleged herein;

- whether statements made by Defendants to the investing public in the Offering Documents for the IPO, or during the Class Period, misrepresented material facts about the business, operations and management of Iris;

- whether the Offering Documents contained untrue statements of material fact or omitted to state other facts necessary to make the statements made not misleading;

- whether the Exchange Act Individual Defendants caused Iris to issue false and misleading financial statements during the Class Period;

- whether certain Defendants acted knowingly or recklessly in issuing false and misleading financial statements;

- whether the prices of Iris securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

- whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

211. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

212. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

- Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

- the omissions and misrepresentations were material;

- Iris securities are traded in an efficient market;

- the Company's shares were liquid and traded with moderate to heavy volume during the Class Period;

- the Company traded on the NASDAQ and was covered by multiple analysts;

- the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

- Plaintiffs and members of the Class purchased, acquired and/or sold Iris securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts.

213.   Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

214.   Additionally, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

/ / /

/ / /

145

## VII.   CAUSES OF ACTION

## <u>COUNT I</u>

## Violations of Section 10(b) of the Exchange Act and Rule 10b-5
## (Against the Exchange Act Defendants)

215.   Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

216.   This Count is asserted against the Exchange Act Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

217.   During the Class Period, the Exchange Act Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in connection with the purchase and sale of securities. Such schemes were

146

intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Iris securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Iris securities and options at artificially inflated prices.    In furtherance of this unlawful scheme, plan and course of conduct, the Exchange Act Defendants, and each of them, took the actions set forth herein.

218.   Pursuant to the above plan, scheme, conspiracy, and course of conduct, each of the Exchange Act Defendants participated directly or indirectly in the preparation and/or issuance of the quarterly and annual reports, SEC filings, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Iris securities.  Such reports, filings, releases, and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about Iris's finances and business prospects.

219.    By virtue of their positions at Iris, the Exchange Act Defendants had actual knowledge of the materially false and misleading statements and material omissions alleged herein and intended thereby to deceive Plaintiffs and the other members of the Class, or, in the alternative, the Exchange Act Defendants acted with reckless disregard for the truth in that they failed or refused to ascertain and disclose such facts as would reveal the materially false and misleading nature of the statements made, although such facts were readily available to the Exchange Act Defendants.  Said acts and omissions of the Exchange Act Defendants were committed willfully or with reckless disregard for the truth.  In addition, each of the Exchange Act Defendants knew or recklessly disregarded that material facts were being misrepresented or omitted as described above.

220.    Information showing that the Exchange Act Defendants acted knowingly or with reckless disregard for the truth is peculiarly within the Exchange Act Defendants' knowledge and control.  As the senior managers and/or directors of Iris, the Exchange Act Individual Defendants had knowledge of the details of Iris's internal affairs.

221.    The Exchange Act Individual Defendants are liable both directly and indirectly for the wrongs complained of herein.   Because of their positions of control and authority, the Exchange Act Individual Defendants were able to and did, directly or indirectly, control the content of the statements of Iris.  As officers and/or directors of a publicly-held company, the Exchange Act Individual Defendants had a duty to disseminate timely, accurate, and truthful information with respect to Iris's businesses, operations, future financial condition, and future prospects.  As a result of the dissemination of the aforementioned false and misleading reports, releases and public statements, the market price of Iris securities was artificially inflated throughout the Class Period.  In ignorance of the adverse facts concerning Iris's business and financial condition which were concealed by the Exchange Act Defendants, Plaintiffs and the other members of the Class purchased or otherwise acquired Iris securities at artificially inflated prices and relied upon the price of the securities, the integrity of the market for the securities and/or upon statements disseminated by the Exchange Act Defendants, and were damaged thereby.

149

222.   During the Class Period, Iris securities were traded on an active and efficient market.  Plaintiffs and the other members of the Class, relying on the materially false and misleading statements described herein, which the Exchange Act Defendants made, issued or caused to be disseminated, or relying upon the integrity of the market, purchased or otherwise acquired shares of Iris securities at prices artificially inflated by the Exchange Act Defendants' wrongful conduct.  Had Plaintiffs and the other members of the Class known the truth, they would not have purchased or otherwise acquired said securities, or would not have purchased or otherwise acquired them at the inflated prices that were paid.  At the time of the purchases and/or acquisitions by Plaintiffs and the Class, the true value of Iris securities was substantially lower than the prices paid by Plaintiffs and the other members of the Class.  The market price of Iris securities declined sharply upon public disclosure of the facts alleged herein to the injury of Plaintiffs and Class members.

223.  By reason of the conduct alleged herein, the Exchange Act Defendants knowingly or recklessly, directly or indirectly, have violated Section 10(b) of the Exchange Act and Rule 10b-5 promulgated thereunder.

224.  As a direct and proximate result of the Exchange Act Defendants' wrongful conduct, Plaintiffs and the other members of the Class suffered damages in connection with their respective purchases, acquisitions, and sales of the Company's securities during the Class Period, upon the disclosure that the Company had been disseminating misrepresented financial statements to the investing public.

## COUNT II

**Violations of Section 20(a) of the Exchange Act
(Against the Exchange Act Individual Defendants)**

225.  Plaintiffs repeat and re-allege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

226.  During the Class Period, the Exchange Act Individual Defendants participated in the operation and management of Iris, and conducted and participated, directly and indirectly, in the conduct of Iris's business affairs.  Because of their senior positions, they knew the adverse

151

non-public information about Iris's misstatement of income and expenses and false financial statements.

227.   As officers and/or directors of a publicly owned company, the Exchange Act Individual Defendants had a duty to disseminate accurate and truthful information with respect to Iris's financial condition and results of operations, and to correct promptly any public statements issued by Iris which had become materially false or misleading.

228.   Because of their positions of control and authority as senior officers, the Exchange Act Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which Iris disseminated in the marketplace during the Class Period concerning Iris's results of operations.  Throughout the Class Period, the Exchange Act Individual Defendants exercised their power and authority to cause Iris to engage in the wrongful acts complained of herein.  The Exchange Act Individual Defendants, therefore, were "controlling persons" of Iris within the meaning of Section 20(a) of the Exchange Act.  In this

capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of Iris securities.

229.   Each of the Exchange Act Individual Defendants, therefore, acted as a controlling person of Iris.  By reason of their senior management positions and/or being directors of Iris, each of the Exchange Act Individual Defendants had the power to direct the actions of, and exercised the same to cause, Iris to engage in the unlawful acts and conduct complained of herein. Each of the Exchange Act Individual Defendants exercised control over the general operations of Iris and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

230.   By reason of the above conduct, the Exchange Act Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by Iris.

/ / /

/ / /

/ / /

## COUNT III

**Violations of Section 11 of the Securities Act
(Against the Securities Act Defendants)**

231.  Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

232.  This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of the Class, against the Securities Act Defendants.

233.  The Offering Documents for the IPO were inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

234.  Iris is the registrant for the IPO.  The Securities Act Defendants named herein were responsible for the contents and dissemination of the Offering Documents.

235.  As issuer of the shares, Iris is strictly liable to Plaintiffs and the Class for the misstatements and omissions in the Offering Documents.

236.   None of the Securities Act Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Offering Documents were true and without omissions of any material facts and were not misleading.

237.   By reasons of the conduct herein alleged, each Securities Act Defendant violated, and/or controlled a person who violated Section 11 of the Securities Act.

238.   Plaintiffs acquired Iris shares pursuant and/or traceable to the Offering Documents for the IPO.

239.   Plaintiffs and the Class have sustained damages.  The value of Iris shares has declined substantially subsequent to and because of Defendants' violations.

/ / /

/ / /

/ / /

## COUNT IV

### Violations of Section 12 of the Securities Act
### (Against the Securities Act Defendants)

240.    Plaintiffs repeat and re-allege each and every allegation contained above as if fully set forth herein.

241.    This count is asserted by Plaintiffs against the Securities Act Defendants and is based upon Section 12(a)(2) of the Securities Act.

242.    The Securities Act Defendants were sellers, offerors, and/or solicitors of purchasers of stock offered by Iris pursuant to the IPO. The Securities Act Defendants issued, caused to be issued, and/or signed the IPO Registration Statement in connection with the Offering. The IPO Registration Statement was used to induce investors, such as Plaintiffs and other members of the Class, to purchase Iris securities.

243.    The IPO Registration Statement was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

244.   The Securities Act Defendants' actions of solicitation included participating in the preparation of the false and/or misleading IPO Registration Statement.   None of the Defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Registration Statement were true and without omission of any material facts and were not misleading.

245.   Plaintiffs and other Class members did not know, nor could they have known, of the untruths and/or omissions contained in the IPO Registration Statement.

246.   By virtue of the conduct alleged herein, the Section 12 Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

/ / /

/ / /

/ / /

## COUNT V

**Violations of Section 15 of the Securities Act
(Against the Securities Act Individual Defendants)**

247.  Plaintiffs repeat and incorporate each and every allegation contained above as if fully set forth herein.

248.  This Count is asserted against the Securities Act Individual Defendants and is based upon Section 15 of the Securities Act, 15 U.S.C. § 77o.

249.  The Securities Act Individual Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, controlling persons of Iris within the meaning of Section 15 of the Securities Act.  The Securities Act Individual Defendants had the power and influence and exercised the same to cause Iris to engage in the acts described herein.

250.  The Securities Act Individual Defendants' positions made them privy to and provided them with actual knowledge of the material facts concealed from Plaintiffs and the Class.

251. By virtue of the conduct alleged herein, the Securities Act Individual Defendants are liable for the aforesaid wrongful conduct and are liable to Plaintiffs and the Class for damages suffered.

## **PRAYER FOR RELIEF**

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgement interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## **DEMAND FOR TRIAL BY JURY**

Plaintiffs hereby demand a trial by jury.

Dated:  November 12, 2024        Respectfully submitted,

COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
Peter S. Pearlman
Matthew F. Gately

/s/ Matthew F. Gately
_____
Matthew F. Gately

Park 80 Plaza West-One
250 Pehle Avenue, Suite 401
Saddle Brook, New Jersey 07663
Telephone: (201) 845-9600
Facsimile:  (201) 845-9423
Email:        psp@njlawfirm.com
                   mfg@njlawfirm.com

*Counsel for Lead Plaintiffs and Liaison Counsel*

BOTTINI & BOTTINI, INC.
Francis A. Bottini, Jr.  (*pro hac vice*)
Albert Y. Chang (*pro hac vice*)
7817 Ivanhoe Avenue, Suite 102
La Jolla, California 92037
Telephone:     (858) 914-2001
Facsimile:      (858) 914-2002
Email:    fbottini@bottinilaw.com
               achang@bottinilaw.com

*Lead Counsel for Lead Plaintiffs*